**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| **v.** | § | Case No.: |
| | § | |
| **CHRISTOPHER A. FAULKNER,** | § | |
| **BREITLING ENERGY CORPORATION,** | § | |
| **JEREMY S. WAGERS,** | § | |
| **JUDSON F. ("RICK") HOOVER,** | § | |
| **PARKER R. HALLAM,** | § | |
| **JOSEPH SIMO,** | § | |
| **DUSTIN MICHAEL MILLER RODRIGUEZ,** | § | |
| **BETH C. HANDKINS,** | § | **Jury Trial Demanded** |
| **GILBERT STEEDLEY,** | § | |
| **BREITLING OIL & GAS CORPORATION,** | § | |
| **CRUDE ENERGY, LLC,** | § | |
| **PATRIOT ENERGY, INC.,** | § | |
| | § | |
| Defendants, | § | |
| | § | |
| **and** | § | |
| | § | |
| **TAMRA M. FREEDMAN and** | § | |
| **JETMIR AHMEDI,** | § | |
| | § | |
| Relief Defendants. | § | |
| | § | |

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission") files this Complaint

against Defendants Christopher A. Faulkner, Breitling Energy Corporation, Jeremy S. Wagers,

Esq., Judson F. "Rick" Hoover, Parker R. Hallam, Joseph Simo, Dustin Michael Miller

Rodriguez, Beth C. Handkins, Gilbert Steedley, Breitling Oil & Gas Corporation, Crude Energy,

LLC, and Patriot Energy, Inc. (collectively "Defendants") and Tamra M. Freedman and Jetmir

Ahmedi (collectively "Relief Defendants"), and alleges as follows:

## INTRODUCTION

Chris Faulkner and his co-Defendants have defrauded investors out of approximately $80 million through the sale of oil-and-gas working interest investments over the course of at least the last five years.  Faulkner and his co-Defendants duped hundreds of people out of millions of dollars by intentionally and repeatedly lying about several aspects of the investments, including the relationships between and among the Defendants, Faulkner's industry experience, the nature and operation of the investments, the estimated costs to drill and complete the prospects, the use of investor proceeds, and the projected oil and gas production that investors could expect.  Once in receipt of investor funds, Faulkner, assisted by his co-Defendants, brazenly misappropriated *at least* $30 million of investors' funds for extravagant personal expenses, including lavish meals and entertainment, international travel, cars, jewelry, gentlemen's clubs, and personal escorts. The Defendants, as a result of their conduct, violated numerous federal securities laws, including the antifraud, reporting, and books and records provisions.  The Commission brings this action in the interest of protecting the public from any further fraudulent activity and to hold Defendants accountable for their roles in this long-lasting and egregious fraud.

## SUMMARY

1.      Since at least 2011, Chris Faulkner has orchestrated a massive, multi-pronged, and fraudulent scheme that has defrauded hundreds of investors across the country out of approximately $80 million invested in oil-and-gas investments sold by companies he owns and controls (the "Faulkner Scheme").  Faulkner – who has appeared on CNBC, CNN International, Fox Business News, and the BBC to discuss oil-and-gas topics, and who hosted a weekly radio talk show in Dallas – has misappropriated at least $30 million in investor funds to maintain a lifestyle of decadence and debauchery.

2.      To perpetrate his fraudulent scheme, Faulkner used at least four entities that he controlled, including publicly-traded Breitling Energy Corporation (ticker: "BECC").  He also enlisted scores of other individuals to help perpetuate the Faulkner Scheme, including the seven other individual defendants in this case that actively defrauded, or otherwise participated in schemes to defraud, investors.

3.      The Faulkner Scheme involved the unregistered and fraudulent offer and sale by Faulkner-controlled entities of working interest investments ("investments") in more than 20 oil-and-gas prospects in several states.  Faulkner conducted three versions of this core fraud, using Breitling Oil and Gas Corporation ("BOG"), Crude Energy, LLC ("Crude"), and Patriot Energy, Inc. ("Patriot") to offer the investments.  Faulkner drafted confidential information memoranda ("CIMs") and marketing brochures provided to prospective investors in BOG, Crude, and Patriot offerings that were replete with material misrepresentations and omissions.  Dustin Michael Miller Rodriguez ("Miller") helped perpetrate the fraud in all three iterations, while Parker Hallam did so with BOG and Crude.  In these capacities, they directed the firms' sales efforts.

4.      As soon as BOG began offering investments in oil-and-gas prospects, Faulkner misrepresented his education, experience, and background.  He claimed to have earned master's and doctorate degrees from universities, which he had not.  He represented that he had extensive and diverse experience "in all aspects of oil and gas operations," when he had no such experience.  In fact, his only exposure to the oil-and-gas industry was through website data hosting work he and his prior company, C I Host, performed for oil-and-gas companies.  Yet, he promoted himself as an expert in the oil-and-gas industry, even branding himself as the "Frack Master."  He also paid a public relations firm to promote him and to book appearances on television and radio shows.

5.      The heart of the Faulkner Scheme, however, involved knowingly lying to investors about how much it would likely cost to drill and complete the wells and how much the investments would likely earn.  Faulkner received estimates for drilling and completion costs – known as Authority for Expenditures or "AFEs" – from operators that actually drilled and completed oil-and-gas wells for BOG, Crude, and Patriot offerings.  Instead of including these estimates in the offering materials, Faulkner baselessly and grossly inflated these estimates and included his bloated figures in the offering documents provided to investors.  BOG, Crude, and Patriot then tied the price of the investments to these claimed estimated costs, and sold the investments on a lump sum or "turnkey" basis to investors.  Because BOG, Crude, and Patriot kept the difference between the total amount of money they raised from investors on each offering and the actual costs of drilling and completing the well, this gross inflation of AFEs by Faulkner ensured that he and the entity Defendants would pocket millions of dollars in illicit profits from unwitting investors.

6.      As part of the offering materials, Faulkner included reports authored by licensed petroleum geologist Joseph Simo that recommended drilling wells on the prospects and often included oil-and-gas production projections.  Faulkner, Simo, BOG, and Crude portrayed Simo as an independent, unaffiliated third party, despite the fact he was associated with Faulkner and his various entities.  In projecting production on the prospects, Simo started with the historical production from the best performing wells within a certain proximity to the proposed drilling location and used those figures as a baseline, assuming without any basis that the BOG prospects would perform as well as the best performing wells during the prior decades.  Not only did Faulkner, Simo, and BOG fail to disclose Simo's affiliation with BOG or his flawed

methodology for projecting production, but they also routinely failed to disclose Simo's track record of consistently and grossly overestimating production.

7.     But even Simo's inflated projections were not good enough for Faulkner, who on numerous occasions took Simo's numbers, indiscriminately increased them, and then included the increased projections in reports purportedly signed by Simo.   These reports were then provided to investors in the offering materials.   By exaggerating these already overstated projections, Faulkner made investing in the prospects more enticing to investors, which consequently made selling working interests in the projects easier for Hallam, Miller, and the sales staff.   But investors had virtually no chance of ever receiving returns anywhere near these levels, a fact Defendants did not disclose.

8.     After duping investors to obtain their funds, Faulkner misappropriated a significant portion to live extravagantly and excessively.   He repeatedly requested Beth Handkins, a Faulkner associate who controlled all relevant bank accounts of BOG, Crude, and later Patriot, to: (i) make millions of dollars in payments for charges on Faulkner's personal American Express ("Amex") cards; and (ii) cut him checks for unsupported expense reimbursements and phony service fees.   Throughout the various phases of the Faulkner Scheme, Handkins consistently diverted funds to Faulkner at his behest and without regard for the intended use of the funds.

9.     The Faulkner Scheme evolved in December 2013 when Faulkner obtained control of a public company (Bering Exploration, ticker: BRX) through a transaction he orchestrated with the assistance of Defendant Jeremy Wagers, a Texas attorney who joined BOG in 2012. Although Faulkner, Wagers, and others portrayed BECC as an exploration and production ("E&P") company that would acquire and develop prospects in Texas, Oklahoma, and North

Dakota, neither BECC nor its officers possessed experience in traditional E&P operations.  But this was not Faulkner's plan for BECC.

10.     At the same time as he created BECC, Faulkner established Crude to emulate BOG and act as BECC's covert sales arm.  Faulkner inserted Hallam, Miller, and Handkins as Crude's officers, and transitioned nearly all of BOG's employees and sales staff over to Crude.  Crude then offered and sold unregistered oil-and-gas investments based on similarly embellished cost estimates disguised as legitimate AFEs.  Faulkner drafted Crude's offering materials, which contained similar misrepresentations to the ones in BOG's, but failed to disclose his affiliation or involvement with Crude.  Instead, the representations in Crude's offering materials were attributed to Miller and Hallam, who reviewed and approved the materials before they were sent to investors.  Moreover, Crude never disclosed to its investors that the prospects it offered were subject to continuous drilling provisions and interlocked obligations involving other prospects.  As a result, Crude investors never knew they could lose their entire investment in a given prospect if certain payment and completion milestones with other Crude prospects were not met.

11.     From December 2013 through April 2015, Faulkner repeatedly requested Handkins to transfer funds from Crude to BECC.  Without asking what the funds were for or why Crude needed to send the money, Handkins initiated practically all of these transfers, ultimately sending $36 million (or 94 percent of all funds raised by Crude) to BECC.  Faulkner and Wagers told Handkins there were no problems with the transfers because the entities were "consolidated."  Hallam approved many of these transfers, and initiated some himself.

12.     From the time BECC went public, Faulkner asked Handkins to make more than $18 million in payments on his Amex cards.  Through his conduct, Faulkner knowingly violated virtually every provision of BECC's expense reimbursement policy, which was approved and

initiated by BECC's board of directors in December 2013.  In addition to the personal benefits he received as a result of payments on his Amex cards, Faulkner also obtained millions of dollars in reimbursements for expenses he purportedly incurred on behalf of the company.  Faulkner often submitted reimbursement requests without supporting documentation, and typically lied that his purely personal expenditures were for business purposes.  These reimbursements were approved indiscriminately by Wagers or Judson F. "Rick" Hoover, BECC's Chief Financial Officer ("CFO").  Sometimes Faulkner submitted reimbursement requests for charges he incurred on his Amex cards, allowing him to double-dip and receive payments for charges already paid for with company funds.

13.     To further conceal personal spending and expense reimbursements from BECC, Faulkner and Wagers conceived the idea of obtaining Amex cards in their names that were subordinated to the Amex account of Defendant Gilbert Steedley, BECC's Vice President of Capital Markets.  Faulkner used this card – which he referred to as his "whore card" – to charge more than $1 million for personal travel, expenses for various personal escorts, gentlemen's clubs, nightclubs, and associated expenditures.  Wagers used his card predominantly for gentlemen's club expenses, including nearly $40,000 in charges at a Dallas gentlemen's club over a four-day period in July 2014.  Faulkner requested that Handkins pay these credit card charges using company funds.  She complied, meaning that virtually every dollar of payment on the "whore card" and for Wagers' salacious expenses was made using investor funds.

14.     As part of the BECC phase of the Faulkner Scheme, Faulkner, Wagers, and Hoover signed several public reports filed with the Commission that contained materially false and misleading statements.  Among other things, BECC misrepresented or failed to disclose: (i) BECC's relationship with, and total financial dependence on, Crude; (ii) Faulkner's direction and

influence over Crude's operations, and the personal financial benefits he received directly and indirectly from Crude; (iii) a business model that was identical to BOG's turnkey model with Crude serving as the sales arm; (iv) its results of operations; and (v) that it had sufficient internal controls and "sound counter-balancing mechanisms to ensure the continued accountability of [Faulkner] to the Board."  Faulkner, Wagers, and Hoover also made similar false and misleading statements to the company's auditors.  Moreover, by virtue of the overtly deficient and fraudulent expense reimbursement requests and their blatant disregard for devising and maintaining internal controls, Faulkner, Wagers, and Hoover caused BECC to fail to accurately keep and maintain its books and records.

15.     In late 2014, BECC's stock price was negatively impacted like others in the industry because of a drop in oil prices.  To counteract this, Faulkner deployed the next phase of the Faulkner Scheme by attempting to manipulate BECC's stock price and trading volume.  During a three-month window from December 2014 through February 2015, Faulkner engaged in heavy daily trading in BECC's stock through at least two nominee accounts in the names of Steedley and Range Quest Resources (a private entity Faulkner owned and controlled).  To fund this trading, Faulkner routed hundreds of thousands of dollars from BECC to these two nominee accounts.  These transfers were sourced by investor funds provided to Crude.  He "marked the close" on BECC's stock by initiating hundreds of small lot orders at or near the close of normal trading hours, oftentimes establishing the day's highest trading price at the end of the day.  Faulkner's trading was done in an attempt to manipulate BECC's stock price and trading volume, and helped create the false impression that investors unaffiliated with the company were trading in the stock.

16.     In March 2015, the Faulkner Scheme transitioned again.  This time, Faulkner moved his oil-and-gas sales arm from Crude to Patriot after he had a falling out with Hallam.  He shut down Crude's offices, renamed another shell company he controlled (Simple Solutions) as Patriot, installed Miller as its President and sole director/officer, and seamlessly continued sales operations without Hallam.  Faulkner and Handkins set up new bank accounts styled as "Simple Solutions d/b/a Crude Energy" to intercept incoming checks intended for investments in Crude's offerings.  Faulkner and Wagers also directed Miller to assign all of Crude's oil-and-gas working interests to Patriot.  Patriot took over as BECC's covert sales arm by engaging in unregistered offerings of oil-and-gas investments.  Patriot offering materials – drafted by Faulkner, and attributed to and signed by Miller – include substantively identical misrepresentations as Crude's offering documents.  At Faulkner's request and with Miller's approval, Handkins transferred millions of dollars from Patriot's investors to BECC and hundreds of thousands of dollars directly to Faulkner for personal expenses.

17.     Faulkner's repeated and extensive misappropriation of investor funds finally derailed his scheme in April 2016.  Even though Patriot had raised exponentially more funds than needed to drill, test, and complete its prospects, Faulkner siphoned off so much money that Patriot could no longer fund the drilling and completion of its prospects.  This was problematic not only for the Patriot prospects, but also for the BOG and Crude prospects for which Patriot was responsible to make ongoing expense payments.  As a result, numerous prospects have been shut-in or have had liens placed on them.  Moreover, because the Patriot prospects were subject to the same continuous drilling and interlocked obligations as Crude, at least half of the Patriot prospects sold to investors have reverted back to the original landowner, leaving these investors with no interest in the prospects in which they invested.

18.     As a result of all of this conduct, BOG, Crude, and Patriot have fraudulently sold approximately $80 million in oil-and-gas investments in more than 20 oil-and-gas offerings/prospects to hundreds of investors across the country.  And, as a result of this fraudulent conduct, Faulkner has misappropriated *at least* $30 million in investor funds through payments made for personal expenses on his Amex cards and via funds paid directly to entities he owned and controlled.

19.     By engaging in this fraud, the Defendants have variously committed numerous violations of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §77a *et seq.*] and the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §78a *et seq.*], as set forth in more detail below.  These include violations of the: (i) antifraud provisions, (ii) securities registration provisions, (iii) reporting provisions, (iv) books and records and internal control provisions, (v) certification provisions, (vi) proxy provisions, and (vii) beneficial ownership reporting provisions.

20.     In the interest of protecting the public from any further fraudulent activity and harm, the Commission brings this action against the Defendants and the Relief Defendants variously seeking: (i) permanent injunctive relief; (ii) disgorgement of ill-gotten gains; (iii) accrued prejudgment interest on those ill-gotten gains; (iv) civil monetary penalties; (v) officer-and-director bars; and (vi) a penny stock bar.

## JURISDICTION AND VENUE

21.     This case centers around offers and sales of fractionalized working interests in oil-and-gas prospects to investors, as well as purchases and sales of stock in a corporation registered with the Commission under Section 12(g) of the Exchange Act [15 U.S.C. § 78l(g)].  Pursuant to the definitions of the term "security" in Section 2(a)(1) of the Securities Act [15

U.S.C. § 77b] and Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c], interests in oil-and-gas rights and stock are securities.  Thus, the Court has jurisdiction over this action pursuant to Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78(aa)].

22.     Venue is proper because a substantial part of the events or omissions giving rise to the claims occurred within the Northern District of Texas, Dallas Division.  Defendants BECC, BOG, Crude, and Patriot maintain[ed] their principal places of business in Dallas, Texas, and all individual defendants worked in the Dallas offices of one or more of these four entity defendants.  Further, several of the defendants reside in Dallas County.  All of these locations are within the Dallas Division of the Northern District of Texas.

## DEFENDANTS

23.     **Christopher A. Faulkner**, age 39, resides in Dallas, Texas.  He currently serves as the President, Chief Executive Officer ("CEO"), and Chairman of the Board of Directors of BECC, and is the beneficial owner of more than 10 percent of BECC's common stock.  Faulkner co-founded BOG and served as its President until December 2013.  Faulkner also controlled and directed the actions of Crude and Patriot.  Prior to orchestrating the Faulkner Scheme, Faulkner founded and ran a website data hosting company named C I Host.

24.     **Breitling Energy Corporation ("BECC")** is a corporation organized in Nevada with its principal place of business in Dallas, Texas.  BECC was formed through a December 2013 asset-for-stock transaction involving BOG, Breitling Royalties Corporation ("BRG"), and Bering Exploration (OTC ticker: BERX).  Faulkner, Hallam, and Miller beneficially own approximately 90 percent of BECC's stock through their ownership in BOG and BRC.  BECC is registered with the Commission under Section 12(g) of the Exchange Act.  On September 4,

2015, BECC issued a Form 8-K, signed by Faulkner, acknowledging that its "financial statements for the annual periods ended December 31, 2013 and 2012 and the interim quarterly periods ended September 30, 2014, June 30, 2014, and March 31, 2014 should not be relied upon due to errors in the recording of oil and gas assets, revenue interests and drilling activities that were discovered during our preparation for our audit of the financial statements for the year ended December 31, 2014." BECC has failed to: (i) file required annual and quarterly reports since the third quarter of 2014, (ii) amend its annual reports for 2012 and 2013, and (iii) amend its quarterly reports for the first three quarters of 2014.

25.     **Jeremy S. Wagers**, **Esq.**, age 39, resides in Dallas, Texas.  Wagers is a licensed Texas attorney, and has been since 2002.  Wagers currently serves as General Counsel ("GC") and Chief Operating Officer ("COO") of BECC, and has since BECC's inception in December 2013.  Previously, Wagers served as GC and Chief Compliance Officer ("CCO") of BOG from December 2012 to December 2013.  Before joining BOG, he spent nine years working for two high-profile law firms in Houston, Texas, and nine months working for another oil-and-gas company.

26.     **Judson F. ("Rick") Hoover**, age 58, resides in Highland Village, Texas.  Hoover is a Certified Public Accountant ("CPA") licensed by the Colorado Board of Accountancy in 1993.  He was BECC's Chief Financial Officer ("CFO") from February 2014 to February 2015.

27.     **Parker R. Hallam**, age 35, resides in Dallas, Texas.  Hallam co-founded Defendant BOG, serving as its COO and co-heading its sales efforts with Miller from inception until December 2013.  From December 2013 through March 2015, Hallam served as the President and a managing member of Crude.  Hallam beneficially owns more than 10 percent of BECC's common stock.

28.     **Joseph Simo**, age 64, resides in Plano, Texas.  Simo is the founder and sole owner of Simo Energy, LLC, a Dallas-based firm that purportedly provided independent, third-party petroleum geology services to BOG, BECC, Crude, and Patriot.  During the period when BOG offered and sold oil-and-gas investments, Simo signed documents purporting to be BOG's Vice President of Exploration.  He later served as BECC's President for Upstream Operations.  Simo is a petroleum geologist licensed by the Texas Board of Professional Geoscientists.

29.     **Dustin Michael Miller Rodriguez ("Miller")**, age 41, resides in Dallas, Texas.  Miller co-founded BOG with Faulkner and Hallam, serving as its Chief Investment Officer ("CIO") and co-heading its sales division with Hallam from inception through December 2013.  From December 2013 through March 2015, Miller served as Chief Investment Officer ("CIO") and a managing member of Crude.  In March 2015, Miller became the President and sole Director of Patriot.  Miller beneficially owns more than 10 percent of BECC's common stock.  From April 2009 to July 2009, Miller was a registered representative associated with a broker-dealer registered with the Commission.  He is not currently registered with the Commission or associated with a broker-dealer registered with the Commission.

30.     **Beth C. Handkins**, age 41, resides in Waxahachie, Texas.  From December 2013 through March 2015, Handkins was identified in Crude's offering materials and elsewhere as Crude's COO.  From March 2015 through March 2016, Handkins served in the same capacity for Patriot.  Handkins controlled the bank accounts for BOG, Crude, Patriot, and BECC.

31.     **Gilbert R. Steedley**, age 51, resides in Bronxville, New York.  From December 2013 through September 2015, Steedley served as BECC's Vice President of Capital Markets.

32.     **Breitling Oil & Gas Corporation ("BOG")** is a limited liability company that was originally organized in Oklahoma in 2004 under the name Southwest Energy Exploration,

LLC.  In July 2010, Faulkner – who controlled Southwest Energy – changed the name to BOG when he, Hallam, and Miller co-founded oil-and-gas operations in Dallas, Texas.  BOG maintained its principal place of business in Dallas, Texas until December 2013 when it was part of the transaction that birthed BECC.  BOG remains in existence and is one of two primary entities through which Faulkner, Hallam, and Miller own stock in BECC.  Faulkner, Hallam, and Miller each own one-third of BOG.  Neither BOG nor its securities are registered with the Commission.

33.     **Crude Energy, LLC ("Crude")** is a limited liability company organized in Nevada with its principal place of business in Dallas, Texas.  Faulkner originally organized the entity as a Wyoming limited liability company in July 2008 under the name Enhanced Funding, LLC.  In June 2013, Faulkner changed the name to Crude.  Hallam is Crude's President, and Hallam and Miller are Crude's managing members.  From late 2013 through April 2015, Crude served as the sales arm for BECC to sell working interests in oil-and-gas prospects to investors.  Neither Crude nor its securities are registered with the Commission.

34.     **Patriot Energy, Inc. ("Patriot")** is a corporation organized in North Dakota with its principal place of business in Dallas, Texas.  Faulkner originally organized the entity in June 2008 under the name Simple Solutions, Inc., but changed the name to Patriot Energy in March 2015.  Miller is Patriot's President and its sole Director.  From March 2015 through May 2016, Patriot served as the sales arm for BECC to sell working interests in oil-and-gas prospects to investors.  Neither Patriot nor its securities are registered with the Commission.

**RELIEF DEFENDANTS**

35.     **Tamra M. Freedman**, age 37, resides in Sherman Oaks, California.  Freedman is Faulkner's ex-wife.  During the relevant time period, Freedman received more than $1.8 million in funds from BOG and BECC.

36.     **Jetmir Ahmedi**, age 39, resides in Dallas, Texas.  Ahmedi, who is Faulkner's close friend, received more than $487,000 from BOG and BECC during the relevant period.

**RELATED ENTITY**

37.     **Breitling Royalties Corporation ("BRC")** is a corporation organized in Texas with its principal place of business in Dallas.   Faulkner, Hallam, and Miller each own one-third of BRC.  BRC maintained its principal place of business in Dallas, Texas until December 2013 when it was part of the transaction that birthed BECC.  BRC remains in existence and is one of two primary entities through which Faulkner, Hallam, and Miller own stock in BECC.  Neither BRC nor its securities are registered with the Commission.

**STATEMENT OF FACTS**

38.     Prior to 2009, Faulkner was the founder and chief executive of a variety of businesses, including C I Host, a website data hosting company.  Prior to 2009, he had never managed, run, operated, or even worked in an oil-and-gas business, and only had tangential exposure to the industry through his data hosting business.

39.     In or around 2009, Faulkner met with Hallam and Miller, two individuals with experience selling oil-and-gas investments, to discuss starting an oil-and-gas company.  In or around 2010, Faulkner, Hallam, and Miller started BOG in Dallas, Texas.  Faulkner took a shell company he controlled, which was originally organized in Oklahoma in 2004 under the name Southwest Energy Exploration, LLC, and changed its name to BOG.  Faulkner then appointed

himself President of BOG, and Hallam and Miller as Chief Operating Officer ("COO") and Chief Investment Officer ("CIO"), respectively.   In these roles, Hallam and Miller headed BOG's sales activities.

40.     BOG started its operations at least as early as 2011 when it began offering and selling unregistered investments – in the form of working interests in oil and gas prospects in Texas, Oklahoma, and North Dakota – to investors across the country on a turnkey basis.   In this turnkey arrangement, investors made lump-sum payments to BOG for a fractionalized working interest in an oil-and-gas prospect.   BOG represented to investors that these lump-sum payments were directly tied to the estimated costs to drill, test, and complete the prospects.   In return, BOG agreed to assume the risk of any cost overruns without requiring any additional contributions from investors.   BOG offered and sold these turnkey investments through a combination of cold-calling prospective investors from purchased lead lists and through general advertising of investment opportunities on its website.

41.     From January 2011 through December 2013, BOG offered and sold more than $43 million in investments in oil-and-gas working interests in the following prospects (collectively the "BOG Offerings"), none of which were registered with the Commission:

| Offering | Date Listed on CIM[1] | Units Offered | Turnkey Unit Price | Total BOG Offering |
|---|---|---|---|---|
| Woodring #1 | 1/1/2011 | 12 units | $109,155 | $1,319,700 |
| Big Tex 3 Well | 5/4/2011 | 10 units | $115,000 | $1,150,000 |
| Buffalo Run #1H | 6/20/2011 | 10 units | $210,000 | $2,100,000 |
| Golden Ridge 2 Well | 8/25/2011 | 12 units | $258,000 | $3,096,000 |
| Warrior | 12/1/2011 | 100 units | $41,488 | $4,148,800 |
| Big Caesar 2 Well | 12/1/2011 | 10 units | $410,000 | $4,100,000 |
| Big Caesar #1H | 5/1/2012 | 10 units | $205,000 | $2,050,000 |
| Goodbird #1H | 5/1/2012 | 10 units | $250,000 | $2,500,000 |
| Pumpkin Ridge 2 Well | 8/1/2012 | 10 units | $410,000 | $4,100,000 |
| Bighorn 2 Well | 11/1/2012 | 10 units | $410,000 | $4,100,000 |
| Bison Hill #1H | 3/1/2013 | 10 units | $210,000 | $2,100,000 |

---

[1]     BOG offered and sold the offerings for months after the dates listed on the CIMs.  For example, even though the Buffalo Run #1H CIM was dated June 20, 2011, sales began in July 2011 and continued through at least October 2011.

| Leafwing #1H | 3/1/2013 | 100 units | $30,000 | $3,000,000 |
| Arbuckle #1H | 4/1/2013 | 10 units | $250,000 | $2,500,000 |
| Eagle Eye #1H | 8/15/2013 | 10 units | $250,000 | $2,500,000 |
| Nighthawk | 10/1/2013 | 10 units | $200,000 | $2,000,000 |

42.    For the BOG Offerings, Faulkner drafted, edited, and/or approved, and had authority over, all of the written offering materials that BOG provided to prospective investors, which included a CIM, a marketing brochure, and a subscription agreement.

43.    In offering materials for the BOG Offerings, Faulkner marketed himself as having a "diverse background in the oil and gas industry" with "extensive past experience in all aspects of oil and gas operations. . ." He further promoted himself, through appearances on radio programs and television shows, as an expert in "fracking" – hydraulic fracturing, the process of drilling and injecting fluid into the ground at a high pressure to fracture shale rocks to release natural gas. In fact, he later authored a book published in June 2014 called "The Fracking Truth," touting himself as the "Frack Master." As mentioned above, when he started BOG in 2010, Faulkner's limited exposure to the oil-and-gas industry was through the web hosting work C I Host performed for oil-and-gas companies.

44.    In BOG's offering documents and on its website, Faulkner and BOG also misled investors about Faulkner's education, claiming he earned a master's degree in information science from the University of North Texas and a doctorate degree from Concordia College. Neither representation was true.

45.    In addition to misrepresentations about Faulkner's education, experience, and background, Faulkner, Hallam, and Miller operated BOG contrary to numerous representations in the offering documents BOG provided to investors, including: (i) BOG's use of investor funds; and (ii) geological reports and production projections supplied by Simo, a purportedly independent and third-party geologist.

**Misrepresentations in BOG's offering documents about use of investor funds.**

46.     In AFEs included in BOG's offering materials, BOG and Faulkner provided detailed line-item estimates of costs that it claimed it reasonably expected to incur in drilling and completing the prospects.  BOG tied the purchase price for the working interest units directly to the estimated costs of the prospects.  For example, if a prospect was estimated to cost $5 million to drill, test, and complete, BOG would offer investments in one percent of that prospect for $50,000 (1% x $5 million).

47.     BOG's offering documents repeatedly tied together and cross-referenced BOG's estimated costs, the AFEs, and the purchase price of a working interest unit.  For example, BOG's CIM for its Buffalo Run offering included the following representations:

| Section of CIM | Representations Regarding Estimated Costs and the AFE |
|---|---|
| Cover Page | "The purchase price for the Units represents the Units' share of estimated Drilling and Testing Costs and Completion and Equipping Costs associated with the Well." |
| Application of Proceeds | "This figure represents the Units' share of the actual cost of the land leases, geophysical, legal, and title and the estimated [costs] for the Well…" |
| Pricing | "Each Participant shall be responsible for paying his share of all estimated Drilling and Testing Costs and Completion and Equipping Costs incurred during Operations.  The Company's estimate of the aggregate costs likely to be incurred can be found as part of [the AFE] attached to this Memorandum." |
| Compensation / Pricing of Units | "The purchase price for the Units represents the Units' share of <u>fixed</u> Drilling and Testing Costs and <u>fixed</u> Completion and Equipping Costs associated with the Well.  The purchase price was established by the Company, and represents the estimated costs which the Company is expected to incur for Drilling and Testing Costs and Completion and Equipping Costs." |
| Definitions | "AFE shall mean the estimate of expenses which are reasonably expected to be incurred during Operations.  The AFE is attached to the Memorandum as part of Exhibit B and sets forth the Company's estimates of Drilling and Testing Costs and Completion and Equipping Costs." |

48.     BOG also expressly represented to investors that it would not collect any management fees or fees for overhead and organization costs.  As a result, the only two ways BOG would be compensated from its offerings were: (i) via a "Back-In After Payout" (BIAP) revenue sharing arrangement, and (ii) through amounts it raised in excess of the costs it "reasonably expected to incur."  BOG's BIAP revenue sharing was only triggered after investors received a 100-percent return of their principal investment, which never occurred on any of the prospects which were the subject of the BOG Offerings.  In fact, *none* of BOG's prospects even came close to returning 100 percent of investors' principal.  As a result, the only way BOG made money on any of its offerings was when the amounts it raised from investors (i.e., the costs it "reasonably expected to incur" as evidenced by the AFEs) exceeded the actual costs of drilling, testing, and completing the well.  So, Faulkner decided to rig the process.

49.     Well operators for the BOG prospects created AFEs and provided them to BOG and Faulkner as part of being hired to operate a new well; however the operators' AFEs were *never* included in BOG offering documents provided to prospective investors.  Instead, Faulkner either: (i) significantly inflated the line items in the AFEs provided by the well operators, or (ii) simply concocted exorbitant line estimates.  Faulkner and BOG then included these doctored and/or baseless AFEs in BOG's offering documents, representing that they were estimates of costs BOG reasonably expected to incur for drilling, testing, and completing the wells.

50.     By grossly inflating the estimated costs in the AFEs, Faulkner ensured huge profits for BOG because there was no possibility that the *actual* costs would ever approach the grossly inflated *estimated* costs represented to investors in BOG's CIMs.

51.     For the BOG Offerings in which Faulkner received AFEs from well operators *before* the date on the CIM, such as the Woodring #1, the Big Tex 3 Well, the Warrior, and the Buffalo Run #1H, Faulkner drastically marked up the operators' estimates.

52.     For BOG offerings where Faulkner did not receive an AFE from well operators prior to the date on the CIMs, such as the Big Caesar #1H, the Goodbird, and the Nighthawk, a comparison of Faulkner's AFEs to those provided to BOG by the well operators shortly after the date of the CIMs highlights the absurdity of Faulkner's estimates.   Faulkner's AFE for the Goodbird prospect, for example, was *more than 18 times* the operator's actual AFE.

53.     Incredibly, Faulkner re-used AFEs from prior offerings, even though they were for prospects that were in different locations and for wells that were to be drilled to different depths.   For example, the Big Caesar, Pumpkin Ridge, and Bighorn prospects included identical AFEs despite involving prospects with different operators, prospect locations, and proposed drilling depths.

54.     Even though BOG and Faulkner knew some or all of these actual costs before BOG offered a new prospect, Faulkner marked these up as well.   For example, Faulkner knew that the land for the Buffalo Run prospect would cost approximately $80,000 for BOG's 12.5 percent interest ($640,000 for the total cost of the land) before BOG ever offered the prospect to investors.   Ten days before the date listed on the CIM, the operator sent BOG and Faulkner an AFE totaling $7,194,000.   However, in the Buffalo Run CIM, Faulkner listed the "reasonably expected" costs for Geology, Geophysical, Acreage and Legal Title alone at $8,185,432, which was more than the operator's entire AFE.   In fact, in some of BOG's offering materials – including for the Warrior, Big Horn 2, and Big Caesar 2 – BOG represented that the AFEs

included the *actual* cost of "land leases, geophysical, legal and title expenses."  This was never the case.

### BOG sold interests it did not own.

55.     On several occasions, BOG sold to investors a larger percentage of working interests in a prospect than BOG actually owned.  Instead of disclosing this fact to investors, BOG and Faulkner surreptitiously papered over the overselling by moving investors out of the oversold prospect and into different prospects, advising investors that BOG was exercising its contractual right to reassign investors to *comparable* prospects.  BOG often placed investors in substitute prospects in different states with different operators, providing materially different ownership interests than what investors had bargained for.  BOG's indiscriminate reassignment of investors to different wells or prospects than the ones in which they had invested was not authorized by or disclosed in the offering materials, and was false, deceptive, and misleading.

56.     Additionally, on multiple occasions BOG sold interests in prospects it did not even own.  For example, BOG offered units representing a 5-percent working interest in the Bison Hill prospect, even though BOG actually acquired less than 3.5 percent from the operator.  This practice resulted in investors receiving a diluted share of working interest than what they had bargained for and what BOG represented they would receive.

### BOG failed to segregate investor funds.

57.     In the CIMs for the BOG Offerings, BOG and Faulkner represented that investor funds would be deposited into segregated bank accounts in the name of the particular offering or prospect, and that payments for drilling, testing, and completing costs would be paid from these segregated bank accounts.  Keeping the funds segregated provided a level of assurance to investors that their funds would be available to drill, test, and complete their prospect, and not

for something else.   However, BOG's representations in this regard were false. Handkins – typically at Faulkner's request – transferred investor funds into a commingled BOG operating account shortly after receipt.  Handkins then paid costs associated with multiple prospects using this BOG operating account.    The result was that BOG often had difficulty paying bills on its prospects, and later lost investors' interests in prospects when it failed to pay bills.  This mismanagement is all the more egregious and shocking in light of the fact that BOG raised exponentially more money than it needed to drill and complete the prospects.

58.     As a result of all of these things, BOG and Faulkner misled investors about the expected costs of the prospects, how their funds would be safeguarded and used, and often provided investors with working interests in materially different prospects than the ones that BOG represented investors would receive.  They also failed to disclose to investors the impact of these things on their potential investment returns.   Hallam and Miller disseminated BOG's materially misleading offering materials for each of the BOG Offerings and reiterated these misrepresentations as part of their own sales efforts to investors.

**Simo's geologist reports.**

59.     BOG and Faulkner represented in the CIMs that BOG "relie[d] upon the Dallas-based firm of Simo Energy, LLC and its principal, Mr. Joe Simo, for their expertise in petroleum energy."  BOG, Faulkner, and Simo conspired to make it appear that Simo was an independent third-party providing geology services on an objective basis, even though he was neither independent nor unaffiliated.   In fact, Simo signed documents on behalf of BOG as its Vice President of Exploration.   Nonetheless, offering documents for BOG Offerings included geology reports signed by Simo, on Simo Energy letterhead, recommending that BOG drill the prospects.

60.     Additionally, Simo's reports typically included projections for oil and gas well production.   Faulkner and BOG took those well projections and created a table showing projected investment returns that they included in BOG's offering documents.   The problem is that Simo's projections for BOG prospects were calculated using a rudimentary and flawed methodology: he took historical production of the best performing wells within a predetermined proximity of the proposed drilling location and assumed those figures as the baseline for his projections.   Using this methodology, Simo assumed – without a reasonable basis – that BOG would perform as well as the best performing wells of prior decades.

61.     Faulkner, Hallam, Miller, and BOG's sales staff also used Simo's projections to entice investors to invest in BOG's offerings.   However, they failed to disclose that Simo's projections were consistently, and abysmally, overstated; actual production on the wells was often less than 10 percent of Simo's projections.

62.     In spite of the fact that Simo routinely overestimated production projections, Faulkner was not satisfied.   He frequently and unilaterally increased Simo's figures by 100 percent or more on several occasions without notifying Simo or disclosing this change to investors.   Faulkner included these unilateral adjustments on Simo Energy letterhead, included Simo's signature, and incorporated these overinflated projections in offering materials sent to investors.   For example, on the Big Horn prospect, Faulkner unilaterally changed Simo's production projections from a range of 1,000 to 3,000 barrels of oil per day ("BOPD") to a range of 5,000 to 7,000 BOPD.

63.     Based on the activities detailed above, BOG, Faulkner, and Simo intentionally misled investors about various aspects of Simo's geology reports.   And Hallam and Miller, who

knew about the poor performance of prior prospects but continued to offer and sell newer prospects, were *at least* negligent in not disclosing the prior results to investors.

### BOG sales staff and commissions.

64.     While Faulkner coordinated all of BOG's operations and managed much of the business, Hallam and Miller led the sales efforts and managed BOG's sales staff.  Hallam, Miller, and the salespeople disseminated the materially misleading offering materials for the BOG Offerings and reiterated these misrepresentations as part of their sales efforts to investors. According to BOG's (and later Crude's and Patriot's) CIMs, only company officers (specifically Hallam and Miller) would offer and sell working interests to investors, and no one would receive transaction-based compensation.  This was a lie.

65.     Although Hallam and Miller did offer and sell these investments to investors, the sales staff received millions of dollars in transaction-based compensation.  The salespeople generally cold-called investors from lead lists or followed up on investor contact in response to BOG's, Crude's, and Patriot's public advertising of their offerings.  Contrary to representations in the CIMs however, the salespeople typically received up to 10-percent commissions on every dollar they helped bring in the door for their integral role in the sales process, including advising prospective investors on the merits of particular investments using the false and misleading offering materials detailed above.

66.     Moreover, in connection with their sales pitches as part of the unregistered offerings, BOG's salespeople failed to sufficiently determine the accreditation status of investors.  The salespeople relied on investors to effectively self-accredit themselves by posing general questions about their accreditation status and by having investors complete a

questionnaire.  At no point did the salespeople, or anyone else at BOG, attempt to independently verify a potential investor's accreditation status.

### Faulkner's misappropriated BOG investor funds.

67.     After investors sent funds to BOG to invest in one of its offerings, Faulkner misappropriated a significant portion of these funds in at least two ways: (i) direct payments to Amex for expenses Faulkner incurred on Amex cards he used; and (ii) checks issued to him or entities he controlled for unsupported expense reimbursements and phony service fees.

68.     Faulkner used his Amex cards for some BOG-related expenses such as advertising and lead fees, but he also used them extensively for lavish personal expenditures. Without segregating personal expenditures or providing any statements detailing his charges, Faulkner repeatedly requested Handkins to pay his Amex bills in their entirety.  As a result, between 2011 and 2013, BOG paid almost $8.6 million directly to Amex for charges incurred by Faulkner on his credit cards.

69.     In 2013 alone, Faulkner and Relief Defendant Tamra Freedman, Faulkner's wife at the time, charged approximately charged approximately $7 million on Amex cards Faulkner used.  Faulkner claimed that *all* of these charges were legitimate business expenses without providing documents identifying the nature of the expenditures.  Without questioning Faulkner about the request or asking for documentation supporting the supposed *business* expenses, Handkins paid the outstanding balances on the cards using BOG funds.  Many of the charges were personal, including tens of thousands of dollars in charges to his personal concierge, gentlemen's clubs, and assorted high-end fashion stores.

70.     In addition to these direct payments to Amex, between 2011 and 2013, Faulkner sought scores of payments from BOG for personal expenses through claimed expense

reimbursements and phony service fees.  Even though he often failed to provide any supporting documentation for these claimed business expenses or services, Handkins issued checks or made wires totaling approximately $7.8 million directly from BOG to him personally or to entities he controlled during this time period.

71.     As a result of the conduct and activities described above related to BOG:

a.      Faulkner and BOG defrauded investors;

b.      Hallam and Miller managed sales staff and sold investments to investors relying upon misrepresentations and omissions in BOG's offering materials;

c.      Handkins made practically all of the monetary transfers, many without any supporting documentation; and

d.      Simo created geology reports using a baseless methodology and misrepresented his affiliation with BOG and Faulkner.

**Transition from BOG to BECC and Crude**

72.     In late 2012, Faulkner began the process of taking BOG and BRC public.  He hired Wagers, a Texas lawyer, who joined BOG as its GC and CCO.  Faulkner also hired Hoover to assist BOG in the transition to becoming a public company.

73.     In December 2013, BOG and BRC – two entities owned and controlled by Faulkner, Hallam, and Miller – acquired Bering, a company traded on the OTC Link market as "BRX."  This acquisition was accomplished through an asset transfer agreement whereby BOG and BRC acquired 92.5% of Bering's stock, in exchange for a portion of BOG's and BRC's assets.  Faulkner, Hallam, and Miller became beneficial owners of 92.5 percent of BECC's common stock, which they held indirectly through their ownership in BOG and BRC.

74.     Faulkner and Wagers changed the name of the public entity to Breitling Energy Corporation and its ticker symbol to "BECC."  Faulkner became BECC's President, CEO, and

Chairman of the Board of Directors, while Wagers became its GC and COO.  In February 2014, Hoover formally became BECC's CFO.  Although Hoover and Wagers had some experience in public companies, Faulkner had never worked for a public company before.

75.     In preparing to become public, BECC also engaged a public accounting firm to audit its financial statements, which included results of operations for BOG and BRC.  Faulkner, Wagers, and Hoover lied to the auditors with an eye towards obtaining a clean audit opinion for BECC.  These lies are discussed in more detail below.

76.     BECC portrayed itself in public filings, on its website, and otherwise as E&P company that would acquire and develop oil-and-gas prospects in Texas, Oklahoma, and North Dakota.  Despite these representations, none of BECC's management had any experience conducting traditional E&P operations, which was material because they were competing with established, billion-dollar E&P companies for the right to drill and operate wells.

**Faulkner starts up Crude.**

77.     In 2013, in anticipation of the asset transfer transaction that formed BECC, Faulkner changed the name of a private Wyoming shell company he controlled from Enhanced Funding, LLC to Crude.  He then installed Hallam and Miller as Crude's two managing members, with Hallam acting as Crude's President and Miller as its CIO.  In November 2013, Hallam converted Crude into a Texas limited liability company.  And while legal documents identified Hallam and Miller as Crude's managing members, Faulkner directed and controlled Crude's operations.  Faulkner signed Crude's office lease, and owned or leased all of Crude's furniture and operating assets.  Further, Faulkner transferred nearly all of BOG's sales staff and employees, including Handkins, to Crude.  Handkins' primary responsibility was to control

Crude's bank accounts, and she was identified in her emails and certain offering materials as Crude's COO.

78.     Faulkner designed Crude to operate exactly like BOG, offering and selling investments – in the form of working interest units – to investors based on inflated "estimated" costs disguised as legitimate AFEs.  Faulkner and Wagers designed and organized Crude to operate as BECC's covert sales arm and primary funding source.  Crude also became responsible for making ongoing expense payments on BOG's prospects.

79.     In February 2014, BECC agreed to pay approximately $2.4 million for the right to drill eight wells on 3,680 acres of land in Sterling County, Texas (the "Farmout Agreement"). Under the terms of this Farmout Agreement, BECC had the right to develop leases and earn acreage for each well drilled, but such rights were contingent upon certain continuous drilling and completion obligations.  BECC had to drill a well every six months, and it would not acquire title to the well until it drilled to sufficient depth to test for completion.  If BECC failed to comply with these obligations, the agreement would terminate, BECC would lose its interest in any prospects that were not completed in accordance with the agreement (including those drilled but not completed), and BECC's rights the property would revert back to the landowner.

80.     Once Faulkner acquired rights to the properties under the Farmout Agreement on BECC's behalf, Wagers drafted a series of documents that ostensibly obligated Crude to pay BECC millions of dollars.  First, BECC entered into an agreement with Crude (the "Crude ASA"), pursuant to which Crude agreed to pay BECC: (i) $100,000 per month, (ii) $150,000 per prospect delivered to Crude, and (iii) a 20 percent carried interest in each prospect, regardless of the amount of the prospect resold by Crude to investors.  In exchange for these fees, BECC purported to provide Crude with access to its client lists and prospects.

81.     Wagers also created a series of assignments that obligated Crude to purchase certain prospects associated with the Farmout Agreement (the Red Wolf, White Wolf, and Blue Wolf prospects) from BECC at exorbitant premiums over what it paid for the prospects.  Wagers presented the assignments to Hallam, represented that signing the assignments was in Crude's best interests, and instructed Hallam to sign them on Crude's behalf – even though Wagers was BECC's COO and GC.  Hallam did not read or review the assignments before signing them.

82.     This arrangement, which appeared to paper millions of dollars of undisclosed contractual obligations for Crude, was a sham.  In reality, these documents were attempts by Faulkner and Wagers to disguise the *actual* relationship between Crude and BECC: Crude operated as BECC's undisclosed, consolidated subsidiary and covert sales arm.

83.     Between December 2013 and April 2015, Crude raised more than $38 million from hundreds of investors.  Most of these funds were associated with Crude's primary working interest offerings that were the subject of the assignments detailed in the paragraphs above, including Crude's Red Wolf, White Wolf, Blue Wolf, and Cottonwood offerings  Handkins, as the controller of Crude's bank accounts, transferred more than $36 million of these funds (more than 94%) to BECC[2] at Faulkner's request.  Hallam and Miller, Crude's managing members and executives, were aware of these transfers and that they were not associated with specific prospect expenditures or the purported Crude ASA.  In fact, on multiple occasions, Hallam provided additional authorization for Handkins to make the transfers.

84.     Almost all of BECC's incoming funds between December 2013 and March 2015 came from Crude investors.  A significant majority of these funds were used by BECC to

---

[2]      Notably, BECC continued to use operating bank accounts in the names of BOG and BRC as its primary operating accounts during this time.

continue paying Faulkner's personal expenses through expense reimbursements and direct payments to Faulkner's Amex cards.

85.     Additionally, from time to time, Crude also made direct payments on Faulkner's Amex cards.  Between January 12, 2015 and February 24, 2015 alone, Handkins made hundreds of thousands of dollars in payments to Amex directly out of Crude's bank accounts for charges made by Faulkner.  Hallam knew about these payments and even authorized them from time to time.

### Crude's Misrepresentations to Investors

86.     Similar to BOG, Crude offered and sold working interests in oil-and-gas prospects to investors on a turnkey basis.  And Faulkner drafted, edited, and/or approved, Crude's offering materials – which included CIMs, marketing brochures, and subscription agreements – despite the fact that the CIMs omitted any mention of him or his affiliation with Crude.  Hallam and Miller reviewed the offering materials and were aware that the statements therein were attributable to them and omitted any mention of Faulkner's involvement in the company.  Hallam signed marketing brochures for each offering as Crude's CEO, and Hallam, Miller, and Handkins were identified in the brochures as Crude's executives.  While the BOG offering materials listed BECC as the operator for the wells/prospects, it did not disclose Crude's actual relationship with BECC.

87.     Moreover, Crude's CIMs contained misrepresentations and omissions similar to those in BOG's CIMs, including the use of AFEs that purported to reflect "likely" costs that Crude expected to incur in drilling, testing, and completing each prospect.  Crude claimed in its offering materials that it drafted the AFEs; however as with BOG, Faulkner actually drafted them.  BECC, listed as the operator of record for the prospects offered to investors, hired a

contract operator for Crude's projects.  Given that BECC and Crude were not actually drilling the wells, which they had no experience or expertise to do, they had no reasonable or informed basis to estimate the likely costs that would be incurred to drill and complete the wells.  None of these facts were disclosed to investors in Crude's CIMs.

88.     The contract operator on Crude's prospects provided Faulkner and Simo, serving as BECC's President of Upstream Operations, with AFEs containing estimates of the costs to drill and complete the wells.  Faulkner again disregarded those estimates and created his own AFEs that he ultimately included in Crude's offering documents.  As with BOG, Faulkner's estimates were typically 3-4 times the operator's estimates.

89.     Crude also misrepresented to investors that their funds would be deposited into a segregated bank account, and used to pay the "estimated" costs to drill, test, and complete specific prospects.  Handkins commingled investor funds in Crude's operating account shortly after they were deposited.  Handkins then used the Crude operating account to pay expenses and, more often, funnel funds to BECC at Faulkner's request.  Even though Handkins managed the Crude investor lists and tracked the amount of money coming in from investors for each prospect, she made the transfers without regard for the intended use of the funds as represented to Crude's investors.

90.     Hallam and Miller approved this practice for the duration of Crude's operations without any checks or balances.  In fact, Hallam initiated some of these transfers from Crude to BECC, knowing that they were not tied to specific prospects.  This arrangement, like the one previously with BOG, gave Faulkner access to millions of dollars of investor funds.  As with BOG, these funds were typically diverted to pay Faulkner's Amex bills or issue Faulkner millions of dollars in checks.  As a result, even though Hallam and Miller fully sold – and often

oversold – Crude's prospects at levels well above the legitimate projected costs included in the well operators' AFEs, Crude often struggled to provide the operators with sufficient funds to drill and complete the prospects.

91.     Crude's offering materials included Simo's geologist reports, which advocated drilling the various prospects.  Although Faulkner did not include specific production projections in Crude's offering documents, Crude and Simo continued to represent that a third-party geologist (not BECC, where Simo served as its President of Upstream Operations) provided an independent recommendation that Crude should drill and develop the prospects.

92.     Crude also failed to disclose that properties it offered and sold to investors, which were part of the Farmout Agreement, were subject to ongoing obligations that could result in investor funds being lost (the "Farmout Agreement Provisions").  For example, if BECC failed to comply with the continuous drilling provision, any well that had not yet been completed would revert back to the party from whom BECC bought the interest.  Since Crude was selling prospects subject to the Farmout Agreement, this meant that Crude's investors were subject to an undisclosed risk that their interests could disappear not only if certain milestones were not met on their prospect, but also entirely due to actions on a wholly unrelated prospect.

**Faulkner misappropriated investor funds through BECC.**

93.     On the same day in December 2013 that Faulkner and Wagers engineered the asset-for-stock transaction by and between BOG, BRC, and Bering, BECC's board of directors approved a company policy for expense reimbursements that purported to apply to all BECC employees.  Purporting to establish standards for properly documenting and accounting for various expenses incurred on the company's behalf, the policy included the following highlights:

a.      BECC will not reimburse expenses without proper documentation;

    b.      Employees are expected to be "conservative" in their spending;

    c.      BECC will not reimburse for personal expenses, even on business trips; and

    d.      Hotel and travel expenses are to be booked as "economical" as possible, with strict limits on meal ($45/day) and lodging (only those "necessary" consistent with IRS rates) reimbursements.

Faulkner and Hoover, as CEO and CFO, were specifically identified as the only persons with authority to exempt BECC employees from the policy.  But this put the fox in charge of the hen house.

94.    Faulkner violated virtually every provision of this policy.   He pilfered $5.3 million directly from BECC by submitting unsupported expense reimbursement requests. Faulkner typically submitted reimbursement requests without receipts or supporting documentation.  Furthermore, Faulkner falsified the reimbursement requests by claiming that his personal expenses were for business purposes, creatively describing the purpose for many expenses as simply "Business Purpose."  Despite this lack of support, and readily apparent red flags associated with Faulkner's reimbursement requests, Hoover and Wagers approved these without any regard for the company's reimbursement policy.   As a result of Hoover's and Wagers's blatant disregard for the company's internal controls, BECC repeatedly made payments to Faulkner wholly unrelated to the company's business.  Hoover would ultimately classify these Faulkner payments in BECC's general ledger as "marketing" and "advertising" expenses when they were neither, and in reality served one purpose:  to sustain Faulkner's lavish lifestyle.

95.    In addition to Faulkner's expense reimbursements, Faulkner continued pilfering investor funds by repeatedly requesting Handkins to make payments on Amex cards Faulkner

used.  From the time BECC went public in December 2013, Handkins made more than $18 million in payments to Amex on these cards.

96.     As with Faulkner's expenditures while he was at BOG, a significant portion of Faulkner's Amex card charges were personal.  In 2014 alone, Handkins made payments directly to Amex for overwhelming personal expenditures on cards Faulkner used, including, among others: (i) more than $950,000 to Status Luxury Group, Faulkner's personal concierge company, for private entertainment; (ii) approximately $480,000 to In the Know Experience, a travel/lifestyle company; (iii) more than $220,000 for private jet carriers; (iv) approximately $190,000 to three New York nightclubs; and (v) more than $100,000 to Amazon.  Worse, numerous charges on the Amex cards were the source of Faulkner's expense reimbursement requests.  This "double dipping" enabled Faulkner to receive a check as "reimbursement" *and* also have the credit card charge paid for by the company.

97.     In addition to the direct payments for Faulkner's Amex charges, Faulkner and Wagers conceived a new method to use investor funds for their own personal benefit.  Faulkner and Wagers asked Steedley to allow them to use Amex cards that were associated with Steedley's existing Amex Platinum account, promising that all charges on the card would be paid.  This arrangement allowed Faulkner and Wagers to use these subordinate cards for personal charges while concealing from company employees and auditors that they (not Steedley) were the reasons for the charges.  Faulkner used this card – which he referred to as his "whore card" – to charge more than $1 million solely for travel and expenses for various women, gentlemen's clubs, nightclubs, and associated salacious expenditures.  For example, during a two-month period in 2014, Faulkner incurred more than $1 million in charges on lavish hotels, travel and entertainment expenses for assorted women and female escorts, and various other entertainment

expenses.   Using investor funds transferred from Crude, BECC paid for virtually all of the transactions on Faulkner's "whore card."

98.   Although Wagers charged less frequent and smaller expenditures than Faulkner, he still accumulated tens of thousands of dollars in personal expenditures that were ultimately paid by BECC.  Wagers used his card predominantly for gentlemen's club expenses, including nearly $40,000 in charges at a Dallas gentlemen's club over a four-day period in July 2014.  As with his own card, Faulkner instructed Handkins to make payments using investor funds on the Steedley-Wagers card as well.

99.   Additionally, Faulkner funneled funds to Relief Defendants Tamra Freedman and Jetmir Ahmedi.   Between March 2014 and June 2015, Faulkner directed the transfer of approximately $482,000 to Ahmedi, one of Faulkner's close friends who was a frequent participant in trips and parties bankrolled by Faulkner using investor funds.   Additionally, in 2014 (prior to their divorce), Faulkner transferred at least $2.5 million to accounts in Freedman's name.  While some of these funds were ultimately returned to Faulkner's accounts at a later date, more than $1.8 million of these funds were never returned.  Freedman also received a personal benefit from many of the charges on Faulkner's Amex cards, which were paid for by Handkins paid out of BOG, Crude, and Patriot bank accounts.  Freedman and Ahmedi have no legitimate claims to these funds they received, or from which they otherwise benefitted directly or indirectly.

## BECC's public misrepresentations.

100.   Similar to the misrepresentations and omissions in BOG and Crude offering materials, BECC's public filings – which were reviewed and signed by Faulkner, Hoover, and Wagers – are replete with misrepresentations and/or omissions on material issues.

101.    In BECC's initial Form 8-K filed on December 9, 2013 and signed by Faulkner, BECC first disclosed that it entered into the Crude ASA whereby Crude would pay BECC certain administrative fees.  Later, in BECC's Form 10-K filed on March 31, 2014 – signed and certified by Faulkner and Hoover, and signed by Wagers – BECC claimed that "from time to time" it may offer working interests and royalties to Crude.  These disclosures were false.

102.    The Form 8-K and Form 10-K both treated Crude as a party that may occasionally transact with BECC.  Although the public reports create the impression that the arrangement between BECC and Crude could generate millions of dollars in fees for BECC, BECC did not sell prospects to Crude; it used Crude as its covert sales arm.  BECC actually consolidated Crude's results of operations in its general ledger, a fact never disclosed to the public in BECC's filings or to investors in Crude's offerings.  The only disclosure BECC made about consolidation in its 2013 Form 10-K omitted any discussion of Crude.  Moreover, BECC never revealed Faulkner's involvement and influence over Crude's operations.  In fact, BECC's outside auditor would later conclude that "Crude is so intertwined with Breitling that it is near impossible for Crude to act as a standalone and separate company."  BECC's misrepresentations about its relationship with Crude were incorporated by reference in the subsequent Forms 10-Q that BECC filed, because they included representations that the financial statements "should be read in conjunction with" BECC's most recently filed Form 10-K.  BECC further clouded the public's understanding of its business model in Forms 8-K it filed on November 12, 2014 and December 4, 2014 (both signed by Faulkner).  In those filings, BECC claimed its "Asset Management Division" divested a portion of its working interests "through strategic industry relationships," a phrase that Faulkner and BECC used to describe its purported agreements with Crude and later Patriot.  Faulkner, Hoover, and Wagers knew or were severely reckless in not knowing that these

reports were false.  Faulkner and Wagers repeatedly told Crude (and later Patriot) employees that entities were consolidated.  Furthermore, Hoover consolidated the entities' results of operations in BECC's general ledger.

103.    Additionally, BECC issued Forms 8-K dated May 15, 2014, August 13, 2014, and November 14, 2014, all signed by Faulkner.  In each of these reports, the company claimed significant financial success as the result of increased third party interests in the company's working interests and royalty prospects and the company's "de-risking" of operating positions by selling them to third parties.  At no point in any of these reports does BECC disclose that these sales were taking place via a consolidated entity (Crude) to investors through fraudulent offerings and with offering materials drafted by BECC's President and CEO.

104.    Additionally in its 2013 Form 10-K, BECC specifically and emphatically distanced its business model from the turnkey model used by BOG, stating "[BOG] acquired their oil and gas assets in connection with a business model that differs substantially from that of [BECC] or an ordinary oil and gas exploration and production company."  However, BOG's business model *was* BECC's business model with the added layer that BECC used Crude (and later Patriot) to sell the turnkey investments.  Faulkner, Hoover, and Wagers all knew or were severely reckless in not knowing that BECC was using Crude as its covert sales arm, using the BOG business model.

105.    Furthermore, in a February 2014 Form 8-K issued by BECC and signed by Faulkner, BECC disclosed its results of operations for 2011 and 2012, which actually covered the period before BECC existed and thus incorporated BOG's and BRC's results of operations.  This report perpetuated a lie littered throughout BOG's offering materials, stating that "BOG bases the price at which it sells its working interests under the turnkey drilling agreement on its

*estimates of the costs . . . and is based upon the historical cost to complete those activities.*"  As discussed extensively above, BOG's cost estimates, represented to investors in AFEs in offering documents, were not "based on the historical cost to complete those activities," but were based on fraudulently inflated figures devised by Faulkner.  Faulkner knew or was severely reckless in not knowing that this representation was categorically false as he was responsible for contriving the bloated AFEs in BOG's offerings without any reference to historical costs.

106.    Further, each of BECC's 2014 quarterly reports on Forms 10-Q – signed and certified by Faulkner and Hoover – included a brief description of BECC's Results of Operations.  In these reports for the first three quarters of 2014, BECC claimed that its expenses increased *"primarily"* due to costs associated with becoming a public company, and costs associated with developing inventory for sales.  Although BECC may have incurred additional expenses in these areas, the *primary* reason for the increases was the uncontrolled and unchecked personal spending by Faulkner – BECC's President, CEO, and Chairman – which he accomplished with the help of Hoover, Wagers, and Handkins.  BECC also issued Forms 8-K dated August 13, 2014 and November 14, 2014, signed by Faulkner, wherein it described its quarterly results.  In these reports, BECC reiterated its claims that increases in expenses were due to "marketing expenses," without any mention that these expenses were almost wholly payments to Faulkner.

107.    More than half of BECC's increases in expenditures for the first three quarters of 2014 ($9.6 million of $18 million) came from purported marketing expenses.  And 91 percent of these so-called marketing expenses during this period were actually payments to: (i) Amex for Faulkner's bills, or (ii) Faulkner directly.  In total, at least $0.25 of every $1.00 that BECC spent during the first nine months of 2014 was for Faulkner's personal benefit.  BECC failed to

disclose this material information in its public filings.  Faulkner, and Hoover knew or were severely reckless in not knowing that these representations were false.  Hoover was responsible for categorizing the expenses in the company's general ledger, enabling him access to the real (and undisclosed) reason BECC's expenses continued to increase.

108.    On April 30, 2014, BECC issued a proxy statement signed by Wagers which included the following misrepresentations and omissions: (a) BECC reiterated its misrepresentations about its relationship with Crude, identifying Crude as a related party because of Hallam's and Miller's ownership but failing to mention, among others things, Faulkner's influence and control over Crude or Crude's consolidation with BECC; and (b) contrary to the seemingly unfettered ability that Faulkner had to pilfer company resources and investor funds, BECC claimed that it "has in place sound counter-balancing mechanisms to ensure the continued accountability of the [CEO] to the Board."  Moreover, BECC's proxy statement made the company's only disclosure, to this day, about the compensation it paid to Faulkner: for the last three weeks of December 2013, BECC purportedly did not pay Faulkner any salary.  Wagers knew or was severely reckless in not knowing that these statements in this proxy statement were false and misleading or that the proxy statement contained material omissions.  Wagers was intimately familiar with BECC's relationship with Crude, including Crude's consolidation with BECC.  And by virtue of his approvals Faulkner's expense reimbursement requests, Wagers knew that BECC did not have sound counter-balancing mechanisms to ensure the continued accountability of Faulkner to the Board.

109.    In addition to misrepresentations about the company's financial performance and relationship with Crude, BECC also misrepresented the performance of certain prospects where it was involved.  On September 25, 2014, BECC issued a Form 8-K signed by Faulkner,

attaching a press release that purported to update investors on the performance of the Parramore #1 prospect, sold by Crude as the Red Wolf prospect.  The report correctly stated that initial production on the prospect was 85 BOPD.  However, the report failed to disclose that after the initial 24 hour period, production plummeted.  Without mentioning that production had fallen into the 18-27 BOPD range at the end of August, BECC stated that "during the last nine days, oil and gas production has steadily increased…A continued increase in oil and gas production is anticipated."  Although oil production had increased from late August, BECC and Crude investors had no idea that the production had dropped so precipitously after the initial 24-hour period, and that current production was a fraction of the initial production mentioned in the release.

110.    In March 2015, BECC engaged an accounting firm to act as its outside auditor.  As part of the new auditor's review of BECC's quarterly results of operations, the firm's engagement partner questioned Wagers about the relationship between BECC and Crude.  The auditor concluded Crude should be consolidated with BECC based on the following:

a.    BECC participated in the formation of Crude to facilitate BECC's business;

b.    BECC makes the most impactful decisions for Crude, including the pricing of the working interests;

c.    BECC benefits economically because the pricing is established in such a way that Crude breaks even; and

d.    Crude's only source of prospects to offer to investors come from BECC.

The auditor also concluded that "Crude is so intertwined with Breitling that it is near impossible for Crude to act as a standalone and separate company."  None of this information was ever disclosed in public reports or otherwise to investors.

111.     However, on September 4, 2015, BECC issued a Form 8-K signed by Faulkner, acknowledging that *none* of the financial reports it filed after its merger with Bering Exploration should be relied upon "due to errors in the recording of oil and gas assets, revenue interests and drilling activities . . ."  It also disclosed that it failed to properly implement its internal controls over financial reporting in 2012, 2013, and 2014, and that it had ineffective disclosure controls and procedures in 2013 and 2014.   BECC represented that it was "still in the process of determining the extent of the errors" and that it would file amended Forms 10-K and 10-Q for each of the affected periods "as soon as practicable," acknowledging the possibility that further misstatements of its financial statements could occur if these failures were not remediated.   To date, BECC has neither amended these filings nor filed quarterly and annual reports on an on-going basis as it is required to do.

**BECC's misrepresentations and lies to auditors.**

112.     As noted in Paragraph 75 above, BOG sought and obtained an unqualified audit report in 2013 as part of its efforts to become publicly-traded BECC.   In connection with the auditor's work, Hoover, Wagers and Faulkner lied to the auditor about various aspects of BOG's past and BECC's future operations, including:  (i) the relationship between BECC and Crude; (ii) BECC's use of turnkey deals; and (iii) representations about Faulkner's expense reimbursements.

Relationship between BECC and Crude.

113.     During the audit of BECC's 2011, 2012, and 2013 financial statements – which reflected BOG's financials through the first week of December 2013 – BECC's initial auditor discussed the Crude ASA with Hoover and Wagers, and stated that there was the potential under GAAP (generally accepted accounting principles) that Crude's operations would need to be consolidated with BECC's for financial reporting purposes.

114.     In response to this query from the auditors, Hoover and Wagers lied to the auditors about the relationship between the two entities.   Hoover told the auditors that "[t]he agreements and legal work was structured early on to assure there was a clear delineation between" the two entities.   Wagers similarly told the auditors that Crude had very little to do with the future of BECC.   As detailed above, both of these statements were false, and Hoover and Wagers were at least negligent in making these statements.

<u>BECC's use of turnkey deals.</u>

115.     In January 2014, the auditors pressed BECC about whether it was going to continue offering turnkey deals to investors.   The audit engagement partner stated that it was his understanding that BECC would not be doing turnkey deals "because it creates several large issues, which also creates several audit issues."

116.     Wagers responded to the engagement partner, stating that "[t]here will be no new turnkey contracts."   Wagers was at least negligent in failing to disclose that BECC used Crude to sell turnkey offerings to investors, based on his intimate knowledge of BECC's relationship with Crude.

<u>Representations about Faulkner's expense reimbursements.</u>

117.     BECC's auditors could not find supporting documentation for a number of transactions, including a significant number of expense reimbursements for Faulkner.   As a result, the auditor determined that it needed Faulkner to represent that such expenses were for business expenses as part of its audit of BECC's financial statements.

118.     Faulkner signed a letter prepared by the auditor, representing that the millions of dollars he received from BOG were expense reimbursements for the benefit of BECC.   As

detailed above, Faulkner knew this representation was false and he was, *at the very least,* negligent in making this misrepresentation.

### Faulkner manipulated the market in BECC's stock by "marking the close."

119.    In late 2014, BECC's stock price suffered like that of many legitimate oil companies, dropping 36.7 percent from October 1, 2014 to November 28, 2014.

120.    To counteract this drop, Faulkner initiated a scheme in December 2014 to manipulate BECC's stock by executing purchase orders at or near the close of normal trading hours to influence the closing price – a practice known as "marking the close."  From December 2014 through February 2015, Faulkner heavily traded BECC through *at least* two nominee accounts: (i) a TD Ameritrade ("TDA") account in the name of Defendant Steedley ("Steedley Account"); and (ii) a TDA account in the name of Range Quest Resources, an entity he owned and controlled ("RQ Account").

121.    Faulkner made a concerted effort to conceal his trading.  He convinced Steedley to let him trade in the Steedley Account.  Steedley complied because Faulkner promised him BECC stock and the trading was intended to sustain the stock and create the appearance of active trading.  In addition to convincing Steedley to let him use the Steedley Account, Faulkner opened up the RQ Account with a brokerage application that omitted his affiliation with BECC. In fact, on the portion of the application for his employment, Faulkner listed his position as the sole officer and CEO of *Crude*.

122.    Next, Faulkner ensured that he could trade without using his own funds.  For the Steedley Account, Faulkner directed the transfer of more than $200,000 into the account via a series of wires and transfers with funds that can be traced back to investors.  Faulkner utilized a similar approach for the RQ Account.

123.    Faulkner traded *every trading day* during this three-month period from December 2014 through February 2015 through thousands of limit orders, which accounted for approximately 25% of BECC's trading volume during this period.  Faulkner's trading was so extensive that he alone accounted for more than 25% of BECC's trading volume on at least half of the days during this time period, and often accounted for more than 40%.

124.    As part of this high volume trading, Faulkner established a pattern of executing numerous buy orders shortly before the closing bell.  In fact, between December 4, 2014 and January 30, 2015, Faulkner marked the close of BECC's stock at least 24 times, setting the intraday trading high on at least six occasions with his last-minute trades.

125.    Faulkner's trades were done in an economically disadvantageous manner, plainly indicating his intent to manipulate the market for BECC's stock.  For example, in December 2014, TDA compliance personnel noted the following about the Steedley Account: "[o]ver the past week, the client has established a pattern of uneconomical (and possibly manipulative) trading in BECC.  Client paying $9.99 commission on orders up to $1000 on a low volume security with an average of $80K."   Ultimately, Faulkner paid thousands of dollars in commissions for various small lot trades he made throughout the day and to mark the close. More than half of his trades were for 1,000 shares or less, and more than a quarter were for 500 shares or less.  Faulkner's trading artificially sustained and increased BECC's stock price.

126.    From December 1, 2014 through March 2, 2015, BECC's stock price increased $0.02/share (a 4.2% increase), even though oil dropped 28% during this time frame. Additionally, companies in the energy sector typically saw stock price *decreases* during this time period.  The Russell 2000 Energy Index dropped 3.07%, and legitimate oil-and-gas E&P

companies suffered significant price drops.  Given the magnitude, timing, and prevalence of Faulkner's trades, Faulkner's trading helped sustain and increase BECC's stock price.

127.    In conjunction with these trades, Faulkner, as an officer of BECC, failed to file forms with the Commission reflecting changes in his beneficial ownership of BECC's stock, as required by Section 16 of the Exchange Act.

128.    Faulkner continued this pattern of trading until TDA shut down the Steedley and Range Quest accounts in early March 2015 for suspicious trading in BECC's stock.

**Transition from Crude to Patriot.**

129.    In early 2015, Hallam and Faulkner began to quarrel.  Even though Faulkner relied on Crude to fund BECC – and, in turn, his lavish lifestyle – Faulkner punished Hallam's perceived insubordination by once again pivoting the Faulkner Scheme.  In late March 2015, while Hallam was out of town, Faulkner coordinated the startup of a new entity – Patriot – to take Crude's place.  Faulkner changed the name of another shell company he owned (Simple Solutions, Inc.) to Patriot, and installed Miller as its President and its sole director, shareholder, and officer.  Since Faulkner controlled the Crude lease and its computers and servers, he moved almost all of this to a new suite he leased for Patriot's offices and instructed the Crude employees that they would now work for Patriot.  Upon Hallam's return, he saw that Crude had been effectively shut down.

130.    Faulkner and Handkins then set up new bank accounts styled as "Simple Solutions d/b/a Crude Energy" so that Patriot could intercept incoming checks from Crude investors who had invested in Crude offerings, and deposit them into an account that Patriot and Miller – and not Hallam – controlled.  Faulkner and Wagers then directed Miller, who was an officer and a managing member of Crude, to assign all of Crude's interests to Patriot to allow

operations to continue seamlessly without Hallam.  Patriot also became responsible for making ongoing expense payments for BOG's and Crude's prospects.

131.    Patriot ultimately took over Crude's sales staff and executed a nearly identical Administrative Services Agreement with BECC as the Crude ASA, albeit with significantly increased fees ($300,000 per month and $250,000 per prospect) (the "Patriot ASA").   Since April 2015, Patriot has played Crude's role, serving as BECC's covert sales arm via unregistered offerings of oil-and-gas investments and utilizing nearly indistinguishable offering materials drafted, edited, or approved by Faulkner.  Patriot's offering materials, signed by and attributed to Miller, include similar misrepresentations as those in Crude's offering documents.

132.    Patriot and Faulkner revised the AFE definition in the Patriot offering documents, but it was substantively the same.  As a result, investors were unable to assess what portion of their investment would actually be used for prospect-related expenses.

133.    And incredibly, even though he was Patriot's President and sole director, Miller never reviewed or edited Patriot's CIMs even though the statements therein were attributed solely to him.   Miller and the salespeople sent these Faulkner-drafted offering materials to investors and used them in selling the Patriot prospects.

134.    Patriot also took over Crude's role as the primary money source for BECC and Faulkner.   Handkins, who Faulkner transitioned from Crude to Patriot, continued managing investor lists and controlled Patriot's bank accounts.   At Faulkner's request and with Miller's knowledge, Handkins continued the pattern established at Crude and transferred millions of dollars of Patriot investor funds to BECC without regard for any specific prospect expenditure.  She also made more than $500,000 in Amex payments for Faulkner's personal Amex cards, and

more than $365,000 in additional payments to entities controlled by Faulkner. Handkins continued this conduct until her resignation in March 2016.

135. Meanwhile, BECC doubled down on its misrepresentations about the relationship between BECC and Crude by regurgitating similar falsehoods about its relationship with Patriot. In a May 1, 2015 Form 8-K signed by Faulkner, BECC disclosed the Patriot ASA and, similar to its disclosure about the Crude ASA, claimed that Patriot would pay BECC hundreds of thousands of dollars per month and per prospect. As with Crude, these statements were misleading. Patriot replaced Crude as BECC's sales arm in or around March 2015, and Patriot's operations – like Crude's – were consolidated with BECC. This consolidation created the misleading impression that Patriot could purchase services from, and generate millions of dollars in fees for, BECC. The Form 8-K also claimed that Miller "controlled" Patriot, which was at best false or misleading given Faulkner's control over Patriot's operations and Faulkner's drafting of Patriot's offering materials. And BECC affirmed its purported "strategic relationship" with Patriot in a June 25, 2015 Form 8-K signed by Faulkner.

136. Patriot offered working interests in four different prospects – the Blue Wolf, the Thoroughbred, the Cole, and the Black Bear. Remarkably, although Patriot raised millions of dollars from investors at a significant premium to the operator-provided AFEs, the operators for the prospects never received sufficient funds to put *any* of the Patriot prospects into production status. For example, investors sent Patriot approximately $3.3 million for its Thoroughbred offering. According to the operator AFE for the prospect, it would take less than $1.3 million to complete the prospect. However, Patriot and BECC remitted only $760,000 in payments to the operator, the bare minimum to drill the prospect and comply with the Farmout Agreement's continuous drilling provisions. The rest of the investor funds were commingled with other

Patriot investors' funds and then used for expenses completely unrelated to the Thoroughbred. Thus, despite raising millions of dollars more than the actual costs, neither Patriot nor BECC provided sufficient funds to complete the prospect and put it into production.

137.    In April 2016, with money running out, BECC failed to comply with the continuous drilling provision of the Farmout Agreement.  As a result, portions of the land associated with the Farmout Agreement have reverted back to the landowner.  Additionally, the landowner is seeking the return of multiple prospects that have not been completed in accordance with the Farmout Agreement, including the Thoroughbred.  As previously discussed above, neither Crude nor Patriot (nor Hallam and Miller) disclosed the Farmout Agreement, the continuous drilling provisions contained therein, or the risk that investors would lose their entire interest if these provisions were not satisfied.

## FIRST CLAIM FOR RELIEF

### Violations of the Antifraud Provisions of the Securities Act
### Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]

[against Defendants Christopher A. Faulkner, Parker Hallam,
Dustin Michael Miller Rodriguez, Joseph Simo,
Beth Handkins, Breitling Oil & Gas Corporation,
Crude Energy, LLC, and Patriot Energy, Inc.]

138.    The Commission repeats and re-alleges Paragraphs 1 through 137 of this Complaint, as if fully set forth herein.

139.    By engaging in the conduct described herein, Faulkner, Hallam, Miller, Simo, Handkins, BOG, Crude, and Patriot, directly or indirectly, singly or in concert, in the offer or sale of securities, by use of the means or instrumentalities of interstate commerce or of the mails, knowingly or with severe recklessness, employed devices, schemes, or artifices to defraud.

140. By engaging in the conduct described herein, Faulkner, Hallam, Miller, Simo, BOG, Crude, and Patriot, directly or indirectly, singly or in concert, in the offer or sale of securities, by use of the means or instrumentalities of interstate commerce or of the mails, and at least negligently, obtained money or property by means of untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

141. By engaging in the conduct described above, Faulkner, Hallam, Miller, Simo, Handkins, BOG, Crude, and Patriot, directly or indirectly, singly or in concert, in the offer or sale of securities, by use of the means or instrumentalities of interstate commerce or of the mails, and at least negligently, engaged in transactions, practices, and/or courses of business which operate as a fraud or deceit upon purchasers, prospective purchasers, and other persons.

142. By engaging in this conduct, Faulkner, Hallam, Miller, Simo, BOG, Crude, and Patriot violated, and unless enjoined will continue to violate, Sections 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)].

143. By engaging in this conduct, Handkins violated, and unless enjoined will continue to violate, Sections 17(a)(1) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and 77q(a)(3)]

## SECOND CLAIM FOR RELIEF

### Violations of Antifraud Provisions of the Exchange Act
### Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5]

[against Defendants Christopher A. Faulkner, Breitling Energy Corporation,
Jeremy Wagers, Judson F. "Rick" Hoover, Parker Hallam,
Dustin Michael Miller Rodriguez, Joseph Simo, Beth Handkins,
Breitling Oil & Gas Corporation, Crude Energy, LLC, and Patriot Energy, Inc;
aiding-and-abetting by Defendant Gilbert Steedley]

144.    The Commission repeats and re-alleges Paragraphs 1 through 137 of this Complaint, as if fully set forth herein.

145.    By engaging in the foregoing misconduct, Faulkner, BECC, Wagers, Hoover, Hallam, Miller, Simo, BOG, Crude, and Patriot, in connection with the purchase or sale of securities, by use of means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, directly or indirectly: (i) employed devices, schemes, or artifices to defraud; (ii) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engaged in acts, practices, and courses of business which operate as a fraud or deceit upon persons, including purchasers or sellers of securities.

146.    By engaging in the foregoing misconduct, Handkins, in connection with the purchase or sale of securities, by use of means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, directly or indirectly: (i) employed devices, schemes, or artifices to defraud; and (iii) engaged in acts, practices, and courses of business which operate as a fraud or deceit upon persons, including purchasers or sellers of securities.

147.    Faulkner, BECC, Wagers, Hoover, Hallam, Miller, Simo, Handkins, BOG, Crude, and Patriot engaged in the above-referenced conduct knowingly or with severe recklessness.

148.    By engaging in the foregoing misconduct, Steedley knowingly or recklessly aided and abetted, pursuant to Section 20(e) of the Exchange Act, Faulkner's fraudulent and manipulative purchases of BECC stock, which by use of means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, directly or indirectly: (i) employed devices, schemes, or artifices to defraud; and (iii) engaged in acts, practices, and courses of business which operate as a fraud or deceit upon persons, including purchasers or sellers of securities.

149.    By engaging in this conduct, Faulkner, BECC, Wagers, Hoover, Hallam, Miller, Simo, BOG, Crude, and Patriot violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a), 10b-5(b), and 10b-5(c) thereunder [17 C.F.R. § 240.10b-5].

150.    By engaging in this conduct, Handkins violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and 10b-5(c) thereunder [17 C.F.R. §§ 240.10b-5(a), 240.10b-5(c)].

151.    By engaging in this conduct, Steedley aided and abetted, and unless enjoined will continue to aid-and-abet, violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and 10b-5(c) thereunder [17 C.F.R. §§ 240.10b-5(a), 240.10b-5(c)].

## THIRD CLAIM FOR RELIEF

### Violations of the Securities Registration Provisions of the Securities Act
### Section 5 [15 U.S.C. §§ 77e]

[against Defendants Christopher A. Faulkner, Parker Hallam,
Dustin Michael Miller Rodriguez, Breitling Oil & Gas Corporation,
Crude Energy, LLC, and Patriot Energy, Inc.]

152.    The Commission repeats and re-alleges Paragraphs 1 through 137 of this Complaint, as if fully set forth herein.

153.    By their conduct as alleged above, Faulkner, Hallam, Miller, BOG, Crude, and Patriot, directly or indirectly, singly or in concert with others, (i) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of written contracts, offering documents, or otherwise, securities as to which no registration statement was in effect; (ii) for the purpose of sale or delivery after sale, carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, securities as to which no registration statement was in effect; or (iii) made use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell, through the use or medium of written contracts, offering documents, or otherwise, securities as to which no registration statement had been filed.

154.    By engaging in this conduct, Faulkner, Hallam, Miller, BOG, Crude, and Patriot have violated, and unless enjoined, will continue to violate Section 5 of the Securities Act [15 U.S.C. § 77e].

## FOURTH CLAIM FOR RELIEF

### Violations of Reporting Provisions of the Exchange Act
### Section 13(a), and Rules 12b-20, 13a-1, 13a-11, 13a-13
### [15 U.S.C. § 78m(a) and 17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13 ]

[against Defendant Breitling Energy Corporation; aided-and-abetted by
Defendants Christopher Faulkner, Jeremy Wagers, and Judson F. "Rick" Hoover]

155.    The Commission repeats and re-alleges Paragraphs 1 through 137 of this
Complaint, as if fully set forth herein.

156.    By engaging in the foregoing misconduct, BECC, whose securities are registered
pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l], failed to file annual, quarterly, and
periodic reports (on Forms 10-K, 10-Q, and 8-K) with the Commission that were true and
correct, and failed to include material information in its required statements and reports as was
necessary to make the statements made, in light of the circumstances under which they were
made, not misleading.

157.    By engaging in the foregoing misconduct, BECC violated, and unless enjoined
will continue to violate, Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and
13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13].

158.    Faulkner, Wagers, and Hoover, pursuant to Section 20(e) of the Exchange Act,
knowingly or recklessly provided substantial assistance to BECC in its violations of Section
13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R.
§§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13].

159.    By reason of the foregoing, Faulkner, Wagers, and Hoover aided and abetted
BECC's violations and, unless restrained and enjoined, will continue to aid and abet such
violations, of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1,
13a-11, and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13].

## FIFTH CLAIM FOR RELIEF

**Violations of the Books and Records and Internal Controls Provisions of the Exchange Act
Section 13(b)(2)(A) and 13(b)(2)(B) [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)]**

[against Defendant Breitling Energy Corporation; aided-and-abetted by
Defendants Christopher Faulkner, Jeremy Wagers, and Judson F. "Rick" Hoover]

160.    The Commission repeats and re-alleges Paragraphs 1 through 137 of this Complaint, as if fully set forth herein.

161.    By engaging in the foregoing misconduct, BECC, whose securities were registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l]:

    a.    failed to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected the transactions and disposition of its assets; and

    b.    failed to devise and maintain a system of internal controls sufficient to provide reasonable assurances that: (i) transactions were recorded as necessary to permit preparation of financial statements in conformity with GAAP or any other criteria applicable to such statements, and (ii) to maintain accountability of assets.

162.    By engaging in the foregoing misconduct, BECC violated and, unless enjoined, will continue to violate Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)].

163.    Faulkner, Wagers, and Hoover knowingly or recklessly provided substantial assistance to Defendant BECC in its failure to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflected the transactions and dispositions of the assets of Defendant BECC.

164.    By reason of the foregoing, Faulkner, Wagers, and Hoover aided and abetted, pursuant to Section 20(e) of the Exchange Act, BECC's violations and, unless restrained and

enjoined, will continue to aid and abet such violations of Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

165.    Faulkner, Wagers, and Hoover knowingly or recklessly provided substantial assistance to Defendant BECC in its failure to devise and maintain a sufficient system of internal accounting controls.

166.    By reason of the foregoing, Faulkner, Wagers, and Hoover aided and abetted, pursuant to Section 20(e) of the Exchange Act, BECC's violations and, unless restrained or enjoined, will continue to aid and abet such violations of Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)].

## SIXTH CLAIM FOR RELIEF

**Circumventing or Failing to Implement Internal Controls under Exchange Act Section 13(b)(5) [15 U.S.C. § 78m(b)(5)] and Rule 13b2-1 [17 C.F.R. § 240.13b2-1]**

[against Defendants Christopher Faulkner, Jeremy Wagers, and Judson F. "Rick" Hoover]

167.    The Commission repeats and re-alleges Paragraphs 1 through 137 of this Complaint, as if fully set forth herein.

168.    By engaging in the foregoing misconduct, Faulkner, Wagers, and Hoover, as officers of BECC: (i) knowingly circumvented or knowingly failed to implement a system of internal accounting controls; or (ii) knowingly falsified, or caused to be falsified, BECC's books, records, and/or accounts of BECC.

169.    As a result of their conduct, Faulkner, Wagers, and Hoover violated and, unless enjoined, will continue to violate Section 13(b)(5) [15 U.S.C. § 78m(b)(5)] of the Exchange Act and Rule 13b2-1 thereunder [17 C.F.R. § 240.13b2-1] by, directly or indirectly, falsifying or causing to be falsified, the books, records, or accounts of Defendant BECC, subject to Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

### SEVENTH CLAIM FOR RELIEF

**Misrepresentations and Misconduct in Connection with
the Preparation of Required Reports
Exchange Act Rule 13b2-2 [17 C.F.R. § 240.13b2-2]**

[against Defendants Christopher Faulkner, Jeremy Wagers, and Judson F. "Rick" Hoover]

170.    The Commission repeats and re-alleges Paragraphs 1 through 137 of this Complaint, as if fully set forth herein.

171.    By engaging in the foregoing misconduct, Faulkner, Wagers, and Hoover, officers of BECC, violated Exchange Act Rule 13b2-2(a) [17 C.F.R. § 240.13b2-2(a)] by, directly or indirectly, making, or causing to be made, materially false or misleading statements, or omitting to state, or causing another person to omit to state, material facts necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading, to an accountant in connection with (i) an audit, review, or examination of the financial statements of Defendant required to be made pursuant to Commission rules, or (ii) the preparation or filing of documents or reports required to be filed with the Commission.

172.    By engaging in the foregoing misconduct, Faulkner, Wagers, and Hoover, officers of BECC, violated Exchange Act Rule 13b2-2(b) [17 C.F.R. § 240.13b2-2(b)] by directly or indirectly taking action, or directing another to take action, to coerce, manipulate, mislead, or fraudulently influence an independent public or certified public accountant engaged in the performance of an audit or review of the financial statements of BECC required to be filed with the Commission while they knew or should have known that such action(s), if successful, could result in rendering BECC's financial statements materially misleading.

173.    As a result of their conduct, Faulkner, Wagers, and Hoover violated and, unless enjoined will continue to violate, Exchange Act Rule 13b2 [17 C.F.R. § 240.13b2-2].

## EIGHTH CLAIM FOR RELIEF

**Violations of Certification Rules of the Exchange Act**
**Exchange Act Rule 13a-14 [17 C.F.R. § 240.13a-14]**

[against Defendants Christopher Faulkner and Judson F. "Rick" Hoover]

174.    The Commission repeats and re-alleges Paragraphs 1 through 137 of this Complaint, as if fully set forth herein.

175.    On the following dates, acting under Section 302 of the Sarbanes-Oxley Act of 2002 and Exchange Act Rule 13a-14, Faulkner and Hoover certified Forms 10-K and 10-Q on behalf of BECC: March 31, 2014 (2013 Form 10-K), May 14, 2014 (Form 10-Q for Q1-2014), August 13, 2014 (10-Q for Q2-2014), and November 13, 2014 (10-Q for Q3-2014).

176.    Specifically, Faulkner and Hoover certified that they had reviewed these reports and that, based on their respective knowledge, the reports did not contain any untrue statements of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and, based on their knowledge, the financial statements and other financial information included in the reports, fairly presented in all material respects the financial condition, results of operations, and cash flows of BECC of, and for, the periods presented in the reports.

177.    At the time that Faulkner and Hoover issued these certifications they knew or were severely reckless in not knowing that the reports they certified contained untrue statements of material facts and/or omitted to state material facts necessary to make the statements made therein, in light of the circumstances under which they were made, not misleading.

178.    By reason of the foregoing, Faulkner and Hoover violated, and unless enjoined will continue to violate, Exchange Act Rule 13a-14 [17 C.F.R. § 240.13a-14] promulgated under Section 302 of the Sarbanes-Oxley Act of 2002.

## NINTH CLAIM FOR RELIEF

**Proxy Violations of the Exchange Act**
**Section 14(a) and Rule 14a-9 [15 U.S.C. § 78n(a) and 17 C.F.R. § 240.14a-9]**

[against Defendants Breitling Energy Corporation and Jeremy Wagers]

179.     The Commission repeats and re-alleges Paragraphs 1 through 137 of this Complaint, as if fully set forth herein.

180.     On April 30, 2014, BECC filed a definitive proxy statement, despite knowing that representations or disclosures contained within the proxy statement, at the time and in light of the circumstances in which they were made, were false and misleading with respect to material facts, or omitted to state material facts necessary in order to make the representations or disclosures not false or misleading or necessary to correct statements which were false or misleading.  Wagers signed the proxy statement despite knowing that these statements were false or misleading, or that they contained omissions of material facts necessary in order to make the statements therein not false or misleading or necessary to correct any statement which was false and misleading.

181.     BECC and Wagers, by use of the mails or any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission has prescribed as necessary or appropriate for the public interest or for the protection of investors, have: (a) solicited or permitted the use of its name to solicit any proxy or consent or authorization in respect of any of BECC, a security registered pursuant to Section 12 of the Exchange Act; or (b) solicited by means of any proxy statement, a form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in light of the circumstances in which it was made, was false or misleading with respect to any material fact, or which omitted to state any material fact necessary in order to make the statements therein not false or misleading

or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

182.    By reason of the foregoing, BECC and Wagers have violated, and unless enjoined will continue to violate, Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)] and Rule 14a-9 [17 C.F.R. § 240.14a-19].

## TENTH CLAIM FOR RELIEF

**Violation of the Beneficial Ownership Reporting Requirements of the Exchange Act Section 16(a) and Rule 16a-3 [15 U.S.C. § 78p(a) and 17 C.F.R. § 240.16a-3]**

[against Defendant Christopher Faulkner]

183.    The Commission repeats and re-alleges Paragraphs 1 through 137 of this Complaint, as if fully set forth herein.

184.    The common stock of BECC is registered with the Commission under Section 12(g) of the Exchange Act and is quoted on the OTC Link, operated by OTC Markets Group, Inc.

185.    During all relevant time periods, Faulkner, directly or indirectly, beneficially owned more than 10 percent of the issued and outstanding shares of stock in BECC, and met the definition of a "person" as defined in Rule 16(a)(1) of the Exchange Act [17 C.F.R. § 240.16a-1] as to trading in BECC securities.

186.    Section 16(a) of the Exchange Act [15 U.S.C. § 78p(a)] mandates that officers, directors, and persons that directly or indirectly beneficially own more than 10 percent of any class of any registered security periodically file statements with the Commission regarding changes in their ownership of that security.

187.    Faulkner, directly or indirectly, beneficially owned more than 10 percent of the issued and outstanding shares of stock in BECC.

188.    Faulkner was required to file Forms 4 with the Commission when there was a change in his beneficial ownership of BECC stock during a month.

189.    By engaging in the conduct described above, Faulkner did not file statements with the Commission to report changes in his direct or indirect beneficial ownership of BECC stock, as required by Section 16(a) of the Exchange Act and Rule 16a-3 thereunder.

190.    By engaging in the conduct described above, Faulkner violated, and unless enjoined will continue to violate, Section 16(a) of the Exchange Act [15 U.S.C. § 78p(a)] and Rule 16a-3 thereunder [17 C.F.R. § 240.16a-3].

## ELEVENTH CLAIM FOR RELIEF

### Equitable claim against Relief Defendants
[against Relief Defendants Tamra M. Freedman and Jetmir Ahmedi]

191.    The Commission repeats and re-alleges Paragraphs 1 through 137 of this Complaint, as if fully set forth herein.

192.    Tamra M. Freedman and Jetmir Ahmedi, directly or indirectly, received funds or benefitted from the use of funds, which are proceeds of the unlawful activity alleged above. They obtained funds and property, directly or indirectly, from Faulkner that were obtained by him as a result of the securities law violations described herein.

193.    Freedman and Ahmedi have no legitimate claims to such funds received, or from which they otherwise benefitted from, directly or indirectly.

194.    The Commission is entitled to an order, pursuant to common law equitable principles – such as disgorgement, unjust enrichment, and constructive trust – and pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)], requiring Freedman and Ahmedi

to disgorge all of the proceeds they received, either directly or indirectly, from Faulkner that he derived from the illegal activities described above.

195.    As a result of the conduct described above, Defendants Freedman and Ahmedi should disgorge their ill-gotten gains, plus prejudgment interest thereon.

## PRAYER FOR RELIEF

For these reasons, the Commission respectfully asks the Court to enter a final judgment:

1.    permanently enjoining Christopher A. Faulkner from:

    a.    violating Sections 5 and 17(a) of the Securities Act and Sections 10(b), 13(b)(5), and 16(a) of the Exchange Act and Rules 10b-5, 13a-14, 13b2-1, 13b2-2, and 16a-3 thereunder, and from aiding-and-abetting violations of Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act and Rules 13a-1, 13a-11, 13a-13, and 12b-20 thereunder; and

    b.    participating, directly or indirectly, including, but not limited to, through any entity owned or controlled by him, in the issuance, purchase, offer, or sale of any unregistered securities, provided however that such injunction shall not prevent him from purchasing or selling securities for his own personal account.

2.    permanently enjoining Breitling Energy Corporation from violating Sections 10(b), 13(a), 13(b)(2)(A), 13(b)(2)(B), and 14(a) of the Exchange Act and Rules 10b-5, 13a-1, 13a-11, 13a-13, 12b-20, and 14a-9 thereunder.

3.    permanently enjoining Jeremy S. Wagers from:

    a.    violating Sections 10(b) and 14(a) of the Exchange Act and Rules 10b-5, 13b2-1, 13b2-2, and 14a-9 thereunder, and from aiding-and-abetting violations of Section 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act and Rules 13a-1, 13a-11, 13a-13, and 12b-20 thereunder; and

    b.    participating, directly or indirectly, including, but not limited to, through any entity owned or controlled by him, in the issuance, purchase, offer, or sale of any unregistered securities, provided however that such injunction shall not prevent him from purchasing or selling securities for his own personal account.

4.    permanently enjoining Judson F. "Rick" Hoover from violating Section 10(b) of the Exchange Act and Rules 10b-5, 13a-14, 13b2-1, and 13b2-2 thereunder, and from aiding-and-abetting violations of Sections 13(a), 13(b)(2)(A), and

13(b)(2)(B) of the Exchange Act and Rules 13a-1, 13a-11, 13a-13, and 12b-20 thereunder.

5.    permanently enjoining Parker R. Hallam from:

    a.    violating Sections 5 and 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder; and

    b.    participating, directly or indirectly, including, but not limited to, through any entity owned or controlled by him, in the issuance, purchase, offer, or sale of any unregistered securities, provided however that such injunction shall not prevent him from purchasing or selling securities for his own personal account.

6.    permanently enjoining Joseph Simo from violating Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rules 10b-5 thereunder.

7.    permanently enjoining Dustin Michael Miller Rodriguez from:

    a.    violating Sections 5 and 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder; and

    b.    participating, directly or indirectly, including, but not limited to, through any entity owned or controlled by him, in the issuance, purchase, offer, or sale of any unregistered securities, provided however that such injunction shall not prevent him from purchasing or selling securities for his own personal account.

8.    permanently enjoining Beth Handkins from violating Sections 17(a)(1) and 17(a)(3) of the Securities Act and Section 10(b) of the Exchange Act and Rules 10b-5(a) and 10b-5(c) thereunder.

9.    permanently enjoining Gilbert Steedley from aiding-and-abetting violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and 10b5-(c) thereunder.

10.    permanently enjoining Breitling Oil & Gas Corporation from violating Sections 5 and 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

11.    permanently enjoining Crude Energy, LLC from violating Sections 5 and 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

12.    permanently enjoining Patriot Energy, Inc. from violating Sections 5 and 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

13.     ordering all the Defendants and Relief Defendants to disgorge ill-gotten gains and benefits obtained or to which they were not otherwise entitled, as a result of the violations alleged herein, plus prejudgment interest on those amounts;

14.     ordering all the Defendants to pay civil penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

15.     ordering that Faulkner, Wagers, Hoover, Hallam, Miller, and Handkins are barred, pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], from serving as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l], or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)];

16.     ordering that Faulkner is barred, pursuant to Section 20(g)(1) of the Securities Act [15 U.S.C. § 77t(g)(1)] and Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)], from participating in any offering of a penny stock; and

17.     granting such additional relief as the Court deems just, appropriate, and equitable.


Respectfully submitted,


DATED:  June 24, 2016

_____
B. DAVID FRASER
Lead Attorney
Texas Bar No. 24012654
SCOTT MASCIANICA
Texas Bar No. 24072222
SECURITIES AND EXCHANGE COMMISSION
Burnett Plaza, Suite 1900
801 Cherry St., Unit #18
Fort Worth, TX 76102-6882
(817) 978-1409
(817) 978-4927 (fax)
FraserB@sec.gov

ATTORNEY FOR PLAINTIFF
SECURITIES AND EXCHANGE COMMISSION