IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| Plaintiff, | § § | Civil Action No. 3:16-CV-1735-D |
| VS. | § § | |
| CHRISTOPHER A. FAULKNER, et al., | § § | |
| Defendants. | § § | |

MEMORANDUM OPINION
AND ORDER

The court-appointed temporary receiver ("Receiver") moves to hold defendants Christopher A. Faulkner ("Faulkner"), Breitling Oil & Gas Corporation ("BOG"), and Breitling Energy Corporation ("BECC"), and nonparties Carole Faulkner, Esquire ("Carole") (Faulkner's mother), Breitling Royalties Corporation ("BRC"),[1] and U.S. Property Investments, Inc. ("USPI") in civil contempt for violating three court orders: the August 14, 2017 order appointing a temporary receiver ("August 14 Receivership Order"), the August 14, 2017 order freezing defendants' assets ("August 14 Asset Freeze Order") (collectively, the "August 14 Orders"), and the September 25, 2017 order appointing a temporary receiver ("September 25 Receivership Order"). Following an evidentiary hearing, the court finds by clear and convincing evidence that Faulkner violated the August 14 Orders and the September 25 Receivership Order; that BECC and BOG violated the August 14 Orders; that

_____

[1]BRC is referred to in the court's show cause orders as "Breitling *Royalty* Corporation."

BRC knowingly aided and abetted Faulkner in violating the August 14 Orders; and that Carole and USPI knowingly aided and abetted Faulkner in violating the September 25 Receivership Order. The court therefore holds Faulkner, BECC, BOG, Carole, BRC, and USPI (collectively, "respondents," unless the context otherwise requires) in civil contempt to the extent set forth in this memorandum opinion and order and otherwise denies the Receiver's motions.

I

In 2016 the U.S. Securities and Exchange Commission ("SEC") filed this lawsuit against Faulkner, BECC, Jeremy S. Wagers, Judson F. Hoover, Parker R. Hallam ("Hallam"), Joseph Simo, Dustin Michael Miller Rodriguez ("Miller"), Beth C. Handkins, Gilbert Steedley, BOG, Crude Energy, LLC ("Crude"), and Patriot Energy, Inc. ("Patriot").[2] The SEC alleges that, since 2011, Faulkner and his codefendants have orchestrated a massive scheme to defraud investors in Faulkner's oil and gas companies of approximately $80 million. According to the SEC, in carrying out this scheme, Faulkner and other defendants violated § 17(a) of the Securities Act of 1933, § 10(b) of the Securities Exchange Act of 1934, and SEC Rule 10b-5, promulgated thereunder. BRC—a corporation that the SEC alleges Faulkner, Hallam, and Miller each own one-third apiece—is designated as a "Related Entity" in the complaint and first amended complaint.

In 2017 the SEC filed a motion for a preliminary injunction, *ex parte* temporary

---

[2]The SEC also sued Tamra M. Freedman and Jetmir Ahmedi as relief defendants.

restraining order, asset freeze, appointment of a receiver to conserve the assets of Faulkner,

BECC, and BOG (collectively, the "Receivership Defendants"), and other ancillary relief

(including a sworn accounting, document preservation, and expedited discovery). The SEC

alleged that, after it filed suit, the Receivership Defendants continued to defraud investors

out of an additional $110,000 in oil and gas production revenues. On August 14, 2017 the

court entered the August 14 Orders, appointing a temporary receiver and granting a

temporary restraining order and asset freeze order. The court allowed the parties to submit

additional briefing regarding the remaining relief that the SEC requested.

The August 14 Orders pertained to the Receivership Assets, which at the time were

limited to

> all oil-and-gas related assets—in any form or of any kind
> whatsoever—owned controlled, possessed, or managed, directly
> or indirectly, by Defendants Christopher A. Faulkner, [BOG],
> and [BECC], including all oil-and-gas related revenue from oil-
> and-gas operators or others payable to any of the Receivership
> Defendants, and all oil-and-gas assets held in the name of any
> of the Receivership Defendants.

Aug. 14 Receivership Order at 1-2. Under these orders, all Receivership Assets were

"frozen until further order of this Court," and "all persons and entities with direct or indirect

control over any of the Receivership Assets, other than the Receiver, [were] hereby

restrained and enjoined from directly transferring, . . . secreting, diverting, [or] rerouting . . .

such assets." *Id.* at 2. The August 14 Receivership Order further directed all persons and

entities with control of the Receivership Assets to turn over all such assets and related books,

records, and accounts.  *Id.* at 4.  The August 14 Orders also allowed the Receiver to take possession of the Receivership Defendants' private mailbox located in Colleyville, Texas (the "Colleyville Mailbox"), and barred the Receivership Defendants from "open[ing] a new mailbox, or tak[ing] any steps . . . to receive mail in contravention of this Order."  *Id.* at 5-6.

On September 5, 2017 the Receiver filed his first motion to show cause, seeking to hold the Receivership Defendants and nonparties Carole and BRC in civil contempt for violating the August 14 Orders.  The Receiver lists two groups of violations.  He first alleges that the Receivership Defendants and Carole deliberately concealed attempts—before and after entry of the August 14 Orders—to direct Receivership Defendants' mail away from the Colleyville Mailbox to a different private mailbox located in Grapevine, Texas (the "Grapevine Mailbox").  The Receiver alleges that this conduct violated the August 14 Orders' asset freeze, mail, and interference provisions.  He also maintains that the Receivership Defendants failed to turn over the oil and gas related assets of BRC, failed to make corporate representatives available for an interview with the Receiver, and failed to turn over mail addressed to the Receivership Defendants.  The Receiver alleges that this conduct violated August 14 Orders' cooperation, mail, and turn over provisions.  The court entered a show cause order on September 6, 2017.

On September 25, 2017, after all parties had the opportunity to submit briefing on the SEC's additional requested relief, the court issued the September 25 Receivership Order. This order expands the scope of Receivership Assets from only those related to oil and gas

activities to "all assets—in any form or of any kind whatsoever—owned, controlled, managed, or possessed by [the Receivership Defendants], directly or indirectly." Sept. 25 Receivership Order at 1. The Receivership Estate collectively consists of

> all Receivership Assets, including, but not limited to, monies, funds, securities, credits, effects, goods, chattels, lands, premises, leases, claims, rights, and other assets, together with all rents, profits, dividends, interest, or other income attributable thereto, of whatever kinds, that the Receivership Defendants own, possess, have a beneficial interest in, or control directly or indirectly.

*Id.* at 3. The September 25 Receivership Order

> restrained and enjoined [all persons with direct or indirect control over any Receivership Assets receiving notice of the order] from directly or indirectly taking any action . . . that would . . . A. interfere with the Receiver's efforts to take control, possession or management of any Receivership Assets; . . . B. hinder, obstruct or otherwise interfere with the Receiver in the performance of his duties; . . . or, D. interfere with or harass the Receiver . . . .

*Id.* at 2-3.

On October 22, 2017 the Receiver moved to amend the court's prior order to show cause, now alleging that Faulkner and Carole should be held in civil contempt for violating the September 25 Receivership Order. The Receiver contends that Faulkner and Carole have taken numerous actions to conceal the sum of $210,000 from the Receiver. The Receiver maintains that this money represents part of the proceeds from Faulkner's sale of a technology company—RackAlley, LLC ("RackAlley")—of which he was a partial owner. The court entered a second show cause order on October 23, 2017.

On November 30, 2017 the Receiver again moved to amend the court's prior order to show cause. He alleged that, in addition to the aforementioned conduct, Carole and an additional nonparty, USPI, filed a lawsuit against the Receiver in California state court without leave of this court. The Receiver contends that this violates the September 25 Receivership Order and that Carole and USPI should be held in civil contempt.

Respondents oppose the Receiver's motion and amended motions. The court has conducted an evidentiary hearing and now enters its ruling.

## II

To prove that Faulkner, BECC, and BOG should be held in civil contempt, the Receiver "must establish by clear and convincing evidence that (1) a court order was in effect, (2) the order required specified conduct by the respondent, and (3) the respondent failed to comply with the court's order." *United States v. City of Jackson, Miss.*, 359 F.3d 727, 731 (5th Cir. 2004). "The contemptuous actions need not be willful so long as the contemnor actually failed to comply with the court's order." *Am. Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 581 (5th Cir. 2000) (citing *NLRB v. Trailways, Inc.*, 1013, 1017 (5th Cir. 1984)). "'[I]n civil contempt proceedings the question is not one of intent but whether the alleged contemnors have complied with the court's order.'" *Jim Walter Res., Inc. v. Int'l Union, United Mine Workers of Am.*, 609 F.2d 165, 168 (5th Cir. 1980) (quoting *United States v. Ross*, 243 F. Supp. 496, 499 (S.D.N.Y. 1965)). "Good faith is not a defense to a civil contempt; the question is whether the alleged contemnor complied with the court's

order." *Chao v. Transocean Offshore*, 276 F.3d 725, 728 (5th Cir. 2002). These principles of intent apply to Faulkner, BECC, and BOG, as defendants in this action, but not to Carole, BRC, and USPI, who are nonparties. Nonparties may also be held in civil contempt, but they must act with actual notice of the court's order and knowingly aid and abet another in violating the order. *See NLRB v. Laborers' Int'l Union of N. Am., AFL-CIO*, 882 F.2d 949, 954 (5th Cir. 1989); *Waffenschmidt v. Mackay*, 763 F.2d 711, 714 (5th Cir. 1985). "Although good faith is not a defense to a civil contempt order, good faith is relevant to whether a non-party knowingly aided or abetted another in violating a court order." *Whitcraft v. Brown*, 570 F.3d 268, 272 (5th Cir. 2009) (citing *Waffenschmidt*, 763 F.2d at 726).

In the contempt context, "clear and convincing evidence" is

> that weight of proof which produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations ought to be established, evidence so clear, direct, weighty and convincing as to enable the fact finder to come to a clear conviction, without hesitancy, of the truth of the precise facts of the case.

*Travelhost, Inc. v. Blandford*, 68 F.3d 958, 961 (5th Cir. 1995) (internal quotation marks omitted) (quoting *In re Medrano*, 956 F.2d 101, 102 (5th Cir. 1992) (adopting in contempt context definition of clear and convincing evidence used in attorney disbarment proceeding).

III

The court begins by examining the alleged conduct surrounding the Colleyville and Grapevine mailboxes.

A

The Receiver maintains that Faulkner, BECC, BOG, and Carole deliberately concealed the fact that, before the August 14 Orders were entered, they had effected changes of addresses for the Receivership Defendants' mail from the Colleyville Mailbox to the Grapevine Mailbox; that Faulkner and BRC effected a change of address after the August 14 Orders were entered for oil and gas payments to BRC; and that Carole attempted to access the Grapevine Mailbox and mail related to the Receivership Assets after the August 14 Orders were entered and the Receiver made multiple demands to turn over Receivership Assets and records related to BRC. The Receiver contends that this conduct violated the asset freeze, mail, and interference provisions of the August 14 Orders.

Respondents contend that their conduct does not warrant holding them in contempt. They posit that the August 14 Orders are vague as to whether they apply to BRC and BRC's assets. Faulkner maintains that because the August 14 Orders are not clear and unambiguous, he cannot be held in contempt for diverting BRC's mail. Similarly, Carole asserts that she interpreted the August 14 Orders to not apply to BRC or its assets. She contends that, because her interpretation was made in good faith, she cannot be held in contempt.

- 8 -

The Asset Freeze Provision of the August 14 Orders states that "all Receivership Assets are frozen until further order of this Court." Aug. 14 Receivership Order at 2.[3] This provision enjoins anyone with direct or indirect control over such assets from "receiving, changing selling, pledging, assigning, secreting, diverting, rerouting, liquidating, or otherwise disposing of or withdrawing such assets," and directs that they "relinquish such possession, custody, or control to the Receiver." *Id.* The Asset Freeze specifically includes "oil-and-gas production revenue checks or proceeds in the possession or control of any of the Receivership defendants." *Id.* at 2-3.

The August 14 Orders also authorize the Receiver "to take immediate possession, custody and control of [the Colleyville Mailbox] and all other private mail boxes and post-office boxes that have received oil-and-gas revenue in the name, on behalf, or for the benefit of any of the Receivership Defendants since April 1, 2016." *Id.* at 5. The Receiver is further authorized to open all mail received by these mailboxes. *Id.* The August 14 Orders instruct

---

[3]The August 14 Orders define Receivership Assets as

> all oil-and-gas related assets—in any form or of any kind whatsoever—owned controlled, possessed, or managed, directly or indirectly, by Defendants [Faulkner], [BOG], and [BECC], including all oil-and-gas related revenue from oil-and-gas operators or other payable to any of the Receivership Defendants, and all oil-and-gas assets held in the name of any of the Receivership Defendants.

Aug. 14 Receivership Order at 1-2.

that the "Receivership Defendants shall not open a new mailbox, or take any steps or make any arrangements to receive mail in contravention of this Order." *Id.* at 6.

The Interference provisions of the August 14 Orders prohibit the Receivership Defendants and all persons receiving notice of the order from "interfer[ing] with the Receiver's efforts to take control, possession, or management of any Receivership Assets"; "destroying or altering records or information"; or "interfer[ing] with or harrass[ing] the Receiver." *Id.* at 7-8.

C

The court first addresses Faulkner's conduct.[4]  The evidence presented at the hearing establishes that, after the court entered the August 14 Orders, Faulkner attempted to change the address at which BRC would receive oil and gas revenues.  The day after the court entered the August 14 Orders, Faulkner emailed change of address forms to an oil and gas producer, Chesapeake Energy ("Chesapeake").  That same day, he also mailed these forms to Chesapeake's Revenue Distribution Department.  These forms changed the "Check/Revenue Address" for BRC from the Colleyville Mailbox to the Grapevine Mailbox. Patrick Craine, Esquire, Chesapeake's Deputy General Counsel and Chief Risk and Compliance Officer, testified that Chesapeake provides these forms to its business partners when an oil well comes into production.

---

[4]Although the Receiver also seeks to hold BOG, BECC, BRC, and USPI in contempt, all of his allegations center around the conduct of Faulkner and Carole.  Therefore, the court will organize its analysis throughout this memorandum and opinion accordingly.

The evidence also shows that BRC, as a company, held oil and gas related assets beyond those associated with Chesapeake. The mail seized by the Receiver from the Grapevine Mailbox included correspondence from oil and gas companies addressed to BRC. *See* R. Ex. 20 at 3 (letter from Texland Petroleum, L.P. addressed to "Breitling Royalties Corp"). Moreover, Rodney Sowards ("Sowards") of Veritas Advisory Group testified regarding the relationship of the companies owned or controlled by Faulkner. According to Sowards, his firm identified over 500 money transfers among BECC, BOG, Patriot, Crude, and BRC. *See* R. Ex. 62; Hrg. Tr. 108-09. BECC and BOG—both of whom are Receivership Defendants—received $42 million from BRC over this five-year period, while BRC received $12.8 million in transfers from BECC and BOG. R. Ex. 62. Faulkner does not contest that BECC and BOG represent oil and gas assets. Faulkner does note, however, that these records end in February 2016, and that there are no records of any such transactions thereafter among BECC, BOG, and BRC. Although this is true, it is of limited significance. The absence of records after February 2016 is in part due to Faulkner's failure to produce any BECC or BOG documents from April 2016 onward.[5] Moreover, these financial records demonstrate nonetheless a longstanding pattern of BRC's control over oil and gas revenue—a pattern corroborated by Faulkner's attempt to redirect BRC's oil and gas revenue checks from Chesapeake.

The hearing evidence further shows that BRC was controlled by Faulkner, a

---

[5]The court addresses this conduct *infra* at § IV.

Receivership Defendant, and that Faulkner acted as BRC's owner in attempting to forward its mail to the Grapevine Mailbox. Although not indicated on BRC's corporate documentation, Faulkner's former business partner (Hallam) testified that "Faulkner was the director" of BRC. Hrg. Tr. 24. He also testified that Faulkner was an owner of BOG, BECC, and BRC. *Id.* at 29-30. Another business partner (Miller) testified that Faulkner was a part-owner of BRC and managed the company's operations and finances on a day-to-day basis. *Id.* at 33. Similarly, Faulkner publicly displayed his control over BRC. In each of his emails to Chesapeake changing the address of BRC, Faulkner's signature reads "Chris Faulkner CEO Breitling Royalties." *See* R. Ex. 46, 47. The cover letter accompanying the letter Faulkner mailed is written on BRC letterhead and signed "Chris Faulkner CEO." R. Ex. 49. Thus Faulkner controlled BRC, a company that held oil and gas related assets, and attempted to divert these assets to a mailbox that was at the time unknown to the Receiver.

Faulkner contends, that regardless of these facts, the August 14 orders are ambiguous as to whether they apply to BRC.[6] The court disagrees. Although Faulkner is correct that the August 14 Orders do not name BRC specifically, the order's language makes clear that at least some of BRC's assets fall within its scope. The August 14 Orders cover "all oil and gas related assets—in any form or of any kind whatsoever" directly or indirectly owned,

---

[6]Faulkner also argues that the September 25 Receivership Order's expansion of scope demonstrates that the August 14 Orders' scope was inherently ambiguous. This is also incorrect. The broad scope of the September 25 Receivership Order's is an intentional response to the Receivership Defendants' alleged conduct, as set out in the Receiver's briefing, not merely an attempt to eliminate ambiguities in the August 14 Orders.

controlled, or managed by Faulkner, BECC, or BOG.  Aug. 14 Receivership Order at 1-2.

As the foregoing facts demonstrate, BRC was both controlled by Faulkner and receiving oil

and gas related assets from Chesapeake.  Therefore, these funds were Receivership Assets,

and under the clear terms of the August 14 Orders, Receiver had access to any mailbox to

which the funds were sent.  Rather than direct the proceeds to the Receiver, as the August

14 Orders require, Faulkner attempted to divert them to a mailbox that the Receiver had yet

to discover.

The court therefore finds by clear and convincing evidence that Faulkner violated the

August 14 Orders.  Because Faulkner had notice of the August 14 Orders as a Receivership

Defendant, and was acting in his capacity as an agent of BRC, the court also finds by clear

and convincing evidence that BRC knowingly aided and abetted Faulkner in violating the

August 14 Orders.  Therefore, the court holds Faulkner and BRC in civil contempt for this

conduct.

D

The court next turns to the evidence regarding Carole's mailbox-related conduct.  At

the time the court entered the August 14 Orders, Carole was the attorney of record for BRC,

BECC, and BOG.  *See* R. Ex. 11; R. Ex. 15.  In July 2017 Carole mailed Permanent Change

of Address Orders to the U.S. Postal Service ("USPS") for both BECC and BOG, redirecting

their mail from the Colleyville Mailbox to the Grapevine Mailbox.  The Postal Service

confirmed these changes later that month.  The Receiver testified that, on August 15, he and

Carole spoke by telephone regarding the Colleyville Mailbox. Carole did not mention the Grapevine Mailbox during their conversation.

In an email exchange on August 30, 2017—after the Receiver discovered that Faulkner had attempted to divert BRC's Chesapeake revenue checks to the Grapevine Mailbox—Carole assured the Receiver that none of the Receivership Defendants' assets had been forwarded or transferred to the Grapevine Mailbox. *See* R. Ex. 15. She stated instead that "only the communications and correspondence relating to [BRC] [were] transferred to that address." *Id.* Carole asserted that BRC was not covered by the August 14 Orders, and that the Receiver did not have the right to seize the contents of that mailbox. R. Ex. 15. The Receiver later seized from the Grapevine Mailbox multiple pieces of mail addressed to BEC.[7] Many of these letters were sent by oil and gas production companies. And Carole unsuccessfully attempted to access the Grapevine Mailbox on August 31, 2017.

The court finds by clear and convincing evidence that Faulkner, BECC, and BOG violated the August 14 Orders by failing to disclose the existence of the Grapevine Mailbox—a private mailbox receiving oil and gas assets and records. The court therefore holds Faulkner, BECC, and BOG in civil contempt for this conduct.

_____

[7]In her briefing, Carole maintains that any Receivership Defendant's mail delivered to the Grapevine Mailbox was mistakenly directed there. She acknowledges that she filed change of address forms with the USPS for BECC and BOG in July 2017. Carole contends, however, that the USPS informed her orally that it would not forward mail from the Colleyville Mailbox because it was a private commercial mail receiving agency. This, she avers, demonstrates that her statement that only BRC's correspondence was forwarded to the Grapevine Mailbox was made in good faith.

The court also finds, however, that the Receiver has not established by clear and convincing evidence that Carole—a nonparty—knowingly aided and abetted Faulkner in violating the August 14 Orders by diverting Receivership Assets. The Receiver presented evidence that Carole had submitted change of address forms to transfer BECC's and BOG's mail from the Colleyville mailbox to the Grapevine Mailbox before the entry of the August 14 Orders. But none of the BECC and BOG mail seized from the Grapevine Mailbox had been addressed to the Colleyville Mailbox. *See* Ex. 20 (demonstrating that all BOG and BECC mail forwarded from "1910 Pacific Ave. Dallas, TX"). The evidence is insufficient to support the finding that Carole knew this mail was forwarded to the Grapevine Mailbox. Similarly, the fact that Carole attempted to access the Grapevine Mailbox was consistent with her belief that it only contained mail not covered by the August 14 Orders, and therefore could not be seized by the Receiver. This proof does not establish under a clear and convincing evidence standard the "knowing" state-of-mind required to hold Carole in civil contempt. Because the Receiver has failed to meet his burden, the court denies his motion to hold Carole in civil contempt for this conduct.

## IV

The court now turns to the Receiver's complaint that Faulkner, BECC, BOG, BRC, and Carole withheld corporate documents and refused to designate corporate representatives for the Receivership Defendants.

## A

The Receiver maintains that Faulkner and Carole have failed to make corporate representatives for BOG, BECC, and BRC available for interview; that Faulkner, BECC, BOG, BRC, and Carole have failed to turn over Receivership Assets, and records and information related to Receivership Assets (specifically for the period April 2016 to the present); and that Faulkner, BECC, BOG, BRC, and Carole have failed to turn over all mail in their possession that was sent either to the Colleyville Mailbox or to the Grapevine Mailbox. The Receiver contends that this violates the cooperation, mail, and turn over provisions of the August 14 Orders.

Respondents contest each accusation. Carole contends that there are no additional records pertaining to the Receivership Defendants to turn over to the Receiver, and that all relevant records were seized by the Internal Revenue Service and the Federal Bureau of Investigation in April 2016. Faulkner contends that the more than 30 boxes of documents that he has since produced for the Receiver exhausts the relevant records in his possession. Regarding interview requests, Carole and Faulkner maintain that, because they are asserting their Fifth Amendment rights against self-incrimination, the Receiver cannot hold them in contempt for refusing to testify as corporate representatives of BOG, BECC, and BRC.

## B

The August 14 Orders authorize the Receiver "to take immediate possession of all Receivership Assets and all books, records, and accounts relating to the Receivership

Assets." Aug. 14 Receivership Order at 4. All persons and entities having control, custody, or possession of any of the Receivership Assets are directed "to turn over such books, records, and accounts to the Receiver, on his request." *Id.* Moreover, the Receivership Defendants and their agents are ordered to "cooperate with and assist the Receiver in the performance of his duties." *Id.* at 3, 18.

The September 25 Receivership Order requires similar conduct. It obligates Faulkner and past and present Receivership Defendant officers "to preserve and turn over to the Receiver forthwith all paper and electronic information of, and/or relating to, the Receivership Defendants and/or all Receivership Assets." *See* Sept. 25 Receivership Order at 4. The order also expands the definition of Receivership Assets to encompass all assets of the Receivership Defendants. *See id.* at 1.

## C

The court first addresses the alleged refusal of Faulkner, BOG, BECC, and BRC to turn over Receivership Asset records and to designate corporate representatives. The plain language of the August 14 Orders (and the currently controlling September 25 Receivership Order) requires the Receivership Defendants and their agents to cooperate in producing documents within the scope of the orders.[8] The Receiver has established that BECC, BOG, and BRC were receiving oil and gas proceeds as late as September 2017. Nevertheless, neither the Receivership Defendants nor BRC has provided the Receiver with any records

_____

[8]The expanded scope of the September 25 Receivership Order covers not only BOG's and BECC's records, but BRC's as well.

related to the Receivership Assets dated after April 2016. To the extent that Faulkner, BOG, BECC, and BRC retain possession of these documents, they have violated the August 14 Orders and are not compliant with the September 25 Receivership Order.

In a civil contempt proceeding, after the moving party has shown that the respondent has violated a court order, the respondent must produce evidence in support of the defense that the respondent is unable to comply with the order. *In re Ramirez*, 605 Fed. Appx. 361, 365 (5th Cir. 2015) (per curiam) (citing *United States v. Rylander*, 460 U.S. 752, 757 (1983)); *see also United States v. Meeks*, 719 F.2d 809, 812 (5th Cir. 1983) (per curiam). Faulkner asserts two grounds for his inability to comply.

First, he relies upon his Fifth Amendment privilege against self-incrimination, which he asserted at both his deposition and the evidentiary hearing on the Receiver's contempt motion. He contends that he "cannot provide the identity and location of Receivership Assets, bank account, addresses where mail has been received, or other information requested by the Receiver . . . without waiving his rights." D. Resp. to Mot. Am. at 11.

The court holds that, to the extent that this information falls within Faulkner's right against self-incrimination, he is entitled to assert his Fifth Amendment rights as an individual. Neither the Receiver nor the court can force him to violate his individual Fifth Amendment privilege against self-incrimination, either through the testimonial act of producing certain documents or compelling certain answers. *See Bellis v. United States*, 417 U.S. 85, 87 (1974) ("It has long been established . . . that the Fifth Amendment privilege

against compulsory self-incrimination protects an individual from compelled production of his personal papers and effects as well as compelled oral testimony.")

To the extent, however, that Faulkner argues that the Fifth Amendment excuses him—as an officer of BECC, BOG, and BRC—from designating representatives for BECC, BOG, and BRC, the court disagrees. Corporations have no Fifth Amendment privilege against self-incrimination. *Braswell v. United States*, 487 U.S. 99, 105, 108 (1988). While the court cannot compel individuals to speak in their corporate capacity if they can properly invoke an individual privilege—as is the case here—corporations *can* be compelled to answer questions through an agent who will not invoke the privilege. *See In re Grand Jury No. 86-3*, 816 F.2d 569, 574 (11th Cir. 1987) (abrogated on other grounds); *United States v. Barth*, 745 F.2d 184, 189 (2d Cir. 1984). If needed, the court can require a corporation to retain a person not previously associated with the corporation to answer questions. *See Sprint Nextel Corp. v. Ace Wholesale, Inc.*, 2014 WL 11930612, at *2 (N.D. Ga. Feb. 28, 2014); *S.E.C. v. Mut. Benefits Corp.*, 2008 WL 239167, at *3 (S.D. Fla. Jan. 28, 2008); *City of Chicago v. Wolf*, 1993 WL 177020, at *1-2 (N.D. Ill. May 21, 1993); *Grand Jury No. 86-3*, 816 F.2d at 574; *Barth*, 745 F.2d at 189; *In re Grand Jury Proceedings*, 708 F. Supp. 492, 494-95 (E.D.N.Y. 1988) ("*Grand Jury* ").

Similarly, to the extent that Faulkner maintains that the Fifth Amendment excuses him from producing documents he holds in his official capacity as a corporate officer of BOG, BECC, and BRC, the court also disagrees. "An individual [corporate custodian]

cannot assert his personal privilege in order to defeat a subpoena for corporate records, even if the records contain information incriminating him." *In re Grand Jury Subpoenas Dated June 27, 1991*, 772 F. Supp. 326, 329 (N.D. Tex. 1991) (Sanders, J.) (citing *Bellis*, 417 U.S. at 88-89; *United States v. White*, 322 U.S. 694, 699 (1944)); *see also Braswell*, 487 U.S. at 109-10 (holding that custodians of corporate documents have no act of production privilege under Fifth Amendment regarding corporate documents). Therefore, all documents that Faulkner holds in a custodial capacity for BECC, BOG, and BRC must be turned over to the Receiver under the terms of the August 14 Orders and the September 25 Receivership Order.

Faulkner also contends that he is unable to comply with the court's orders because he does not possess any more documents after producing the 30 additional boxes for the Receiver. In such circumstances, "[w]here compliance is impossible, neither the moving party nor the court has any reason to proceed with the civil contempt action. It is settled however, that in raising this defense, the defendant has a burden of production." *Rylander*, 460 U.S. at 757 (citing *McPhaul v. United States*, 364 U.S. 372, 379 (1960)). This means that Faulkner must produce evidence that he has none of the documents required to be produced. The Receiver has proved that he has not been given documents related to the Receivership Defendants from April 2016 onward. At the contempt hearing, Faulkner presented no evidence or explanation as to why no documents exist from this period, asserting his Fifth Amendment right in response to all questions. The assertion of the Fifth Amendment, however, "has never been thought to be in itself a substitute for evidence that

would assist in meeting a burden of production." *Id.* at 758; *see also Meeks*, 719 F.2d at 812 ("The privilege against self-incrimination cannot substitute for evidence."). Therefore, the court finds that Faulkner has failed to meet his burden of production that he does not possess Receivership Defendant-related documents from the requested time period.

The court therefore finds by clear and convincing evidence that Faulkner, BECC, and BOG violated the court's orders to turn over all documents related to the Receivership Assets and to cooperate with the Receiver in the performance of his duties. The court also finds by clear and convincing evidence that BRC knowingly aided and abetted the Receivership Defendants violations of the court's orders to turn over Receivership Assets and documents related to the Receivership Assets. The court therefore holds Faulkner, BECC, BOG, and BRC in civil contempt for this conduct.

### D

The court now turns to Carole's alleged refusal to turn over BOG, BECC, and BRC records and designate corporate representatives.

The Receiver has failed to prove by clear and convincing evidence that Carole knowingly aided and abetted Faulkner by retaining mail, documents, or assets that should have been turned over to the Receiver. The court finds that Carole attempted to open the Grapevine Mailbox once, but was unsuccessful. The Receiver offers no additional evidence that Carole opened and retained mail, documents, or assets from the Grapevine Mailbox. None of the evidence presented established that Carole has retained specific documents or

assets related to the Receivership Defendants. Without this evidence, the court declines to draw such an adverse inference from Carole's assertions of her Fifth Amendment privilege. The provisions of the September 25 Receivership Order remain applicable to Carole, and should additional evidence emerge from Faulkner's disclosures that she has retained documents covered by the order, the Receiver can move anew to hold Carole in civil contempt. On the present record, however, the court declines to hold Carole in civil contempt on this ground.

Regarding the designation of corporate representatives, Carole has since withdrawn as counsel for BOG and BECC. *See* Mot. for Withdrawal of Counsel. Because Carole is no longer an agent or officer of BOG or BECC, she is unable to make a corporate representative available for an interview with the Receiver. Civil contempt is either a coercive or remedial sanction, and it is therefore inappropriate when the respondent's compliance with the court's directive is presently impossible and the consequences of the alleged defiant conduct can be otherwise remedied. *See Meeks*, 719 F.2d at 812; *Macomb v. Jacksonville Paper Co.*, 336 U.S. 128, 191 (1949) ( "[c]ivil . . . contempt is a sanction to enforce compliance with an order of the court or to compensate for losses or damages sustained by reason of noncompliance"). Therefore, the court declines to hold Carole in civil contempt on this basis.

V

The court now turns to the alleged conduct concerning the sale of RackAlley and whether it violates the September 25 Receivership Order.

A

The Receiver contends that the $210,000 produced from RackAlley's sale ("RackAlley Proceeds") are Receivership Assets. According to the Receiver, Faulkner—as a part owner of RackAlley—was immediately entitled to a $210,000 share of the sale proceeds. Rather than turn this money over to the Receiver, however, Faulkner directed that the proceeds be distributed to USPI. The Receiver maintains that USPI is a shell entity controlled by Faulkner and Carole to prevent the Receiver from seizing the Rack Alley proceeds under the September 25 Receivership Order. Although the Receiver successfully froze two checks representing $150,000 of the proceeds, the Receiver alleges that Faulkner and Carole deposited $60,000 of the proceeds in a USPI bank account at Bank of the West ("Bank of the West Account"), and they have since refused to produce these funds for the Receiver. The Receiver maintains that Faulkner—aided and abetted by Carole—violated the asset freeze, turn over, and the interference provisions of the September 25 Receivership Order through this conduct.

Faulkner maintains that the RackAlley proceeds are not subject to the Receiver's authority due to the timing of the transactions in question. He contends that, because the proceeds were not oil and gas assets, they were not subject to the August 14 Orders—the

only orders in effect at the time of the sale. Faulkner also posits that the court did not issue the September 25 Receivership Order until after RackAlley had already issued the proceed checks to USPI. Faulkner asserts that he neither owns nor controls USPI, and that, as a result, he no longer controlled the assets and they fell outside the Receivership Estate once RackAlley issued the proceeds checks to USPI.

## B

The September 25 Receivership Order expands the scope of Receivership Assets from only "oil-and-gas" related assets to "all assets—in any form or of any kind whatsoever—owned, controlled, managed, or possessed by [the Receivership Defendants.]" Sept. 25 Receivership Order at 1. It provides that "all Receivership Assets are frozen," and that anyone with control over said assets is "restrained and enjoined from directly or indirectly transferring, setting off, receiving, changing, selling, pledging, assigning, liquidating, or otherwise disposing of or withdrawing such assets." *Id.* at 2.

Like the August 14 Orders, the September 25 Receivership Order contains a turn over provision. It states that "[a]ll persons and entities with direct or indirect control over any Receivership Assets are ordered to relinquish and such control to the Receiver." *Id.* at 6. Moreover, the order requires that Faulkner and the agents of the Receivership Defendants "preserve and turn over to the Receiver forthwith all paper and electronic information of, and/or relating to [all Receivership Assets]." *Id.* at 4.

The order also instructed all persons receiving notice of the September 25

Receivership Order not to interfere with the Receiver as he executes his duties. It specifically bars all persons receiving notice of the order from "interfer[ing] with the Receiver's efforts to take control, possession, or management of any Receivership Assets"; "hinder[ing], obstruct[ing], or otherwise interfer[ing] " with the Receiver in the performance of his duties ; or "interfer[ing] with or harrass[ing] the Receiver." *Id.* at 11.

C

The court finds by clear and convincing evidence that the RackAlley proceeds were under Faulkner's control as of the effective date of the September 25 Receivership Order, and therefore are Receivership Assets. The evidence establishes, first, that Faulkner was a member and part-owner of RackAlley. RackAlley is a technology company based in California. In early September, it was purchased by HiVelocity Hosting. Faulkner is listed as a member on RackAlley's September 2011 member operating agreement. Similarly, Matthew Rapaport ("Rapaport")—a member of RackAlley—testified that Faulkner had a one-third ownership interest as a member of RackAlley and had contributed funding to the company. Rapaport acknowledged that Faulkner was not listed as a member of RackAlley on state records, but he testified that the member operating agreement accurately reflected the true RackAlley ownership structure.

Hearing testimony and other hearing evidence also illustrate that Faulkner was in control of these funds when the court issued the September 25 Receivership Order. Rapaport

testified that Faulkner directed that his share of the RackAlley proceeds be sent to USPI.[9]

Accordingly, the final distribution agreement indicates that $283,333.33 be paid to USPI.[10]

The Receiver testified that RackAlley drafted and issued three checks of $60,000, $70,000, and $80,000 to USPI on September 21. The checks were mailed to Faulkner's home address in Venice Beach, California on the same date. The outstanding $60,000 check was not deposited into USPI's bank account until September 29—after the court issued the order.

Faulkner is correct that RackAlley proceeds are not oil and gas assets, and therefore were not covered by the August 14 Orders. Nevertheless, the September 25 Receivership Order enlarged the Receivership Assets to "all assets—in any form or of any kind whatsoever—owned, controlled, managed, or possessed by [the Receivership Defendants], directly or indirectly." Sept. 25 Receivership Order at 1. The court finds by clear and convincing evidence that, at the time the court issued this order, these checks issuing funds deriving from Faulkner's ownership interest were under Faulkner's control. Therefore, they are Receivership Assets. And as Receivership Assets, they should have been turned over to the Receiver in accordance with the September 25 Receivership Order.

The Receiver has proved by clear and convincing evidence that Faulkner violated the

---

[9]A draft agreement for the distribution of the RackAlley sale proceeds lists Faulkner as the broker of the sale. Rapaport testified that this was incorrect, explaining that the parties initially used this language as a method of allowing Faulkner to receive his sale proceeds as a RackAlley owner, despite not being listed as such on state tax forms.

[10]Rapaport explained that $210,000 would be paid to Faulkner immediately, while the remainder would be transferred later.

September 25 Receivership Order's provisions requiring that all Receivership Assets be frozen and turned over to the Receiver. For this conduct, the court holds Faulkner in civil contempt.

D

The Receiver also proved by clear and convincing evidence that Carole and Faulkner jointly controlled USPI. Carole established USPI as a Wyoming corporation in September 2016. The 2017 Annual Report filed with the State of Wisconsin lists a "C A Faulkner" as the President, Secretary, and Director of USPI. "C A" are the first and middle initials of both Faulkner and Carole. The Receiver testified that Carole and Faulkner have attempted to use this naming convention previously in fraudulently opening bank accounts to enable both to operate accounts opened in a single name. Carole and Faulkner also employ strikingly indistinguishable signatures on business documents, consisting of a single elongated "C." *Compare* R. Ex. 30 (Carole's signature on Bank of the West Corporation Signature Card Account) *with* R. Ex. 48 (Faulkner's signature on Chesapeake change of address forms). While USPI's Bank of the West Account lists Carole as the sole authorized signer, the signature on the account paperwork is this single "C." *See* R. Ex. 30. Moreover, the mailing address for the Bank of the West Account is Faulkner's Venice Beach residence. *Id.*

The timing of changes to corporate documents also supports the finding that Faulkner and Carole jointly control USPI. The Receiver demanded Faulkner's share of the RackAlley Proceeds on Friday September 29, 2017. On October 3, 2017 USPI's 2017 Annual Report

was amended; "C A Faulkner" was removed and replaced by Shannon Bresnahan ("Bresnahan") in all positions. At this time, Bresnahan was in a personal relationship and living with Faulkner. Accordingly, Bresnahan's address on the Annual Report was Faulkner's Venice Beach residence address, the same address to which the RackAlley Proceeds checks were addressed, and the same address listed for USPI's bank account. The Receiver testified that Bresnahan had no knowledge of this.[11]

Faulkner and Carole lack a persuasive alternative explanation for why USPI received the RackAlley proceeds. Carole asserts in her briefing that she was the broker of the RackAlley deal, but she introduced no evidence in support of this claim. Indeed, Faulkner's own text messages indicate that Carole sought out another owner of RackAlley to provide an affidavit attesting to this. That owner never signed the affidavit, and now Faulkner's own explanation for the payment—that *he* was the broker—contradicts Carole's briefing. When asked about this conduct, both Carole and Faulkner asserted their Fifth Amendment rights. In a civil proceeding, the court is entitled to draw an adverse inference from a witness' invocation of his or her Fifth Amendment rights.[12] Faced with the Receiver's corroborating

---

[11]After Carole's and Faulkner's counsel were served with notice of the Receiver's production subpoena to Bank of the West regarding any accounts related to Bresnahan, USPI's 2017 Annual Report was again amended to replace Bresnahan with a "Gerald Pitts." *See* R. Ex. 36.

[12]

> [A]lthough a jury in a criminal case is not permitted to draw adverse inferences based on a defendant's invocation of his Fifth Amendment rights, it is well settled that "the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence

evidence, the court finds that such an inference is appropriate here in finding that Faulkner and Carole exercised joint control over USPI.

The Receiver also proved by clear and convincing evidence that Carole knowingly prevented the Receiver from accessing the RackAlley Proceeds. After already depositing the $60,000 check, Carole attempted to deposit the remaining $70,000 and $80,000 RackAlley Proceed checks in the Bank of the West Account on October 11, 2017. This attempt failed because RackAlley—under direction of the Receiver—placed a hold on these checks. Two days later, Carole cashed a check drawn on the Bank of the West account for $10,000. She then wrote a second check for $50,000, which she used to purchase a cashier's check for the same amount. The Bank of the West has since frozen the cashier's check, but the $10,000 remains outstanding.

The court finds by clear and convincing evidence that Carole knowingly aided and abetted Faulkner in violating the September 25 Receivership Order through her use of USPI and the Bank of the West Account. Carole cannot avoid being held in contempt based on a defense of good faith. Both Carole, as counsel for several of the Receivership Defendants,

---

offered against them."

*Hinojosa v. Butler*, 547 F.3d 285, 292 (5th Cir. 2008) (quoting *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976)). "[W]hile a person may refuse to testify during civil proceedings on the ground that his testimony might incriminate him . . . his refusal may be used against him in a civil proceeding." *Farace v. Indep. Fire Ins. Co.*, 699 F.2d 204, 210 (5th Cir. 1983). "In general, the decision as to whether to admit a person's invocation of the Fifth Amendment into evidence is committed to the discretion of the district court." *FDIC v. Fid. & Deposit Co.*, 45 F.3d 969, 977 (5th Cir. 1995).

and her own counsel of record received notice when the court issued the September 25 Receivership Order, and therefore had notice of its contents. Moreover, when asked about her knowledge of the September 25 Receivership Order's contents, Carole asserted her Fifth Amendment rights. Because she received direct notice of the filing of the September 25 Receivership Order, the court finds it appropriate to draw an adverse inference that Carole was aware of the contents of the order. *Cf. Whitcraft*, 570 F.3d at 273 (reversing contempt holding related to nonparty due to absence of evidence that nonparty had knowledge of terms of order). Therefore, the court holds Carole in civil contempt on this basis.

VI

Finally, the court turns to whether Carole and USPI violated the September 25 Receivership Order by filing a lawsuit against the Receiver in California state court.

A

The Receiver maintains that Carole and USPI violated the September 25 Receivership Order when they sued him in California state court; that this lawsuit was barred by the plain language of the September 25 Receivership Order; that USPI and Carole had notice of the September 25 Receivership Order; and that Carole and USPI intentionally filed this lawsuit "with the purpose of impeding the Receiver's efforts to administer the Estate." R. 2d Mot. to Amend at 7. Neither Carole nor USPI responded to this portion of the Receiver's allegations in their briefing. Carole also did not address this lawsuit at the contempt hearing.

B

The September 25 Receivership Order stays all litigation deemed to be an Ancillary

Proceeding.  Ancillary Proceedings included

> [a]ll civil legal proceedings of any nature, including, but not
> limited to, bankruptcy proceedings, arbitration proceedings,
> foreclosure actions, default proceedings, or other actions of any
> nature involving: (a) *the Receiver, in his capacity as Receiver*;
> (b) *any Receivership Assets, wherever located*; (c) the
> Receivership Defendants, including subsidiaries and
> partnerships; or, (d) any of the Receivership Defendants' past or
> present officers, directors, managers, agents, or general or
> limited partners sued for, or in connection with, any action
> taken by them while acting in such capacity of any nature,
> whether as plaintiff, defendant, third-party plaintiff, third-party
> defendant, or otherwise[.]

Sept. 25 Receivership Order at 12 (emphasis added).  All parties to Ancillary Proceedings

"are enjoined from commencing or continuing any such legal proceeding, or from taking any

action, in connection with any such proceeding, including, but not limited to, the issuance

of process."  *Id.*  The September 25 Receivership Order also restrains and enjoins "all

persons receiving notice of this order" from taking any action that would "interfere with or

harass the Receiver, or interfere in any manner with the exclusive jurisdiction of this court

over the Receivership Estate."  *Id.*

C

The evidence demonstrates that Carole received notice of the September 25

Receivership Order's electronic filing as both an individual and through her counsel of

record.  Nevertheless, Carole and USPI filed a lawsuit against the Receiver on November

14, 2017. The Receiver was personally served with process on November 27, 2017. The lawsuit alleges that the Receiver intentionally interfered with Carole and USPI's rights related to USPI's Bank of the West Account and USPI's business relationship with RackAlley. Carole and USPI bring multiple claims, including intentional interference with contract, intentional interference with prospective economic advantage, negligent interference with business relationships, intentional infliction of emotional distress, invasion of privacy, and defamation. The lawsuit makes no mention of the instant SEC civil enforcement action, does not disclose that the Receiver is, in fact, a receiver in such an action, and does not specify that the Receiver's alleged "interference" with Bank of the West and Rack Alley is related to his duties as a court-appointed receiver. Instead, it only refers to him as an individual.

The court finds by clear and convincing evidence that Carole and USPI violated the plain terms of the September 25 Receivership Order's stay provisions. In doing so, they aided and abetted Faulkner's noncompliance with the September 25 Receivership Order's terms.[13] The California lawsuit was a civil legal proceeding involving the Receiver in his capacity as Receiver as well as Receivership Assets. Therefore, it was an Ancillary Proceeding. All parties to such proceedings were prohibited from commencing and serving process related to such suits. Despite this clear language, Carole sued the Receiver over matters related to Receivership Assets in California state court.

---

[13]Faulkner's violations of the September 25 Receivership Order are described *supra* at § V.

Moreover, Carole and USPI cannot establish a defense of good faith. Even if Carole intended to contest whether the RackAlley Proceeds were Receivership Assets, the September 25 Receivership Order made clear that this court has exclusive jurisdiction over all matters related to the Receiver and Receivership Estate. *See* Sept. 25 Receivership Order at 11. And as explained *supra* at § V(D), both Carole and her counsel of record received notice when the court issued the September 25 Receivership Order, and therefore had notice of its contents. Because the Receiver has shown by clear and convincing evidence that Carole knowingly violated the Stay Provisions of the September 25 Receivership Order, the court holds her in civil contempt on this basis.

## VII

Having held respondents in civil contempt as to at least some of the grounds on which the Receiver relies, the court now decides what sanctions should be imposed.

## A

"Upon a finding of contempt, the district court has broad discretion in assessing sanctions to protect the sanctity of its decrees and the legal process." *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 582 (5th Cir. 2005) (citing *Am. Airlines*, 228 F.3d at 585). "'Judicial sanctions in civil contempt proceedings, may in a proper case, be employed for either or both of two purposes: to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained.'" *Am. Airlines*, 228 F.3d at 585 (quoting *United States v. United Mine Workers of Am.*, 330 U.S. 258, 303-04 (1947)).

"'The imposition or denial of sanctions of necessity involves a fact-intensive inquiry into the circumstances surrounding the activity that is the subject of sanctions.'" *Test Masters*, 428 F.3d at 582 (quoting *Thomas v. Capital Sec. Servs., Inc.*, 836 F.2d 866, 873 (5th Cir. 1988) (en banc)).  When a contempt sanction is coercive, "the district court has broad discretion to design a remedy that will bring about compliance."  *Perfect Fit Indus., Inc. v. Acme Quilting Co.*, 673 F.2d 53, 57 (2d Cir. 1982) (citing *Vuitton et Fils S.A. v. Carousel Handbags*, 592 F.2d 126, 130 (2d Cir. 1979); *Powell v. Ward*, 643 F.2d 924, 933 (2d Cir. 1981) (per curiam)).  The court can require that the contemnors pay reasonable attorney's fees incurred by the moving party in obtaining a contempt finding.  *See Cook v. Ochsner Found. Hosp.*, 559 F.2d 270, 272 (5th Cir. 1977) ("Courts have, and must have, the inherent authority to enforce their judicial orders and decrees in cases of civil contempt.  Discretion, including the discretion to award attorneys' fees, must be left to a court in the enforcement of its decrees." (citing *United Mine Workers*, 330 U.S. at 303-04)).  The court is also permitted to impose a conditional fine for the purpose of compelling the contemnor to comply with the court's order, provided the amount is reasonably designed to force compliance, without being punitive.  *In re Dinnan*, 625 F.2d 1146, 1149 (5th Cir. 1980) (per curiam) (citing *United Mine Workers*, 330 U.S. at 303-04).  "A coercive, nonpunitive fine payable to the clerk of the court is an appropriate tool in civil contempt cases."  *Id.* (citing cases and treatises).

"A fixed term of imprisonment, with the proviso that the contemnor will be released

if he complies with the court order, is a proper penalty for civil contempt and the imposition of such penalty does not make the proceeding criminal." *Id.* A district court may order the civil contemnors imprisoned until they comply with the order or condition imposed by the court. *FDIC v. LeGrand*, 43 F.3d 163, 168 (5th Cir. 1995); *see also Hutto v. Finney*, 437 U.S. 678, 690 (1978) ("Civil contempt proceedings may yield a conditional jail term[.]"). "Unlike criminal contempt where imprisonment and a fine cannot be combined, a finding of civil contempt permits the coercive combination of both fine and imprisonment." *In re Dinnan*, 625 F.2d at 1150 (citation omitted).

B

The court has held Faulkner in civil contempt for diverting Receivership Assets to the Grapevine Mailbox; for failing to produce any Receivership Defendant-related documents from the period of April 2016 to the present; for failing to produce a corporate representative for BECC, BOG, and BRC; and for failing to turn over the outstanding RackAlley Proceeds to the Receiver.

The court orders that Faulkner account for all oil and gas assets, and the mail and records related to those assets, taken into his possession as a corporate officer of BOG, BECC, and BRC since April 2016. This includes all mail and checks received since that time by the Colleyville Mailbox, the Grapevine Mailbox, or any other mailbox that received Receivership Assets. The court orders that Faulkner provide the mail, documents, and proceeds—or information accounting for their whereabouts or existence—to the Receiver

within 28 days of the date this memorandum opinion and order is filed.

The court orders that Faulkner make corporate representatives for BECC, BOG, and BRC available to interview with the Receiver within 28 days of the date this memorandum opinion and order is filed. If Faulkner retains a person or persons previously not associated with either BECC, BOG, or BRC for these interviews, these individuals "must be provided with sufficient knowledge to be able to understand the documents provided by the corporations." *Wolf*, 1993 WL 177020, at *2 (citing *Grand Jury*, 708 F. Supp at 494-95; *Grand Jury No. 86–3*, 816 F.2d at 574) ("Hiring a new agent and pointing the agent to documents are not privileged testimonial acts and therefore are not protected.") Faulkner is not required to provide information to the corporate representative that is solely contained in Faulkner's memory and that is not implied by a document. This will ensure that Faulkner is not compelled to provide protected testimony to the corporate representative and, thus, testify indirectly. *See id.*; *Mut. Benefits Corp*, 2008 WL 239167, at *4.

The court orders that Faulkner return the outstanding RackAlley Proceeds to the Receiver within 28 days of the date this memorandum opinion and order is filed. Of the $60,000 successfully deposited in USPI's bank account at Bank of the West, $10,000 has been successfully withdrawn and is unaccounted for. *See* R. Supp. Sub. at 2. The remaining $50,000 remains in USPI's account after Bank of the West stopped payment on a cashier's check purchased with these funds. *Id.* The court orders that Faulkner return the $10,000, and that Faulkner and Bank of the West allow the Receiver to seize the remaining $50,000

in USPI's account.

If Faulkner fails to comply with the foregoing orders within 28 days of the date this memorandum opinion and order is filed, the court will order the United States Marshals Service to arrest Faulkner and hold him in custody until he purges himself of the contempt. Additionally, for each calendar day that Faulkner is late in complying, he must pay to the clerk of court a fine in the sum of $500.

C

The court has held Carole in civil contempt for failing to turn over the outstanding RackAlley Proceeds to the Receiver and for commencing a lawsuit against the Receiver in California state court without the leave of this court.

The court orders Carole to return the outstanding RackAlley Proceeds to the Receiver. As explained above, $10,000 remains unaccounted for, and $50,000 remains in USPI's bank account. The court orders Carole to return the $10,000 that was withdrawn, and that Carole and Bank of the West allow the Receiver to seize the remaining $50,000 in USPI's account. If Carole fails to return the outstanding RackAlley Proceeds within 28 days of the date this memorandum opinion and order is filed, the court will order the United States Marshals Service to arrest Carole and hold her in custody until she purges herself of the contempt.[14] Additionally, for each calendar day that Carole is late in complying, Carole must pay to the

---

[14]Faulkner is also being held in contempt for withholding the RackAlley Proceeds. Therefore, if either Faulkner or Carole returns the RackAlley Proceeds to the Receiver, both will be in compliance with the court's orders.

clerk of court a fine in the sum of $500.

The court also orders that the California lawsuit be dismissed with prejudice. If Carole fails to comply with this memorandum opinion and order within 28 days of the date it is filed, the court will order the United States Marshals Service to arrest Carole and hold her in custody until she purges herself of the contempt. Additionally, for each calendar day that Carole is late in complying, Carole must pay to the clerk of court a fine in the sum of $500.

The court orders that Carole pay, jointly and severally with USPI, the Receiver's reasonable and necessary attorney's fees and costs incurred by the lawsuit she filed in California state court. The Receiver must follow the procedures detailed *infra* at § VIII to apply for these attorney's fees and costs.

## D

The court has held BOG in civil contempt for failing to disclose the Grapevine Mailbox to the Receiver; for failing to produce any Receivership Defendant-related documents from the period of April 2016 to the present; and for failing to produce a corporate representative.

The court orders that BOG account for all oil and gas assets, and the mail and records related to those assets, taken into its possession since April 2016. This includes all mail and checks received since that time by the Colleyville Mailbox, the Grapevine Mailbox, or any other mailbox that received Receivership Assets. The court orders that BOG provide the

mail, documents, and proceeds—or information accounting for their whereabouts or existence—to the Receiver within 28 days of the date this memorandum opinion and order is filed.

The court orders that BOG make a corporate representative available to interview with the Receiver.[15] If BOG retains a person or persons previously not associated with either BOG for these interviews, these individuals "must be provided with sufficient knowledge to be able to understand the documents provided by the corporations." *Wolf*, 1993 WL 177020, at *2 (citing *Grand Jury*, 708 F. Supp at 494-95; *Grand Jury No. 86–3*, 816 F.2d at 574)

If BOG fails to comply with the above orders within 28 days of the date this memorandum opinion and order is filed, for each calendar day that BOG is late in complying, BOG must pay to the clerk of court a fine in the sum of $500.

E

The court has held BECC in civil contempt for failing to disclose the Grapevine Mailbox to the Receiver; for failing to produce any Receivership Defendant-related documents from the period of April 2016 to the present; and for failing to produce a corporate representative.

The court orders that BECC account for all oil and gas assets, and the mail and

---

[15]Faulkner is also being held in contempt for not appointing a corporate representative for BOG. Therefore, if either Faulkner himself or BOG appoints a corporate representative, both will be in compliance with the court's orders.

records related to those assets, taken into its possession since April 2016. This includes all mail and checks received since that time by the Colleyville Mailbox, the Grapevine Mailbox, or any other mailbox that received Receivership Assets. The court orders that BECC provide the mail, documents, and proceeds—or information accounting for their whereabouts or existence—to the Receiver within 28 days of the date this memorandum opinion and order is filed.

The court orders that BECC make a corporate representative available to interview with the Receiver.[16] If BECC retains a person or persons previously not associated with either BECC for these interviews, these individuals "must be provided with sufficient knowledge to be able to understand the documents provided by the corporations." *Wolf*, 1993 WL 177020, at *2 (citing *Grand Jury*, 708 F. Supp at 494-95; *Grand Jury No. 86–3*, 816 F.2d at 574)

If BECC fails to comply with the above orders within 28 days of the date this memorandum opinion and order is filed, for each calendar day that BECC is late in complying, BECC must pay to the clerk of court a fine in the sum of $500.

F

The court has held BRC in civil contempt for diverting Receivership Assets to the Grapevine Mailbox; for failing to produce any Receivership Defendant-related documents

---

[16]Faulkner is also being held in contempt for not appointing a corporate representative for BECC. Therefore, if either Faulkner himself or BECC appoints a corporate representative, both will be in compliance with the court's orders.

from the period of April 2016 to the present; and for failing to produce a corporate representative.

The court orders that BRC account for all oil and gas assets, and the mail and records related to those assets, taken into its possession since April 2016. This includes all mail and checks received since that time by the Colleyville Mailbox, the Grapevine Mailbox, or any other mailbox that received Receivership Assets. The court orders that BRC provide the mail, documents, and proceeds—or information accounting for their whereabouts or existence—to the Receiver within 28 days of the date this memorandum opinion and order is filed.

The court orders that BRC make a corporate representative available to interview with the Receiver.[17] If BRC retains a person or persons previously not associated with either BRC for these interviews, these individuals "must be provided with sufficient knowledge to be able to understand the documents provided by the corporations." *Wolf*, 1993 WL 177020, at *2 (citing *Grand Jury*, 708 F. Supp at 494-95; *Grand Jury No. 86–3*, 816 F.2d at 574)

If BRC fails to comply with the above orders within 28 days of the date this memorandum opinion and order is filed, for each calendar day that BECC is late in complying, BRC must pay to the clerk of court a fine in the sum of $500.

---

[17]Faulkner is also being held in contempt for not appointing a corporate representative for BRC. Therefore, if either Faulkner himself or BRC appoints a corporate representative, both will be in compliance with the court's orders.

## G

The court has held USPI in civil contempt for commencing a lawsuit against the Receiver in California state court without leave of this court. If USPI fails to comply with this memorandum opinion and order within 28 days of the date it is filed, then for each calendar day that USPI is late in complying, USPI must pay to the clerk of court a fine in the sum of $500.

The court orders that USPI pay, jointly and severally with Carole, the Receiver's reasonable and necessary attorney's fees and costs incurred by the lawsuit it filed in California state court. The Receiver must follow the procedures detailed *infra* at § VIII to apply for these attorney's fees and costs.

## VIII

The court also holds that the Receiver is entitled to recover his reasonable and necessary attorney's fees and costs incurred in prosecuting the instant contempt motion.

Within 28 days of the date this memorandum opinion and order is filed, the Receiver must apply for these fees and costs by filing an application, supporting brief, and supporting evidence in the form of an appendix. Privileged material contained in the evidence may be redacted from the pleadings filed publicly and from the pleadings disclosed to respondents, but complete descriptions must be filed in a separate, unredacted version that is filed with the court under seal. The court will decide whether any parts of the redacted materials must be disclosed publicly or to respondents. Opposition briefs and supporting evidence in the

form of appendices must be filed within 21 days, and reply briefs must be filed within 14 days of the filing of the opposition response.

*   *   *

In sum, the court grants in part and denies in part the Receiver's September 5, 2017 motion; grants the Receiver's October 22, 2017 motion; and grants the Receiver's November 30, 2017 motion. The court holds Faulkner, BECC, BOG, BRC, USPI, and Carole in civil contempt to the extent set forth in this memorandum opinion and order and orders them to purge themselves of the contempt within 28 days of the date this memorandum opinion and order is filed.

**SO ORDERED**.

February 13, 2018.

_____
SIDNEY A. FITZWATER
UNITED STATES DISTRICT JUDGE