IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION


| | | |
|---|---|---|
| SECURITIES AND EXCHANGE | ( | 3:16-CV-01735-D |
| COMMISSION | ( | |
|                 Plaintiff, | ( | |
| | ( | |
| | ( | |
| VERSUS | ( | DALLAS, TEXAS |
| | ( | |
| | ( | |
| | ( | |
| CHRISTOPHER A. FAULKNER, et al. | ( | |
|                 Defendant. | ( | DECEMBER 14, 2017 |



TRANSCRIPT OF SHOW CAUSE

BEFORE THE HONORABLE SIDNEY A. FITZWATER

UNITED STATES DISTRICT JUDGE, and a jury


A P P E A R A N C E S:


        FOR THE RECEIVER:        EDWIN J. TOMKO
                                 Dykema Cox Smith
                                 1717 Main Street
                                 Suite 4200
                                 Dallas, TX 75201
                                 214/462-6447
                                 Fax: 214/462-6401
                                 Email: etomko@dykema.com
                                 ATTORNEY TO BE NOTICED
                                 Bar Status: Admitted/In Good Standing

```
                               JASON M. ROSS
                               Dykema Gossett PLLC
                               1717 Main Street
                               Suite 4200
                               Dallas, TX 75201
                               214/462-6417
                               Fax: 214/462-6401
                               Email: jross@dykema.com

        FOR THE DEFENDANT:     CARTER BOISVERT
  Christoper Faulkner          Friedman & Feiger LLP
                               5301 Spring Valley Rd
                               Suite 200
                               Dallas, TX 75254
                               972/788-1400
                               Fax: 972/788-2667
                               Email: cboisvert@fflawoffice.com


        FOR THE DEFENDANT:     CAROLE A. FAULKNER
  Carole Faulkner and          Law Offices of Carole A Faulkner
  US Properties                4010 Ambleside Ct
                               Colleyville, TX 76034
                               817-879-1377
                               Fax: 469-675-6404
                               Email: faulkner4010@yahoo.com





        COURT REPORTER:        PAMELA J. WILSON, RMR, CRR
                               pam_wilson@txnd.uscourts.gov
                               1100 Commerce Street, Room 1535
                               Dallas, Texas 75242
                               214.662.1557


     Proceedings reported by mechanical stenography,

  transcript produced by computer.
```

SHOW CAUSE HEARING - DECEMBER 12, 2017

**P R O C E E D I N G S**

THE SECURITY OFFICER:  All rise.

The United States District Court for the Northern District of Texas is now in session, the Honorable Sidney A. Fitzwater presiding.

Let us pray.

God save the United States and this Honorable Court.

THE COURT:  Be seated, please.

The matter before the court is Securities and Exchange Commission versus Christopher A. Faulkner and others.

At this time the court hear the temporary receiver's motion for contempt as amended.  I'll begin by asking counsel to make their appearances for - record, beginning with counsel for the temporary receiver.

MR. TOMKO:  Your Honor, Ed Tomko from Dykema Cox Smith with Jason Ross.

MR. BOISVERT:  Good morning, Your Honor.

Carter Boisvert with the law firm of Friedman & Feiger. I'm going to be joined today by my paralegal Scott Shall.  And I'm here today with my client, Christopher Faulkner.

MS. FAULKNER:  Carole Faulkner for the nonparties Carole Faulkner and U.S. Property Investments.

THE COURT:  Mr. Tomko, do you wish to make an opening statement?

1          MR. TOMKO:   Yes, Your Honor.  Very briefly.

2          THE COURT:   You may approach the lectern.

3          MR. TOMKO:   We would invoke the rule, Your Honor,

4    for the witnesses, if there are any witnesses.

5       Do you have anybody in the courtroom?

6          MR. BOISVERT:   Just my client.

7          MR. TOMKO:   Okay.  Well . . .

8          THE COURT:   Why don't you go ahead, Mr. Tomko, while

9    they're working on it.

10          MR. TOMKO:   May it please the court.

11       In this matter the receiver will establish before the

12    court by clear and convincing evidence that contempt of this

13    court has been perpetrated by Chris Faulkner and Carole

14    Faulkner in diverting funds that were identified as

15    receivership funds.

16       These funds were removed from the mailbox in Colleyville

17    and have not been turned over to the receiver or accounted

18    for.  This has been going on since at least the time that the

19    SEC filed their original complaint, which was in June of 2016.

20       In addition, the contempt individuals diverted mail from

21    the Colleyville mailbox to a Grapevine mailbox.  They made

22    false statements concerning what mail was being delivered to

23    Grapevine.  They failed to produce any corporate

24    representatives or custodians for the purpose of interview by

25    the receiver for the companies in which they were either

1   owners, managers, directors, officers, or counsel.

2        They have also failed to produce any records of the

3   corporations for any activities from at least the period of

4   June 2016 until the date of this hearing.

5        We would also show that there was contempt of this court

6   by Chris Faulkner, Carole Faulkner and U.S. Properties by

7   diverting proceeds from a sale of a company in California

8   called RackAlley.  We will show that those proceeds were

9   diverted to a separate company, U.S. Properties, that had no

10  interest in those proceeds at all, that there was false

11  documentation that was created in order to establish -- or

12  attempt to establish the appropriateness of that transfer, and

13  that we have had diverted at least $60,000 that we know of

14  that was withdrawn from those proceeds, and a hold has been

15  placed on the additional $150,000, which is in the custody of

16  the Bank of the West or still in the custody of RackAlley.

17       Finally, we will show that Carole Faulkner is in contempt

18  of this court by her filing of a lawsuit in Los Angeles state

19  court against Mr. Taylor individually with -- and we will show

20  that in that lawsuit she never represents to the court that

21  Mr. Taylor is a -- a receiver of a federal court and that that

22  is in direct contravention of the orders that were issued by

23  this court at the beginning of this procedure.

24       At the end we will ask for the appropriate remedies for

25  this contempt.

1    Thank you.

2             THE COURT:  Mr. Boisvert.

3             MR. BOISVERT:  Thank you, Your Honor.

4    May it please the court.

5        Again, my name is Carter Boisvert.  I'm here on behalf of

6    my client Chris Faulkner.

7        I think the issues here today, Your Honor, are -- are

8    very simple.  And I think with respect to the evidence that's

9    relevant to the issues of this hearing today, I think the

10   evidence will show that my client is not in contempt of either

11   the court's August 14th, 2017 order appointing temporary

12   receiver or the court's September 25th, 2017 memorandum

13   opinion and order.

14       With respect to the assets of Breitling Royalties

15   Corporation, Your Honor, and the RackAlley sale, the August

16   14th, 2017 order is clearly limited to just -- to just oil and

17   gas assets.  And with respect to whether it applies to

18   Breitling Royalties Corporation, Breitling Royalties

19   Corporation is not mentioned in the August 14th order.  I

20   think because of that lack of clarity both the receiver and my

21   client sought clarification of that order and in the September

22   25th order the court did clarify that and extended the scope

23   of the receivership to the Breitling Royalties Corporation.

24       But with respect to the August 14th, 2017 order, Your

25   Honor, that order clearly does not apply -- it only applies

1     and it's very clear it only applies to oil and gas assets.

2           And I think the evidence will show that RackAlley is not

3     an oil and gas company, that the proceeds from the sale of

4     that company are not oil and gas assets.

5           Furthermore, when the court did clarify in its order on

6     September 25th that the scope of the receivership was going to

7     be much broader and cover all assets of the receivership

8     defendants, which by the way were defined as Breitling Energy,

9     Breitling Oil & Gas, and Christopher Faulkner, that it would

10    apply to all of their assets.  I think the evidence will show

11    that the RackAlley sale and the transfer of the proceeds from

12    that RackAlley sale all occurred prior to that September 25th

13    order.  Therefore, they were -- the sale of that company, the

14    assets, the proceeds from the sale of that company, fall under

15    the scope of the August 14th order, Your Honor, which clearly

16    did not extend to the RackAlley company, the RackAlley sale,

17    and RackAlley proceeds.

18          In order to hold Mr. Faulkner in contempt of court, as

19    the court is aware, the order that he's subject to and that

20    the violations apply to has to be crystal clear with respect

21    to what conduct constitutes contempt.  And in this case I

22    think the August 14th order is ambiguous and vague with

23    respect to whether it does apply to Breitling Royalties

24    Corporation.

25          My client is asserting his Fifth Amendment rights, Your

1  Honor, so to the extent the receiver is seeking to hold him in

2  contempt of court for not providing information that might

3  waive those rights, Mr. Faulkner simply cannot comply with

4  those terms of the order as he is asserting those rights.

5      Finally, with respect to the turnover of documents, we've

6  produced approximately 30 boxes of documents to the receiver.

7  We've done that electronically.  We asked them if that's how

8  they wanted those documents -- documents produced.

9      Everything that my client has in his possession or that

10  we took possession of from Breitling, documents that weren't

11  seized by the SEC in the original seizure, were left over at

12  the offices, we've produced all of those documents.

13      So I can represent to the court that everything my client

14  has provided to me and that we have in our possession has been

15  turned over to the receiver at this time.

16      And so at the conclusion of this hearing, Your Honor,

17  we're going to ask that the court deny the relief requested by

18  the receiver and deny the motions for contempt.

19      Thank you.

20          THE COURT:  Ms. Faulkner.

21          MS. FAULKNER:  We're going to waive opening

22  arguments at this time, Your Honor.

23          THE COURT:  Mr. Tomko, you may proceed.

24          MR. TOMKO:  First witness, we would call

25  Mr. Rapoport.

```
 1            MR. TOMKO:   May it please the court.
 2        Here is the witness exhibits.
 3        Raise your right hand, please.
 4              MATTHEW RAPOPORT, WITNESS, SWORN
 5            THE COURT:   Be seated, please.   And if you'll speak
 6   into the microphone.
 7                   DIRECT EXAMINATION
 8   BY MR. ROSS:
 9   Q.    Could you state your name for the record.
10   A.    Matthew Rapoport.
11   Q.    And, Mr. Rapoport, where do you live?
12   A.    I live in Los Angeles, California.
13   Q.    Okay.   And what's your occupation?
14   A.    IT director.
15   Q.    Okay.
16        Are you familiar with a company called RackAlley, LLC?
17   A.    Yes, I am.
18   Q.    How are you familiar with RackAlley?
19   A.    I am you have the LLC members formerly.
20   Q.    And if you could briefly describe, what is -- what is
21   RackAlley?
22   A.    RackAlley is a web hosting company and internet
23   services.
24   Q.    Are you familiar with a person named Christopher
25   Faulkner?
```

1    A.    Yes, I am.

2    Q.    Okay.   Do you see him in the courtroom today?

3    A.    Yes, I do.

4    Q.    Okay.   Do you have an understanding as to whether Chris

5    Faulkner was a member of RackAlley, LLC?

6    A.    Yes, I do.

7    Q.    All right.   And in your mind is a member the same thing

8    as an owner of the LLC?

9    A.    Yes.   Yes, it is.

10   Q.    Okay.   Did -- was Chris Faulkner an owner of RackAlley,

11   LLC?

12   A.    Yes, he was.

13   Q.    Okay.   What was the percentage of Chris Faulkner's

14   ownership of RackAlley?

15   A.    33.3 percent.

16   Q.    Okay.   And the binder in front of you, I'm going to ask

17   you to turn to Receiver's Exhibit 37.

18         Just let me know when you're there.

19   A.    I'm there.

20   Q.    Okay.   Are you familiar with this document?

21   A.    Yes, I am.

22   Q.    Is this a document that was maintained at RackAlley?

23   A.    Yes, it was.

24            MR. ROSS:   I'm going to move for admission of

25   Receiver's Exhibit 37, Your Honor.

```
 1              THE COURT:   Any objection?
 2              MR. BOISVERT:   No objection, Your Honor.
 3              MS. FAULKNER:   No objection, Your Honor.
 4              THE COURT:   Receiver Exhibit 37 is admitted.
 5   BY MR. ROSS:
 6   Q.    Could you briefly describe what this document is, what
 7   Exhibit 37 is?
 8   A.    This was a member operating agreement to allow interest
 9   to be acquired by Chris Faulkner.
10   Q.    Okay.  And what's the date on first line of that
11   document?
12   A.    September 16th, 2011.
13   Q.    And do you see where at the first paragraph of that
14   document it says, "This operating agreement is made and
15   entered into as of September 16th, 2011, by Christopher
16   Faulkner, an individual"?
17   A.    Yeah.
18   Q.    Did I read that correctly?
19   A.    Yes.
20   Q.    And then later in that same paragraph it says "referred
21   to as the members individually as a member"; is that correct?
22   A.    That's correct.
23   Q.    Did Chris Faulkner make monetary contributions to the
24   LLC?
25   A.    Yes, he did.
```

1  Q.    Do you know offhand what his -- what his monetary

2  contribution to -- to join as a member of the LLC was?

3  A.    I'd like to correct that.

4  Q.    Okay.

5  A.    He made monetary contributions to myself and Mohamed

6  Arab.

7  Q.    Okay.  And did he do that -- did he make those monetary

8  contributions to yourself and Mr. Arab for purposes of buying

9  into RackAlley, buying an interest in it?

10 A.    As one of the stipulations, yes.

11 Q.    Okay.  What other stipulations did you and Mr. Arab

12 require for Mr. Faulkner to obtain an ownership interest in

13 RackAlley?

14 A.    He would pay rent at the office for -- for 12 months.

15 Q.    Okay.

16 So that -- so let me stop you there, if I could.

17      So that was one of the stipulations, is that he would pay

18 rent.

19      Did Mr. Faulkner actually pay rent?

20 A.    The rent was paid.

21 Q.    Okay.  Did he fulfill that obligation?

22 A.    Yes.

23 Q.    What other stipulations did you and Mr. Arab provide

24 before Mr. Faulkner could take an ownership position in

25 RackAlley?

1   A.   He would run monthly marketing campaigns.

2   Q.   And did in fact Mr. Faulkner do that?

3   A.   Yes, he did.

4   Q.   And did he pay money for marketing?

5   A.   He did the marketing himself.

6   Q.   Were there any other stipulations?

7   A.   That we would receive ownership in Dr. Geek --

8   Q.   Okay.

9   A.   -- Corporation.

10  Q.   Okay.  And do you know whether -- whether that actually

11  happened?

12  A.   I'm not sure.

13  Q.   Okay.

14       I'd like you to turn -- before we go there, are you

15  familiar with Chris Faulkner's signature?

16  A.   Yes.

17  Q.   Okay.  You've seen it on documents?

18  A.   Yes.

19  Q.   You've personally seen him sign things?

20  A.   Yes.

21  Q.   Okay.  I'd like you to turn to the third page of Exhibit

22  37.

23       Right there in the upper left-hand corner, is that

24  Christopher Faulkner's signature?

25  A.   Yes.

1    Q.    The big loopy C?

2    A.    Yes.

3    Q.    Okay.  Did you see him sign this document?

4    A.    Yes.

5    Q.    I'd like you to turn to Exhibit 39.

6          Are you there?

7    A.    Yes.

8    Q.    Are you familiar with this document?

9    A.    Yes.

10   Q.    And this was a document that was maintained as part of

11   the business documents of RackAlley?

12   A.    Yes.

13              MR. ROSS:  I would move for admission of Exhibit

14   39.

15              THE COURT:  Any objection?

16              MR. BOISVERT:  No objection, Your Honor.

17              MS. FAULKNER:  No objection, Your Honor.

18              THE COURT:  Receiver Exhibit 39 is admitted.

19   BY MR. ROSS:

20   Q.    Could you tell the court what this document is.

21   A.    This is the agreement for distributions of proceeds from

22   the sale of the RackAlley assets.

23   Q.    And -- and this appears to be text on an email; is that

24   correct?

25   A.    That's correct.

1    Q.    So this was a draft of the -- of the terms of the

2    agreement; is that your understanding?

3    A.    Yes, that's correct.

4          Now, what is the --

5                MR. BOISVERT:  I'm sorry to interrupt.  But I just

6    want to interpose an objection at this point as to the

7    relevance of this unless they can establish that RackAlley is

8    an oil and gas company, oil and gas asset.  I don't see how

9    this is relevant with respect to the August 14th, 2017 order.

10               THE COURT:  Overruled at this point.

11               MR. ROSS:  Thank you, Your Honor.

12   BY MR. ROSS:

13   Q.    Mr. Rapoport, what is the purpose of this -- of this

14   document?

15   A.    To -- for the agreement of distributions to be paid out

16   to individuals.

17   Q.    Okay.  So -- so RackAlley was -- was selling its assets

18   to another company?

19   A.    That's correct.

20   Q.    Okay.  What was the name of the company that RackAlley

21   was selling its assets to?

22   A.    Hivelocity.

23   Q.    Now, this document is dated August 18th; is that correct?

24         That first line there?

25   A.    That's correct.

Q.   Okay.  As of August 18th did you have an understanding as to the percentage of the proceeds Chris Faulkner was supposed to receive from the sale of the RackAlley assets?

A.   Yes, I was.

Q.   What was that percentage?

A.   Roughly 33.3 percent after -- after the Millitzer Capital broker was paid.

Q.   Okay.  Now, it says here, if you look down at the portion of the document that says who's going to receive what money, there's a listing, the second listing is for $283,833.33 to be paid to U.S. Property Investments, USPI.  Was USPI a member of RackAlley, LLC?

A.   No, it was not.

Q.   Did USPI provide any services to RackAlley?

A.   No, it did not.

Q.   Did USPI act as RackAlley's broker on the sale?

A.   No, it did not.

Q.   Why is USPI receiving that 280 plus thousand dollars?

A.   Because that's the -- that's the party that was -- that Chris Faulkner had said that the money was to be going to.

        MR. BOISVERT:  I'm going to object to the hearsay, Your Honor.

        THE COURT:  Overruled.

BY MR. ROSS:

Q.   So Chris -- Chris Faulkner directed that his distribution

1    be paid to USPI?

2    A.    That's correct.

3    Q.    Mr. Rapoport, are you -- are you familiar with corporate

4    records of RackAlley that do not list Chris Faulkner as a

5    member of the LLC?

6    A.    State records --

7    Q.    Okay.

8    A.    -- yes.

9    Q.    But was, in fact, Chris Faulkner an owner of RackAlley,

10   LLC?

11   A.    As the operating agreement stands.   Yes.

12   Q.    Did you understand Chris Faulkner to be in actuality one

13   of the owners --

14   A.    Yes.

15   Q.    -- of RackAlley, LLC?

16   A.    Yes.

17   Q.    Did you ever hear Chris Faulkner describe himself as an

18   owner of RackAlley, LLC?

19   A.    Yes.

20   Q.    He did?

21   A.    Yes.

22   Q.    I'd like you to turn to Exhibit 38.

23         Are you familiar with this document?

24   A.    Yes.

25   Q.    Is this document -- is this a document that was

1    maintained by RackAlley, LLC?

2    A.   This was -- yes, it was.

3         MR. ROSS:  I would move for admission of Receiver

4    Exhibit 38.

5         THE COURT:  Any objection?

6         MR. BOISVERT:  Well, I would object on the basis

7    that it appears to be an unsigned agreement and also it's

8    hearsay.

9         THE COURT:  Overruled.

10       Any other objections?

11        MS. FAULKNER:  No, Your Honor.  I'll say the same

12   thing.

13        THE COURT:  The objections are overruled.

14       Receiver Exhibit 38 is admitted.

15   BY MR. ROSS:

16   Q.   Mr. Rapoport, is this another draft of the distribution

17   agreement for RackAlley's -- the proceeds of the RackAlley

18   sale?

19   A.   This is a different draft, an initial draft.

20   Q.   Okay.  If you look on -- on this draft, it says right

21   there, about a third of the way down, $300,000 to be paid to

22   Chris Faulkner - broker.

23       Do you see where I'm --

24   A.   Yes.

25   Q.   -- saying?

1          Did Chris Faulkner as a broker in the sale of RackAlley's

2     assets?

3     A.    No, he did not.

4     Q.    Who directed that Chris Faulkner be listed as a broker on

5     the sale -- on this document?

6     A.    From what I recall, I believe a lawyer retained from

7     RackAlley through Mohamed, the other business partner, had

8     indicated that that would be the best way to proceed.

9     Q.    I don't want to get into any privileged conversations

10    between RackAlley and its lawyers on that, but did you have an

11    understanding as to why that was the best way to proceed?

12    A.    Because Chris wasn't listed on any official documents as

13    an owner of RackAlley.

14    Q.    But you were -- you still understood him to be an owner?

15    A.    That's correct.

16    Q.    And Chris Faulkner was still expecting to be paid as an

17    owner; is that correct?

18    A.    Yes.   That's correct.

19    Q.    And this -- this draft distribution agreement provides

20    that he will be paid in line with what the other owners were

21    paid; is that correct?

22    A.    That's correct.

23              MR. ROSS:   One moment, Your Honor.

24         I'll pass the witness, Your Honor.

25              THE COURT:   Cross-examination.

```
 1              MR. BOISVERT:  Thank you, Your Honor.
 2                       CROSS EXAMINATION
 3   BY MR. BOISVERT:
 4   Q.    You said -- you testified that RackAlley is a web hosting
 5   internet services company?
 6   A.    That's correct.
 7   Q.    Does it have any involvement in any oil and gas business?
 8   A.    No, it does not.
 9   Q.    Would you characterize any of the proceeds from the sale
10   of RackAlley as oil and gas assets?
11   A.    I would -- no.
12   Q.    Okay.  With respect to Exhibit 37, this agreement is
13   dated September 16th, 2011, correct?
14   A.    That's correct.
15   Q.    And you would agree that that date is before September
16   25th, 2017, correct?
17   A.    That's correct.
18   Q.    And then with respect to Exhibit 39, which is the
19   agreement for distribution of proceeds, that agreement is
20   dated August 18th, 2017.  Correct?
21   A.    That's correct.
22   Q.    And, again, you would agree that that is before September
23   25th, 2017?
24   A.    That is correct.
25   Q.    And with respect to Exhibit 38, that's dated August 18th,
```

1    2017?

2    A.    That is correct.

3    Q.    And this was created prior to September 25th, 2017,

4    correct?

5    A.    That's correct.

6    Q.    When did RackAlley sell its assets?

7    A.    September 15th, 2017.

8    Q.    And, again, that's prior to September 25th, 2017?

9    A.    That's correct.

10   Q.    And when were proceeds from the sale of RackAlley

11   distributed to USPI?

12   A.    I -- I do not have that information.

13   Q.    Okay.

14         MR. BOISVERT:   Pass the witness, Your Honor.

15         THE COURT:   Ms. Faulkner.

16         MS. FAULKNER:   Just a couple of questions, Your

17   Honor.

18                       CROSS EXAMINATION

19   BY MS. FAULKNER:

20   Q.    Mr. Rapoport, did RackAlley file R-- IRS tax returns each

21   year?

22   A.    Yes, it did.

23   Q.    And who are the members listed on those tax returns?

24   A.    Myself and Mohamed Arab.

25   Q.    But you're saying that Chris Faulkner owned a third?

| 1 | A. | That's correct. |

1   A.   That's correct.

2   Q.   But he's not listed on any of the IRS tax forms?

3   A.   That's correct.

4   Q.   What about the state?

5        Because this is California, the state income tax forms.

6   A.   He was not listed on those either.

7   Q.   Only you and Mohamed Arab?

8   A.   That's correct.

9   Q.   All right.  What about the public information that's

10  filed annually in California dealing with LLC, who was listed

11  as any of the members?

12  A.   It was a Nevada LLC.  And he was not listed on that

13  either.

14  Q.   Okay.  Are there any notices to the public that

15  Mr. Faulkner was listed or potentially a member of this LLC?

16  A.   No.

17  Q.   All right.

18            MS. FAULKNER:  That's all, Your Honor.

19            THE COURT:  Redirect?

20                      REDIRECT EXAMINATION

21  BY MR. ROSS:

22  Q.   Did Chris Faulkner know that he was a member of the LLC?

23  A.   Yes, he did.

24            MR. BOISVERT:  Object, speculation.

25            THE COURT:  Overruled.

1           MR. ROSS:   Nothing further, Your Honor.

2           THE COURT:   Any recross?

3           MR. BOISVERT:   No, Your Honor.

4           MS. FAULKNER:   No, Your Honor.

5           THE COURT:   Any objection to excusing the witness?

6           MR. BOISVERT:   No.

7           THE COURT:   All right.   Thank you, sir.   You may

8    step down.

9       You're excused.

10          MR. ROSS:   Your Honor, just to clarify on one thing,

11   I believe the respondents have listed Mr. Rapoport as a

12   witness in their case in chief.   He is going to be flying back

13   to California today and I was hoping he could be excused for

14   the remainder of the day.

15          MR. BOISVERT:   He's not on my witness list, Your

16   Honor, so I'm fine with that.

17          THE COURT:   Do you have any objection, Ms. Faulkner?

18          MS. FAULKNER:   No, I don't, Your Honor.

19          THE COURT:   All right.   You're excused.   And you may

20   return to California.

21          MR. RAPOPORT:   Thank you.

22          MR. ROSS:   Mr. Hallam, Your Honor.

23          THE COURT:   Raise your right hand, please.

24          PARKER REESE HALLAM, WITNESS, SWORN

25          THE COURT:   All right.   Be seated, please, and speak

1    into the microphone.

2                         DIRECT EXAMINATION

3    BY MR. TOMKO:

4    Q.    Good morning.

5    A.    Good morning.

6    Q.    Would you state your full name for the record, please.

7    A.    Parker Reese Hallam.

8    Q.    And, Mr. Hallam, do you know Mr. Chris Faulkner?

9    A.    Yes.

10   Q.    Is he in the courtroom today?

11   A.    Yes.

12   Q.    How do you know Mr. Faulkner?

13   A.    We were in business together.

14   Q.    What kind of business were you in with Mr. Faulkner?

15   A.    The oil and gas business.

16   Q.    And what year did you go into business with him, sir?

17   A.    2009.

18   Q.    Okay.  What was the name of the business?

19   A.    Breitling Oil & Gas Corporation.

20   Q.    Okay.  Who were the owners of Breitling Oil & Gas

21   Corporation in 2009?

22   A.    Christopher Faulkner, Dusty Michael Miller Rodriguez, and

23   me.

24   Q.    Okay.  And how much did each of you own?

25   A.    One-third.

1  Q.   Now -- now, we have obtained records from the State of

2  Texas concerning the various business entities that are named

3  Breitling, and I have before you in that notebook Receiver's

4  Exhibit 54.

5      Can you --

6  A.   Open it up?

7  Q.   -- look at that, please.

8         MR. TOMKO:  Your Honor, this exhibit contains a

9  certification from the State of Texas that it is a true and

10  correct copy.  And we would move the admission of 54,

11  Receiver's Exhibit 52, Receiver's Exhibit 55, Receiver's

12  Exhibit 56, and Receiver's Exhibit 53.  All are state records

13  with certifications.

14         THE COURT:  Any objection?

15         MR. BOISVERT:  No objection, Your Honor.

16         MS. FAULKNER:  No objection, Your Honor.

17         THE COURT:  Receiver Exhibits 52, 53, 54, 55, and 56

18  are admitted.

19         MR. TOMKO:  Thank you, Your Honor.

20  BY MR. TOMKO:

21  Q.   Looking at Exhibit 54, what business does that indicate?

22      What business is that for, sir?

23  A.   Breitling Oil & Gas Corporation.

24  Q.   And is the designation of officers, directors, and other

25  personnel accurately displayed in that document?

1   A.   Chris Faulkner was a director, not Tamra Freedman.

2   Q.   All right.  Who is Tamra Freedman?

3   A.   It's Chris's wife, or former wife.

4   Q.   And the other two are you, correct?

5   A.   Say that one more time.

6   Q.   The other -- the other directors are you and Mr. Miller?

7   A.   Yes.

8   Q.   All right.  And Mr. Faulkner is designated as the

9   registered agent; is that correct?

10   A.   Yes.

11   Q.   All right.  If you would, sir, go to Exhibit 52.

12        And can you -- is that an accurate depiction of the

13   members, directors, other officers of Breitling Royalties

14   Corporation?

15   A.   Tamra Freedman was not a director.  Chris Faulkner was

16   the director.  Otherwise, it's -- it's accurate.

17   Q.   And Exhibit 53, can you look at that, sir.

18        And what entity is that?

19   A.   Breitling Energy Corporation.

20   Q.   And does this accurately depict the officers, directors,

21   and personnel?

22   A.   It -- it does for -- it does when the company became a

23   public company, but I believe that Miller, myself -- Miller

24   and myself were directors of this company prior to the company

25   going public.

1   Q.   And do you know when the company went public, what year?

2        If you know.

3   A.   I could take a stab at it, but I'm not sure if I know the

4   exact --

5   Q.   No.  No.  No.

6   A.   -- date.

7   Q.   How was -- how was that company formed?

8        Do you know how that -- the public company was formed?

9   A.   Chris handled all the structuring of all the entities.

10  Q.   Okay.  Exhibit 55.  That, sir, are you familiar with that

11  company?

12  A.   Breitling Energy Companies, Incorporated?

13  Q.   Yes.

14  A.   Yes.

15  Q.   Are the -- if you look at the page that designates

16  certificate of formation, does that accurately depict who the

17  directors were of that company, sir?

18  A.   The certificate of formation for this says Breitling

19  Energy Corporation.

20  Q.   And who are designated as the directors?

21  A.   Chris Faulkner, Michael Miller, and me.

22  Q.   Okay.  Who -- who ran each of these Breitling companies?

23       Who was the officer who ran the company, sir?

24  A.   Chris Faulkner.

25  Q.   Who handled the finances of the companies?

A.    Chris Faulkner.

Q.    I'd like to show you what has been marked for admission as Exhibit -- Receiver's Exhibit 70.

Would you look at that, sir.

What is that, sir?

What does that purport to be, that document, just the document?

A.    It's a -- it's a whiteboard presentation by Chris Faulkner showing a diagram of the of the Breitling Oil & Gas companies.

Q.    Did you take that photograph?

A.    I did.

Q.    Is this a true and correct copy of the depiction of what was in the photograph when you took it?

A.    Yes.

Q.    All right.  And this is a true and correct copy of that photograph?

A.    Yes.

Q.    All right.

MR. TOMKO:  We would move for admission, Your Honor, of Exhibit 70.

MR. BOISVERT:  Your Honor, we filed a motion to strike with respect to Exhibit 64 through 70.  This particular exhibit was produced to us and added to this Receiver's Exhibit list, I believe, on Tuesday.  The deadline to file

1    exhibit lists was last Thursday, and so we move to strike this

2    as being lately designated.

3            THE COURT:  All right.  The court, as it indicated

4    in its order, can determine in connection with this hearing

5    whether the exhibit should be stricken or disregarded.

6        At this point I don't know of a basis to strike it, other

7    than the timeliness, and therefore, I overrule the objection.

8    BY MR. TOMKO:

9    Q.   When was the photograph --

10           THE COURT:  Just a moment.

11           MR. TOMKO:  I'm sorry.

12           THE COURT:  Receiver Exhibit 70 is admitted.

13   BY MR. TOMKO:

14   Q.   When was that photograph taken, sir, do you know?

15   A.   November of 2012.

16   Q.   Okay.  And why did you take this photograph?

17   A.   I wanted a copy of the diagram because at the time I

18   didn't understand fully what was going to happen with the

19   companies and how it was going to be reorganized.

20   Q.   Now, you were not an officer of the public company; is

21   that correct?

22   A.   Not when it was a publicly-traded company.

23           MR. TOMKO:  Okay.  That's all we have, Your Honor.

24       Pass the witness.

25           THE COURT:  Cross-examination.

CROSS EXAMINATION

BY MR. BOISVERT:

Q.    Good morning, Mr. Hallam.

A.    Good morning.

Q.    I've just got a few questions for you.

      If you can turn back to Exhibit 52, the first page.

      The first page lists two public information reports, one filed on December 31st 2012, and one filed on December 31st 2012.

      Do you see that?

A.    So the public information report December 31st, 2012, yes.

Q.    Yes.  Did the receiver show you a copy of that report before your testimony today?

A.    I -- I don't recall.

Q.    And -- and that report would have listed who the officers and directors of Breitling Royalties Corporation would be?

A.    I -- I don't recall.

Q.    Okay.  Are you familiar with what information is on a public information report?

A.    No.

Q.    And, again, with respect to the public information report filed on December 31st, 2012, were you shown a copy of that report?

A.    I don't recall.

1    Q.    Okay.  And do you know if that -- do you know if that

2    report would have shown who the officers and directors of

3    Breitling Royalties Corporation were?

4    A.    I don't know.

5    Q.    Do you know whether or not Christopher Faulkner was

6    listed as a director in either of those two reports?

7    A.    I don't recall seeing them.

8    Q.    Okay.  And with respect -- there's another public

9    information report that was filed on December 31st, 2013,

10   effective as of March 26, 2014.

11         Were you shown a copy of that report before --

12   A.    I'm not -- I'm not sure where you're talking about.  Say

13   that again.

14   Q.    Oh, it's the -- it's the I believe fifth item down?

15   A.    On the same page?

16   Q.    On the same page.  Yes.

17   A.    The December 31st?

18   Q.    2013.

19   A.    Okay.  What's the question?

20   Q.    Were you shown a copy of that report before your

21   testimony today?

22   A.    I don't recall.

23   Q.    Okay.  And do you know whether that report would have

24   listed Christopher Faulkner as a director of Breitling

25   Royalties Corporation?

```
 1    A.    I don't know.
 2              MR. BOISVERT:   I'll pass the witness, Your Honor.
 3              MS. FAULKNER:   No questions of this witness, Your
 4    Honor.
 5              MR. TOMKO:   One question.
 6              THE COURT:   Redirect?
 7              MR. TOMKO:   One question.
 8                        REDIRECT EXAMINATION
 9    BY MR. TOMKO:
10    Q.    The Breitling companies, who was the owner of the private
11    Breitling companies?
12    A.    The private Breitling companies, so can you name the
13    companies for me?
14    Q.    Breitling Oil & Gas, Breitling Energy, and Breitling
15    Royalty.
16    A.    The owners of the companies for Breitling Oil & Gas
17    before it went public were Chris Faulkner, Michael Miller, and
18    me.
19    Q.    And is that true for the other Breitling privately-owned
20    companies?
21    A.    Yes.
22              MR. TOMKO:   No further questions.
23              THE COURT:   Any other questions?
24              MR. BOISVERT:   One last question, Your Honor.
25                        RECROSS EXAMINATION
```

1    BY MR. BOISVERT:

2    Q.    When were you last associated with Breitling Royalties

3    Corporation?

4    A.    Can you ask the question in another way perhaps?

5          I'm not . . .

6    Q.    Well, what was -- what was your role with respect to

7    Breitling Royalties Corporation?

8    A.    I owned one-third of the company.

9    Q.    Okay.  And when were -- when was -- when was the last

10   time you owned one-third of the company?

11   A.    I don't recall.

12   Q.    Can you approximate?

13         In the last year?

14   A.    I -- I don't know.

15   Q.    In the last six months?

16   A.    I don't know.

17   Q.    Okay.

18             MR. BOISVERT:   Nothing further, Your Honor.

19             MS. FAULKNER:   No questions, Your Honor.

20             THE COURT:   Any objection to excusing the witness?

21             MR. TOMKO:   No objections, Your Honor.

22             THE COURT:   All right.  Thank you, sir.

23         You may step down.  You're excused.

24             MR. TOMKO:   Mr. Miller.

25         Next witness is Mr. Miller, Your Honor.

```
 1              THE COURT:  Raise your right hand, please.
 2             MICHAEL MILLER RODRIGUEZ, WITNESS, SWORN
 3              THE COURT:  Be seated, please, and speak into the
 4   microphone.
 5                        DIRECT EXAMINATION
 6   BY MR. TOMKO:
 7   Q.    State your name for the record, please.
 8   A.    Dustin Michael Miller Rodriguez.
 9   Q.    Are you familiar with Chris Faulkner?
10   A.    I am.
11   Q.    Do you see him here in the courtroom today?
12   A.    I do.
13   Q.    How did you -- what is your relationship with
14   Mr. Faulkner?
15   A.    I met him through Parker Hallam.
16   Q.    And what type of relationship did you have with him?
17   A.    Business relationship.
18   Q.    What types of businesses did you deal with Mr. Faulkner
19   in?
20   A.    Breitling Crude and Patriot oil companies.
21   Q.    In the oil and gas business?
22   A.    That's correct.
23   Q.    Okay.
24         Were you a co-owner of these businesses with
25   Mr. Faulkner?
```

1   A.   I was.

2   Q.   And who else was a owner of those businesses, if anyone?

3   A.   Chris Faulkner, Parker Hallam, and myself.

4   Q.   Okay.  And those businesses include Breitling Oil & Gas

5   Company, the private company.  Are you familiar with that?

6   A.   Yeah.

7   Q.   Okay.  What was Chris's role in Breitling Oil & Gas

8   Company, the private company?

9   A.   CEO.

10   Q.   Okay.  And who managed that company on a day-to-day

11   basis?

12   A.   He did.

13   Q.   Who managed the finances of that company?

14   A.   He did.

15   Q.   Okay.  What about Breitling Royalties Corporation, who --

16   who were the owners of that?

17   A.   Chris Faulkner, Parker Hallam, and myself.

18   Q.   And who managed that company on a day-to-day business?

19   A.   Chris Faulkner.

20   Q.   Who managed the finances of that company?

21   A.   Chris Faulkner.

22   Q.   Are you familiar with Carole Faulkner?

23   A.   I am.

24   Q.   How did you become familiar with her?

25   A.   That's Chris's mom.  And at the beginning of the

1    companies she was there for advice.  And she helped me with my

2    child support one time.  And she help me set up my LLC.

3    Q.    You say she was there for advice.  She was advising you

4    and the other officers or directors concerning these oil and

5    gas companies?

6    A.    You know, I don't know.  She never gave me advice

7    directly on the companies, but I think Chris would lean on her

8    for a little bit for advice before we had general counsel.

9    Q.    Do you know whether or not she played any role in -- in

10   forming these companies?

11   A.    I do not know.

12   Q.    Okay.

13         Breitling Energy Corp., Inc., that's a public company,

14   are you familiar with that?

15   A.    A little bit.

16   Q.    Okay.  What role, if any, did you hold in that?

17   A.    Can you repeat that question?

18   Q.    What role did you have in the public company?

19   A.    I believe I was a director.

20   Q.    All right.  Who ran the public company?

21   A.    Chris Faulkner.

22   Q.    Who ran the finances of the company?

23   A.    Chris Faulkner.

24   Q.    How is the public company formed, are you familiar with

25   that?

1    A.    Very little.  I believe it backed into another company
2    called Bering.
3    Q.    Called Bering?
4    A.    Uh-huh.
5    Q.    Was that a shell company at the time, do you know?
6    A.    I think so.
7    Q.    All right.  And Breitling Royalty Fund, LLC, are you
8    familiar with that, sir?
9    A.    I am not.
10   Q.    You are not?
11         Okay.  Breitling Energy Corporation, the public company,
12   was that -- who owned the public company?
13   A.    I would say Breitling owned it.
14   Q.    Breitling the -- what Breitling entities, if you know?
15   A.    I do not know.
16   Q.    Okay.  Are you familiar with a company called Crude
17   Energy?
18   A.    Yes.
19   Q.    Okay.  And what is Crude Energy?
20   A.    Crude was just a money raising company.  Essentially it
21   took over what Breitling left behind when it went public.
22   Q.    Okay.  Who was -- who were the officers of Crude?
23         MR. BOISVERT:  Your Honor, I'm going to object to
24   the relevance of Crude Energy.
25         THE COURT:  Overruled at this point.

1    BY MR. TOMKO:

2    Q.    Who were the officers of Crude?

3    A.    Parker Hallam and myself.

4    Q.    Who ran Crude?

5    A.    Parker did, primarily.

6    Q.    Okay.  Did Chris play any role in Crude?

7    A.    Yes.

8    Q.    All right.  Who role did he play?

9    A.    I think he just over -- he was over seeing it.  He was

10   over the top of it.

11   Q.    When you say "over the top of it," what -- what does that

12   finally mean?

13   A.    I think he made the final decisions.  He was the decision

14   marker.

15   Q.    He was the decision marker?

16   A.    I believe so.

17   Q.    All right.  What about Patriot Energy, are you familiar

18   with that?

19   A.    I am.

20   Q.    What role, if any, did you have to be in that?

21   A.    I was supposed to be the owner of it.

22   Q.    When you say you were "supposed to be," what does that

23   mean?

24   A.    Well, you know, come to find out Chris really made the

25   decisions on that as well --

```
1    Q.    I see.

2    A.    -- just like Crude.

3    Q.    Who -- who made all -- who handled all the finances for

4    the companies that we've just discussed?

5    A.    Chris.

6    Q.    For all of the companies?

7    A.    Yes.

8              MR. TOMKO:   That's all I have, Your Honor.

9              THE COURT:   Cross-examination.

10                        CROSS EXAMINATION

11   BY MR. BOISVERT:

12   Q.    Good morning.

13   A.    Good morning.

14   Q.    When were you last involved with Breitling Royalties

15   Corporation?

16   A.    I can't remember.  It's been a long time.

17   Q.    Maybe 2012?

18   A.    Maybe.

19   Q.    But certainly within the last -- not in the last few

20   years?

21   A.    Correct.

22   Q.    And would it be fair to say that you have no personal

23   knowledge with respect to the ownership or management of

24   Breitling Royalties Corporation since you left?

25   A.    Yes.
```

Q.    Would that also -- when did you leave these other

companies you just referenced, Crude Energy and the others?

A.    I left Crude when it was over.  Parker had walked away

from it and that's when I left it, right away.

Q.    Was that several years ago as well?

A.    Yeah.

Q.    And would the same be fair to say you don't know with

respect to the ownership or management of those companies, you

don't know who was in control of that after you left?

A.    You can say that.

Q.    Okay.

            MR. BOISVERT:  Pass the witness, Your Honor.

            MS. FAULKNER:  No questions, Your Honor.

            MR. TOMKO:  No objection.

            THE COURT:  Any objection to excusing the witness?

            MR. TOMKO:  No objection, Your Honor.

            MR. BOISVERT:  No, Your Honor.

            MS. FAULKNER:  No, Your Honor.

            THE COURT:  Thank you, sir.  You may step down.

You're excused.

            THE WITNESS:  You're welcome.

            MR. ROSS:  Your Honor, the receiver calls Patrick

Craine.

            THE COURT:  Raise your right hand, please.

                    PATRICK CRAINE, WITNESS, SWORN

1          THE COURT:  Be seated, please, and speak into the

2    microphone.

3                         DIRECT EXAMINATION

4    BY MR. ROSS:

5    Q.    Mr. Craine, could you state your name for the record and

6    spell your last name, please.

7    A.    Patrick Craine, C-r-a-i-n-e.

8    Q.    Where are do you live?

9    A.    Oklahoma City.

10   Q.    And what is your occupation, Mr. Craine?

11   A.    I'm the deputy general counsel and the chief risk and

12   compliance officer at Chesapeake Energy.

13   Q.    And you're also a Texas licensed attorney; is that

14   correct?

15   A.    I am.

16   Q.    How long have you been licensed?

17   A.    Twenty years.

18   Q.    And how long have you worked at Chesapeake?

19   A.    Five years in June.

20   Q.    All in the same position?

21   A.    Started out as the chief compliance officer and then

22   transitioned to deputy general counsel and chief risk and

23   compliance officer later.

24   Q.    Okay.  And before taking the job at Chesapeake you

25   practiced law in the D/FW area; is that correct?

1    A.    Yes.

2    Q.    I'd like you to turn in the binder there and -- and look

3    briefly at Exhibits 42 and 43.  If you could look at those.

4         Are you familiar with those documents?

5    A.    I am.

6    Q.    Did Chesapeake have a business relationship with some of

7    the Breitling companies?

8    A.    Yes.

9    Q.    Did Chesapeake come -- come into Exhibits 42 and 43 as

10   part of its business records?

11   A.    Yes.  They were served on us in mid-August of this year,

12   I believe.

13              MR. ROSS:  I would move for admission of receiver's

14   Exhibits 42 and 43.

15              MR. BOISVERT:  No objection.

16              THE COURT:  Receiver Exhibits 42 and 43 are

17   admitted.

18   BY MR. ROSS:

19   Q.    And I'm sorry if -- if you've already answered this, but

20   when did Chesapeake come into possession of these documents?

21   A.    Mid-August of this year.

22   Q.    And they were served upon Chesapeake; is that your

23   understanding?

24   A.    That's correct.

25   Q.    And after they were served on Chesapeake did they come to

1  your attention individually?

2  A.    They did.

3  Q.    And what did you do once you received these documents?

4  A.    I read the documents and then looked at the parties

5  involved and then requested that our team research the

6  different entities involved and suspend payments until we

7  determined what the company needed to do.

8  Q.    Okay.  When you say that you requested that they suspend

9  payments, suspend payments to whom?

10  A.    To any of the entities involved in the receivership

11  order.

12  Q.    Okay.  And how did you describe to your team what

13  entities were involved?

14  A.    I gave them the names of the pleadings -- names on the

15  pleadings and then told them to look for anything related to

16  Mr. Faulkner or Breitling and have them research that and get

17  back to me.

18  Q.    And so that was your internal staff that performed that

19  research for you?

20  A.    Yes.

21  Q.    Okay.  When did your staff return the results of your

22  request?

23  A.    I believe August 23rd or August 24th.

24  Q.    I'd like you to look at Exhibit 45.

25       Are you familiar with this document?

1    A.    I am.

2    Q.    Is this document one of the documents that was sent to

3    you by your team in connection with the research you asked

4    them to perform?

5    A.    It was.

6              MR. ROSS:  I would move for admission of Exhibit

7    45.

8              THE COURT:  Any objection?

9              MR. BOISVERT:  No -- well, I object on the basis

10   that it's hearsay, Your Honor.

11             THE COURT:  Will you lay the foundation for the

12   business record?

13             MR. ROSS:  Yeah.  Absolutely, Your Honor.

14   BY MR. ROSS:

15   Q.    Is -- is Exhibit 45 a -- a document that's kept in the

16   normal course of Chesapeake's business?

17   A.    It is.

18   Q.    And is it created or maintained at the time that it

19   was -- of the events described therein?

20   A.    It is.

21   Q.    And as part of its normal business to keep records like

22   this?

23   A.    Yes.

24             MR. ROSS:  I'll move for admission of Exhibit 45.

25             MR. BOISVERT:  No further objection, Your Honor.

```
 1              THE COURT:   And will you establish whether the
 2    information provided was by someone with personal knowledge?
 3              MR. ROSS:   Yes.   Of course, Your Honor.
 4    BY MR. ROSS:
 5    Q.    Was the information in Exhibit 45 provided by someone
 6    with personal knowledge?
 7    A.    Yes.
 8    Q.    Now, if we could get a little bit to the meat of the
 9    document.
10              THE COURT:   Let the court make a ruling then.
11              MR. ROSS:   I apologize, Your Honor.
12              THE COURT:   The objection is now overruled and
13    receiver Exhibit 45 is admitted.
14    BY MR. ROSS:
15    Q.    And Exhibit 45 was one of the documents returned to you
16    by your team in response to your research request?
17    A.    Yes.
18    Q.    I'd like you to turn to Exhibit 46.
19          Are you familiar with this document?
20    A.    I am.
21    Q.    And is this -- is this a document that is kept in the
22    normal course of Chesapeake's business?
23    A.    It is.
24    Q.    And maintained as part of its business?
25    A.    It is.
```

1    Q.    And are the events described therein made by someone at

2    Chesapeake with personal knowledge thereof?

3    A.    They are.

4              MR. ROSS:   Your Honor, I would move for admission of

5    Exhibit 46.

6              MR. BOISVERT:   No objection, Your Honor.

7              THE COURT:   Receiver Exhibit 46 is admitted.

8    BY MR. ROSS:

9    Q.    I'd like you to flip -- look if you could at Exhibit 57.

10   I'm sorry.  Forget that.  Never mind.

11         I'd like you to look at Exhibit 47.

12         Are you familiar with Exhibit 47?

13   A.    Yes.

14   Q.    Is this a document that was maintained by Chesapeake?

15   A.    Yes.

16   Q.    And is this a document that was returned to you in

17   response to your request for research regarding the temporary

18   restraining order and the order appointing the temporary

19   receiver?

20   A.    Yes.

21             MR. ROSS:   I would move for admission of Exhibit

22   47.

23             MR. BOISVERT:   No objection, Your Honor.

24             MS. FAULKNER:   No objection, Your Honor.

25             THE COURT:   Receiver Exhibit 47 is admitted.

BY MR. ROSS:

Q.    I'd like you to look at Exhibit 48, if you could.

      Are you familiar with this document?

A.    I am.

Q.    Is this a document maintained by Chesapeake?

A.    Yes.

Q.    And was this document provided to you by your staff in
response to your request for research regarding the TRO and
the order appointing the temporary receiver?

A.    Yes.

      MR. ROSS:   I would move for admission of Exhibit 48,
Your Honor.

      MR. BOISVERT:   No objection, Your Honor.

      MS. FAULKNER:   No objection, Your Honor.

      THE COURT:   Receiver Exhibit 48 is admitted.

BY MR. ROSS:

Q.    And Exhibit 49, if you could.

A.    Yes.

Q.    Are you familiar with this document?

A.    I am.

Q.    And was this again a document that was provided to you by
your staff at Chesapeake in response to your request for
research regarding the TRO and the order appointing the
receiver?

A.    Yes.

```
 1              MR. ROSS:  I would move for admission of Exhibit
 2    49.
 3              MR. BOISVERT:  No objection, Your Honor.
 4              MS. FAULKNER:  No objection, Your Honor.
 5              THE COURT:  Receiver Exhibit 49 is admitted.
 6    BY MR. ROSS:
 7    Q.    And I'd like you to look at Exhibit 50, if you could.
 8    A.    Yes.
 9    Q.    Is this a document that was maintained by Chesapeake?
10    A.    Yes.
11    Q.    And this is maintained in Chesapeake's files?
12    A.    Yes.
13    Q.    And was this, again, a document that was provided to you
14    by your staff in response to your request for research as to
15    the TRO and the order appointing the temporary receiver?
16    A.    Yes.
17              MR. ROSS:  I would move for admission of Exhibit
18    50.
19              MR. BOISVERT:  No objection, Your Honor.
20              MS. FAULKNER:  No objection, Your Honor.
21              THE COURT:  Receiver Exhibit 50 is admitted.
22    BY MR. ROSS:
23    Q.    And I'd like you to look at Exhibit 51, if you could.
24    A.    Yes.
25    Q.    And are you familiar with this document?
```

1    A.    I am.

2    Q.    And is this document that was provided to you by your

3    staff in response to your request for research regarding the

4    TRO and the order appointing temporary receiver?

5    A.    Yes.

6              MR. ROSS:   I would move for admission of Exhibit

7    51.

8              MR. BOISVERT:   The Exhibit 51 I have, Your Honor,

9    just appears to be a blank electronic change of address form,

10   so I'm not sure what the relevance is.

11             MR. ROSS:   I think we can establish relevance and

12   I'm happy to go through the business records colloquy.

13             MR. BOISVERT:   I mean, there's no information on it.

14             THE COURT:   Why don't you ask a few more

15   foundational questions.   It's not a hearsay objection he's

16   making, it's really a relevance objection.

17             MR. ROSS:   Sure.   Okay.

18   BY MR. ROSS:

19   Q.    Exhibit 51, is -- is that a document that was provided to

20   Breitling Royalties Corporation?

21   A.    Yes.

22   Q.    And -- and that Exhibit 51 was provided to you as -- as

23   part of your request for research regarding the Breitling

24   companies; is that correct?

25   A.    Yes.

1          MR. ROSS:  Now I would move for its admission, Your

2     Honor.

3          THE COURT:  Any objection?

4          MR. BOISVERT:  Well, again, Your Honor, this -- this

5     Exhibit 51 doesn't reflect a document that was sent to

6     Breitling, so, again, I -- I object to the relevance.

7          THE COURT:  The objection goes to the weight and is

8     overruled.

9          Receiver Exhibit 51 is admitted.

10    BY MR. ROSS:

11    Q.   And, Mr. Craine, just to address these, sort of in their

12    totality, do Exhibits 45 through 51, is -- is that the entire

13    package that was provided to you by your staff in response

14    to -- to your request for research on the TRO and order

15    appointing --

16    A.   Yes.  These were the documents they provided.

17    Q.   Okay.  Look at Exhibit 45.

18    A.   Yes.

19    Q.   This is a document called division order instruction

20    sheet.  Can you provide the court with a little explanation as

21    to what this is?

22    A.   Yes.  When a well comes into production this is the form

23    provided as far as address and also changes of address.

24    Q.   Okay.  And so this particular Exhibit 45 was provided

25    to -- to Breitling Royalties Corp.; is that correct?

1    A.    Yes.

2    Q.    And if you would turn -- flip back to Exhibit 51.

3          This blank change of address form, was that also provided

4    to Breitling Royalties Corp.?

5    A.    I am not sure.

6    Q.    Okay.

7          But in any event, this was part of the package that was

8    returned to you for research --

9    A.    Correct.

10   Q.    -- after research.

11         I'd like you to look at Exhibit 46.

12         This is a change of address form; is that correct?

13   A.    Yes.

14   Q.    And this is something that -- that Chesapeake would keep

15   on file?

16   A.    Yes.

17   Q.    And who -- if -- if you look there at the second page --

18              MR. BOISVERT:  I'm sorry.  I apologize.  What

19   exhibit this?

20              MR. ROSS:  46.

21              MR. BOISVERT:  Thank you.

22   BY MR. ROSS:

23   Q.    Down towards the bottom, who does it say filled out this

24   form?

25   A.    Chris A. Faulkner.

1    Q.    Okay.  And there towards the top, it says "your name,"
2    who does it say?
3    A.    Chris Faulkner.
4    Q.    And what is the new address that's provided there?
5    A.    2150 West Northwest Highway, Suite 114-1133, Grapevine,
6    Texas, 76034.
7    Q.    Okay.  So just to back up a little bit, what's the
8    purpose of this change of address form for Chesapeake's
9    purposes?
10   A.    This is where to send revenue checks.  So this is asking
11   us to change the distributions from 3930 Glade Road to the
12   Northwest Highway address.
13   Q.    If you flip back to the first page on that, what's the
14   date on this document?
15   A.    The email was sent Tuesday, August 15, 2007, at 10:04
16   a.m.
17   Q.    Okay.  Now, if you flip to Exhibit 49.
18   A.    Yes.
19   Q.    Does this appear to be the -- in substance the same
20   change of address form as we just saw in Exhibit 46?
21   A.    Yes.  The one difference I would note that there's a
22   mailroom stamp from Chesapeake on top.
23   Q.    Okay.  So Exhibit 46 was provided electronically?
24   A.    Correct.
25   Q.    And Exhibit 49 would be -- would convey the same

1    information about the change of address but it was received by
2    mail; is that correct?
3    A.    Yes.   This would be the physical hard copy sent to our
4    mailroom.
5    Q.    Okay.   And if you look at the second page there --
6    A.    Yes.
7    Q.    -- is that a letter from Chris Faulkner?
8    A.    Yes.
9    Q.    And what's the date of that letter?
10   A.    August 15, 2017.
11   Q.    Okay.
12         And at the end of that first paragraph, Mr. Faulkner is
13   saying "Please update your records and forward all
14   communications, payments, and documents to the new address"?
15   A.    Yes.
16   Q.    And that new address being the address on Northwest
17   Highway; is that correct?
18   A.    Correct.
19   Q.    And the third page of that document, that's the photocopy
20   of the envelope that Chesapeake would keep?
21   A.    Correct.
22         It has the mailroom stamp as well.
23   Q.    Now, if you could turn back to Exhibit 47.
24   A.    Yes.
25   Q.    If you flip to the second page of this document it's --

1    it's a document entitled division order.

2        Could you provide the court with a little background of

3    what this document is.

4    A.    It is instructing us where distributions and proceeds

5    should be sent.

6    Q.    And, again, the second page is changing this from an

7    address on Glade Road to a new address on Northwest Highway;

8    is that correct?

9    A.    Correct.

10   Q.    And if you flip back to the first page --

11   A.    Yes.

12   Q.    -- was this document electronically submitted to

13   Chesapeake?

14       Okay.  But it appears there's -- there's a handwritten

15   signature and the actual form is handwritten.

16       Do you require a handwritten form for this division

17   order?

18   A.    Yes.  And a signature.

19   Q.    Okay.  So even if it's sent electronically it's -- it's

20   got to be printed out and hand signed?

21   A.    Yes.

22   Q.    And -- and the first page indicates that this is sent

23   from Christopher Faulkner; is that correct?

24   A.    Yes.

25   Q.    And what's the date that this was sent and the time?

1    A.    Tuesday, August 15, 2017, at 12:09 p.m.

2    Q.    And if you could look at Exhibit 49?

3    A.    Yes.

4    Q.    I'm sorry.  Exhibit 48.

5    A.    Yes.

6    Q.    Is this the -- in substance the same division order that

7    was in Exhibit 47 but conveyed by mail rather than

8    electronically?

9    A.    Yes.

10   Q.    And if you look at the second page you'll see the

11   mailroom stamp?

12   A.    Yes.

13   Q.    When -- when was this actually received by Chesapeake?

14   A.    August 18, 2017.

15   Q.    Now, if you look at the last pages of Exhibit 48 and

16   49 --

17   A.    Yes.

18   Q.    -- those appear to be duplicates of the same -- photocopy

19   of the same envelope?

20   A.    Yes.

21   Q.    Were Exhibits 48 and 49 sent in the same package?

22   A.    I am not sure.

23   Q.    Okay.  But if you look at Exhibit 50, there's a UPS

24   tracking history?

25   A.    Yes.

1    Q.    That would appear to correlate to those two documents; is

2    that correct?

3    A.    Yes.

4    Q.    Okay.  And if you look at the second page of Exhibit 50,

5    does that indicate when the actual -- when the package was

6    sent -- was provided to the United States Postal Service for

7    delivery?

8    A.    Yes, it does.

9    Q.    And when was that?

10   A.    August 15, 2017, at 4:25 p.m.  It notes USPS in

11   possession of item in Los Angeles.

12   Q.    Okay.  Now, you testified earlier you received these

13   Exhibits 49 -- or 45 through 51 from your research department

14   on August 23rd or August 24th?

15   A.    Correct.

16   Q.    What did you do after you received these change of

17   address forms back?

18         Go ahead.

19   A.    I believe I received them late the 24th and then

20   contacted the receiver and the SEC on the morning of the 25th.

21   Q.    And what did you tell them when you contacted them?

22   A.    I conveyed what was in the research and then sent them an

23   email detailing the different documents and the research

24   findings.

25   Q.    Okay.  So you conveyed to them that at or around August

1    15th change of address forms and division orders indicating a

2    change of address were sent by Chris Faulkner for Breitling

3    Royalties Corp.?

4    A.    Yes.

5    Q.    Okay.  So you talked to the SEC and you talked to the

6    receiver.

7          What other actions did you take?

8    A.    Later that day I took the substance of the email I'd sent

9    and put it in the form of a declaration that I submitted to

10   the SEC and the receiver on the 25th.

11   Q.    Did you also suspend any payments from going out?

12   A.    Yes.

13   Q.    Is that suspension still in effect?

14   A.    Yes.

15   Q.    Is this the first time that Chesapeake has had to suspend

16   an account when there's some sort of question as to ownership

17   of that account?

18   A.    No, it isn't.

19   Q.    What other contexts does that come up in?

20   A.    We see it with government orders, sometimes tax liens,

21   title disputes, and other governmental orders, and court

22   orders.

23   Q.    Okay.  And what is Chesapeake's response to those --

24   those sorts of --

25   A.    Essentially the exact same thing that occurred here.  We

1    research the issue, put the funds in suspense, and then wait

2    for further direction before distributing any proceeds.

3              MR. ROSS:  Pass the witness, Your Honor.

4              THE COURT:  Cross-examination.

5                        CROSS EXAMINATION

6    BY MR. BOISVERT:

7    Q.   Morning.  I just have a few questions for you.

8         If you could turn back to Exhibit 42, Exhibits 42 and 43.

9    A.   Yes.

10   Q.   Would you agree with me that Breitling Royalties

11   Corporation is not mentioned in either of these orders?

12   A.   Yes.

13             MR. BOISVERT:  Nothing further, Your Honor.

14             MS. FAULKNER:  No questions, Your Honor.

15             THE COURT:  Any other questions?

16             MR. ROSS:  Yes.  Briefly, Your Honor.

17                      REDIRECT EXAMINATION

18   BY MR. ROSS:

19   Q.   I'd like you to look back at Exhibit 43, if you could.

20   A.   Yes.

21   Q.   I'd like you to look at the second paragraph on the first

22   page.

23   A.   Yes.

24   Q.   Where it says, "The court finds that, based on the record

25   in these proceedings, the appointment of a temporary receiver

1  in this action is necessary and appropriate for the purposes

2  of marshalling and preserving all oil and gas related

3  assets-in any form or of any kind whatsoever" --

4      Did I read that correctly?

5  A.   Yes.

6  Q.   -- "owned, controlled, possessed, or managed, directly or

7  indirectly, by defendant Christopher A. Faulkner."

8      Did I read that correctly?

9  A.   Yes.

10 Q.   And it was your understanding that in Exhibits 45 through

11 51 Christopher Faulkner was the one conveying information

12 regarding a change of address?

13 A.   Yes.

14 Q.   And if you look last -- last page of Exhibit 43, if you

15 could.

16 A.   Yes.

17 Q.   Does this indicate when this order was signed?

18 A.   Yes.

19 Q.   When was that?

20 A.   August 14, 2017, at 7:52 a.m.

21      MR. ROSS:  Pass the witness, Your Honor.

22      THE COURT:  Any recross?

23      MR. BOISVERT:  No, Your Honor.

24      THE COURT:  Any objection to excusing the witness?

25      All right.  Thank you, sir.

1        THE WITNESS:  Thank you.

2        THE COURT:  You may step down.  You're excused.

3     At this time we're going to take our morning break for 20

4   minutes.

5        We'll resume at 10:45.

6        So at this time we'll resume at 10:45.

7        THE SECURITY OFFICER:  All rise.

8                 (Recess taken at 10:25.)

9               (Proceedings resumed at 10:45.)

10        THE SECURITY OFFICER:  All rise.

11        THE COURT:  You may be seated.

12     You may call your next witness.

13        MR. TOMKO:  The receiver would call Carole Faulkner,

14   Your Honor.

15        THE COURT:  Raise your right hand, please.

16          CAROLINA FAULKNER, WITNESS, SWORN

17        THE COURT:  All right.  Be seated, please.

18     Before we begin, Mr. Tomko, may I ask the witness:  I

19   understand you are a lawyer, but do you wish to have a lawyer

20   present, because the record indicates you have invoked your

21   Fifth Amendment rights --

22        THE WITNESS:  Correct.

23        THE COURT:  -- at various times.  And do you wish

24   counsel to be present to advise you on the Fifth Amendment?

25        THE WITNESS:  They've already advised me, Your

1  Honor, before.

2          THE COURT:  All right.  You may proceed, Mr. Tomko.

3                    DIRECT EXAMINATION

4  BY MR. TOMKO:

5  Q.    Good morning.  We've not met before?

6  A.    No.

7  Q.    My name is Ed Tomko and I represent Tom Taylor, the

8  receiver in this case.

9        State your full name for the record, please.

10 A.    Carolina Faulkner.

11 Q.    And, Ms. Faulkner, what do you do for a living?

12 A.    I work for a software company, in the legal department.

13 Q.    All right.  You are an attorney?

14 A.    Yes, I am.

15 Q.    And for how long have you been an attorney?

16 A.    Since 1989.

17 Q.    All right.  And you're admitted in the State of Texas?

18 A.    Yes, sir.

19 Q.    And in the State of California?

20 A.    Yes, sir.

21 Q.    All right.  You -- in your capacity as an attorney you

22 represented Breitling Oil & Gas and Breitling Energy in the

23 investigation conducted by the Securities and Exchange

24 Commission?

25 A.    At this time, based on the advice of counsel, I am

1  exercising my Fifth Amendment rights underneath the U.S.
2  Constitution.
3  Q.    I'd ask you, ma'am, if you would look at Exhibit 2,
4  Receiver's Exhibit 2, please.
5       Is that a document that you can identify?
6  A.    At this time, based on advice of counsel, I'm exercising
7  my Fifth Amendment rights underneath the U.S. Constitution.
8  Q.    This is a document that was sent to you by the SEC, is it
9  not, on the 14th of August, at 2:38 p.m.?
10 A.    At this time I'm exercising my rights underneath the
11 Fifth Amendment of the United States Constitution.
12 Q.    And this document advised you that these orders had been
13 entered by the court as of that time and that date; is that
14 correct?
15 A.    At this time I'm exercising my Fifth Amendment rights
16 under the U.S. Constitution.
17 Q.    And did you have an opportunity to review the orders that
18 were issued by this court at that time?
19 A.    At this time I'm exercising my Fifth Amendment rights
20 under the U.S. Constitution.
21 Q.    Is it -- did you have any question about what was covered
22 by those orders at the time that you reviewed them?
23 A.    I'm exercising my Fifth Amendment rights under the U.S.
24 Constitution.
25 Q.    The -- is it not correct that it prohibited diverting or

1    rerouting any -- any and all oil and gas operators otherwise

2    ordered by the court?

3          Do you recall that, ma'am?

4    A.    I'm exercising my Fifth Amendment rights under the U.S.

5    Constitution.

6    Q.    So anything in that that was ambiguous to you?

7    A.    I'm exercising my Fifth Amendment rights under the U.S.

8    Constitution.

9    Q.    And Exhibit 43, which is the order appointing the

10   temporary receiver, are you familiar with that document?

11   A.    I'm exercising my Fifth Amendment rights under the U.S.

12   Constitution.

13   Q.    And is it not true that that document says "The court

14   finds that based on the records in these proceedings the

15   appointment of a temporary receiver in this action is

16   necessary and appropriate for the purpose of marshalling and

17   preventing all oil and gas related assets in any form or of

18   any kind whatsoever, owned, controlled, possessed, or managed,

19   directly or indirectly, by the defendant Christopher A.

20   Faulkner"; is that an accurate description of what this

21   document says, ma'am?

22   A.    I'm exercising my Fifth Amendment rights under the U.S.

23   Constitution.

24   Q.    I call your attention then to Exhibit R 11.

25          Is that your response to a request by Mr. Taylor for

1    information involving the assets and the records of Breitling

2    Oil & Gas and Breitling Energy?

3    A.    I'm exercising my Fifth Amendment rights under the U.S.

4    Constitution.

5    Q.    And you made representations in this document, Receiver's

6    Exhibit 11, as you stated, it is -- your responses were in

7    red, although they were not copied in red on the paper.  Is

8    that correct?

9    A.    I am exercising my Fifth Amendment rights under the U.S.

10   Constitution.

11           MR. TOMKO:  Your Honor, we would move for the

12   admission of Exhibit Number 11.

13           THE COURT:  Any objection?

14           MR. BOISVERT:  It's hearsay, Your Honor.  It's also

15   unauthenticated.  Sorry.

16           THE COURT:  Mr. Tomko --

17           MR. TOMKO:  Your Honor, this is a true and correct

18   copy of a document that was authored by this witness with the

19   top of the document being her writing and a segment of each of

20   these responses are in her -- were provided by her.

21       I -- I would ask the court that in her failure -- in her

22   invocation of the Fifth Amendment that we may make a -- a

23   finding that this is in fact a true and correct copy of a

24   document that she authored and presented.

25           As it -- it's also a party admission, Your Honor.

1          THE COURT:  I believe it will need to be

2    authenticated through another witness.  I understand that

3    you're offering this as a party admission, but the -- the

4    witness has not laid the foundation for this document.

5          MR. TOMKO:  All right.  Well, we will offer it then

6    through another witness, Your Honor.

7    BY MR. TOMKO:

8    Q.   Exhibit 14, are you familiar with that, Ms. Faulkner?

9    A.   I'm exercising my rights under the Fifth Amendment of the

10   United States Constitution.

11   Q.   This is an document, again, from Mr. Taylor to you

12   advising you that you had attempted to obtain mail from a

13   mailbox.  Are you familiar with that?

14   A.   I'm exercising my Fifth Amendment rights under the U.S.

15   Constitution.

16   Q.   Did -- did you in fact attempt to divert mail to a post

17   office box in -- on -- at 2150 Northwest Highway in Grapevine,

18   Texas?

19   A.   I'm exercising my Fifth Amendment rights under the

20   Constitution.

21   Q.   You in fact opened that mailbox, did you not, ma'am?

22   A.   I'm exercising my Fifth Amendment under the U.S.

23   Constitution.

24   Q.   And you diverted the mail from that mailbox to the

25   original mailbox that was covered by the court order giving

1    the custody of the first mailbox to Mr. Taylor as the

2    receiver; is that not correct, ma'am?

3    A.    I'm exercising my Fifth Amendment rights under the U.S.

4    Constitution.

5    Q.    Exhibit 15.  This is a document that you authored on the

6    30th of August of 2017.  You sent this document to Mr. Taylor.

7          Can you identify that as a document that you prepared?

8    A.    I'm exercising my Fifth Amendment rights under the U.S.

9    Constitution.

10   Q.    And in this document you said that, "As previously stated

11   to you and provided in writing, none of the defendants assets

12   or communications were transferred to the Northwest Highway

13   address --"

14          MR. BOISVERT:  Your Honor, I'm going to object.

15   He's reading from a document that's not in evidence.

16          THE COURT:  Regardless, he can use that as a

17   foundation for a question.

18          I'll overrule the objection.

19   BY MR. TOMKO:

20   Q.    Do you recall making that statement?

21   A.    I'm exercising my Fifth Amendment right under the U.S.

22   Constitution.

23   Q.    And at that time you advised Mr. Taylor that only the

24   correspondence for Breitling Royalties was transferred to the

25   Colleyville post office box; is that correct?

A.    I'm exercising my Fifth Amendment rights under the U.S.
Constitution.

Q.    Was it not true, ma'am, that other mail for other
Breitling entities was also transferred to the new post office
box?

A.    I'm exercising my Fifth Amendment rights under the U.S.
Constitution.

Q.    I ask you to look at Exhibit Number -- Receiver's Exhibit
Number 12.

      This is a form that was provided by the post office
department.  And it indicates, does it not, that the mail for
Breitling Oil & Gas was transferred from the Colleyville post
office box to the Grapevine post office box?

A.    I'm exercising my Fifth Amendment rights under the U.S.
Constitution.

Q.    And Breitling Oil & Gas is a different entity than
Breitling Royalties; is that not correct?

A.    I'm exercising my Fifth Amendment rights under the U.S.
Constitution.

Q.    And if we look at Exhibit 13, also from the post office,
it indicates that Breitling Energy mail was diverted from
Colleyville to Grapevine; is that correct?

A.    I'm exercising my Fifth Amendment rights under the U.S.
Constitution.

Q.    And Breitling Energy is a different entity from Breitling

1    Royalties; is that not correct?

2    A.    I'm exercising my Fifth Amendments under the U.S.

3    Constitution.

4    Q.    And if we look at Exhibit R 20, these purport to be

5    envelopes that were received at the Grapevine post office.  Do

6    we -- can we acknowledge that at least V-e-n-t-a-n-a, Ventana,

7    Exploration and Production Company purports to be an oil and

8    gas company; is that correct?

9    A.    I'm exercising my Fifth Amendment rights under the U.S.

10   Constitution.

11   Q.    That Sven Energy, LLC, is an oil and gas company?

12   A.    I'm exercising my Fifth Amendment rights under the U.S.

13   Constitution.

14   Q.    And can we agree that Texland, T-e-x-l-a-n-d, Petroleum

15   is an oil and gas company?

16   A.    I'm exercising my Fifth Amendment rights under the U.S.

17   Constitution.

18   Q.    Did you also visit the Grapevine post office and attempt

19   to collect mail from there?

20   A.    I'm exercising my Fifth Amendment under the U.S.

21   Constitution.

22   Q.    And you were the last person, were you not, that

23   collected mail from the Colleyville post office?

24   A.    I'm exercising my Fifth Amendment rights under the U.S.

25   Constitution.

1    Q.    Mr. Taylor requested that you provide that information to

2    the receivership, did he not?

3    A.    I am exercising my Fifth Amendment rights under the U.S.

4    Constitution.

5    Q.    And you refused to provide those documents that you

6    obtained from the post office box to Mr. Taylor?

7    A.    I'm exercising my Fifth Amendment rights under the U.S.

8    Constitution.

9    Q.    And you requested that Mr. Taylor return to you all mail

10   that was -- he received from the Grapevine post office once he

11   got custody of that; is that correct?

12   A.    I'm exercising my Fifth Amendment rights under the U.S.

13   Constitution.

14   Q.    Now, I call your attention to Exhibit Number 23.

15         R 23 purports to be an email from you to Mr. Goforth?

16         You recognize Mr. Goforth as being an attorney who

17   represents Mr. Taylor?

18   A.    I'm exercising my Fifth Amendment rights under the U.S.

19   Constitution.

20   Q.    And in this document you said you were going to send them

21   documents that relate to Breitling Energy Corporation and

22   Breitling Oil & Gas.

23         Did you ever send them any documents, ma'am?

24   A.    I'm exercising my Fifth Amendment rights under the U.S.

25   Constitution.

Q.    In fact, you never sent them any documents, have you,
ma'am?

A.    I'm exercising my Fifth Amendment under the U.S.
Constitution.

Q.    You advised them that documents had been seized by the
IRS, FBI, and SEC, and that that was the reason you weren't
producing documents; is that correct?

A.    I'm exercising my Fifth Amendment rights under the U.S.
Constitution.

Q.    And, in fact, the documents that were seized by the
government were seized a year before, over a year before the
time you sent this information to Mr. Taylor?

A.    I'm exercising my Fifth Amendment rights under the U.S.
Constitution.

Q.    And in your capacity as the attorney for the corporations
you never provided a corporate representative or made
available a corporate representative to Mr. Taylor for him to
examine about the business activities of the corporations,
have you?

A.    I'm exercising my Fifth Amendment rights underneath the
U.S. Constitution.

Q.    And you've never provided them any records of any
activities of those businesses subsequent to the search by the
government in 2016?

A.    I am exercising my Fifth Amendment rights under the U.S.

1   Constitution.

2   Q.    Now, I want to show you a document that is identified as

3   Receiver's Exhibit 64, and ask you if you can identify that

4   document, ma'am?

5   A.    I'm exercising my Fifth Amendment rights under the U.S.

6   Constitution.

7   Q.    This purports to be a business record that was opened at

8   a bank, CitiBank, in the name of Cindy A. Faulkner.  Is that

9   correct, ma'am?

10   A.    I'm exercising my Fifth Amendment rights under the U.S.

11   Constitution.

12   Q.    Are you -- did you represent yourself to be Cindy A.

13   Faulkner to the bank for the purposes of opening this account?

14   A.    I am exercising my Fifth Amendment rights under the U.S.

15   Constitution.

16   Q.    And that is your signature that appears on that document,

17   is it not, ma'am?

18   A.    I am exercising my Fifth Amendment rights under the U.S.

19   Constitution.

20   Q.    Now, there were -- subsequent orders were issued by the

21   court after the order that we've just talked -- looked at

22   before, the orders that were provided to you in August of

23   2017.

24        There were also orders by the court in September of 2017.

25   Is that correct, ma'am?

A.    I'm exercising my Fifth Amendment rights under the U.S.
Constitution.

Q.    In your capacity as the attorney for the two companies
that were named by the SEC, you were made aware, were you not,
on September the 5th of 2017 that a request for an order to
show cause for contempt had been filed by the receiver.  Is
that not correct, ma'am?

A.    I'm exercising my Fifth Amendment rights under the U.S.
Constitution.

Q.    And that on -- September the 6th the order granting that
motion was submitted by this court.  You were aware of that
also in your capacity as an attorney for the two entities; is
that correct?

A.    I'm exercising my Fifth Amendment rights under the U.S.
Constitution.

Q.    And a memorandum and opinion was issued by this court on
or about September 25th, 2017.  You were made aware of that in
your capacity as counsel for the entities; is that correct,
ma'am?

A.    I'm exercising my Fifth Amendment rights under the U.S.
Constitution.

Q.    And that document, which is Exhibit R 66, says on page 8,
"This encompasses entities controlled by Faulkner to which the
unrebutted evidence indicates he may have redistributed either
BOG or BECC investors assets, including Breitling Royalty

1    Corporation."  Is that correct, ma'am?

2    A.    I'm exercising my Fifth Amendment rights under the U.S.

3    Constitution.

4    Q.    At no point did it limit -- limit this order just to

5    Breitling Royalty Corporation, did it, ma'am?

6    A.    I'm exercising my Fifth Amendment rights under the U.S.

7    Constitution.

8    Q.    In fact, these orders covered all assets that were

9    directly or indirectly owned, controlled by Mr. Chris

10   Faulkner, did it not, ma'am?

11   A.    I'm exercising my rights under the Fifth Amendment of the

12   United States Constitution.

13   Q.    Now, you opened a bank account, did you not, in the Bank

14   of the West, in September of -- of 2017?

15   A.    I'm exercising my Fifth Amendment rights under the U.S.

16   Constitution.

17           MR. TOMKO:  Your Honor, the Bank of the West

18   documents we have a certificate from the bank that

19   authenticates these documents as true and correct copies, and

20   that's Exhibit 30 and Exhibits 32 and 31.

21       And we would move to admit those documents into evidence

22   as true and correct copies of documents maintained by Bank of

23   West and authenticated by a custodian for the Bank of the

24   West.

25           THE COURT:  Any objection to 30, 31, and 32?

1          MR. BOISVERT:  I object to the authentication, Your

2     Honor.  There's nothing in these exhibits that authenticate

3     these documents.

4          MR. TOMKO:  They're authenticated as true and

5     correct copies of the records of Bank of the West.

6          THE COURT:  Will you identify where I can find that

7     authentication?

8          MR. TOMKO:  The authentication is Exhibit -- is

9     Receiver's Exhibit -- Exhibit 57, Your Honor.

10         MR. BOISVERT:  My objection, Your Honor, is that

11    there's nothing attached to Exhibit 57.

12        There are no -- there are no documents attached that

13    are -- that are being purportedly authenticated.

14         THE COURT:  They do appear to be identified;

15    however, on page 2 of that exhibit in a listing, so I'll

16    overrule the objection.

17        Ms. Faulkner, I'm not sure whether in your role as -- as

18    your counsel you wish to be heard by way of objection to these

19    exhibits or not, or -- or whether your Fifth Amendment rights

20    prevent you from objecting, but I just don't want to overlook

21    you if you do want to object.

22         THE WITNESS:  I have Fifth Amendment rights, I have

23    to exercise those, Your Honor.

24         THE COURT:  Okay.  Fine.

25        Receiver Exhibits 30, 31 and 31 are admitted.

BY MR. TOMKO:

Q.    Exhibit Receiver 30, Ms. Faulkner, is a new account card that was signed with your signature; is that correct?

A.    I'm exercising my Fifth Amendment rights under the U.S. Constitution.

Q.    And you opened that account on September the 6th of 2017; is that correct?

A.    I'm exercising my Fifth Amendment rights under the U.S. Constitution.

Q.    That was the day after the request to order to show cause was issued.  And it was the day that the judge granted the order to show cause.  Is that correct?

A.    I am exercising my Fifth Amendment rights under the U.S. Constitution.

Q.    And you opened this account in the name of U.S. Property Investment, Incorporated; is that correct?

A.    I'm exercising my Fifth Amendment rights under the U.S. Constitution.

Q.    And you identified yourself, Carole Faulkner, as the president of that company?

A.    I'm exercising my Fifth Amendment rights under the U.S. Constitution.

Q.    And you also identified yourself as the secretary of that company?

A.    I'm exercising my Fifth Amendment rights under the U.S.

1    Constitution.

2    Q.    Now, have provided documents as exhibits too, for this

3    hearing, have you not?

4    A.    As the attorney?

5    Q.    Yes.

6    A.    I'm exercising my Fifth Amendment rights under the U.S.

7    Constitution.

8    Q.    And your document, Defendant's Exhibit 18, is a document

9    that you provided for the purpose this hearing; is that

10   correct?

11   A.    I'm exercising my Fifth Amendment rights under the U.S.

12   Constitution.

13   Q.    And it indicates, does it not, that Mr. Pitts -- who is

14   Gerald Pitts?

15   A.    I'm exercising my Fifth Amendment rights under the U.S.

16   Constitution.

17   Q.    And it indicates that -- that he was the person who

18   originally adopted the resolution to incorporate U.S.

19   Properties Investment; is that correct?

20   A.    I'm exercising my Fifth Amendment rights under the U.S.

21   Constitution.

22   Q.    He was the original director of U.S. Properties on the

23   29th of September of 2016; is that correct?

24   A.    I am exercising my Fifth Amendment rights under the U.S.

25   Constitution.

Q.    Now, there's a signature that appears on that document,
acceptance of appointment as director.  And it says, "Carole
Faulkner."  Is that correct?

A.    I'm exercising my Fifth Amendment rights under the U.S.
Constitution.

Q.    But this is not your signature, is it, ma'am?

A.    I'm exercising my rights under the Fifth Amendment of the
United States Constitution.

Q.    And the -- there was a annual filing with the State of
Wyoming for U.S. Properties Investment.  And it identifies
C.A. Faulkner as the treasurer or fiscal agent.

      Are you that C.A. Faulkner, ma'am?

A.    I'm exercising my rights under the Fifth Amendment of the
United States Constitution.

Q.    You've also provided a tax return for U.S. Properties
Investment Corporation; is that correct?

A.    I'm exercising my Fifth Amendment rights under the United
States Constitution.

Q.    And this return was provided by you as an exhibit for
this hearing; is that correct?

A.    I'm exercising my rights under the Fifth Amendment of the
United States Constitution.

Q.    It is Defendant Carole Faulkner Exhibit 19 in your
providing -- the exhibit that you provided?

A.    I am exercising my rights under the Fifth Amendment of

1    the United States Constitution.

2    Q.    And it indicates that you are filing the return for 2016.

3          Is that correct?

4    A.    I am exercising my rights under the Fifth Amendment of

5    the United States Constitution.

6    Q.    And your signature appears on this document; is that

7    correct?

8    A.    I am exercising my rights under the Fifth Amendment of

9    the United States Constitution.

10   Q.    And this document purports to have been signed by you on

11   October 1st of 2017.  Is that correct?

12   A.    I am exercising my rights under the First -- Fifth

13   Amendment of the United States Constitution.

14   Q.    And the document indicates that there were no revenue or

15   expenses incurred by U.S. Properties for the year 2016; is

16   that correct?

17   A.    I am exercising my rights under the U.S. -- I'm

18   exercising my rights under the Fifth Amendment of the United

19   States Constitution.

20   Q.    Are you familiar at all with the company called

21   RackAlley, ma'am?

22   A.    I'm exercising my rights under the Fifth Amendment of the

23   United States Constitution.

24   Q.    And is it not true that U.S. Properties had no business

25   dealings at all with RackAlley during the period of 2016 and

1    2017?

2    A.    I am exercising my rights under the Fifth Amendment of

3    the United States Constitution.

4    Q.    And is it not correct, ma'am, that Mr. Chris Faulkner was

5    an owner, one-third owner of RackAlley during this period of

6    time?

7    A.    I'm exercising my rights under the Fifth Amendment of the

8    United States Constitution.

9    Q.    And is it not correct, ma'am, that Mr. Faulkner directed

10   that the proceeds from a transaction, a sale by -- of assets

11   by RackAlley that were his interest be transferred to U.S.

12   Properties?

13        Is that correct, ma'am?

14   A.    I am exercising my Fifth Amendment rights under the U.S.

15   Constitution.

16   Q.    And as a result of that direction by Mr. Faulkner, U.S.

17   Properties received a series of checks from RackAlley; is that

18   correct, ma'am?

19   A.    I am exercising my rights under the Fifth Amendment of

20   the United States Constitution.

21   Q.    And is it not correct, ma'am, that Exhibit R 40, which is

22   a business record that was filed with the State of California,

23   indicates that the agent for RackAlley, LLC, a Nevada

24   corporation, is Carole Faulkner?

25   A.    I am exercising my rights under the Fifth Amendment of

1  the United States Constitution.

2  Q.    And it lists the address as 1780 E. Sahara S-a-h-a-r-a,

3  Avenue, Suite 490-856, Las Vegas, Nevada, as a entity --

4  mailing address for that entity; is that correct?

5  A.    I'm exercising my Fifth Amendment rights under the U.S.

6  Constitution.

7  Q.    And it also indicates 1663, S-a-w-t-e-l-l-e, Avenue,

8  Suite 240, Los Angeles, California, 900025, [sic] as an

9  address for that company, does it not?

10 A.    I'm exercising my rights under the Fifth Amendment of the

11 United States Constitution.

12 Q.    And that Los Angeles address is an address of the office

13 that Mr. Faulkner maintains in California; is that correct?

14 A.    I am exercising my rights under the Fifth Amendment of

15 the United States Constitution.

16 Q.    And are you a person who shares that particular doct--

17 that office with Mr. Faulkner in California?

18 A.    I am exercising my rights under the Fifth Amendment of

19 the United States Constitution.

20 Q.    Now, Exhibit 31 that's been entered into evidence as a

21 record for the Bank of the West indicates this account, as

22 we've seen by the -- the signature card, was opened on

23 September the 6th of 2017.  Is that correct?

24 A.    I am exercising my rights under the Fifth Amendment of

25 the United States Constitution.

Q.    And it was entered -- opened with an additional -- an

initial deposit of $100.

        Is that correct?

A.    I am exercising my Fifth Amendment rights under the U.S.

Constitution.

Q.    And on September 29th of 2017, a deposit of $60,000 was

made into that account; is that correct?

A.    I am exercising my rights under the Fifth Amendment of

the United States Constitution.

Q.    And that $60,000 was a check that was issued by RackAlley

to U.S. Properties; is that not correct?

A.    I'm exercising my Fifth Amendment rights under the U.S.

Constitution.

Q.    In fact, if we look at Exhibit 32, we see that the check

and the deposit ticket are -- are in the first page of Exhibit

32.  Is that correct?

A.    I'm exercising my Fifth Amendment rights under the U.S.

Constitution.

Q.    Now, also in October, specifically October the 12th, an

attempt was made to deposit $150,000 into the account at Bank

of the West; is that correct?

A.    I am exercising my rights under the Fifth Amendment of

the U.S. Constitution.

Q.    And that money was also in the form of two checks from

RackAlley to U.S. Properties Investment; is that correct?

1  A.    I am exercising my rights under the Fifth Amendment of

2  the United States Constitution.

3  Q.    And is it not true that on or about the 3rd of October,

4  2017, a document was filed with the State of Wyoming that

5  removed you, C.A. Faulkner, that's -- that -- let me rephrase

6  that.  Sorry.  Withdraw that question.

7        Do you go by the initials C.A. Faulkner on occasion?

8  A.    I'm exercising my rights under the Fifth Amendment of the

9  United States Constitution.

10 Q.    And Mr. Faulkner also goes by that same designation, C.A.

11 Faulkner on occasion; is that not true?

12 A.    I am exercising my rights under the Fifth Amendment of

13 the U.S. Constitution.

14 Q.    But on or about October the 3rd of 2017, C.A. Faulkner

15 was removed as president, secretary, and director of U.S.

16 Properties in the State of Wyoming; is that correct, ma'am?

17 A.    I'm exercising my rights under the Fifth Amendment of the

18 U.S. Constitution.

19 Q.    And designated at that time as president, vice president,

20 secretary, and director of U.S. Properties was an individual

21 named Shannon Bresnahan; is that correct?

22 A.    I'm exercising my Fifth Amendment rights under the U.S.

23 Constitution.

24        THE COURT:  Will you spell Bresnahan for the court

25 reporter.

1          MR. TOMKO:  Yes, sir.

2      B-r-e-s-n-a-h-a-n.

3  BY MR. TOMKO:

4  Q.    And who is Shannon Bresnahan?

5  A.    I'm exercising my Fifth Amendment rights under the U.S.

6  Constitution.

7  Q.    Shannon Bresnahan was at that point in time a live-in

8  associate of Mr. Faulkner; is that correct?

9  A.    I am exercising my Fifth Amendment rights under the U.S.

10  Constitution.

11  Q.    And Shannon Bresnahan had no knowledge that she was ever

12  appointed as a officer or director of that entity, was she,

13  ma'am?

14  A.    I'm exercising my Fifth Amendment rights under the U.S.

15  Constitution.

16  Q.    At any rate, ten days later, on October the 13th, is it

17  not correct that another change was filed with the State of

18  Wyoming to change the officers of U.S. Property Investment.

19  Is that correct?

20  A.    I am exercising my Fifth Amendment rights under the U.S.

21  Constitution.

22  Q.    And October the 13th of 2017, ten days later,

23  Ms. Bresnahan was removed from all positions and in her place

24  as secretary and director was a man by the name of Gerald

25  Pitts again, the man who formed the company originally.  Is

1  that correct, ma'am?

2  A.   I'm exercising my Fifth Amendment rights under the U.S.

3  Constitution.

4  Q.   And as of August 10th -- excuse me -- Oct-- October 13th

5  of 2017, there was no president or vice president indicated in

6  the records of the State of Wyoming for U.S. Properties; is

7  that correct, ma'am?

8  A.   I'm exercising my Fifth Amendment rights under the U.S.

9  Constitution.

10  Q.   Receiver's Exhibit 33, which is in evidence, indicates

11  that there was a check written on the Bank of the West account

12  for U.S. Properties, check number 9-- I believe that's a 486,

13  to cash for $10,000; is that correct, ma'am?

14  A.   I'm exercising my Fifth Amendment rights under the U.S.

15  Constitution.

16  Q.   And that check is signed by you.

17       Is that correct?

18  A.   I'm exercising my Fifth Amendment rights under the U.S.

19  Constitution.

20  Q.   And that check was in fact cashed?

21  A.   I'm exercising my rights under the Fifth Amendment of the

22  U.S. Constitution.

23  Q.   And the proceeds of that check were not made available to

24  the receiver, were -- was it, ma'am?

25  A.   I'm exercising my rights under the Fifth Amendment of the

1   U.S. Constitution.

2   Q.    In addition, check 6-- excuse me -- 9487 was issued on

3   October the 12th of '17, for a Bank of the West cashier's

4   check for $50,000; is that correct, ma'am?

5   A.    I'm exercising my Fifth Amendment rights under the U.S.

6   Constitution.

7   Q.    And that check is signed by you; is that correct, ma'am?

8   A.    I'm exercising my Fifth Amendment rights under the U.S.

9   Constitution.

10  Q.    And that check was in fact cashed?

11  A.    I'm exercising my Fifth Amendment rights under the U.S.

12  Constitution.

13  Q.    And those proceeds of $50,000 were not made available to

14  the trustee for -- excuse me -- the receiver for the

15  receivership account, was it, ma'am?

16  A.    I'm exercising my rights under the Fifth Amendment of the

17  United States Constitution.

18  Q.    Now, ma'am, you had an opportunity in your capacity as

19  the attorney for the two entities that were named by the SEC

20  to receive Exhibits R 43 and R 44, which are orders of the

21  order.

22      Were you familiar with those orders of the court, ma'am?

23  A.    I'm exercising my rights under the Fifth Amendment of the

24  United States Constitution.

25  Q.    And Exhibit 44 expands the definition of "ancillatory"

1    [sic] proceedings beyond just the three entities that were

2    identified in the original complaint by the SEC; is that not

3    correct, ma'am?

4    A.    I'm exercising my rights under the Fifth Amendment of the

5    United States Constitution.

6    Q.    And it also indicates that there -- the receiver -- it

7    stays all litigation involving the assets or the interests

8    that are covered by the receivership, does it not, ma'am?

9    A.    I'm exercising my rights under the Fifth Amendment of the

10   United States Constitution.

11   Q.    And it directs that any action that may be brought

12   against the receiver be instituted in the court that issued

13   that order, which is this court, does it not, ma'am?

14   A.    I'm exercising my Fifth Amendment rights under the U.S.

15   Constitution.

16   Q.    But in total disregard of that order you have sued

17   Mr. Taylor in state court in Los Angeles, have you not, ma'am?

18   A.    I am exercising my Fifth Amendment rights under the U.S.

19   Constitution.

20   Q.    And in that suit you indicate that Mr. Taylor has

21   affected -- or he has been a -- had affect on your business

22   dealings; is that correct, ma'am?

23   A.    I am exercising my Fifth Amendment rights under the U.S.

24   Constitution.

25   Q.    But in that complaint you never, ever indicate that

1    Mr. Taylor was acting as a receiver at the appointment of a

2    federal District Court in Texas in the activities that he was

3    undertaking against you or your companies, did you, ma'am?

4    A.    I'm exercising my Fifth Amendment rights under the U.S.

5    Constitution.

6    Q.    Now, ma'am, did there come a time when you prepared or

7    edited a draft of a affidavit for a man by the name of Mohamed

8    Arab?

9    A.    I'm exercising my rights under the Fifth Amendment of the

10   United States Constitution.

11   Q.    Mohamed Arab was a partner, was he not, of your -- of

12   Mr. Faulkner in RackAlley?

13   A.    I'm exercising my Fifth Amendment rights under the U.S.

14   Constitution.

15   Q.    And you prepared or drafted that or edited that affidavit

16   to -- for the purpose of Mr. Arab to execute it; is that

17   correct?

18   A.    I'm exercising my Fifth Amendment rights under the U.S.

19   Constitution.

20   Q.    And you received, did you not, in your capacity as the

21   attorney for the companies, the filing by the receiver that

22   included a signed affidavit by Mr. Arab, did you not?

23   A.    I'm exercising my Fifth Amendment rights under the U.S.

24   Constitution.

25   Q.    And the information in the affidavit signed by Mr. Arab

1    was directly contradictory to the information you included in

2    the affidavit that you prepared or edited for Mr. Arab; is

3    that correct?

4    A.    I'm exercising my Fifth Amendment rights under the U.S.

5    Constitution.

6            MR. TOMKO:   That's all I have, Your Honor.

7            THE COURT:   Cross-examination?

8            MR. BOISVERT:   No questions, Your Honor.

9            THE COURT:   Do you wish to offer any testimony?

10           MS. FAULKNER:   No, Your Honor.

11           THE COURT:   All right.   You may step down.

12       You may call your next witness.

13           MR. ROSS:   Your Honor, the receiver called

14   Christopher Faulkner.

15           THE COURT:   Raise your right hand, please.

16           CHRISTOPHER FAULKNER, WITNESS, SWORN

17                  DIRECT EXAMINATION

18   BY MR. ROSS:

19   Q.    Good morning, Mr. Faulkner.

20   A.    Good morning.

21   Q.    Could you please state your name for the record.

22   A.    Christopher Faulkner.

23   Q.    Mr. Faulkner, as of August 2017, you had an ownership

24   interest in Breitling Royalties Corporation, did you not?

25   A.    Based on advice of counsel I hereby invoke my Fifth

1    Amendment rights afforded me by the U.S. Constitution.

2    Q.    Mr. Faulkner, as of August 2017, you exercised control

3    over Breitling -- Breitling Royalties Corporation, did you

4    not?

5    A.    Exercising my Fifth Amendment rights under the U.S.

6    Constitution.

7    Q.    Mr. Faulkner, as of August 2017, you had an ownership

8    interest in Breitling Energy Corporation, did you not?

9    A.    I'm exercising my Fifth Amendment rights afforded me by

10   the U.S. Constitution.

11   Q.    Mr. Faulkner, as of August 2017, you had an -- a -- you

12   exercised control over Breitling Energy Corporation, did you

13   not?

14   A.    I'm exercising my Fifth Amendment rights afforded me by

15   the U.S. Constitution.

16   Q.    Mr. Faulkner, as of August 2017, you had an ownership

17   interest in Breitling Oil & Gas Corp., did you not?

18   A.    I'm exercising my Fifth Amendment rights afforded me by

19   the U.S. Constitution.

20   Q.    Mr. Faulkner, as of August 2017, you exercised control

21   over Breitling Oil & Gas Corp., did you not?

22   A.    I'm exercising my Fifth Amendment rights given me by the

23   U.S. Constitution.

24   Q.    Mr. Faulkner, as of August 2017, you had an ownership

25   interest in Breitling Energy Companies, Inc., did you not?

A.    I'm exercising my Fifth Amendment rights given me by the
U.S. Constitution.

Q.    Mr. Faulkner, as of August 2017, you exercised control
over Breitling Energy Companies, Inc., did you not?

A.    I'm exercising my Fifth Amendment rights given me by the
U.S. Constitution.

Q.    Mr. Faulkner, as of August 2017, you had an ownership
interest in Breitling Royalties Fund, LLC, did you not?

A.    I'm exercising my Fifth Amendment rights given me by the
U.S. Constitution.

Q.    Mr. Faulkner, as of August 2017, you exercised control
over Breitling royalty Funds, LLC, did you not?

A.    I'm exercising my Fifth Amendment rights given me by the
U.S. Constitution.

Q.    Mr. Faulkner, as of August 2017, you had an ownership
interest in RackAlley, LLC, did you not?

A.    I'm exercising my Fifth Amendment rights given me by the
U.S. Constitution.

Q.    Mr. Faulkner, as of August 2017, you exercised control
over RackAlley, LLC, did you not?

A.    I'm exercising my Fifth Amendment rights under the U.S.
Constitution.

Q.    Mr. Faulkner, as of August 2017, you had an ownership
interest in Breitling Ventures Corp., did you not?

A.    I'm exercising my Fifth Amendment rights under the U.S.

1  Constitution.

2  Q.   Mr. Faulkner, as of August 2017, you had -- you exercised

3  control over Breitling Ventures Corp., did you not?

4  A.   I'm exercising my rights -- my Fifth Amendment rights

5  under the U.S. Constitution.

6  Q.   Mr. Faulkner, as of August 2017, you had an ownership

7  interest in Crude Energy, LLC, did you not?

8  A.   I'm exercising my Fifth Amendment rights under the U.S.

9  Constitution.

10  Q.   Mr. Faulkner, as of August 2017, you had a -- you

11  exercised control over Crude Energy, did you not?

12  A.   I'm exercising my Fifth Amendment rights under the U.S.

13  Constitution.

14  Q.   Mr. Faulkner, as of August 2017, you had an ownership

15  interest in Patriot Energy, Inc., did you not?

16  A.   I'm exercising my Fifth Amendment rights under the U.S.

17  Constitution.

18  Q.   Mr. Faulkner, as of August 2017, you exercised control

19  over Patriot Energy, Inc., did you not?

20  A.   I'm exercising my Fifth Amendment rights under the U.S.

21  Constitution.

22  Q.   Mr. Faulkner, I'd like you to turn to Receiver's Exhibit

23  42, which has already been admitted into evidence.

24      Mr. Faulkner, as of August 14th, 2017, you received

25  notice of the temporary restraining order and asset freeze

1  order in Exhibit 42, did you not?

2  A.    I'm exercising my Fifth Amendment rights under the U.S.

3  Constitution.

4  Q.    Mr. Faulkner, I'd like you to turn to Exhibit 43, which

5  is already admitted into evidence.

6      Mr. Faulkner, as of August 14th, 2017, you had received

7  notice of the execution by this court of the order in Exhibit

8  43 appointing a temporary receiver, did you not?

9  A.    I'm exercising my Fifth Amendment rights under the United

10 States Constitution.

11 Q.    Mr. Faulkner, paragraph 16 of Exhibit 43 states that,

12 "The receivership defendants --" the last sentence of that

13 paragraph states, "The receivership defendants shall not open

14 any mailbox or take any steps or make any arrangements to

15 receive mail in contravention of this order, whether through

16 the U.S. Mail, a private mail depository, or courier service."

17 Is that correct?

18 A.    I'm exercising my Fifth Amendments rights under the U.S.

19 Constitution.

20 Q.    Mr. Faulkner, you took steps to receive mail at 2115 West

21 Northwest Highway, Suite 114-1133, Grapevine, Texas, 76051,

22 didn't you?

23 A.    I'm exercising my Fifth Amendment rights given to me by

24 the U.S. Constitution.

25 Q.    Mr. Faulkner, you failed to disclose to the receiver that

1  you had taken steps to receive mail at that Northwest Highway

2  address, didn't you?

3  A.   Exercising my Fifth Amendment rights under the United

4  States Constitution.

5  Q.   Mr. Faulkner, I would like you to turn to Exhibit 46,

6  which has already been admitted into evidence.

7        Mr. Faulkner, after you were in receipt of the order

8  appointing the temporary receiver in Exhibit 43, Exhibit 46

9  shows that you took steps to change an address form and sent

10  that form to Chesapeake Energy Corporation, did you not?

11  A.   Exercising my Fifth Amendment rights under the United

12  States Constitution.

13  Q.   And, Mr. Faulkner, I'd like you to look at Exhibit 47,

14  which has already been admitted into evidence.

15        Mr. Faulkner, Exhibit 47 indicates that after you were in

16  receipt of the order appointing the temporary receiver you

17  took steps to change the address on a division order and sent

18  that to Chesapeake Energy, does it not?

19  A.   I am exercising my Fifth Amendment rights under the U.S.

20  Constitution.

21  Q.   Mr. Faulkner, I'd like you to turn to Exhibit 48, which

22  is already into evidence.

23        Mr. Faulkner, Exhibit 48 indicates that after you were in

24  receipt of the order appointing the temporary receiver, which

25  was issued by this court on August 14th, you took steps to --

1    to change the address for a division order and sent that
2    change of address to Chesapeake Energy, did you not?
3    A.    I'm exercising my Fifth Amendment rights under the United
4    States Constitution.
5    Q.    Mr. Faulkner, I'd like you to turn to Exhibit 49, which
6    has already been admitted into evidence.
7          Mr. Faulkner, after you were in receipt of the order
8    appointing the temporary receiver issued by this court on
9    August 14th, Exhibit 49 indicates that you took steps to
10   change an address for division orders and payments to be sent
11   by Chesapeake Energy to a new address on Northwest Highway,
12   did you not?
13   A.    I'm exercising my Fifth Amendment rights under the U.S.
14   Constitution.
15   Q.    Mr. Faulkner, you never advised the receiver of the
16   existence of the Northwest Highway P.O. Box indicated in
17   Exhibits 46, 47, 48, and 49, did you?
18   A.    I'm exercising my Fifth Amendment rights under the United
19   States Constitution.
20   Q.    Mr. Faulkner, I'd like you to turn to Receiver's Exhibit
21   8.
22         Mr. Faulkner, as of August 15th, 2017, you received
23   requests for cooperation from the receiver in this matter, did
24   you not?
25   A.    Exercising my Fifth Amendment rights under the United

1    States Constitution.

2    Q.    Mr. Faulkner, in response to those requests did you

3    advise the receiver as to the identity and status of checks?

4    A.    I'm exercising my Fifth Amendment rights under the U.S.

5    Constitution.

6    Q.    Mr. Faulkner, in response to requests from the receiver

7    received by you on August 15th, did you identify for the

8    receiver checks or wires or other payments that have come into

9    your direct or indirect custody or control or otherwise

10   disposed of since April 2016?

11   A.    I'm exercising my Fifth Amendment rights under the U.S.

12   Constitution.

13   Q.    Mr. Faulkner, as of receiving requests for cooperation

14   from the receiver on August 15th, 2017, you did not identify

15   each and every receivership asset to the receiver, did you?

16   A.    I'm exercising my Fifth Amendment rights under the U.S.

17   Constitution.

18   Q.    Mr. Faulkner, on page -- paragraph 4 of Exhibit 8, if you

19   would look at that.

20         As of receiving requests for cooperation from the

21   receiver on August 15th, 2017, you did not identify each and

22   every account at any financial institution receiving funds,

23   including, without limitation, oil and gas production proceeds

24   related to receivership assets, did you?

25   A.    I'm exercising my Fifth Amendment rights under the United

1    States Constitution.

2    Q.    Mr. Faulkner, if you will look at paragraph 5 on page 2

3    of -- of Exhibit 8.

4         Mr. Faulkner, as of August 15th, 2017, in response to a

5    request for cooperation from the receiver, you did not

6    identify the funds constituting -- constituting receivership

7    assets or assets subject to the asset freeze which are

8    currently on deposit anywhere, did you?

9              MR. BOISVERT:   Your Honor, I just want to make an

10   objection to the initial assumption in the question that

11   Mr. Faulkner actually received the request for cooperation by

12   the receiver.  It's not supported by any evidence so far

13   today.

14             THE COURT:   Okay.  Normally, the court would not be

15   concerned because the questions of counsel are not evidence;

16   however, I'm assuming you're going to be requesting an adverse

17   inference as to these questions.  Therefore, the -- in order

18   for the court to draw an adverse inference the question needs

19   to be supported.

20        So do you want to rephrase the question?

21             MR. ROSS:   Yes, Your Honor.

22        And actually, as to the last question, I will withdraw

23   the question.

24        And I would just further represent to the court that

25   while we are not able to lay a foundation as to each and every

1    questions, while Mr. Faulkner invokes his Fifth Amendment

2    rights, we will be able to lay a foundation for these

3    questions and these exhibits through other witnesses.

4           THE COURT:  All right.  The question is withdrawn

5    then.

6    BY MR. ROSS:

7    Q.    Mr. Faulkner, I'd like you to turn to receiver's Exhibit

8    16.

9           Mr. Faulkner, isn't it true that as of August 17th, 2017,

10   the receiver notified you that opening a new mailbox would be

11   a willful violation of the order appointing the temporary

12   receiver?

13   A.    I'm invoking my Fifth Amendment rights afforded me by the

14   U.S. Constitution.

15          MR. ROSS:  Pardon me, Your Honor.

16                        (Pause.)

17   BY MR. ROSS:

18   Q.    Mr. Faulkner, I would like you to look at Exhibit 37,

19   which is already in -- in evidence.

20          On Exhibit 37 you were listed as a member -- member on

21   the operating agreement for RackAlley, LLC, are you not?

22   A.    I'm exercising my Fifth Amendment rights under the U.S.

23   Constitution.

24   Q.    Mr. Faulkner, on the third page of that exhibit, that is

25   your signature under the typewritten name Christopher

1   Faulkner, is it not?

2   A.   I'm exercising my Fifth Amendment rights under the U.S.

3   Constitution.

4   Q.   Mr. Faulkner, I'd like you to look at Exhibit 38, which

5   has already been admitted into evidence.

6        Mr. Faulkner, this lists you as a broker on the sale of

7   RackAlley assets, which is not true, is it?

8   A.   I'm exercising my Fifth Amendment rights under the U.S.

9   Constitution.

10  Q.   Mr. Faulkner, you never acted as a broker for the sale of

11  RackAlley assets, did you?

12  A.   I'm exercising my Fifth Amendment rights under the U.S.

13  Constitution.

14  Q.   Mr. Faulkner, you exercised control over U.S. Property

15  Investments, Inc., do you not?

16  A.   I'm exercising my Fifth Amendment rights under the U.S.

17  Constitution.

18  Q.   Mr. Faulkner, you exercise control over -- or --

19  Mr. Faulkner, you're -- you have an ownership interest in U.S.

20  Properties -- Property Investments, Inc., do you not?

21  A.   I'm exercising my Fifth Amendment rights under the U.S.

22  Constitution.

23  Q.   Mr. Faulkner, I'd like you to look at Exhibit 35.

24       Mr. Faulkner, Exhibit 35 is a document dated October 3rd,

25  2017; is that correct?

1    A.    I'm exercising my Fifth Amendment rights under the United

2    States Constitution.

3    Q.    And this filing, with Shannon Bresnahan as the president,

4    vice president, secretary, and director of U.S. Property

5    Investments, Inc., does it not?

6    A.    I'm exercising my Fifth Amendment rights under the United

7    States Constitution.

8    Q.    Mr. Faulkner, as of October 3rd, 2017, you had a romantic

9    relationship with Shannon Bresnahan, did you not?

10   A.    I'm exercising my Fifth Amendment rights under the United

11   States Constitution.

12   Q.    Mr. Faulkner, as of October 3rd, 2017, you shared a

13   residence with Shannon Bresnahan, did you not?

14   A.    I'm exercising my Fifth Amendment rights under the U.S.

15   Constitution.

16   Q.    Mr. Faulkner, as of today, assets belonging to the

17   receivership estate have been deposited in -- into the

18   accounts of U.S. Property Investments, Inc., have they not?

19   A.    I'm exercising my Fifth Amendment rights under the United

20   States Constitution.

21   Q.    Mr. Faulkner, I'd like you to turn to Receiver's Exhibit

22   65.

23         Mr. Faulkner, on December 8th, 2017, did you send a text

24   message to Mohamed Arab stating "Carole has drafted a lawsuit

25   against you, Matt, RackAlley, and HiV for fraud"?

1          MR. BOISVERT:  Object, Your Honor, hearsay.  Exhibit

2     64 is also not authenticated.

3          THE COURT:  Overruled.

4     BY MR. ROSS:

5     Q.    You can answer the question.

6     A.    I'm exercising my Fifth Amendment rights under the U.S.

7     Constitution.

8     Q.    Mr. Faulkner, did you also text Mr. Mohamed Arab on

9     December 8th attaching a draft affidavit to request that

10    Mr. Arab sign it?

11    A.    I'm exercising my Fifth Amendment rights under the United

12    States Constitution.

13    Q.    Mr. Faulkner, I would like you to turn to Receiver's

14    Exhibit 67.

15         Mr. Faulkner, did you send this document by way of a text

16    message to Mr. Mohamed Arab on December 8th, 2017?

17    A.    I'm exercising my Fifth Amendment rights afforded to me

18    under the United States Constitution.

19         MR. BOISVERT:  Your Honor, if I may, just, again, I

20    want to reiterate my objection from earlier that's addressed

21    in our motion to strike with respect to Exhibits 64 through

22    70.  These were all late designated after the deadline to

23    submit exhibit lists.

24         MR. ROSS:  And, Your Honor, if --

25         MR. BOISVERT:  Your Honor --

1          MR. ROSS:  -- I may respond to that?

2          MR. BOISVERT:  Your Honor, it's also outside of the

3    scope of the motions for contempt in this hearing.

4          THE COURT:  You may respond.

5          MR. ROSS:  Yes.

6       With respect to the timeliness, Your Honor, this was

7    texted to Mr. Arab by Mr. Faulkner on December 8th.  We have

8    no control over when documents were sent and when evidence

9    is -- comes into the possession of the receiver.  It -- it was

10   created after the deadline, so we don't believe it's

11   appropriate for -- for Mr. Faulkner, in particular, to object

12   to timeliness.

13       We also believe it is within the scope.

14          THE COURT:  At this point the motion to strike is

15   denied as to this exhibit and the objection is overruled.

16       You may continue.

17          MR. ROSS:  Thank you.

18   BY MR. ROSS:

19   Q.   Mr. Faulkner, I'd like you to turn to page 2 of Exhibit

20   67.

21       I will be focusing on the first full paragraph beginning,

22   "On or about March . . ."

23       Mr. Faulkner, RackAlley never entered a broker agreement

24   with U.S. Property Investments, Inc., did it?

25   A.   I'm exercising my Fifth Amendment rights based on the

1    United States Constitution.

2    Q.    And, Mr. Faulkner, I would direct you to the last

3    sentence of that same paragraph.

4         Mr. Faulkner, you controlled RackAlley, LLC, did you not?

5    A.    I'm exercising my Fifth Amendment rights under the U.S.

6    Constitution.

7    Q.    Mr. Faulkner, you managed RackAlley, LLC, did you not?

8    A.    I'm exercising my Fifth Amendment rights under the U.S.

9    Constitution.

10   Q.    Mr. Faulkner, you were an owner of RackAlley, LLC, were

11   you not?

12   A.    I'm exercising my Fifth Amendment rights under the U.S.

13   Constitution.

14   Q.    Mr. Faulkner, you were a member of RackAlley, LLC, were

15   you not?

16   A.    I'm exercising my Fifth Amendment rights under the United

17   States Constitution.

18   Q.    Mr. Faulkner, you were a shareholder of RackAlley, LLC,

19   were you not?

20   A.    I'm exercising my Fifth Amendment rights under the U.S.

21   Constitution.

22                        (Pause.)

23        MR. ROSS:   Apologize for the delay, Your Honor.

24        MR. TOMKO:   Exhibit 33.

25   BY MR. ROSS:

Q.    Mr. Faulkner, I'll turn your attention to Exhibit 32,
which has already been admitted into evidence.

Mr. Faulkner, are you in possession of a check issued by
RackAlley, LLC, to U.S. Property Investments, Inc., in the
amount of $60,000, as -- as displayed on Exhibit 32?

A.    I'm exercising my Fifth Amendment rights based on the
U.S. Constitution.

Q.    I'd like to turn your attention to Exhibit 33,
Mr. Faulkner, which is already admitted into evidence.

Mr. Faulkner, have you ever been in possession of the
check shown on the first page of Exhibit 33?

A.    I'm exercising my Fifth Amendment rights based on the
United States Constitution.

Q.    Mr. Faulkner, are you currently -- did you -- did you
cash the check shown on the first page of Exhibit 33?

A.    I'm exercising my Fifth Amendment rights under the United
States Constitution.

Q.    Mr. Faulkner, I'll turn your attention to the second page
of Exhibit 33.

Mr. Faulkner, have you ever been in possession of the
cashier's check noted on the second page of Exhibit 33?

A.    I'm exercising my Fifth Amendment rights under the United
States Constitution.

Q.    Mr. Faulkner, did you -- did you purchase the cashier's
check indicated on the second page of Exhibit 33?

1    A.    I'm exercising my Fifth Amendment rights afforded to me

2    by the United States Constitution.

3    Q.    Mr. Faulkner, are you currently in possession of the

4    check on the second page of Exhibit 33?

5    A.    I'm exercising my Fifth Amendment rights under the United

6    States Constitution.

7              MR. ROSS:   Pass the witness, Your Honor.

8              THE COURT:   Cross-examination?

9              MR. BOISVERT:   No questions, Your Honor.

10             MS. FAULKNER:   No questions, Your Honor.

11             THE COURT:   You may step down.

12        At this time we're going to take our lunch recess until

13   1:30.

14        We will resume at 1:30.

15             THE SECURITY OFFICER:   All rise.

16                  (Recess taken at 12:03.)

17                  (Proceedings resumed at 1:30.)

18             THE SECURITY OFFICER:   All rise.

19             THE COURT:   Be seated, please.

20        You may call your next witness.

21             MR. TOMKO:   Mr. Sowards.

22             RODNEY WAYNE SOWARDS, WITNESS, SWORN

23             THE COURT:   Be seated, please, and speak into the

24   microphone.

25                  DIRECT EXAMINATION

1    BY MR. TOMKO:

2    Q.    Would you state your full name and spell your last name,

3    please.

4    A.    Rodney Wayne Sowards, S-o-w-a-r-d-s.

5    Q.    Mr. Sowards, where are you employed?

6    A.    I'm employed at Veritas Advisory Group here in Dallas.

7    Q.    In what capacity?

8    A.    I'm vice president and founding shareholder.

9    Q.    And what is your field of expertise?

10   A.    Forensic accounting.

11   Q.    And who hired you for this representation?

12   A.    There's been two retentions.   One directly by the SEC and

13   then one by the receiver.

14   Q.    Okay.   And you are appearing today in the capacity of a

15   summary witness; is that correct?

16   A.    That's my understanding, yes.

17   Q.    All right.   And you were requested by the counsel for the

18   receivers to summarize what, sir?

19   A.    To summarize from bank statements and public records

20   various relationship of companies that are either owned or

21   controlled by Christopher Faulkner.

22   Q.    Okay.   I want to call your attention to Exhibit Receiver

23   61.

24         MR. BOISVERT:   Your Honor, may I make an objection

25   to Mr. Sowards' testimony?

1        He's been designated as a summary witness.  We have not

2    been provided the documents on which he's basing his summary

3    today.  Those documents have to be shown to be admissible;

4    otherwise, his testimony today is just pure hearsay based on

5    hearsay documents that have not been admitted today in this

6    proceeding.

7        I would also object to the relevance of Mr. Sowards'

8    testimony today.

9        The documents that the counsel for receiver pur--

10   purports to -- wants to admit through this witness, Your

11   Honor, are -- are Receiver's Exhibits 62 and 63, which

12   appear to be a diagram of money transfers from January 2011

13   through February of 2016, not relevant to any of the -- well,

14   what's being heard today on the order for show cause.

15       And then again, Exhibit 63, Your Honor, appears to be a

16   PowerPoint slide BECC consolidated the operations of BECC

17   accrued which is based on a 10-K dated March 2013.

18       Again, these documents are not in evidence.  They weren't

19   provided to us prior to Mr. Sowards' testimony today in

20   connection with his designation as a summary witness, and we

21   would move to strike this testimony.

22            MR. TOMKO:  Your Honor, all these documents have

23   been provided to them.  They are provided with the original

24   report Mr. Sowards did, his expert report that he did for the

25   SEC.

1    61 is a list of all of the documents that he reviewed

2    for -- for that report and for this report.  And I have been

3    advised by Mr. Soward [sic] and by the SEC that all of these

4    documents were made available to the defendants as part of

5    this litigation.

6         These are not documents that are in the custody and

7    control of the receiver.  They are in the custody and control

8    of the SEC, as a party to the original lawsuit.

9              THE COURT:  And with regard to the hearsay

10   objection, what's your response to that objection?

11             MR. TOMKO:  To which -- to which example is he

12   objecting?

13             MR. BOISVERT:  Well, all of the --

14             THE COURT:  Well, let's just assume that there are

15   some that would be hearsay, what would -- what would be your

16   response?

17             MR. TOMKO:  They're all -- they're all -- they're

18   all bank records that are records of companies that were

19   controlled by Mr. -- by Mr. Faulkner.  We have had testimony

20   here that he controlled the finances of all of these

21   companies.  There are no companies or outside entities from

22   which he is excluded.

23        In addition, the second document, 63, summarizes all

24   public filings by -- bearing -- bearing -- yeah, by the oil

25   company that is a public company, and those documents were all

1    available -- were filed by the company to -- in which

2    Mr. Faulkner is an officer and were provided to the SEC and

3    are part of public record.

4            THE COURT:  Do you wish to reply, Mr. Boisvert?

5            MR. BOISVERT:  Yes, Your Honor.  Thank you.

6        The documents listed on Exhibit 1 don't solely consist of

7    bank statements.

8        With respect to the ones that do, there's no business

9    records affidavit or any documents authenticating these

10   documents or demonstrating that they are business records of

11   the banks which they purport to be bank statements from.

12       None of these documents are in evidence today.

13       The expert report that was provided that was based on

14   these documents, Your Honor, was provided I believe on August

15   7th, 2017, so it predates the orders that are issued today.

16       All of these documents are dated -- there's nothing dated

17   this year, Your Honor, as far as I can tell.

18       So I -- I don't see the relevance of this testimony.  And

19   I stand on the hearsay objection.

20           THE COURT:  Regarding the relevance objection, I'll

21   overrule that objection.

22       Regarding the hearsay objection, if in fact there is a

23   document on which he relies that has not been properly

24   supported, I'll just disregard that when I make my decision.

25       So the objections are overruled subject to my

```
 1    disregarding inadmissible evidence.

 2          You may proceed, Mr. Tomko.

 3               MR. TOMKO:   Thank you, Your Honor.

 4    BY MR. TOMKO:

 5    Q.    Mr. Soward, looking at Exhibit 61, is this a document

 6    that was prepared by you for you?

 7    A.    It was.

 8    Q.    Is this a true and correct copy of that document?

 9    A.    It is an excerpt of the documents for review for you to

10    consider from my original report.

11    Q.    Okay.  And -- and does this document list all of the

12    documents that -- that you reviewed for the purpose of your

13    summary testimony?

14    A.    What I reviewed for the summary is really a subset, but

15    they're all within that document listing, -- yes --

16    Q.    Can you identify on this --

17    A.    -- sir.

18               THE COURT:   Just a moment.

19          If you won't talk over the witness --

20               MR. TOMKO:   I'm sorry.

21               THE COURT:   -- it will help the court reporter.

22               MR. TOMKO:   I'm sorry, Your Honor.

23    BY MR. TOMKO:

24    Q.    Can you identify the specific document you reviewed --

25    A.    I can --
```

1    Q.    -- in preparation for Exhibit 62?

2    A.    Yes, I can.

3          With respect to Exhibit 62, I looked at the bank

4    statement database that contained over 64,000 transactions for

5    102 bank accounts owned or controlled by BOG, BECC, BRC,

6    Crude, Patriot, and Simply Solutions for Faulkner.

7          I also looked at the Wells Fargo bank statements, the

8    Bank of America bank statements, the JP Morgan bank

9    statements, the BBVA Compass bank statements, a list of bank

10   accounts that are denoted on the first page.

11         On the second page, I looked at the Coadvantage payroll

12   data, the Intuit payroll data, the Malone Bailey, Rothstein,

13   R-o-t-h-s-t-e-i-n, Kass, K-a-s-s, audit workpapers.

14         And on the third page I looked at the consolidated

15   general ledgers of BOG, BRC, and Crude.  I looked at the

16   general ledger of Patriot, the general ledger of Crude, and a

17   category of documents called various SEC filings.

18   Q.    And as a result of that review were you able to prepare a

19   graphic to establish cash flow?

20   A.    Yes, sir, I was.

21   Q.    All right.  And I'll ask you to look at Exhibit 62.

22         Is that a document that you recognize, sir?

23   A.    It is.

24   Q.    What is it?

25   A.    It is a document that I had prepared that summarized from

1   the bank account information to help sort of codify the -- the

2   money transfers that happened between BOG, BECC, Crude,

3   Patriot, and BRC.

4       And we've denoted in yellow boxes sort of surrounding it

5   sort of the summary information that accounts for in summary

6   status the amount of transactions and the dollar amount that

7   flowed between those entities.

8           MR. TOMKO:  We would move for the admission, Your

9   Honor, of Exhibit Receiver 62.

10          MR. BOISVERT:  Again, I make the same objection,

11  Your Honor, hearsay based on exhibits -- or documents that are

12  not in evidence and are hearsay themselves.

13      Also I object to the relevance with respect to transfers

14  taking place between January 2011 and February of 2016, which

15  is a year and a half before the court entered the first order

16  that's the subject of the motions today.

17          THE COURT:  I'll overrule the relevance objection.

18      Regarding hearsay, it appears the foundation has been

19  laid that this document is derived from bank statements which

20  would not be hearsay.

21      Again, if I determine that any basis for this is

22  inadmissible, I'll disregard it in making my ruling.

23      Accordingly, Receiver Exhibit 62 is admitted.

24  BY MR. TOMKO:

25  Q.  Can you summarize that for the record, sir.

A.     I think if you look at the bottom left corner of it in

the yellow box that based upon the bank statement analysis

that we did over that time frame, January of '11 through

February of 2016.  We identified over 500 money transfers that

happened between the BECC/BOG entity and BRC, Patriot and

Crude.

       In the bottom right-hand corner you will see that for

over those 500 transactions over 74 million dollars of monies

was transferred between those entities.

       And in the top left yellow box you will denote that we

summarized that the BOG/BECC entities received over $42

million from BRC, Crude, and Patriot, while the same entities,

BOG and BECC, transferred over $13 million to BRC, Crude, and

Patriot.  It's sort of a summary of the money flow in terms of

quantity of transactions and the dollar amount of those

transactions.

Q.     And BRC is what, sir?

A.     That's the Breitling Royalty Corporation.

Q.     Okay.

       Okay.  And call your attention, sir, to Exhibit 63.

       Can you identify that?

A.     Yes.

       This is a -- a three page document that I caused our

staff to create based upon SEC filings and the accounting and

auditors' workpapers for the BECC entity.

1    Q.    The SEC filings for BECC?

2    A.    These are SEC filings, yes, for BECC, yes, sir.

3    Q.    Okay.  And -- and -- and what have you created here?

4          Can you just give us a generic.

5    A.    Sure.

6          The first page is just generally a summary of an SEC

7    filing that -- that reports that BECC is owned and -- between

8    BOG and BRC approximately 92 percent of its shares.  And it's

9    a reporting mechanism that talks about that controlled by

10   ownership that exists between those entities in terms of a

11   controlled voting ownership between those three.

12   Q.    Let me make sure I understand it correctly, BRC and BOC

13   [sic] earn 90 percent -- or 92.5 percent of BECC?

14   A.    BOG, yes, sir.  Yes.

15   Q.    Okay.  I'm sorry.  I'm sorry.

16         A lot of letters.

17   A.    It is.

18   Q.    All right.

19         MR. TOMKO:  Your Honor, we would move for the

20   admission of Exhibit Receiver 63, please.

21         MR. BOISVERT:  Object again to the hearsay and that

22   this is based on documents that have not been authenticated

23   and documents that are also hearsay and object to the

24   relevance.

25         THE COURT:  The objections are overruled.

1     And, again, I'll disregard anything that I find is

2   inadmissible in making my ruling.

3     Receiver Exhibit 63 is admitted.

4   BY MR. TOMKO:

5   Q.    And the relationship Crude and BECC, what did you -- how

6   did you determine that to be a relationship, sir?

7   A.    That was a combination of the SEC public filing as well

8   as the auditor workpapers regarding the necessity for BECC to

9   consolidate the reports of operations from Crude into BECC's

10  accounting and public filing.

11  Q.    Can you work us backward from the filing to how you got

12  there?

13  A.    Sure.

14     The issue arose after the creation of Crude with respect

15  to the auditors and the appropriate GAAP presentation of

16  financial information for BECC as to whether or not BECC

17  exercise sort of dominion and control, economic control over

18  Crude.

19     The auditors determined in their workpapers, and as

20  summarized on the second page of this three page PowerPoint,

21  that BECC did exercise economic dominion and control and that

22  it would be appropriate under GAAP for BECC to actually

23  consolidate the accounting activities and financial reporting

24  of Crude when presenting the quarterly filing for Crude in the

25  third quarter of '14.

Q.    So were they in fact consolidated for the purpose of the public filing?

A.    They were.

Q.    Okay.  And so Crude -- the assets and liabilities of Crude were included in the public filing of BECC?

A.    As well as the state-- the statement of operations from income, yes.

          MR. TOMKO:  Okay.  All right.  I have no further questions, Your Honor.

          THE COURT:  Cross-examination.

                    CROSS EXAMINATION

BY MR. BOISVERT:

Q.    Good afternoon, Mr. Sowards.

A.    Good afternoon.

Q.    Have you had a chance to review the court's August 14, 2017, order in this case?

A.    I have not.

Q.    Okay.  Would it be fair to say that your testimony today has nothing to do with respect to any transactions that occurred on or after August 14th, 2017?

A.    It would be fair to say that my summary does not include any of those -- any transactions after the February of 2016 that was the subject of our report.

Q.    Okay.  And your opinions today are not based on any -- are they based on any documentation dated on or after August

1    14th, 2017?

2    A.    They're not based on any documentation after that date,

3    no, sir.

4    Q.    Okay.

5          After what date?

6    A.    After the date you just said in 20-- they're not based on

7    any documentation after February of 2016.

8    Q.    Okay.  So you're not relying on any documentation after

9    February of 2016?

10   A.    We may have as part of our original report, but for

11   purposes of the summary, no.

12   Q.    Okay.

13   A.    There's no -- there's no bank statement or accounting

14   recordation that we have after that date.

15   Q.    Okay.

16   A.    After February of '16.

17   Q.    Is there any documentation at all?

18   A.    I would have to go back and look and see if there's an

19   email or some other correspondence that we may have been

20   provided subsequent to that February '16, but substantially

21   the bank account analysis and the public filings analysis was

22   up until that February of '16 time frame.

23   Q.    Okay.  And, in fact, on Exhibit 61 you don't identify any

24   documents that you reviewed and considered in connection with

25   your testimony today that are dated -- the latest date I

1    see -- well, I see 2016 dates, but it would be fair to say you

2    relied on nothing dated from January 1, 2017, forward,

3    correct?

4    A.   I think that would be a fair assessment, yes.

5    Q.   And your opinion today has basically offered a

6    mathematical summary of these transactions, correct?

7         You're not opining as to whether any of these

8    transactions were wrongful or not, correct?

9    A.   I don't have any opinion on the character of the

10   transactions.  You're correct that I'm summarizing it and

11   hopefully guidance in terms of what consolidation means, in

12   terms of once you consolidate what does that mean from an

13   accounting perspective that you have some control, otherwise,

14   you would not consolidate.

15             MR. BOISVERT:  Okay.

16        Pass the witness, Your Honor.

17             MS. FAULKNER:  I have no questions, Your Honor.

18             MR. TOMKO:  No further questions, Your Honor.

19             THE COURT:  Any objection to excusing the witness?

20             MR. TOMKO:  None, Your Honor.

21             MR. BOISVERT:  No, Your Honor.

22             THE COURT:  Thank you, sir.  You're excused.

23        You may step down.

24             MR. TOMKO:  The receiver would call the receiver,

25   Your Honor.

```
1              THOMAS L. TAYLOR, III, WITNESS, SWORN
2              THE COURT:  Be seated, please, and speak into the
3    microphone.
4                        DIRECT EXAMINATION
5    BY MR. TOMKO:
6    Q.    State your name for the record, please.
7    A.    It's Thomas L. Taylor, III.
8    Q.    And spell your last name.
9    A.    T-a-y-l-o-r.
10   Q.    Mr. Taylor, give us a little of your background, if you
11   would, please.
12   A.    I'm a graduate of the University of Texas Law School,
13   admitted in Texas and California and New York, on retired
14   status in New York.
15         My practice is focused upon securities litigation and
16   enforcement.  And I spend a good portion of my time acting as
17   a receiver in federal law enforcement actions.
18   Q.    And you've acted as receiver for the SEC?
19   A.    I have.
20   Q.    And you have been appointed by this court as the receiver
21   in this transaction?
22   A.    Yes.
23   Q.    Is that correct?
24         Now, I'd like to call your attention to Exhibit R 42.
25         Are you familiar with that document, sir?
```

1    A.    Yes, I am.

2    Q.    And does that document set forth in summary fashion what

3    your responsibilities and powers are to be?

4    A.    Exhibit 42, I believe, is the TRO and asset freeze.

5    Q.    Okay.  And it says on page -- the bottom of page 1, it

6    identifies what document, sir?

7    A.    Orders entered on the motion of the Securities and

8    Exchange Commission for the issuance of an order ex parte.

9          The burden is relief against defendants.

10   Q.    Okay.  And then Exhibit 43, sir.

11   A.    Exhibit 43 is the order appointing temporary receiver.

12   Q.    And are you familiar with that?

13   A.    I am.

14   Q.    And what does it -- are you familiar with what assets it

15   provided you to have access over in your role as a receiver?

16   A.    Yes.  As set forth in the order, this appointment is

17   necessary for the purposes of marshalling and preserving all

18   oil and gas related assets in any form or of any kind

19   whatsoever owned, controlled, possessed, or managed, directly

20   or indirectly, by the three named defendants.

21   Q.    Did you find that at all confusing?

22   A.    No, I did not.

23   Q.    To you -- did you form an opinion as to what it covered

24   after you read that?

25   A.    I did.

Q.    And what was that opinion, sir?

A.    In my opinion it covered any of the assets related to the Breitling entities which had been controlled by, managed by, or owned by Mr. Faulkner or by the other -- any entity by the two named entities.

Q.    And then calling your attention also to page 3 of that document, paragraph 6-B, what directions were provided to you?

A.    What orders did I issue pursuant to paragraph 6-D?

Q.    6-B, as in boy.

A.    6-B.

We immediately commenced serving the order on various oil and gas producers and other oil and gas related entities that had had business relationships with Faulkner and the related entities.

We immediately took possession of the known post office box.  In fact, I did that on the afternoon of the entry of the order.

I proceeded from there to attempt to serve Mrs. Faulkner as counsel to the two named entities.  We went to her home and were unable to contact her.  I learned that she had been served by mail and that subsequently that evening she had been served with all of the SEC's moving papers.

Q.    Now --

A.    I also contacted counsel to the entities and counsel to Mr. Faulkner to ask them to cooperate in turning over all the

1    assets.

2    Q.    And the post office box that you were given authority

3    for, it's identified, is it not, on page 5, paragraph 11?

4    A.    We were given authority specifically over that P.O. Box,

5    but without limitation.

6    Q.    And what P.O. Box is that, sir?

7    A.    The P.O. Box located at 3930 Glade Road in Colleyville.

8    Q.    Does this document also contain a stay of litigation,

9    sir?

10         Page 8.

11   A.    It does.  It's a fairly standard provision in all federal

12   law enforcement receivership orders.

13   Q.    And was there any ambiguity in that language that you

14   perceived --

15   A.    None.

16   Q.    -- when you read it?

17   A.    No.

18   Q.    And Exhibit 44, sir.  That's issued subsequent to the

19   document 43; is that correct?

20   A.    Yes.  This is an order entered by the court on September

21   25th.

22   Q.    All right.  Does it also indicate what assets are

23   covered?

24   A.    It does.

25   Q.    And what did you understand those assets to be?

```
 1            MR. BOISVERT:  I'm sorry, Mr. Tomko, what paragraph
 2   are you?
 3   BY MR. TOMKO:
 4   Q.   We would look right at the first, "The court finds,"
 5   directly below the order.
 6   A.   Until further order of the court Thomas is appointed to
 7   serve without bond as temporary receiver (the receiver) for
 8   the estates of the receivership defendants and the
 9   receivership assets.
10   Q.   And for the purpose of marshalling and preserving all
11   assets in any form or of any kind whatsoever, owned,
12   controlled, managed, or possessed by defendant Christopher A.
13   Faulkner, Bering Oil and Gas Corporation, and Bering Energy
14   Corporation.
15        Did I read that --
16   A.   Yes.
17   Q.   -- correctly?
18        And does this document also contain a segment on page 5,
19   paragraph A?
20   A.   I'm sorry, paragraph what?
21   Q.   A, as in apple.
22   A.   All oil and gas operators, and all banks, brokerage
23   firms, financial institutions, and other persons, et cetera,
24   rather shall not liquidate, transfer, sell, convey, or
25   otherwise transfer any assets, securities, funds, or accounts
```

1    in the name of or for the benefit of the receivership

2    defendants, except upon instructions from the receiver.

3    Q.    And Mr. Faulkner is one of those receivership defendants,

4    was he not?

5    A.    Yes.

6    And there is no limitation on that, is there, to any specific

7    type of funds?

8    A.    No, there is not.

9    Q.    Any ambiguity that you perceived in that language, sir?

10    A.    No.

11    Q.    I'm going to then draw your attention to Exhibit R 1.

12          Are you familiar with that document?

13    A.    Yes, sir.

14    Q.    And how are you familiar with it?

15    A.    We were coordinating with the Securities and Exchange

16    Commission in immediately serving all necessary parties with

17    the order appointing receiver.

18          I believe I was likely copied on this.

19          I was.  When Mr. McCole confirmed to Mr. Friedman that

20    the orders of the court had been issued.

21    Q.    Is this a true and correct of the document as you

22    received it, sir?

23    A.    Yes.

24    Q.    And have you retained that in your file since then?

25    A.    Yes.

```
 1              MR. TOMKO:  We would move, Your Honor, for the
 2   admission Receiver Exhibit 1.
 3              MR. BOISVERT:  No objection.
 4              MS. FAULKNER:  No objection.
 5   BY MR. TOMKO:
 6   Q.    Receiver Exhibit --
 7              THE COURT:  Just a moment.
 8              MR. TOMKO:  I'm sorry.
 9              THE COURT:  Receiver --
10              MR. TOMKO:  I'm sorry, Your Honor.
11              THE COURT:  -- Exhibit 1 is admitted.
12   BY MR. TOMKO:
13   Q.    Receiver Exhibit 2.
14   A.    Yes.
15   Q.    Are you familiar with that document?
16   A.    I am.
17   Q.    And I would ask you the same questions:
18         Did you receive that document?
19   A.    I did.
20   Q.    Is it a true and correct copy of the document as you
21   received it?
22   A.    Yes, it is.
23   Q.    And did you maintain custody of that document from the
24   time of its reception?
25   A.    I did.
```

```
 1   Q.    And this is an indication to Ms. Faulkner; is that
 2   correct?
 3   A.    That's correct.
 4   Q.    And it is in her capacity as counsel; is that correct?
 5   A.    Yes, it was.
 6              MR. TOMKO:  Your Honor, we would move for the
 7   admission of Exhibit R 2.
 8              THE COURT:  Any objection?
 9              MR. BOISVERT:  No objection.
10              MS. FAULKNER:  No objection, Your Honor.
11              THE COURT:  Receiver Exhibit 2 is admitted.
12   BY MR. TOMKO:
13   Q.    And am I correct in saying on Exhibit R 1 the date is
14   August the 14th, 2017, at 2:47 p.m.?
15   A.    That is correct.
16   Q.    And on Exhibit 2 it is August 14th, 2017, at 2:38 p.m.;
17   is that correct, sir?
18   A.    That is correct.
19   Q.    Now, I want to call your attention to Exhibit 8, sir.
20   A.    Was that 8?
21   Q.    Yes, sir.
22   A.    Yes.
23   Q.    Can you identify that?
24   A.    I can.
25   Q.    What is it?
```

1  A.    It's a communication that I transmitted to counsel for

2  Mr. Faulkner.  It indicates that it's from Kelly Cornelison.

3  That's because it was generated from my assistant's computer,

4  but I wrote the document.

5  Q.    Okay.  And is this a true and correct copy of the

6  document that you prepared at the time?

7  A.    Yes, it is.

8  Q.    Is it -- was it your -- is it your policy to retain and

9  control copies of these documents as you prepare them?

10  A.    Yes.

11         MR. TOMKO:  We would move, Your Honor, for admission

12  of Defendant's Exhibit 8.

13         MR. BOISVERT:  No objection.

14         MS. FAULKNER:  No objection, Your Honor.

15         THE COURT:  Receiver Exhibit 8 is admitted.

16  BY MR. TOMKO:

17  Q.    And in this document did you repeat the information that

18  was contained in the orders from this court?

19  A.    Yes.

20  Q.    All right.

21         And can you just read from the second paragraph starting

22  with "I have been instructed by the court . . ."

23  A.    "I have been instructed by the court to take immediate

24  possession and control of the receivership assets defined as

25  all oil and gas related assets in any form or of any kind

1   whatsoever, owned, controlled, possessed, or managed, directly

2   or indirectly, by defendants Christopher A. Faulkner,

3   Breitling Oil & Gas corporation and Breitling Energy

4   Corporation."

5   Q.    And did you also identify the mailbox on here,

6   Exhibit --

7   A.    I identified it.  And also advised that I had taken

8   possession of that P.O. Box on the afternoon of August 14th.

9   Q.    And this was direct -- this is dated August the 15th of

10  2017 at 12:44 p.m.?

11  A.    Yes.

12  Q.    And this is to counsel for Mr. Friedman?

13        Counsel for Mr. Faulkner, Mr. Friedman?

14  A.    For Mr. Faulkner to Mr. Friedman, yes.

15  Q.    All right.

16        Did -- at this time did you get a response from either

17  counsel for Mr. Faulkner or Mr. Faulkner concerning mailboxes

18  that were possessed or controlled by Mr. Faulk-- Fried--

19  Faulkner (laughing) or any of his entities?

20  A.    Well, as to entities, I received information from

21  Mrs. Faulkner on the 15th regarding the mailbox.

22  Q.    Okay.

23  A.    I did not receive any specific information at that time

24  from Mr. Friedman's firm regarding Mr. Faulkner.

25  Q.    Okay.  No one told you that there was a mailbox on

1  Northwest Highway --

2  A.    No.

3  Q.    -- did they?

4  A.    No.  I had a conversation with Mrs. Faulkner that must

5  have lasted 10 to 15 minutes, during which we discussed in

6  detail the Colleyville mailbox.  And she did not disclose that

7  there was another mailbox at which mail was being received for

8  the receivership entities.

9  Q.    And calling your attention to Exhibit R 9.  Is this a

10  document that you authored, sir?

11  A.    Yes.

12  Q.    And is this a true and correct copy of the document that

13  you prepared at the time?

14  A.    Yes.

15  Q.    And is it your duty -- or your ability to maintain

16  custody and control of copies of these documents once you have

17  prepared them?

18  A.    Yes.

19         MR. TOMKO:  I would move, Your Honor, for the entry

20  of document Receiver Number 9.

21         MR. BOISVERT:  No objection.

22         MS. FAULKNER:  No objection, Your Honor.

23         THE COURT:  Receiver Exhibit 9 is admitted.

24  BY MR. TOMKO:

25  Q.    And this is addressed to whom, sir?

1    A.    Exhibit 9 is direct -- directed to Mrs. Faulkner.

2    Q.    And this is also on August the 15th; is that correct?

3    A.    That is correct.  And I had a -- the conversation I just

4    described on the same day.

5    Q.    The conversation you had with her --

6    A.    Correct.

7    Q.    -- was the same day?

8    A.    Was on that day.

9    Q.    And in that conversation she did not disclose to you the

10   existence of the second mailbox?

11   A.    She did not.

12   Q.    Now, Exhibit R 10, sir.

13   A.    Yes.

14   Q.    Are you familiar with that document?

15   A.    I am.

16   Q.    Is this a document you received in the ordinary course of

17   business?

18   A.    Yes.

19   Q.    And is it a true and correct copy of the document as you

20   received it?

21   A.    Yes.

22   Q.    And did you retain a copy of this document in its exact

23   form in your records since the time of reception?

24   A.    I did.

25   Q.    Okay.

1          MR. TOMKO:   Your Honor, we would move for the

2     admission of Receiver's Exhibit 10.

3          MR. BOISVERT:   No objection.

4          MS. FAULKNER:   No objection, Your Honor.

5          THE COURT:   Receiver Exhibit 10 is admitted.

6     BY MR. TOMKO:

7     Q.   This is a document from counsel for Mr. Faulkner; is that

8     correct, sir?

9     A.   It's -- it's from Josh Blum, who was associated with

10    Mr. Friedman's firm at the time.

11    Q.   And they were counsel for Mr. Faulkner?

12    A.   Counsel to Mr. Faulkner, yes.

13    Q.   And does this indicate to you what actions, if any,

14    Mr. Faulkner is taking to respond to your requests?

15    A.   In general, yes.

16    Q.   And what does it say, in general?

17    A.   Mr. Faulkner states that to the extent the information is

18    in Mr. Faulkner's possession, custody, or control,

19    Mr. Faulkner is working diligently to identify the foregoing

20    information.

21         It's in substance the response on most of these.

22    Q.   Did you receive documents in -- at or about this time

23    from Mr. Faulkner?

24    A.   I did not.

25    Q.   When did you first begin to receive documents from

1   Mr. Faulkner, if you recall?

2   A.    Well, there was a production of a number of boxes of

3   documents.  I am not sure what date that commenced.  I'm sure

4   it was a month after this.

5         Those documents predated the pendency of this litigation,

6   I mean, the litigation in chief, and were largely, if not

7   exclusively, documents that had been gathered a year before.

8   Q.    And did you specifically ask in question number 2 on this

9   document about the checks or other items being retrieved from

10  the post office box?

11  A.    Yes.  I mean, our first order of business was to identify

12  and try to retrieve, recapture assets that had been

13  transmitted and removed from the P.O. Box and other places

14  during the pendency of the litigation.

15  Q.    Did Mr. Faulkner ever make a representative for the

16  companies that he controlled available to you to question

17  about assets for those companies?

18  A.    No, he did not.

19  Q.    Did he ever provide you with the identity of a custodian

20  for the production of records?

21  A.    He did not.

22  Q.    Has he ever filed any -- were there any reports requested

23  of him?

24  A.    The order appointing receiver requires a very detailed

25  financial accounting down to all accounts, income,

1    expenditures, et cetera, during a period of time.  And I never

2    received such a report.

3    Q.    Okay.  To Exhibit Number R 11, sir.

4          Is this a document you prepared?

5    A.    Yes.

6    Q.    Is this a true and correct copy of that document?

7    A.    Well, it includes an email from Mrs. Faulkner and an

8    email from me to her.

9    Q.    Okay.

10   A.    But, yes.

11   Q.    And that was -- you emailed her and she emailed you back;

12   is that what you're saying?

13         Or the other way?

14   A.    Yes.

15   Q.    I screwed that up.

16         Say which way it went.

17   A.    Okay.  I -- I -- I sent her the email from me at the

18   bottom.  At some point during the day I talked to her on the

19   phone.  I then received an email from her at about 1:45 in the

20   afternoon.  And it appears that it was written after our

21   conversation.

22   Q.    Was this a true and correct copy of the document you

23   prepared and you received?

24   A.    Yes.

25   Q.    And have you maintained this document in your records

1    from the time of its reception?

2    A.    Yes.

3            MR. TOMKO:  All right.  I would move, Your Honor,

4    for the admission of Exhibit -- Receiver's Exhibit 11.

5            MR. BOISVERT:  No objection.

6            MS. FAULKNER:  No objection, Your Honor.

7            THE COURT:  Receiver Exhibit 11 is admitted.

8    BY MR. TOMKO:

9    Q.    Does it reference a discussion about pickup from a

10   mailbox?

11   A.    Yes.  On the second page of my email, the numbered

12   paragraph 1, advises that I have -- advises Mrs. Faulkner that

13   I have taken possession, custody, and control of the P.O. Box

14   at 3930 Glade Road in Colleyville.

15   Q.    And do you -- did you see -- did she respond to that

16   document in the paragraph itself, paragraph 1?

17   A.    In the conversation, yes.

18         In the return email, no.

19   Q.    Okay.  What did she say in the conversation, sir?

20   A.    As I have said, this was a 10 to 15 minute conversation.

21         In general, she said that she had from time to time

22   retrieved the mail from Colleyville and that she had

23   transmitted it unopened to Christopher Faulkner and Jeremy

24   Wagers and that she had no documents presently in her

25   possession, custody, or control having to do with the receipt

1  of mail at Colleyville.

2  Q.   Was there any mention by her of the new mailbox at that

3  time?

4  A.   Absolutely not.

5  Q.   Call your attention your -- Mr. Taylor, to Exhibit

6  Receiver 14.

7  A.   Okay.  I'm there.

8  Q.   All right.  Is that a document that you prepared?

9  A.   Yes.

10  Q.   Is this a true and correct copy of that document?

11  A.   Yes.

12  Q.   And is it your business to retain true and correct copies

13  of those documents from the time that they're prepared?

14  A.   Yes.

15  Q.   All right.  And Exhibit 15, sir, can you identify that?

16  A.   Yes.

17  Q.   What is that?

18  A.   Exhibit 15 is a -- an email, correspondence, from Carole

19  Faulkner to me with a copy to my associate.

20  Q.   Did you receive that document by email?

21  A.   I did.

22  Q.   Is this a true and correct copy of the document that you

23  received?

24  A.   It is.

25  Q.   Did you maintain in your records the copy of this

1  document as in the form of which it was received?

2  A.   I did.

3          MR. TOMKO:   Your Honor, I would move for the

4  admission of Receiver's Exhibits 14 and 15.

5          MR. BOISVERT:   No objection.

6          MS. FAULKNER:   No objection, Your Honor.

7          THE COURT:   Receiver Exhibits 14 and 15 are

8  admitted in evidence.

9  BY MR. TOMKO:

10 Q.   Exhibit 15, on the -- in the first paragraph, would you

11 read the first sentence of that -- or the first two sentences

12 of that?

13 A.   "Mr. Taylor; as previously stated to you and provided in

14 writing none" in all caps "of the defendants assets or

15 communication were transferred to the Northwest Highway

16 address, only the communications and correspondence relating

17 to Breitling Royalties Corporation was transferred to that

18 address.   You have no rights, power or authority to access or

19 interfere in Royalties business."

20      This had also been said to me by Mrs. Faulkner in the

21 earlier conversation I described.

22 Q.   Specifically that nothing except for Breitling Royalty

23 Corporation was transferred?

24 A.   That's what this says.

25 Q.   And that's what she told you?

1    A.    That's what she told me.

2    Q.    All right.  And -- and a little later in that same

3    paragraph she says "Breitling Royalties is not an asset of the

4    defendants."

5          Is that correct?

6    A.    That is right.

7    Q.    And said to you you had no right to that asset?

8    A.    That's right.

9          This is a discussion we had had earlier on August 15th.

10   Q.    Did she make any demands of you in that document?

11   A.    Yes, she did.

12   Q.    And what demands were they, sir?

13   A.    She demanded that I not open any mail that wasn't

14   addressed specifically to the named receivership defendants.

15   She instructed me to return any such mail other than directly

16   to the three receivership defendants to her unopened.

17   Q.    Now, I call your attention to Exhibits -- Receiver

18   Exhibits 12 and Receiver's Exhibit 13.

19         Can you identify those, sir.

20   A.    Exhibits 12 and 13 are standard confirmation documents

21   from the U.S. Postal services, which are transmitted to a

22   customer who has initiated an address change.

23   Q.    How did you come into possession of those?

24   A.    My best recollection is these were retrieved from the

25   newly discovered P.O. Box in Grapevine.

1    Q.    And did you maintain these in the form that you received

2    them --

3    A.    I did.

4    Q.    -- since the time of reception?

5    A.    I did.

6         MR. TOMKO:   Okay.   We would offer Exhibits R 12 and

7    R 13, Your Honor.

8         THE COURT:   Any objection?

9         MR. BOISVERT:   I'm sorry.   No objection.

10        MS. FAULKNER:   No objection, Your Honor.

11        THE COURT:   Receiver Exhibits 12 and 13 are admitted

12   in evidence.

13   BY MR. TOMKO:

14   Q.    Exhibit 12, sir, what does it show the entity for which

15   the address is being changed?

16   A.    Breitling Oil & Gas.

17   Q.    That -- that's a different company than Breitling

18   Royalties, as represented to you by Mrs. Faulkner; is that

19   correct?

20   A.    That is correct.   It is the receivership entity.

21   Q.    And she told you only Breitling Royalties was

22   transferred?

23   A.    She did.   In writing.

24   Q.    And I ask you again on Exhibit 13, what --

25   A.    Exhibit 13 is a confirmation for Breitling Energy, the

1    other corporate receivership entity.

2    Q.    And this is also not a different entity than Breitling

3    Royalties; is that correct?

4    A.    Yes.

5    Q.    And both of those were receivership entities?

6    A.    Correct.

7    Q.    Now, Exhibit 16, sir.

8    A.    Yes.

9    Q.    What -- what is that?

10   A.    This is a -- an email transmitted from my associate,

11   Mr. Goforth to Mr. Blum and to Mr. Friedman and to

12   Mrs. Faulkner at my instruction.

13   Q.    And what was the purpose of this email, sir?

14   A.    I believe Mr. Blum had called me to complain that a

15   Breitling Royalties account had been frozen at CitiBank.

16   Q.    And is this a true and correct copy of the document as it

17   was prepared by your office?

18   A.    Yes.

19   Q.    All right.  And is this a document that your office keeps

20   in its business records at the time of preparation?

21   A.    Yes.

22   Q.    And to your knowledge was this document sent to the

23   counsel for Mr. Faulkner?

24   A.    Yes.

25   Q.    And was it sent to Ms. Faulkner as well?

1    A.    Right.   There is substance in here also about the Glade

2    Road mailbox, third paragraph from the bottom.

3    Q.    Okay.

4          MR. TOMKO:   We would move for the admission of

5    Receiver 16, Your Honor.

6          MR. BOISVERT:   No objection.

7          MS. FAULKNER:   No objection, Your Honor.

8          THE COURT:   Receiver Exhibit 16 is admitted.

9    BY MR. TOMKO:

10   Q.    Okay.   What -- would you tell us what it talks about as

11   far as the mailboxes are concerned, sir.

12   A.    In Exhibit 16?

13   Q.    Yes, sir.

14   A.    I believe at this point I had told Mr. Blum about the

15   mailbox change for Breitling Royalties, which we learned about

16   from Chesapeake Energy.

17   Q.    Now, repeat that.

18         How did you learn about that change in mailbox?

19   A.    Shortly after the receivership was implemented,

20   immediately after, we served a number of oil and gas producers

21   with the order.   Many of them very promptly investigated to

22   see if they had assets answering to the order.

23         I received a call from a Patrick Craine, associate

24   general counsel at Chesapeake who had received the order,

25   understood its import, and had initiated a review of

```
 1   Chesapeake assets to see if there were any there that were

 2   implicated.

 3              MR. BOISVERT:  Your Honor, I'm going to object to

 4   the hearsay, speculation as to what he knew.

 5        Or understood.

 6              MR. TOMKO:  He testified.  The record speaks for --

 7   Mr. Craine testified, Your Honor, his record speaks for

 8   itself.

 9              THE COURT:  I'll disregard the last answer of this

10   witness and rely on the testimony of Mr. Craine.

11   BY MR. TOMKO:

12   Q.   Did you subsequently take control of the new mailbox?

13   A.   We did.

14   Q.   Now, call your attention to Exhibit R 23, sir.

15   A.   Yes.

16   Q.   And what is that?

17   A.   This is a -- an email from Carole Faulkner to

18   Mr. Goforth, my associate.

19   Q.   Is this a true and correct copy of that email?

20   A.   Yes.

21   Q.   You received that -- you received that email from

22   Ms. Faulkner?

23   A.   Yes.

24   Q.   And you maintained custody and control of that email --

25   A.   Yes.
```

1    Q.    -- in its form from the reception?

2              MR. TOMKO:   Your Honor, I move for the admission of

3    Receiver's Exhibit 23.

4              MR. BOISVERT:   No objection.

5              MS. FAULKNER:   No objection, Your Honor.

6              THE COURT:   Receiver Exhibit 23 is admitted.

7    BY MR. TOMKO:

8    Q.    Did you receive any documentation subsequent to the

9    receipt of this document from Ms. Faulkner?

10   A.    No.  I never received any documents from Ms. Faulkner.

11   Q.    Did you ever talk to her about receiving -- picking up

12   mail from mailboxes?

13   A.    Yes.

14   Q.    You've talked a little bit about Chesapeake, what about

15   the new box on -- I don't mean Chesapeake, I'm sorry,

16   Colleyview -- Colleyville, the new box on route Northwest

17   Highway?

18   A.    I don't recall a specific conversation with respect to

19   that.

20   Q.    Okay.

21         I'll call your attention then to Receiver's Exhibit 19.

22         Can you identify that, sir?

23   A.    Yes.  This is an email transmitted by Mr. Goforth to

24   Mrs. Faulkner at my instruction.

25   Q.    All right.  Is this a true and correct copy of that

1    document?

2    A.    Yes, it is.

3    Q.    Was it made at or about the time that it is dated?

4    A.    Yes.

5    Q.    Was it forwarded to Ms. Faulkner?

6    A.    Yes.

7    Q.    And is it your business to maintain custody and control

8    of copies of these documents?

9    A.    Yes.

10             MR. TOMKO:   We would move for the admission of

11   Receiver's 19, Your Honor.

12             MR. BOISVERT:   No objection.

13             MS. FAULKNER:   No objection, Your Honor.

14             THE COURT:   Receiver Exhibit 19 is admitted.

15   BY MR. TOMKO:

16   Q.    Would you look at the first paragraph and tell us what

17   you recall about that particular event.

18   A.    Yes.    By this time we knew about the Grapevine mailbox.

19   I believe the SEC staff assisted us in serving them and

20   implementing our control over that mailbox.

21             On this occasion we were in telephonic communication with

22   the -- as best of my recollection we were in telephonic

23   communication with the P.O. Box proprietors and they advised

24   us that Mrs. Faulkner had attempted to access the mailbox on

25   that day.

1    Q.    And did you discuss that with her at any time?

2    A.    Well, certainly by this written communication, which is

3    Exhibit 19.  I don't know that I talked to her directly about

4    it.

5    Q.    Did you ever get any response to this that you're aware

6    of?

7    A.    No.

8    Q.    Exhibit R 20, sir.

9    A.    Yes.

10   Q.    What -- what are these?

11   A.    These are examples of incoming correspondence to the

12   Grapevine mail -- mailbox.

13   Q.    These are documents that you retrieved from the post

14   office box?

15   A.    Correct.  I or persons acting at my direction, yes.

16   Q.    And they are -- had been delivered by the Postal Service

17   to the addressee; is that correct?

18   A.    To the new Grapevine mailbox, yes.

19          MR. TOMKO:  Your Honor, we would enter these -- move

20   for the entry of Receiver 20.

21          THE COURT:  Any objection?

22          MR. BOISVERT:  No objection.

23          MS. FAULKNER:  No objection, Your Honor.

24          THE COURT:  Receiver Exhibit 20 is admitted.

25   BY MR. TOMKO:

```
1    Q.    First page is a letter to Breitling Energy; is that
2    correct?
3    A.    Yes.
4    Q.    At that post office box; is that correct?
5    A.    Yes.   Yes.
6    Q.    Second letter is a document addressed to Breitling
7    Energy, correct?
8    A.    Yes.
9    Q.    At that post office box, correct?
10   A.    At the Grapevine -- at the Grapevine P.O. Box, yes.
11   Q.    Correct.
12         And -- and it is from -- I don't know how to say that
13   word, Ventana Exploration and Production Company; is that
14   correct?
15         Look at the return address up in the left-hand corner.
16   A.    Ventana Exploration and Production, LLC.
17   Q.    Okay.
18         And the next page is also a document to Breitling Energy
19   Corporation; is that correct?
20   A.    Yes.
21   Q.    And it's at the Grapevine mailbox; is that correct?
22   A.    It's to the Grapevine mailbox.
23   Q.    Next document is a Breitling Energy Corporation as well?
24   A.    Yes.
25   Q.    And it is at the Grapevine mailbox?
```

1    A.    Yes.

2    Q.    And it has a return address of S-v-e-n, Sven Energy, LLC;

3    is that correct?

4    A.    Yes.

5    Q.    And then the final document is to Breitling Royalties; is

6    that correct?

7    A.    That is correct.

8    Q.    And -- and that is the -- the entity that Ms. Faulkner

9    said -- told you was the only entity that was receiving mail

10   at that box; is that correct?

11   A.    Correct.

12   Q.    And that is from Texland Petroleum; is that correct?

13   A.    Yes.

14   Q.    Moving along then to -- are you familiar with the term --

15   or the company called RackAlley?

16   A.    I am.

17   Q.    How did you become familiar with that, sir?

18   A.    On or about September 29th a member of the SEC staff

19   alerted me to the fact that Mr. Faulkner was about to receive

20   proceeds, cash proceeds, either the entitlement to those

21   proceeds or the actual cash, arising from the sale of a

22   business in which he held an interest, and that business was

23   identified as RackAlley.

24   Q.    And what did you do as a result of receiving that

25   information?

A.    I immediately used the information that I had received to

investigate the facts and circumstances.  I also contacted

Mr. Faulkner's counsel immediately.  And my call to their firm

was received by Mr. -- I struggle with his name, but

Boisvert.

Q.    Carter.

      (Laughter.)

A.    Let's say Carter, yeah.

Q.    All right.  I call your attention to Receiver's Exhibit

26.

A.    Yes.

Q.    And what is that, sir?

A.    This is an email that I sent to Carter at or about the

time I -- well, it appears I sent it before I even reached him

by phone, to alert him to the fact that Mr. Faulkner was

receiving proceeds, or about to receive proceeds which in my

view belonged to the receivership estate.

Q.    And did you hold a belief that that was covered by the

receivership order?

A.    Of course.  It was an asset of receivership defendant

Christopher Faulkner.

Q.    And what you were basing that on what, sir?

A.    The September 25th order appointing temporary receiver.

Q.    Okay.  Is this Exhibit 26 a true and correct copy of the

email that you sent?

1  A.    It is a copy of my email to Carter.  And I'm quite sure

2  that I forwarded to him an email I had already sent to

3  Mr. Arab asking him to maintain control of the liquid asset

4  involved?

5  Q.    And was this in fact sent to Mr. Boisvert?

6  A.    Yes.

7  Q.    And is this a true and correct copy of the document as it

8  was sent?

9  A.    Yes.

10 Q.    And did you maintain your document in this records from

11 the time that it was sent out?

12 A.    Yes.

13       MR. TOMKO:   Okay.  Your Honor, we would move for the

14 admission of Exhibit Receiver 26.

15       MR. BOISVERT:   No objection.

16       MS. FAULKNER:   No objection, Your Honor.

17       THE COURT:   Receiver Exhibit 26 is admitted.

18 BY MR. TOMKO:

19 Q.    So at this time did you know what the status was of the

20 proceeds from the RackAlley sale?  You, yourself.

21 A.    I believe from the outset I knew that the proceeds had

22 been disbursed and that Mr. Arab as one of the three partners

23 had control of all the funds, including funds destined for

24 Mr. Faulkner.

25 Q.    And is that the information that you passed on to counsel

1    for Mr. Faulkner at that time?

2    A.    At -- at least that much information, if not more.

3    Q.    And as a follow-up, look at Receiver Exhibit 27.

4    A.    Yes.   This is an email dated October 9th from me to

5    Carter.

6    Q.    And is that a true and correct copy of the email?

7    A.    Yes, it is.

8    Q.    And did you send that email to Mr. Boisvert?

9    A.    I did.

10   Q.    And did you maintain in your records a true and correct

11   copy of that email?

12   A.    I did.

13          MR. TOMKO:   I would move for the admission, Your

14   Honor, of receiver Exhibit 27.

15          MR. BOISVERT:   No objection.

16          MS. FAULKNER:   No objection.

17          THE COURT:   Receiver Exhibit 27 is admitted.

18   BY MR. TOMKO:

19   Q.    And what was the purpose of that?

20   A.    It was to make clear to Mr. Faulkner's counsel that I was

21   holding him accountable for these liquid assets that were

22   about to be disposed of unlawfully.

23   Q.    Exhibit 28, sir.

24   A.    Yes.

25   Q.    What is that?

1  A.    At about this time, October 10th, this was the day after

2  my exchange with Carter, Mr. Friedman became involved.  And

3  either he initiated or I initiated another telephone

4  conference involving him and Carter.

5  Q.    Is this a document that you prepared?

6  A.    It is.

7  Q.    Is this a document that you sent to counsel for

8  Mr. Faulkner?

9  A.    It is.

10 Q.    Is this a true and correct copy of that document?

11 A.    Yes, it is.

12 Q.    Did you maintain custody and control of this document in

13 your business records since its inception?

14 A.    I did.

15       MR. TOMKO:  I would move, Your Honor, for the

16 admission of Exhibit Receiver 28.

17       THE COURT:   Any objection?

18       MR. BOISVERT:   No objection.

19       MS. FAULKNER:   No objection, Your Honor.

20       THE COURT:   Receiver Exhibit 28 is admitted.

21 BY MR. TOMKO:

22 Q.    Now, in the third full paragraph, can you summarize what

23 you're talking about there for the court, please?

24 A.    Right.  Well, during the course of the prior telephone

25 conversation Mr. Friedman asked me to put in writing what my

1    contentions were.

2        I advised him that I had already done that once but I'd

3    be happy to do it again, and I did.

4        So this third paragraph summarizes what I knew about it.

5    And I knew that three checks had been drawn to the -- well, to

6    the nominee entity.

7        I knew that the checks had been transmitted to the

8    Eastern Court addressed in Venice Beach, which I knew to be

9    Mr. Faulkner's residence.

10        I knew the checks were made to a nominee entity, U.S.

11    Property.

12        And then I also apparently knew and conveyed to

13    Mr. Friedman that on October 3rd according to the public

14    records of Wyoming Mr. Faulkner had reported to place the

15    nominee entity under the control of his personal friend

16    Shannon Bresnahan, also residing at the same address in Venice

17    Beach.

18    Q.   Did you get a response to this, if you remember, sir?

19    A.   I believe not.  And I was -- I -- I understood that

20    action would be taken by counsel.  Apparently it was not,

21    because I don't think I received any further response.

22    Q.   Look at Exhibit receiver 29, please.

23    A.   Yeah.  I'm at 29.

24    Q.   And what is that?

25    A.   This is yet another letter from me to Mr. Friedman and

1    Carter and others, including an attorney who by this time had

2    come on board to represent Mrs. Faulkner.

3        And here I've summarized everything that has gone on to

4    this date.  We were now about 17 days into this.

5    Q.   And is this a true and correct copy of that document?

6    A.   Yes.

7    Q.   And was this document in fact sent to the parties that

8    you've identified?

9    A.   Yes, it was.

10   Q.   And did you maintain custody and control of this document

11   as part of your business records?

12   A.   Yes, I did.

13           MR. TOMKO:  We would move, Your Honor, for the

14   admission of receiver 29.

15           MR. BOISVERT:  No objection.

16           MS. FAULKNER:  No objection.

17           THE COURT:  Receiver Exhibit 29 is admitted.

18   BY MR. TOMKO:

19   Q.   And in this document you purport to set out specifics of

20   information that you have received up to that point; is that

21   correct?

22   A.   Yes.

23   Q.   And in that document you say that Ms. Bresnahan has no

24   knowledge of or connection to USPI; is that correct?

25   A.   That's correct.

Q.   Without telling us, how did you get that information?

A.   By talking to her?

Q.   Did you get a response to that document, sir?

A.   Not that I recall.

Q.   Okay.  Did you then proceed to get bank records from Bank of the West?

A.   We did.  With the SEC's assistance we located an account which Mrs. Faulkner had opened at Bank of the West.  We immediately subpoenaed the Bank of the West.

Q.   Okay.  And what did you learn -- summarizing the materials, not going through the documents again, but what did you learn about the activity in the account at Bank of the West?

A.   We learned that Mrs. Faulkner had opened an account at Bank of the West in the name of U.S. Property Investments. One of the three checks to U.S. Properties was successfully deposited into the Bank of the West account and the funds dispersed.

We had managed to intercede on the other two checks and Mr. Arab had cooperated in placing a freeze on the other two checks on Bank of America so that Bank of the West was not able to process the two checks and take the funds.

Actually -- actually, Bank of the West credited this bank account with those two checks but immediately reversed when they learned that Bank of America would not consider them good

1    funds.

2    Q.    Okay.  And what is -- what is the current position of

3    those two checks, the 150,000?

4    A.    The funds represented by that's two checks have been

5    remitted to the receivership estate as of this time.

6    Q.    And what about the 60,000 that was issued as the

7    cashier's check and the cash check?

8    A.    There were two checks.  The cash is gone from the

9    account.

10   Q.    Have either of Mr. or Mrs. Faulkner provided you with

11   those assets?

12   A.    They have not.

13   Q.    Have they provided you with any information as to the

14   whereabouts of those assets?

15   A.    No.

16   Q.    Finally, sir, did there come a time when you received

17   notice of a complaint being filed against you?

18   A.    Yes.

19   Q.    And how did that come about?

20   A.    A messenger arrived at my office and delivered the

21   California complaint by hand.

22   Q.    Okay.  And go to Exhibit R 58.

23   A.    That is correct.

24   Q.    Is that a true and correct copy of the complaint as you

25   received it?

1    A.    Yes.   We received it on November 27th.

2    Q.    Does that complaint make any reference at all to the fact

3    that you were acting in your capacity as a receiver for the

4    SEC as appointed by a federal court?

5    A.    It does not.

6    Q.    Does it identify you as anything but an individual?

7    A.    It does not.

8              MR. TOMKO:   We would move for the admission, Your

9    Honor, of Exhibit R 58.

10             MR. BOISVERT:   I have no objection, Your Honor.

11             MS. FAULKNER:   No objection, Your Honor.

12             THE COURT:   Receiver Exhibit 58 is admitted.

13   BY MR. TOMKO:

14   Q.    Now, we spoke at the beginning when we looked at the

15   original court orders.   There was a stay of litigation that

16   was included in those orders; is that correct?

17   A.    Yes.

18   Q.    And was that clear and understandable to you?

19   A.    Of course.

20   Q.    Any ambiguities in that that you noticed?

21   A.    None.   It is a standard provision in virtually all such

22   orders.

23   Q.    Has the receivership incurred any expenses as a result of

24   this lawsuit?

25   A.    We have.

Q.    And how -- what type of expenses have you incurred,

sir --


A.    On the following --

Q.    -- to date?

A.    On the following day I instructed California counsel to

remove the case to the United States District Court for the

Central District of California.  Based upon the exigency of

time we also filed a motion to transfer it to the Northern

District of Texas.

        My counsel conferred with Mrs. Faulkner, advised her that

we would file a 12B1 motion to dismiss for lack of subject

matter jurisdiction.

        She declined to dismiss the complaint.

        And accordingly, the 12-B1 motion has been filed.

Q.    Okay.  As of this date have you received directly or

indirectly from Ms. Faulkner or Mr. Faulkner any assets for

these corporations?

A.    None.

            MR. TOMKO:  I have no further questions, Your Honor.

            THE COURT:  Cross-examination.

            MR. BOISVERT:  Thank you, Your Honor.

                            CROSS EXAMINATION

BY MR. BOISVERT:

Q.    Good afternoon, Mr. Taylor.

1          How are you today?

2     A.    I'll say Carter.

3     Q.    That's fine.  I'm fine with that.  Nobody gets my last

4     name.  Almost nobody.

5          Let's talk about the RackAlley transaction.

6          Are you contending in any way today that the sale

7     proceeds from the RackAlley transaction constitute oil and gas

8     assets?

9     A.    The assets are clearly cash, liquid assets owned by

10    Christopher Faulkner.

11    Q.    Well, that's not my question.

12         Are you characterizing those assets as oil and gas

13    assets?

14    A.    The money?

15    Q.    The proceeds from the sale of RackAlley.

16    A.    No.

17    Q.    Okay.  And you're aware today that the RackAlley

18    transaction took place, the sale of the assets of RackAlley,

19    took place prior to the September -- September 25th, 2017

20    order --

21    A.    Yes.

22    Q.    Correct?

23    A.    Yes, I'm aware of that.

24    Q.    Okay.  And you're aware that the proceeds from the sale

25    of the RackAlley transaction were distributed to USPI prior to

1   September 25th, 2017, correct?

2   A.   Well, some checks were drafted.   The cash was not in

3   Mr. Faulkner's account by then.

4   Q.   Well, they were never in Mr. Faulkner's account.

5   A.   The money was --

6        Okay.   But U.S. Properties --

7   Q.   Correct?

8   A.   -- his nominee entity's account.

9   Q.   What -- what evidence do you have that Mr. Faulkner has

10  any association with USPI?

11  A.   Corporate documents on file.

12  Q.   Can you direct me specifically to those, where

13  Christopher Faulkner is listed as an officer, director, or any

14  relationship whatsoever to RackAlley -- or, I'm sorry, USPI?

15       And we can start with Exhibit 35.

16  A.   Well, Exhibit 35 is the document which represents that

17  Mr. Faulkner's girlfriend is the principal of the entity.   I

18  infer from that that Mr. Faulkner is in control of this asset.

19  She by the way told me she had no control about it and had not

20  authorized the use of her name on this document.

21            MR. BOISVERT:   I object to the hearsay and

22  nonresponsiveness.

23            THE COURT:   Sustained as to nonresponsive.

24  BY MR. BOISVERT:

25  Q.   This document doesn't indicate anywhere that Christopher

1    Faulkner had any association with USPI, correct?

2    A.    Unless C.A. Faulkner in this instance is Christopher

3    Faulkner.  It may.

4    Q.    Is that your opinion?

5    A.    Yes.

6    Q.    Your testimony today is C.A. Faulkner on this document is

7    Christopher Faulkner?

8    A.    I have seen C.A. Faulkner used interchangeably and it's

9    quite possible that this is Christopher Faulkner.

10   Q.    But you don't know for sure?

11   A.    Beg pardon?

12   Q.    You don't know one way or the other?

13   A.    No, I don't.

14   Q.    Is there any evidence that you have, other than -- any

15   other evidence that you're relying on to testify that

16   Christopher Faulkner had any relationship whatsoever with --

17   was in control, an officer or director of USPI?

18   A.    Yes.  I relied on the testimony I heard this morning

19   indicating that Mr. Faulkner had given instructions that the

20   proceeds of the RackAlley transaction be remitted to U.S.

21   Property Investments.

22   Q.    And those instructions also preceded the September 25th,

23   2017 order, correct?

24   A.    I assume so.

25   Q.    Is it your contention -- well, you already testified the

1   RackAlley sale proceeds do not constitute oil and gas assets,

2   correct?

3   A.    The proceeds themselves?

4   Q.    Yes.

5   A.    No, they're not oil and gas proceeds.

6   Q.    So you would agree with me that the sales proceeds are

7   not covered by the August 14, 2017 order by this court?

8   A.    That the sale proceeds were not covered by which order?

9   Q.    Would have been covered by the August 14th, 2017 order.

10  A.    Possibly, but I don't contend here that they were.

11        I say possibly because Mr. Faulkner's interests in

12  RackAlley could have been purchased with oil and gas revenue.

13  Q.    Did you just testify you're not contending that they are?

14  A.    No.

15  Q.    Would you agree then that if Mr. Faulkner had received

16  any sale proceeds from the sale of RackAlley prior to

17  September 25th, 2017, that he could have done whatever he

18  wanted with those proceeds?

19  A.    Until the moment that the September 25th order came into

20  effect --

21  Q.    Correct.

22  A.    -- he could have put them in a bank and I could have gone

23  after them at the bank after September 25th.

24  Q.    He could have given it to charity, he could have given it

25  to his girlfriend, he could have done whatever he wanted?

1    A.    That is correct, he could have disposed of the assets

2    without my intervention prior to September 25th.

3    Q.    Let's turn to Exhibit 29.

4    A.    I'm sorry.  I didn't get the number, Carter.

5    Q.    Exhibit 29.

6    A.    Yes.

7    Q.    Again, this is an email that you sent to Mr. Friedman,

8    myself, and a number of other people, correct?

9    A.    Yes.

10   Q.    This is on October 16th, 2017?

11   A.    Correct.

12   Q.    What investigation had you conducted prior to sending

13   this email with respect to the RackAlley sale?

14   A.    We had gotten the corporate documents I referred to.

15          I had interviewed counsel to the third partner who

16   testified this morning.

17          I had received -- I received perhaps by this point

18   documents related to the RackAlley --

19   Q.    Third partner, you mean Matt Rapoport?

20   A.    Yes.

21   Q.    Okay.  I wanted to clarify.

22   A.    I had by this time seen the -- I'm sorry?

23   Q.    No.  That's fine.

24   A.    By this time I had also reviewed the RackAlley

25   disposition documents.

1    I had also by this time subpoenaed the Bank of the West.

2    I had by this time interviewed Ms. Bresnahan.

3    Q.    Now, when you spoke with Matt Rapoport in connection with

4    your investigation of the RackAlley sale, was his -- was your

5    conversation with him different then than it was today, that

6    the sale of RackAlley occurred prior to September 25th --

7    A.    No.

8    Q.    -- 2017?

9    A.    No.   And I -- let me correct something.

10    I did not talk to him.   I talked to his counsel.

11    Q.    Okay.   Did his counsel advise you that the sale of

12    RackAlley took place after September 25th, 2017?

13    A.    That the -- that the transaction had closed --

14    Q.    That the assets were sold subsequent to September --

15    A.    No.   I knew the assets had been sold the first time I

16    heard about it.

17    Q.    Okay.   So the first statement in paragraph 1 of your

18    email here is -- is not correct, isn't that true?

19    A.    That's -- that's right.   It's not true.

20    Q.    Okay.   Had you been provided with a copy of the agreement

21    signed by Matt Rapoport where approximately I think it was

22    $280,000 of the sale proceeds were to go to USPI?

23    Do you remember that exhibit?

24    A.    I don't remember the exhibit.

25    I knew the number 280,000 was correct because I was also

1  advised that the three partners were entitled to an additional

2  payment a year from now or some period of time in the future.

3  Q.    I'm sorry, when is that payment due to occur?

4  A.    Sometime in the future, I believe up to a year from now.

5  Q.    Okay.

6  A.    I -- I don't know the precise period of time.

7  Q.    Okay.  But that hasn't happened?

8  A.    As far as I know it hasn't, no.

9  Q.    And just to clarify.  With respect to the $210,000 in

10  sale proceeds that you contend were -- were to go

11  Mr. Faulkner, how much was actually unaccounted for?

12  A.    60,000.

13  Q.    Okay.  So you said 10,000 in cash and then another --

14  another check for $50,000?

15  A.    Right.  The -- the $60,000 check was successfully

16  deposited into the Bank of the West account.  There was then a

17  $10,000 counter check and a -- another check purchasing a

18  $50,000 certified check --

19  Q.    Okay.

20  A.    -- or cashier's.  I'm not sure which.

21  Q.    And what facts do you have or evidence do you have to

22  support that Christopher Faulkner has any -- is a signer, has

23  any access to that Bank of the West account where that $60,000

24  was deposited?

25  A.    Well, his mother certainly has access to it.

1    Q.    Okay.  But you don't have any evidence that Christopher

2    Faulkner does?

3    A.    One or the other of them has the cash.

4    Q.    Okay.  So is it your testimony today that you don't know

5    who's on the bank account?

6    A.    I don't know who what?

7    Q.    You don't know who has access to the bank account

8    specifically?  Could be one or the other?

9    A.    It could be both.

10   Q.    What evidence do you have that they're both signers on

11   the account?

12   A.    I don't.

13   Q.    Okay.  You're just speculating?

14   A.    You have the documents -- bank opening documents that are

15   in evidence.

16   Q.    And those don't name Christopher Faulkner on them

17   anywhere, do they?

18   A.    Well, C.A. Faulkner is on there.

19         As I said in the case of the CitiBank accounts that have

20   been before the court today, it's difficult to tell who C.A.

21   Faulkner is.  Could be either.

22   Q.    Do you have any facts or evidence to support that any of

23   those sale proceeds went to Christopher Faulkner?

24   A.    No.

25   Q.    Now, when the SEC originally sought an order appointing a

1  temporary receiver in this case, I'm sure you reviewed those

2  initial pleadings requesting that relief, correct?

3  A.   Well, they were voluminous, but yes.

4  Q.   And you were aware that they actually obtained that order

5  appointing temporary receiver without notice and under seal,

6  correct?

7  A.   I knew that it was under seal.  I'm not sure about the

8  notice.

9  Q.   Okay.  And how did you personally serve Mr. Christopher

10  Faulkner with the TRO and the August 14th, 2017 order

11  appointing temporary receiver?

12  A.   The SEC served him, I didn't.

13  Q.   Oh, I'm sorry.

14      Do you know how the SEC served him?

15  A.   Well, they certainly notified Mr. Friedman, immediately.

16  How they delivered the box of documents I do not know.

17      I do know how Mrs. Faulkner was served, because I went to

18  the residence with the process server with the documents.

19  And I -- I left before they actually delivered them to her,

20  but I am informed that they were personally served, all of

21  them in a box.

22  Q.   Okay.  Do you know how they were personally served on

23  Carole Faulkner?

24  A.   Carole, yeah.

25  Q.   In person?

A.    Yes.

Q.    The scope of the -- in the motion filed by the SEC seeking a temporary receiver in this case, the relief that the SEC was seeking in this case was much broader than what was actually granted in that original August 14th, 2017 order, correct?

A.    My recollection is that there was some limitation on the relief initially sought in the first temporary order.

Q.    I mean, they were seeking a temporary receiver over all of what are now defined as receivership defendants assets, correct?

A.    I can't say specifically.

Q.    But it certainly wasn't limited to just oil and gas assets?

A.    No.

Q.    Okay.  You would also agree with me that Breitling Royalties Corporation is not a party to this SEC action?

A.    I admit they're not a named receivership entity.  By definition they are a party to it.

Q.    They're not a -- they're not a defendant.

A.    Correct.

Q.    And as of today they're still not a defendant in this case, correct?

A.    Not a named defendant, correct.

Q.    And neither is Carole Faulkner?

1    A.    Not at this point.

2    Q.    Okay.   And neither is USPI?

3    A.    Nope.

4    Q.    And neither is RackAlley?

5    A.    Correct.

6    Q.    Subsequently to the entry of the August 14, 2017 order,

7    the SEC sought a -- a broader order appointing temporary

8    receiver, correct?

9    A.    Well, I think they renewed their original application.   I

10   think that's probably the way to describe it.

11   Q.    And that resulted in the September 25th, 2017 order.

12        You would agree that the August 14th, 2017 order does not

13   specifically name Breitling Royalties Corporation in it

14   anywhere, correct?

15   A.    It's not specifically named by name in the order,

16   correct.

17   Q.    And it is in the September 25th, 2017 order, correct?

18   A.    Actually, it's addressed in the judge's memorandum

19   opinion.

20   Q.    Which is dated September 25th --

21   A.    Yes.

22   Q.    -- 2017?

23        Now let's take a look at Exhibit 43.

24        Well, just going back to the RackAlley transaction real

25   quick, I'm sorry, when you first addressed the RackAlley

1    transaction I believe was in your first amended order -- I'm

2    sorry, first amended motion for order to show cause regarding?

3    Contempt, correct?

4    A.    The second amended motion for order to show cause

5    addressed RackAlley.

6    Q.    Second amended motion.

7    A.    Yes.

8          Well --

9    Q.    Well, I believe it was the first -- amended --

10   A.    The first amended, yes.

11   Q.    We only had two amendments, correct?

12   A.    Yes.

13   Q.    And the second one I believe addressed the --

14   A.    The second amended addresses Mrs. Faulkner's filing of

15   the California complaint.

16   Q.    Right.  So at the time you filed the second -- I'm

17   sorry -- the first amended motion for order to show cause,

18   you're aware at that time, and you weren't asserting, that the

19   sale proceeds from the RackAlley sale constituted oil and gas

20   assets, correct?

21   A.    No.

22   Q.    You were seeking contempt of the September 25th, 2017

23   order, correct?

24   A.    Correct.

25   Q.    And you were aware when you filed that motion that the

1  sale of RackAlley -- of RackAlley's assets had taken place

2  prior to September 25th, 2017?

3  A.   I was aware that the sale of assets had occurred prior,

4  yes.

5  Q.   And you were aware that checks had already been issued

6  with respect to those sale proceeds --

7  A.   Not sure about that.  I'm not sure about that.

8       The check certainly hadn't been cashed.

9  Q.   You weren't aware when you filed your motion when the

10  checks were issued?

11 A.   I can't say one way or the other.

12 Q.   Okay.  But you know now that the -- they were issued

13 prior to September 25th --

14 A.   I have it heard that.

15 Q.   -- 2017?

16 A.   It wouldn't have made any difference in my

17 determination.

18 Q.   And the order issued to USPI?

19 A.   Correct.

20      Are we -- are we still going to talk about --

21 Q.   Yes.  I'm sorry --

22 A.   -- 43?

23 Q.   -- to jump around.

24      We'll go to Exhibit 43.

25          THE COURT:  We'll take a break here if you're about

1    to shift gears.

2         Let's take a 15 minute break and we'll resume at 3:15.

3                    (Recess taken at 3:00.)

4                    (Proceedings resumed at 3:15.)

5         THE SECURITY OFFICER:  All rise.

6         THE COURT:  You may resume.

7         THE WITNESS:  Counsel, I did have a request to

8    supplement.

9                    CROSS EXAMINATION (Cont.)

10   BY MR. BOISVERT:

11   Q.   Yeah.  I'm sure your counsel will address that on

12   redirect.

13        I wanted to start by, before we broke we were going to

14   take a look at Exhibit 4.

15        Do you have that in front of you?

16   A.   Did you say 4?

17   Q.   I'm sorry.  That's my exhibit number.

18        It's the Exhibit 43 in your book, which is the August

19   14th, 2017 order appointing temporary receiver.

20   A.   Yes, I have it.

21   Q.   Okay.  At the bottom of the first paragraph and

22   continuing on to -- at the bottom of the -- I'm sorry -- at

23   the bottom of the page, the very last line, the very end,

24   carrying onto the second page, the first two lines, it's --

25   it's got who the order identifies as the receivership

1    defendants, correct?

2    A.    Yes.

3    Q.    And those are defendants Christopher A. Faulkner,

4    Breitling Oil & Gas Corporation, and Breitling ENERGY

5    Corporation, correct?

6    A.    Correct.

7    Q.    Those are all defined as the receivership defendants,

8    correct?

9          Those are the only receivership defendants, correct?

10   A.    They're the only receivership entities.

11         The receivership assets are separately defined.

12   Q.    Right.   The receivership defendants are defined as those

13   three --

14   A.    Correct.

15   Q.    -- parties.

16         And then the sentence continues on, including all oil and

17   gas revenue from oil and gas operators or others payable to

18   any of the receiver defendants, I'd emphasize, payable to any

19   of the receivership defendants, and all oil and gas assets

20   held in the name of any of the receivership defendants.

21         And then there's in parenthesis and in quotes that's

22   defined as receivership assets, correct?

23   A.    Correct.

24   Q.    You would agree with me that -- and, again, I think I

25   asked you this before, but Breitling Royalties Corporation is

1    not specifically mentioned in this order anywhere, correct?

2    A.   It's -- it's not mentioned by name.

3    Q.   And, in fact, in the correspondence that we were looking

4    at between both you and Carole Faulkner as well as you and --

5    and my law firm, there was some disagreement with respect to

6    the attorneys that had received this order as to whether it

7    applied to Breitling Royalties Corporation, correct?

8    A.   Well, Mrs. Faulkner certainly contended that it wasn't

9    covered.  She contended that nothing was covered other than

10   the specifically named entities.  I'm not sure whether

11   Mr. Blum took that same position or not.

12           MR. BOISVERT:  Sorry, Your Honor.  My note cards

13   just fell all over the floor.  I'll just need a second.

14                        (Pause.)

15   BY MR. BOISVERT:

16   Q.   If we could turn to Exhibit 16?

17   A.   1-5?

18   Q.   I'm sorry?

19        1-6.  I'm sorry.

20   A.   1-6.  Yes.

21   Q.   In the second paragraph -- and, again, this is an email

22   from Andrew Goforth to Josh Blum at Friedman and Feiger and

23   Larry Friedman at Friedman & Feiger and Carole Faulkner is

24   copied on this as well, correct?

25   A.   Right.  This is from Mr. Goforth to Mr. --

1  Q.    Blum --

2  A.    -- Blum and Mr. Friedman.

3  Q.    Yes.  And the second paragraph Mr. Goforth writes, "You

4  have raised the question as to whether -- I'm sorry -- you

5  have raised a question as to whether Breitling Royalties

6  account has been frozen at CitiBank.  I'm awaiting a detailed

7  situation report for Citi as to" --

8          THE COURT:  Slow down just a little.

9  BY MR. BOISVERT:

10  Q.    I'm sorry.

11         -- "as to accounts located and blocked.  In any case, if

12  a Breitling Royalties account has been blocked, that is

13  clearly within the scope of the order appointing temporary

14  receiver on two independent bases" and then Mr. Goforth lists

15  bases on which you believe Breitling Royalties Corporation is

16  encompassed within the scope of that order.

17         Was this in response to a query by Mr. Blum as to whether

18  Breitling Royalties Corporation was covered?

19  A.    This was in a response to a complaint that a Breitling

20  Royalties account had been frozen at Citi.

21  Q.    Right.  So you would agree with me that Mr. Faulkner's

22  attorneys had questioned whether Breitling Royalties

23  Corporation and its assets were part of the August 14th, 2017

24  order?

25  A.    Well, they had a contention.  I don't know what their

1    view was.

2    Q.    That's the way they interpreted the order, correct?

3    A.    I don't know.

4    Q.    That Breitling Royalties was not a part of that order?

5          There was certainly a question --

6    A.    There was --

7    Q.    There was a disagreement on that point?

8    A.    There was a contention that the Breitling Royalties

9    account should not have been frozen.

10   Q.    By attorneys, both Carole Faulkner and Mr. Blum, who are

11   attorneys, had --

12   A.    Correct.

13   Q.    -- had a -- had a contention that Breitling Royalties was

14   not included within the scope of that order?

15   A.    Correct.

16   Q.    And after there was this disagreement, or these

17   contentions with respect to whether the order applied to

18   Breitling Royalties, was there an effort made by either you or

19   the SEC to seek some clarification from the court with respect

20   to whether your authority extended to Breitling Royalties

21   Corporation?

22   A.    There was not.  We thought it was very clear that the

23   order was drawn broadly enough to reach the myriad entities

24   associated with the receivership entities.  Particularly in

25   light of the commingling evidence, which had already been

1    placed before the court on the application.

2    Q.    Well, there were subsequently motions filed with the

3    court that led to the court's September 25th, 2017 order,

4    correct?

5    A.    Correct.

6    Q.    And that expanded the scope of your authority as a

7    receiver over the receivership defendants?

8    A.    Well, it expanded it beyond the oil and gas assets.

9    Q.    Right.

10   A.    I don't know that it expanded as to oil and gas assets,

11   because we already believed we had those within the scope.

12   Q.    But it wasn't until September 25th, 2017 that the court

13   specifically identified Breitling Royalties Corporation and

14   its assets as within the scope of your authority as a

15   receiver.

16   A.    By name, yes.

17   Q.    By name.

18         As a receiver appointed by the court you're afforded very

19   broad powers with respect to what you're allowed to do in

20   furtherance of the court's directive and the order appointing

21   you as a receiver, correct?

22   A.    Yes.

23   Q.    And in connection with that -- those broad powers and

24   authority, I mean, you are pretty thorough in your

25   investigations and with -- before you make certain allegations

1    with respect to -- or taking action with respect to certain

2    assets, correct?

3    A.    Correct.

4    Q.    Like you did with the -- the RackAlley transaction?

5    A.    That's what I wanted to supplement on.

6          You asked me for a narrative of what I did to

7    investigate.  Would you like me to do that now?

8    Q.    You can do that on redirect.

9    A.    Okay.

10   Q.    And certainly you wouldn't come in -- well, let's talk

11   about Shannon Bresnahan for instance.  You've come in to court

12   today and testified about conversations that you've had with

13   Ms. Bresnahan, --

14   A.    Yes.

15   Q.    -- correct?

16         Have you taken her deposition?

17   A.    No.

18   Q.    Have you obtained an affidavit or declaration from

19   Ms. Bresnahan?

20   A.    I think she may have signed a declaration.  I'm not sure.

21   She was certainly sent one.

22   Q.    But you don't have one?

23   A.    Well --

24   Q.    You sure don't have a signed declaration from her?

25   A.    A signed declaration from her?

1   Q.    Correct.

2   A.    No, I do not.

3   Q.    And you're asking this court to rely on your

4   interpretation of your conversations with her without any

5   support from Ms. Bresnahan herself as to what she actually

6   told you?

7   A.    To some extent.

8   Q.    And when you make representations in court that Carole

9   Ann Faulkner was not specifically identified with respect to

10  the Bank of the West account as a signer, that's not correct,

11  is it?

12  A.    She's a signer on the account.

13  Q.    That's not what you testified to earlier, is it?

14  A.    I said that C.A. Faulkner was a signer on the account.

15  Q.    You testified you didn't know one way or the other who

16  was a signer, could be Chris, could be Carole.

17  A.    It's -- it's rather difficult to find out because

18  Mrs. Faulkner would not answer that question.

19  Q.    Well, could you turn to Exhibit 30, please?

20        Does that not list Carole Ann Faulkner as a signer for --

21  on the Bank of the West account for U.S. Property Investments?

22  A.    That's what it says.  She absolutely is a signer.

23              MR. BOISVERT:  I pass the witness.

24              MS. FAULKNER:  No questions, Your Honor.

25              MR. TOMKO:  Just briefly, Your Honor.

1        REDIRECT EXAMINATION

2   BY MR. TOMKO:

3   Q.    Just to clarify the record, Exhibit -- Receiver Exhibit

4   32, what is the date on that deposit slip for the $60,000

5   check, sir?

6   A.    I believe it's September 26th.

7   Q.    And that's after the 25th; is that not correct?

8   A.    Correct.  Correct.

9   Q.    And on the next page, what is the date of that deposit

10  slip?

11  A.    The deposit slip for $80,000?

12  Q.    No, for the 150.  Very top of the page.

13  A.    The date is October 11th, '17.

14  Q.    And that's after the 25th of September, is it not?

15  A.    Correct.

16  Q.    And Exhibit 33, the cashier's check and the check to

17  cash, could you identify a date on those?

18  A.    It's October 17th of '17, I believe.

19  Q.    And that also is after the 25th of September, is it not?

20  A.    Yes.

21  Q.    Now, looking at Exhibit 43 --

22  A.    Yes.

23  Q.    -- this is the original August 14th, 2017 order; is that

24  correct, sir?

25  A.    Yes.

1   Q.   And -- and does it not say that the court finds that,

2   based on the records of these proceedings, the appointment of

3   a temporary receiver in this action is necessary and

4   appropriate for the purposes of marshalling and preserving all

5   oil and gas related assets-in any form or of any kind

6   whatsoever-owned, controlled, possessed, or managed, directly

7   or indirectly, by the three named entities?

8        Is that correct?

9   A.   Yes.

10  Q.   And is it your testimony that the "controlled" -- that --

11  that -- is it your testimony that you believed, and you

12  believe today, that Mr. Faulkner controlled Breitling

13  Royalties at the time?

14  A.   Yes.

15  Q.   Okay.  Now, you wanted to correct or supplement your

16  testimony at one point, sir.

17  A.   Right.  I gave a narrative answer of what investigation I

18  made of the RackAlley proceeds and the transaction.  I omitted

19  that I had interviewed two or three times Mr. Arab, who told

20  me that the checks --

21            MR. BOISVERT:  Objection to hearsay, Your Honor.

22            THE COURT:  Are you offering it for the truth?

23            MR. TOMKO:  We're offering it for his state of mind,

24  Your Honor.

25            THE COURT:  Well, I'm not sure his state of mind is

1    really relevant, so I'll sustain the objection.

2            MR. TOMKO:  Okay.  Okay.

3            THE WITNESS:   In any case, I interviewed him two or

4    three times.

5            MR. TOMKO:  I have no further questions, Your Honor.

6            THE COURT:  Recross?

7            MR. BOISVERT:  Thank you, Your Honor.

8        Just real quick.

9                        RECROSS EXAMINATION

10   BY MR. BOISVERT:

11   Q.    On Exhibit 32 --

12   A.    Yes.

13   Q.    -- again, Carole Ann Faulkner was the signer for the Bank

14   of the West account, correct?

15   A.    That is -- that is what the signature card says, yes.

16   Q.    Right.  And the $60,000 was paid to the order of U.S.

17   Property Investments, Inc., and deposited into the Bank of the

18   West account, correct?

19   A.    Which check?

20        Are you talking about the --

21   Q.    I'm sorry.  It's on the bottom of Exhibit 32.

22   A.    Yes.

23   Q.    And that check is dated September 21, 2017?

24   A.    Yes.

25   Q.    And that was issued by RackAlley to USPI?

| | |
|---|---|
| 1 | A.    Yes. |
| 2 | Q.    Correct? |
| 3 | And that predates the September 25th order, correct? |
| 4 | A.    The making of this check? |
| 5 | Q.    Yes. |
| 6 | A.    Yes. |
| 7 | MR. BOISVERT:  Pass the witness. |
| 8 | THE COURT:  Any further questions? |
| 9 | MR. TOMKO:  None, Your Honor. |
| 10 | THE COURT:  Thank you, sir.  You may step down. |
| 11 | MR. TOMKO:  Receiver rests, Your Honor. |
| 12 | THE COURT:  Mr. Boisvert. |
| 13 | MR. BOISVERT:  Defendant Faulkner rests. |
| 14 | THE COURT:  Ms. Faulkner. |
| 15 | MS. FAULKNER:  Known parties USPI and Carole |
| 16 | Faulkner rest. |
| 17 | THE COURT:  Mr. Tomko, do you or your colleague wish |
| 18 | to present any argument? |
| 19 | MR. TOMKO:  I wish to. |
| 20 | I have nothing prepared.  But I will be happy to speak. |
| 21 | We have divided this into three separate segments. |
| 22 | The oil and gas segment, which evolves predominantly |
| 23 | around the checks received at the original Colleyville bank |
| 24 | account -- excuse me -- post office box and then later at the |
| 25 | Northwest Highway post office box.  Those checks are |

1    predominantly by identification of return receipt addresses of

2    oil and gas representative companies.  That mailbox was not

3    disclosed to the receiver.  In fact, it was -- there were

4    opportunities abounded that gave each of the defendants an

5    opportunity to tell the receiver about the new post office

6    box.  When they received the -- when he learned of the post

7    office box Ms. Faulkner directly misled him by saying that

8    only the mail for Royalties was being transferred to that box,

9    when, in fact, we see that the transfers covered both Oil &

10   Gas and Energy Company.

11       The -- the assets that were received in both of those

12   boxes were oil and gas assets that should have been retained

13   at all times for the benefit of the receivership.  We know

14   that assets were taken from there by Ms. Faulkner the Friday

15   before the receiver took custody of that box.  We know that

16   she attempted to remove documents from the second mailbox

17   after the receiver had obtained custody of that mailbox.

18       And we -- we know that those documents were never made

19   available to the receiver.  No accounting of those documents

20   were ever made to the receiver.  No documents about the

21   existence of those companies during the period after the

22   seizure by the federal government was ever made available to

23   the receiver.

24       What we have shown is though that all of these companies,

25   the -- the Breitling companies were interrelated.

1     We have shown that the ownership is interrelated and

2  revolves around Christopher Faulkner.

3     We've shown that the management was interrelated and

4  revolves around Christopher Faulkner.

5     We have shown that the handling of the proceeds and the

6  assets were all interrelated and surrounded by Christian

7  Faulkner -- Christopher Faulkner.

8     And we have also shown that the money was being

9  interchanged between these various entities during the period

10  of time leading up to the beginning of the SEC investigation.

11  There's no testimony in this record that that ever stopped,

12  that there was ever an opportunity where Mr. Faulkner did not

13  control all of the assets of all of those companies right up

14  until today, Your Honor.

15     So as far as the contempt of this court's order, the

16  court's order, the court can take notice of its own orders.

17  They're very clear and concise as to what is covered,

18  anything, all related, controlled, directly, indirectly, by

19  Mr. Faulkner, Breitling Oil & Gas or Breitling Energy.  And we

20  have shown I think clearly convincingly that those things are

21  interwoven and that there was an intentional aspect of this

22  case was the removal of assets that should have been for the

23  receivership from these oil and gas companies and the related

24  entities.

25     As far as the RackAlley situation is concerned, those

1   assets became available to Mr. Faulkner.  He had them in his

2   possession.  He directed that they be sent to his mother's

3   account at the entity in the Bank of the West.  He directed

4   that they be called -- that -- that they be designated as

5   payments to him for services rather than in his one-third

6   ownership position.  And -- and he directed that they be sent

7   to his address to the entity into which Mrs. Faulkner

8   attempted to deposit those documents -- those assets.  Those

9   assets were specifically attempted to be cleared and created

10  into the bank account after the court's second order.

11      I would contend, Your Honor, based upon the information

12  before this court that those assets were covered by the first

13  order, that the first order is not strictly an oil and gas

14  order.  But be that as it may, it's irrelevant, because the

15  second order was already -- was already published before the

16  attempts were made to move the money and those checks, and

17  that $60,000 was removed from that account by the Faulkners

18  after this court issued its September 25th order.

19      We showed that -- that the company that Mrs. Faulkner

20  purports to be in charge of, they have changed the ownership

21  at least three times.  She was in ai -- first gentleman,

22  Mr. -- I believe his name was -- I think it was Rigs (sic),

23  started it, transferred it to Mrs. Faulkner.  She then

24  transfers it to a -- an associate of Mr. Faulkner.  And then

25  10 days later they send it back to the man who formed it,

1    without a president, without a vice president.  As far as we

2    know the company as of today has no officers and directors,

3    that it -- it has just this one gentleman who we have no idea

4    who he is.  We contend that those assets are receivership

5    assets properly covered by the order and should probably be

6    returned to the receivership.

7         Finally, the third matter would be the suit filed by

8    Ms. Faulkner.  We believe that that is a direct violation of

9    the court's order staying all litigation and directing that

10   any actions that were to be undertaken be undertaken in front

11   of this court, in this room.  She is an attorney.  She had

12   access to all these documents that the court has issued.  They

13   are clear, concise.  They are not -- they are not subject to

14   any -- that anyone has testified to any ambiguity that says

15   that there was a -- a space for Ms. Faulkner to sue

16   Mr. Taylor.

17        We also think that it -- that it shows the intent that --

18   by Ms. Faulkner to violate this order specifically by not

19   addressing the fact in the complaint that she filed that

20   Mr. Taylor was in fact a receiver of a Federal District Court

21   for the Securities and Exchange Commission.

22        Based on all that, Your Honor, we believe that the court

23   is within its purview to find these people and this company in

24   contempt of this -- orders of this court.

25        And we would, Your Honor, ask the court to:

1    One, return the -- have them return the $60,000 that was

2    taken from the Bank of the West;

3    We would ask them to relinquish any asset -- any interest

4    to the proceeds that were -- came from the RackAlley --

5    RackAlley sale, to give up all claims, all rights and all

6    actions;

7    That they not sue any of the other RackAlley people as

8    they have threatened to as recently as last Friday for turning

9    assets or holding assets for the receivership;

10   That all proceeds from all oil and gas revenue that has

11   been taken into custody since April of 2016, the time that the

12   SEC filed its complaint, be accounted for, the information

13   being provided to the receiver and those assets being made

14   available to the receiver for the purpose of paying back the

15   investors;

16   That all the mail taken from the two mailboxes since

17   April of 2016 be returned to the receiver or accounted for and

18   all proceeds that were proceeded from that mail be accounted

19   for and returned to the receiver;

20   That all documents that reflect covered financial

21   transactions by the entities since the time that the documents

22   were taken by the SEC or the Department of Justice or the IRS

23   be turned over to the receiver;

24   That they make available corporate representatives for

25   the companies for the purpose of being deposed or at least

questioned by the receiver to identify assets that are subject
to the receivership;

That they include -- that -- we have not talked about
this, but there -- there are a bunch of cashier's checks out
there from the sale of Mr. Faulkner's home that have
disappeared, and we would like them to be -- get -- get an
accounting of the location and disposition of those assets.

And we would ask for the attorney's fees for this
proceeding that have been incurred by the receivership to have
to bring these contempt citations;

We would ask for all the attorney's fees that have been
incurred by the receivership for the suit in California;

And we would ask for the dismissal of the L.A. case with
prejudice;

And we would ask that if the court find it necessary that
the defendants be placed in custody until they have satisfied
these requirements of the court.

One other thing that I failed to -- to mention in my
argument is that the court may take an adverse inference from
all of the testimonies that was generated through Ms. Faulkner
and Mr. Faulkner.  We asked them several questions, and the
court is free to make an adverse inference in this civil
action to their invocation of their Fifth Amendment privilege.

Based on all that, Your Honor, we believe that you would
be justified in finding them in contempt and providing the

1    relief that we have requested.

2         Thank you.

3              THE COURT:  Thank you, counsel.

4         Mr. Boisvert.

5              MR. BOISVERT:  Thank you, Your Honor.

6         With respect to the first segment that Mr. Tomko

7    addressed, Breitling Royalties Corporation, I don't there

8    there's -- I think the evidence is very clear that the August

9    14th, 2017 order itself was unclear, Your Honor.  All of the

10   attorneys that reviewed that order on behalf of, well, Carole

11   Faulkner on her own behalf and my law firm on behalf of

12   Mr. Faulkner, had some dispute as to whether that order

13   applied to Breitling Royalties Corporation.  That resulted in

14   motions practice before this court.  It resulted in a

15   September 25th order, where for the first time Breitling

16   Royalties Corporation was addressed specifically.

17        And, again, Your Honor, this is a -- a criminal contempt

18   proceeding.  The Supreme Court I think has made very clear, as

19   have other circuit courts, that before you find somebody in

20   contempt the order has to be crystal clear with respect to the

21   conduct that is -- is violative or would violate that order,

22   and I don't think in this case that the August 14th, 2017

23   order is crystal clear with respect to whether it applies to

24   Breitling Royalties Corporation.

25        With respect to the interrelation of the Breitling

entities and the ownership of those entities, there was no evidence presented today with respect to that ownership or control since the August 14, 2017 order.

The Breitling employees that testified, the Breitling witnesses that were both testifying as to the status of the Breitling Royalties Corporation as of 2010 and 2012, I believe, despite the fact that there were later filed public information reports that could have been provided to them that they could have reviewed to have subsequent information about the ownership and -- and who the directors of this -- of that company was.

The other testimony related to that is Mr. Soward's summary testimony, which, again, all predates the relevant time period in this -- that's subject of this hearing today, Your Honor. As a matter of fact, none of it -- none of it applied to any documents reviewed that were dated in 2017, and I think Mr. Soward's testified that all this testimony was February 2016 -- related to February 2016 or before.

With respect to RackAlley, I think it's simple, Your Honor. Even Mr. Taylor concedes in his testimony that the sale proceeds from the RackAlley asset sale were not oil and gas assets, clearly not covered by the August 14, 2017 order.

The sale took place, as Mr. Rapoport testified, prior to the September 25th order. The funds were disbursed to USPI per an agreement that Mr. Rapoport signed. Checks were

1   distributed to USPI.  They were deposited -- deposited into a

2   Bank of the West account.  There's no evidence that

3   Mr. Christopher Faulkner had anything to do with that account

4   and there's no evidence today that any of the funds from the

5   proceeds of that sale ended up in Mr. Faulkner's possession.

6       With respect to the adverse inference request, Your

7   Honor, I would just say again, they're asking for a criminal

8   contempt here.  My client has taken the Fifth Amendment -- has

9   asserted his Fifth Amendment rights.  And in order to have an

10  adverse inference there has to be some corroborating evidence,

11  and so I would just ask the court to the extent that no such

12  evidence exists -- and I think with respect to a lot of the

13  allegations asserted by the receiver in its motions there is

14  no support of evidence, at least to support a contempt of the

15  court's either August 14th order or the September 25th order,

16  that no such corroborating evidence exists.

17      The counsel for the receiver has gone through a litany of

18  relief that he's requested.  I don't believe a majority of

19  that was included in -- his original motion papers.  A lot of

20  that I'm hearing for the first time.  We would ask -- well, we

21  would ask that the motions are denied in their entirety and to

22  the extent that any of that relief has not been requested

23  before, that that be denied.

24      I thank you for your time today, Your Honor.

25          THE COURT:  Ms. Faulkner.

1        MS. FAULKNER:   No, Your Honor, we're not going to do
2    closing arguments.
3            THE COURT:   Rebuttal?
4            MR. ROSS:   Your Honor, if I may.
5        Very briefly.   Just wanted to cover a couple of points.
6    First, to clarify, this is a civil contempt proceeding, that's
7    our contention; and the only custodial remedy we're seeking is
8    if the respondents do not purge themselves of their contempt.
9    That is solely within their control.   This is a -- a criminal
10   contempt proceeding requires a jury.   We believe this is an
11   adversary proceeding.   We believe an adverse inference would
12   be appropriate here.   We believe there is corroborating
13   evidence on each and every point for which we would seek an
14   adverse inference.
15       One other point that was not raised directly -- I don't
16   believe was raised directly at the hearing itself, but -- but
17   was certainly a -- a subject of some of the motion papers,
18   was whether the -- the entities may be held in -- in contempt
19   because their corporate representatives happen to be people
20   who have asserted their Fifth Amendment rights.   We believe
21   that the entities and those corporate representatives can be
22   held in contempt.   And the Fifth Amendment should not be used
23   as a King's X against the corporate entities cooperating with
24   the receivership.
25       This has been addressed clearly in Braswell v United

States, by the Supreme Court, that's 487 U.S. 99, where the court says, "A custodian may not resist a subpoena for court records on Fifth Amendment grounds."

Your Honor, this issue has been addressed by lower courts as well.  And in interpreting Braswell and the appropriate recourse, Braswell itself involved a single shareholder LLC, who -- who had been named the corporate rep and he was asserting his Fifth Amendment right.  Courts have addressed this in interpreting Braswell to say that the -- the recourse available in that situation is for the corporation to appoint a different corporate representative who will not be asserting his Fifth Amendment right.

We believe that -- that it is certainly the individual parties, the human parties, who have Fifth Amendment rights.  That is their right to assert the Fifth Amendment.  But it is obstructive of the receivership for the corporate entities to not participate and not to cooperate based on who happens to have been appointed representative of those entities.

I have nothing further, Your Honor.

THE COURT:  All right.  Thank you, counsel.

I will be taking the motion as amended under advisement and issuing a ruling after I deliberate.

One matter I do want to place on the record.

The temporary receiver filed on December 5, 2017, a motion to strike testimonial statements in nonparty Carole

1    Faulkner's response.  That motion is denied as moot, because

2    I'm going to be basing my decision only on the evidence

3    presented during this hearing, either by live testimony or by

4    exhibits.  So there's no need to strike evidence that is in

5    written submissions, because I won't be considering it.

6         All right.  Thank you, counsel.

7         At this time the matter is submitted.

8              THE SECURITY OFFICER:  All rise.

9                   (End of proceedings.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1              INDEX – SHOW CAUSE HEARING

2

3    WITNESS NAME                                  Page   Line

4    MATTHEW RAPOPORT

5        DIRECT EXAMINATION BY MR. ROSS.................... 9     7

6        CROSS EXAMINATION BY MR. BOISVERT ................ 20    2

7        CROSS EXAMINATION BY MS. FAULKNER ................ 21    18

8        REDIRECT EXAMINATION BY MR. ROSS ................. 22    20

9    PARKER REESE HALLAM

10       DIRECT EXAMINATION BY MR. ROSS.................... 24    2

11       CROSS EXAMINATION BY MR. BOISVERT ................ 30    1

12       REDIRECT EXAMINATION BY MR. TOMKO ................ 32    8

13       RECROSS EXAMINATION BY MR. BOISVERT............... 32    25

14   MICHAEL MILLER RODRIGUEZ

15       DIRECT EXAMINATION BY MR. TOMKO................... 34    5

16       CROSS EXAMINATION BY MR. BOISVERT ................ 39    10

17   PATRICK CRAINE

18       DIRECT EXAMINATION BY MR. ROSS.................... 41    3

19       CROSS EXAMINATION BY MR. BOISVERT ................ 58    5

20       REDIRECT EXAMINATION BY MR. ROSS ................. 58    17

21   CAROLINA FAULKNER

22       DIRECT EXAMINATION BY MR. TOMKO................... 61    3

23       DIRECT EXAMINATION BY MR. ROSS.................... 88    17

24   RODNEY WAYNE SORWARDS

25       DIRECT EXAMINATION BY MR. TOMKO................... 104   25
```

1      CROSS EXAMINATION BY MR. BOISVERT ................ 115    11

2    **THOMAS L. TAYLOR, III**

3      DIRECT EXAMINATION BY MR. TOMKO.................... 118    4

4      CROSS EXAMINATION BY MR. BOISVERT ................ 155    23

5      CROSS EXAMINATION (CONT.) BY MR. BOISVERT........ 169    9

6      REDIRECT EXAMINATION BY MR. TOMKO ................ 177    1

7      RECROSS EXAMINATION BY MR. BOISVERT.............. 179    9

8
     **Rule Invoked**                               **Page   Line**
9
                                                      4       3
10

11   **Receiver's Opening Statements**              **Page   Line**

12   MR. TOMKO ............................................... 4    10

13
     **Defendant's Opening Statements**             **Page   Line**
14
     MR. BOSIVERT .......................................... 6     4
15

16   **Receiver Rests**                             **Page   Line**

17   MR. TOMKO ............................................. 180    11

18   **Receiver's Closing Statement**               **Page   Line**

19   MR. TOMKO ............................................. 187    4

20   **Defendant's Closing Statement**              **Page   Line**

21   MR. BOISVERT ......................................... 187    4

22
     **Receiver's Rebuttal Closing Statement**      **Page   Line**
23
     MR. ROSS ............................................. 190    4
24

25

**RECEIVER EXHIBITS**

| Exhibit | Description | Identified | Admitted | Denied |
|---|---|---|---|---|
| 1 | Appointment Order..... | 124 | 124 | |
| 2 | Notice of Order....... | 125 | 125 | |
| 10 | Communication from ... Blum | 130 | 130 | |
| 11 | Unidentified........... | 64 | 133 | 65 |
| 12 | P.O. confirm.......... | 137 | 137 | |
| 13 | P.O. confirms ........ | 137 | 137 | |
| 14 thru 15 | Unidentified........... | 135 | 135 | |
| 16 | Email .................. | 139 | 139 | |
| 19 | Email .................. | 142 | 142 | |
| 20 | Incoming Corresponce. | 143 | 143 | |
| 23 | Email .................. | 141 | 141 | |
| 26 | Email .................. | 147 | 147 | |
| 27 | Email .................. | 148 | 148 | |
| 28 | Letter................. | 149 | 149 | |
| 29 | Letter................. | 151 | 151 | |
| 30 | Bank of West record.. | 73 | 74 | |
| 31 | Bank of West record.. | 73 | 74 | |
| 32 | Bank of West record.. | 73 | 74 | |
| 37 | ........................ | 11 | 11 | |
| 38 | Draft Distribution ... Agreement | 18 | 18 | |
| 39 | Distribution of ....... Proceeds | 14 | 14 | |

| | | | | |
|---|---|---|---|---|
| 1 | 42 | Business records...... 42 | 43 |
| 2 | 43 | Business records...... 42 | 43 |
| 3 | 45 | Chesapeake record..... 44 | 45 |
| 4 | 46 | Change of address..... 46 | 46 |
| 5 | 47 | Chesapeake  record ... 46 | 46 |
| 6 | 48 | Chesapeak record...... 47 | 47 |
| 7 | 49 | Chesapeake record..... 48 | 48 |
| 8 | 50 | Chesapeake record..... 48 | 48 |
| 9 | 51 | Chesapeake's bus...... 49<br>record | 50 |
| 10 | | | |
| | 52 | Tex cert .............. 25 | 25 |
| 11 | 53 | Tex cert. ............. 25 | 25 |
| 12 | 54 | Tex cert. ............. 25 | 25 |
| 13 | 55 | Tex cert. ............. 25 | 25 |
| 14 | 56 | Tex cert. ............. 25 | 25 |
| 15 | 58 | Lawsuit................ 154 | 154 |
| 16 | 61 | Sowards review list .. 107 | 108 |
| 17 | 62 | Diagram of money...... 106<br>transfers | 111 |
| 18 | | | |
| 19 | 63 | Summary of public..... 107<br>filings | 114 |
| 20 | | | |
| | 70 | Diagram................ 28 | 29 |
| 21 | 8 | Notice of Order ....... 126 | 126 |
| 22 | 9 | Communication w/ Ms. . 128<br>Faulkner | 128 |
| 23 | | | |
| 24 | | | |
| 25 | | | |

1        C E R T I F I C A T I O N

2

3

4        I, PAMELA J. WILSON, CSR, certify that the foregoing is a

5    transcript from the record of the proceedings in the foregoing

6    entitled matter.

7

8

9        I further certify that the transcript fees format comply

10   with those prescribed by the Court and the Judicial Conference

11   of the United States.

12

13

14       This the 15th day of February, 2018.

15

16

17

18

19                          s/Pamela J. Wilson
                            _____
20                          PAMELA J. WILSON, RMR, CRR
                            Official Court Reporter
21                          The Northern District of Texas
                                Dallas Division

22

23

24

25

PAMELA J. WILSON, CSR/RMR/CRR
U.S. DISTRICT COURT - 214.662.1557