**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE** | § | |
| **COMMISSION**, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No.: 3:16-cv-01735-D |
| | § | |
| **CHRISTOPHER A. FAULKNER,** | § | |
| **BREITLING ENERGY** | § | |
| **CORPORATION, JEREMY S.** | § | |
| **WAGERS, JUDSON F. ("RICK")** | § | |
| **HOOVER, PARKER R. HALLAM,** | § | |
| **JOSEPH SIMO, DUSTIN MICHAEL** | § | |
| **MILLER RODRIGUEZ, BETH C.** | § | |
| **HANDKINS, GILBERT STEEDLEY,** | § | |
| **BREITLING OIL & GAS** | § | |
| **CORPORATION, CRUDE ENERGY,** | § | |
| **LLC, PATRIOT ENERGY, INC.**, | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| **TAMRA M. FREEDMAN and** | § | |
| **JETMIR AHMEDI**, | § | |
| Relief Defendants. | § | |

QUARTERLY STATUS REPORT OF RECEIVER FOR THE
CALENDAR QUARTER ENDING MARCH 31, 2018

Upon the Motion of the Securities and Exchange Commission (the "Commission"), this

Court entered its Order Appointing Receiver (Dkt. 142) ("September 25 OAR") in the above-

styled action on September 25, 2017, finding the appointment of a receiver "necessary and

appropriate for the purposes of marshaling and preserving all assets—in any form or of any kind

whatsoever—owned, controlled, managed, or possessed by defendants Christopher A. Faulkner

[("Faulkner")], Breitling Oil & Gas Corporation ("BOG"), and Breitling Energy Corporation

("BECC") (collectively, the "Receivership Defendants"), directly or indirectly ("Receivership Assets")." September 25 OAR at 1. Thomas L. Taylor III was "appointed to serve without bond as temporary receiver (the "Receiver") for the estates of the Receivership Defendants and the Receivership Assets." *Id*. ¶2.[1]

In the September 25 OAR the Court required that within the first day of each calendar quarter, beginning January 2, 2018, the Receiver shall file a status report and accounting. *Id*. ¶54. This Status Report is submitted pursuant to that requirement. A schedule of the Receivership's receipts and disbursements as required by the September 25 OAR are attached hereto as Exhibit A. The Receiver addresses below his plan for administration of the Receivership Estate going forward. The Receiver anticipates that he will be in a position to submit a Liquidation Plan, including a claims procedure and procedure for distribution to claimants, by July 1, 2018.

At this juncture, it is clear that some number of putative investors/claimants received conveyances of specific oil and gas interests (with record title) while other putative claimants invested in interests which were pooled and/or administered by Breitling entities. Even the specific conveyances (with record title) are problematic, however, because (1) defendants conveyed percentage interests which exceeded the interests actually owned by defendants and (2) some, if not all, of the oil and gas interests conveyed to investors were purchased with comingled investor funds. These circumstances may require distribution to multiple classes of investors. At this preliminary stage, the Receiver is unable to establish clearly defined investor/claimant

---

[1] In its Memorandum and Opinion and Order (Dkt. 141) this Court expressly held that "Faulkner's assets [vis-à-vis the asset freeze and the Receiver's control] … encompass[] entities controlled by Faulkner to which the unrebutted evidence indicates he may have redistributed either BOG's or BECC's investors' assets—including the Breitling Royalties Corporation." *Id*. at 8.

classes. The Receiver's recommendation to the Court regarding claimant classes will be embodied in a Proposed Liquidation Plan and Plan of Distribution.

## Efforts to Identify and Recover Assets

At the inception of the Temporary Receivership, the Commission's Staff provided the Receiver with information which had been developed during their investigation regarding working interests and royalty interests known to have been held by the Receivership Defendants. Most of the identified oil and gas operators associated with these interests were served with that Order. To the fullest extent possible, the Temporary Receiver initiated communication with these oil and gas operators directing that all revenue and other assets (including assets held in suspense) be remitted to the Receivership Estate. The operators with whom the Receiver has been able to establish contact have cooperated in identifying and documenting oil and gas assets to be administered by the Receivership Estate; they have also cooperated in agreeing to transfer associated revenue going forward. The Receiver also has established communications with a number of investors -- and oil and gas operators associated with them -- who received specific conveyances. Upon information presently available, it appears that -- in some cases -- revenue to which these investors may arguably be entitled is being held in suspense by operators -- primarily because of over-conveyance issues which have become apparent to operators. It is likely that, in other cases, investors are receiving revenue to which they are at least facially entitled.

Going forward, the Receiver will continue to administer the existing oil and gas assets and the revenue associated with those assets while establishing a plan for their liquidation. The Receiver has not been supplied by the Defendants with a complete -- or even coherent -- schedule of oil and gas assets within the Receivership Estate. However, the Receiver and his

staff have assembled -- based upon documents and incoming correspondence available to date -- a schedule of oil and gas assets which are presently known to be subject to the September 25 OAR. The schedule, attached hereto as Exhibit B sets forth the assets identified to date, along with additional data compiled.

In addition to efforts to harvest the available streams of revenue from the presently-known working and royalty interests, the Receiver and his Staff are reviewing documentation and initiating communications to determine whether and to what extent payments of Joint Interest Billings are required in order to preserve assets and determining whether and to what extent payment of such expenses can be justified in terms of preserving Receivership assets. The Receiver also has initiated contact with law firms which regularly represent taxing authorities in order to determine whether and where there are tax liabilities associated with known interests. Where tax liabilities are located, it is anticipated that the Receiver will make best efforts to negotiate with respect to penalties and other fees which might be imposed. The Receiver also is attempting to recover and reinitiate payments from operators who have placed Breitling revenues in suspense for a variety of reasons.

The Receiver is exploring avenues for disposition of those oil and gas assets which are saleable. At this juncture, it is likely that the Receiver will recommend to the Court that the available oil and gas assets be presented for internet auction by a recognized internet auction broker.

**Order to Show Cause Re Contempt**

On September 2, 2017, the Receiver filed with this Court a Motion for Order to Show Cause re Contempt (Dkt. 123) detailing efforts to obtain information necessary to the administration of the Receivership Estate. On September 6, this Court granted the Receiver's

Motion (Dkt. 125). On October 22, 2017, the Receiver filed a Motion to Amend the Order to Show Cause with respect to Faulkner and his mother, non-party Carole A. Faulkner ("Carole Faulkner"), and their efforts to conceal and withdraw proceeds which had been paid to Faulkner's nominee entity, U.S. Property Investments, Inc. ("USPI") from the sale of RackAlley, LLC ("RackAlley"), an enterprise in which Faulkner had owned a significant interest (see *infra* at 4-5). The Receivership Defendants and non-parties Carole Faulkner and USPI were ordered to appear before this Court to show cause why they should not be held in contempt. *See* Dkt. 180. The Receiver filed a Second Motion to Amend Order to Show Cause re: Contempt on November 20, 2017 (Dkt. 203) with respect to Carole Faulkner and USPI, who -- in violation of the September 25 OAR -- filed a lawsuit against the Receiver in California State court. The Receiver's Order to Show Cause as Amended came before the Court on December 14, 2017. Following an evidentiary hearing, this Court took the matter under submission and rendered its Memorandum Opinion and Order on February 13, 2018 ("Contempt Order") (Dkt. 247).

A.   <u>Contempt Order Regarding Discovery of and Accounting for Assets</u>

Pursuant to the Contempt Order, on or about March 13, 2018, Defendant Faulkner identified a single box of documents from among 33 that were produced to the Receiver and represented to the Receiver that this individual box was the repository of documents which Defendant Christopher had received through the PO boxes previously identified in filings with this Court and represented that no additional documents were in his possession, custody, or control. In addition, Defendant Faulkner identified seven bank accounts into which he represented that any or all checks received in the PO boxes were deposited. Defendant Faulkner advised that three of the identified bank accounts had been seized by the IRS prior to the institution of the Receivership. The Receiver will proceed by subpoena, as necessary, to obtain

documents related to the seven bank account into which oil and gas revenue was deposited. Mr. Faulkner, through counsel, also referred to his former business premises in Los Angeles (which housed businesses which are the subject of a separate SEC enforcement action) as a possible repository of relevant documents. Mr. Faulkner advised that documents which had been located at those premises were turned over to his business partner Matthew Rapoport who testified before this Court upon the Order to Show Cause re Contempt. The Receiver is pursuing the possible retrieval of documents from that source.

In the Court's Contempt Order, this Court required that Defendant Faulkner make a corporate representative for BECC, BOG and BRC available for Deposition. On March 22, 2018, the corporate entities presented Chris Sapia for deposition as their Corporate Representative. Mr. Sapia, testified that he was a personal friend of Jeremy Wagers, the former General Counsel of the BECC. He testified that he was being compensated for the appearance for a fee of $5,000 which was paid by a personal check from Carole Faulkner. Mr. Sapia also testified that his source of knowledge regarding the corporate entities consisted of conversations with Christopher Faulkner and a review of documents which the Receiver had supplied to counsel as a non-exhaustive body of documents about which the witness might be examined. Although, for obvious reasons, Mr. Sapia's knowledge of facts and circumstances related to the corporate entities was not extensive, he provided limited useful information -- particularly regarding transfers of funds from the Breitling entities to Grand Mesa Investments, Inc. ("Grand Mesa"), which were used for Christopher Faulkner's personal expenses. *See discussion infra, pp. 9-11.*

In connection with compliance with the Contempt Order, the Receiver requested that Mr. Faulkner account for a series of internet domain names which had been under his control in a GoDaddy account and which were likely acquired with Breitling assets. In response, Mr.

Faulkner through counsel, provided a list of the domain names and advised that the proceeds of the sale for one of these domains had been deposited into one of the known Citibank accounts in or about 2016.

In connection with the Contempt Order, the Receiver expressly made demand that Mr. Faulkner account for a series of Cashier's checks totaling almost $1 million. The provenance of these Cashier's checks is discussed in detail *infra* at pgs 9-11. The Receiver's demand for an accounting of these Cashier's checks in connection with the Contempt Order is based upon the fact that funds used to purchase the Cashier's checks were traceable to oil and gas revenue of the Breitling entities. Mr. Faulkner disclaimed knowledge of the whereabouts of these Cashier's checks or the proceeds associated with them.[2] On March 19, 2018, the Receiver transmitted a letter to Mr. Faulkner's counsel rejecting this response and advising that Mr. Faulkner would be deemed to be in violation of the Contempt Order for failing to account for these assets traceable to revenue from the Breitling entities.

B.  Proceeds from the Sale of RackAlley

The Receiver sought adjudication of contempt regarding the disposition of proceeds from the Sale of RackAlley LLC which, the Receiver asserted, was an asset under the control of Defendant Faulkner. Prior to the hearing of the matter, $150,000 of the proceeds were transferred to the Receivership Estate by Bank of America over the stringent objections of Carole Faulkner. Of the remaining $60,000, $50,000 was held at Bank of the West and $10,000 had come into the possession of Carole Faulkner. Upon presentation of this Court's Contempt Order to Bank of the

---

[2] As discussed below, Carole Faulkner -- in statements to law enforcement -- similarly disclaimed knowledge of the checks' whereabouts. She then proceeded to cash two of them through an offshore entity.

West, it remitted the $50,000 to the Receivership Estate. Carole Faulkner remitted $10,000 to the Receivership Estate on or about March 12, 2018, as ordered.

    C.   <u>California Law Suit Against the Receiver</u>

Coincidentally, on the same date that this Court entered the Contempt Order, the United States District Court for the Central District of California, upon the Receiver's Motion, dismissed the California action for lack of jurisdiction. (Exhibit C.) The Central District Court's Order was entered prior to any action taken by Carole Faulkner. Since this Court's Contempt Order had specifically required Ms. Faulkner to dismiss the California Action with prejudice, counsel for the Receiver called upon Ms. Faulkner to seek dismissal of the California action with prejudice. She complied by filing with the Central District Court a Request for Clarification. In response, the Court entered a notice upon its docket that it lacked subject-matter jurisdiction and, accordingly, could not adjudicate the merits, but that the matter could not re-filed in the Central District of California. (Exhibit D.)

**Investigation Regarding Additional Assets Under the Ownership, Control or Possession of the Defendants**

Since the entry of the September 25 OAR, the Receiver has initiated and will continue to investigate all potential assets of the Receivership Estate.

    A.   <u>Transfers of Putative Receivership Assets to Other Business Entities With Which Defendant Faulkner and the Receivership Entities are Associated</u>

Preliminary review of records of the entity Receivership Defendants and evidence developed by the Commission's Staff indicate that funds were transferred from Receivership Defendants to other entities under the control of defendant Faulkner. These transfers also were the subject of expert testimony before the Court at the December 14, 2017 hearing on Order to Show Cause re Contempt. The Receiver will continue efforts to trace these transfers of

Receivership Assets. The Receiver's efforts in this regard will be directed, without limitation, to entities identified by the Staff of the Commission in its Motion for Preliminary Injunction (Dkt. 102) including Defendants Crude Energy, LLC ("Crude") and Patriot Energy, Inc. ("Patriot") and non-party BRC[3].

The Receiver also has determined that hundreds of thousands of dollars were transferred from Breitling entities to Grand Mesa, an entity owned and controlled by Christopher Faulkner and his wife. As discussed below, funds transferred from Breitling entities into Grand Mesa were then used to purchase the Faulkners' personal residence on Inwood Road in Dallas. *See discussion infra* at 9-11.  The Receiver expects to move the Court for an Order expanding the Receivership to these and other entities.

   B.   Sale of Faulkner Residence and Related Proceeds/Frost Bank Cashier's Checks

Prior to the commencement of the Receivership, Faulkner and his former wife, Tamra Freedman -- through Inwood Partners, a nominee, single-purpose entity -- disposed of their Inwood Road residence in Dallas having a value of approximately $2 million. At or about the time the closing of the sale, ownership of the Inwood entity was transferred to Mr. Faulkner's mother, Carole Faulkner, apparently without consideration. As set forth above, the Receiver has determined that the funds used by the Faulkners to purchase the Inwood residence were derived

---

[3] *See* Memorandum Opinion and Order (Dkt. 141) at 8 ("The court finds that the SEC has met its burden of demonstrating by a preponderance of the evidence that the court should order an asset freeze and appoint a temporary receiver covering Faulkner's assets. This encompasses entities controlled by Faulkner to which the unrebutted evidence indicates he may have redistributed either BOG's or BECC's investors' assets—including the Breitling Royalties Corporation.").

At the December 14, 2017 hearing on the Receiver's Motion for Order to Show Cause re Contempt, expert testimony was presented concerning the commingling of assets between and among the Breitling entities and Crude and Patriot.

from Grand Mesa which, in turn, had received its funds from Breitling entities purportedly as compensation to defendant Faulkner.[4]

Upon closing of the sale of the Inwood residence, Inwood directed that Faulkner's ex-wife, Tamra Freedman, be paid from the proceeds of the sale of the Faulkner Residence to satisfy Christopher Faulkner's purported indebtedness to her -- confirming that Faulkner "controlled [and/or] managed" Inwood directly or indirectly.[5]

The Receiver has determined that the remaining sale proceeds, slightly less than $1 million, were deposited into an Inwood Partners account at Frost Bank. At Carole Faulkner's instruction, the funds were disbursed in the form of sixteen Cashier's checks. Six of the Cashier's checks were negotiated to apparently legitimate institutions shortly after their issue. Ten of these Cashier's checks were not immediately negotiated. Five of the Cashier's checks (each in the amount of $20,000) were made payable to Carole Faulkner; four checks (in the amounts of $700,000, $10,000, $10,000, and $50,000) were made payable to "C. A. Faulkner."

---

[4] Accountants and outside experts for the Commission traced funds from the Breitling entities into Grand Mesa. Additionally, on March 22, 2018, the Receiver deposed Chris Sapia, who was designated as the corporate witness for the Breitling entities pursuant to this Court's Memorandum Opinion and Order re Contempt (Dkt. 247). The Breitling corporate witness confirmed that Christopher Faulkner's "compensation" was transferred from the Breitling entities into Grand Mesa and that Grand Mesa was nominally owned by Tamra Freedman, Mr. Faulkner's former wife. Accounting analysis by the Commission's experts also identified transfers from Grand Mesa related to the purchase of the Inwood residence.

On February 28, 2018, the Receiver deposed Jeremy Wagers, Breitling's former General Counsel who testified, among other things, that the Inwood house was the residence of Christopher Faulkner.

5 These funds transferred to Tamra Freedman were subsequently seized pursuant to a seizure warrant obtained by the United States Attorney for the Northern District of Texas. Pursuant to a proposed agreement, these funds will likely be transferred to the Receivership Estate.

In connection with attempts by the United States Attorney's Office to enforce criminal seizure orders, Carole Faulkner represented to agents of the Federal Bureau of Investigation that the Cashier's checks were transmitted by FedEx to Christopher Faulkner but purportedly had been "lost." It is the Receiver's understanding that Carole Faulkner nonetheless refused to execute affidavits necessary in order to enable Frost Bank to reissue the purportedly "lost" Cashier's checks.

Notwithstanding Carole Faulkner's representations to law enforcement that the Cashier's checks were lost, federal law enforcement officials learned that Ms. Faulkner had successfully negotiated two of the $20,000 checks through an off-shore entity in the United Kingdom. At this juncture, the Receiver urged Frost Bank to freeze proceeds equal to the outstanding Cashiers checks or to otherwise invalidate the instruments themselves.[6] The Receiver also transmitted a letter to Carole Faulkner demanding that she cease and desist from negotiating the remaining Cashiers' checks which are property of the Receivership Estate. Undeterred, Ms. Faulkner proceeded to attempt to negotiate the $50,000 Cashier's check through the same offshore entity in the United Kingdom. In this instance, however, Frost bank declined to honor payment on the check and the $50,000 represented by it remains in possession of Frost bank along with amounts remaining from the initial purchase of cashiers' checks, or approx $837,000. The Receiver is advised by Frost Bank's outside counsel that the remaining checks will not be honored.

Upon full development of evidence regarding the foregoing sequence of events, the Receiver will move this Court for an Order requiring Frost Bank to transfer the remaining funds (approximately $837,000) to the Receivership Estate. In this regard, on about March 16, 2018 the

---

6 The Receiver had on several earlier occasions requested that Frost Bank freeze the funds. It was the position of Frost Bank initially, however, that funds could not be frozen since they had exited the Inwood account.

Receiver attempted to serve the Texas registered agent for Inwood, Carole Faulkner, at her home in Colleyville, which also is purportedly the principal place of business for Inwood. Ms. Faulkner either was not at home or refused to respond to the Receiver's process server. Pursuant to Wyoming Statute 17-28-101, Inwood was required to -- but did not -- maintain a registered agent in Wyoming. Accordingly, Receiver's counsel served a subpoena to Inwood pursuant to Wyoming Statute 17-28-104, which prescribes that service is perfected at the earliest of: (i) The date the entity receives the mail; (ii) The date shown on the return receipt, if signed, either manually or in facsimile, on behalf of the entity; or (iii) Five (5) days after its deposit in the United States mail, as evidenced by the postmark, if mailed postpaid and correctly addressed. At the latest, service was perfected on March 28, 2018.

   C.   Directors & Officers Insurance Policy

   Receivership Defendant BECC is insured by XL Specialty Insurance Company ("XL Specialty") through a Directors & Officers insurance policy ("D&O Policy"). BECC is a named insured along with certain officers and directors. It has been the Receiver's position that the D&O Policy should be included as an asset of the Receivership Estate. In its Memorandum Opinion and Order (Dkt. 141) the Court addressed Faulkner's request to the Court to "permit Faulkner and other insureds to access the directors and officers insurance policy issued to BECC." Dkt. 141 at 3, 9-14. The Court "determine[d] that the D&O Policy is at least in part within the receivership estate," *id*. at 12, and directed the Receiver to "permit XL Specialty Insurance Company to process the Receivership Defendants' claims under Directors and Officers Insurance Policy Number ELU137222-14, until a further order of the court." Dkt. 142 ¶17. The Court ordered Faulkner to "file a motion for the advancement of defense costs" briefing the issue by October 16, 2017, with responses and replies to be filed pursuant to the Court's Local Rules.

Dkt. 141 at 12-13. On October 9, 2017 Defendant Judson Hoover ("Hoover") filed a Motion for the Advancement of Defense Costs and brief and appendix in support ("Hoover Motion") (Dkts. 150-152). Faulkner filed his motion on October 15, 2017. Dkt. 156.[7] The Receiver filed his Responses to these Motions on November 6, 2017. *See* Dkt. 164 (Order Extending Deadlines with respect to the Receiver's response to the Hoover Motion). In addition to addressing the question whether the D&O Policy is a Receivership asset, the Receiver sought unsuccessfully to initiate settlement discussions with the D&O Carrier regarding policy amounts which had not already been expended.

As of the filing of the Quarterly Status Report of Receiver for the Calendar Quarter ending December 31, 2017 (Dkt. 233),  XL Specialty had advanced $810,779 of the $1,000,000 policy limit in payment of defendants' attorney's fees. Counsel for the D&O carrier has advised the Receiver that the remaining $189,221 was paid upon invoices from defense counsel and the policy exhausted as of February 14, 2018.

### Potential Claims of the Receivership Estate

The Receiver has investigated various "clawback" claims pursuant to the Texas Uniform Fraudulent Transfer Act and related equitable principles.

A.  Brokers/Sales Representatives

The Receiver is coordinating efforts with the Staff of the Commission regarding claims against individuals who were active in (and compensated from) the offer and sale of oil and gas

---

[7]  On October 24, 2017 a Notice of Filing was transmitted by the Court's CM/ECF case management system regarding a Motion for the Advancement of Defense Costs filed by Carole Faulkner, purportedly on behalf of BECC (Dkts. 176, 177). The Receiver filed a Motion to Strike that motion from the record, and for sanctions (Dkt. 181), because Carole Faulkner had neither the authority nor the authorization to act on behalf of BECC. *See* Dkt. 142 ¶5; Dkt. 165. She withdrew the motion.

interests by the Defendants. Payments were made by Defendants to numerous individuals and their nominee entities aggregating millions of dollars. The Commission has initiated Administrative Proceedings against at least five of the brokers who received the largest amounts in payments. It is anticipated that the Commission will establish a Fair Fund to receive disgorgements achieved in these Administrative Proceedings for the benefit of claimants in the Receivership.

The Receiver has made demand upon other other brokers and sales representatives who received payments and is attempting to locate and initiate communication with a number of others. In this regard, the Receiver understands that approximately sixteen individuals (mostly through nominee entities) received payments in excess of $100,000. In connection with these efforts, the Receiver is reviewing extensive accounting data assembled by Veritas Advisory Group, Inc. and by the Commission's Staff. To date, no settlements have been reached; the Receiver will pursue settlement discussions where fruitful but expects to initiate clawback litigation in the current quarter.

B.  SEC Settlements with Relief Defendants

In its Complaint herein the Staff of the Commission included Jetmir Ahmedi as a Relief Defendant. The Commission concluded a settlement with Relief Defendant Ahmedi which required him to pay $222,000 of funds received from the Defendants. The settlement funds are to be transmitted to the Receivership Estate for distribution to investors. On or about March 8, 2018, $150,000 of the settlement funds were deposited into the Receivership Estate.

C.  Assets Obtained Through Seizure Warrants

Prior to the institution of the Receivership, the Unites States Attorney's Office had initiated criminal seizure proceedings against Christopher Faulkner and related entities.

Substantial assets were recovered by the Unites States Attorney's Office in connection with these proceedings including cash in the amount of approximately $800,000. The Receiver is engaged in discussions with the United States Attorney's Office regarding the inclusion of these assets within the Receivership Estate for the purpose of distribution to defrauded investors.

### Fee Applications Pursuant to the Order Appointing Receiver

On January 26, 2018, pursuant to the September 25 OAR, the Receiver filed a Motion for Order Approving First Interim Application to Pay Fees Incurred by the Receiver for Quarter Ending December 31, 2017. The amounts requested were $138,691.50 to the Receiver and his firm, $14,379.88 to Corrigan & Morris LLP, $59,092.37 to Dykema Gossett PLLC, and $7,072.50 to Veritas Advisory Group, Inc. The Fee Application is presently pending before this Court.

Pursuant the September 25 OAR the Receiver will shortly transmit a Fee Application covering the first quarter of 2018 to the Commission's Staff for review prior to filing with this Court.

Dated: April 5, 2018                                    Respectfully submitted,

                                                       By:   /s/  Thomas L. Taylor III

                                                       Thomas L. Taylor III
                                                       Texas State Bar: 19733700
                                                       *taylor@tltaylorlaw.com*

                                                       The Taylor Law Offices, P.C.
                                                       245 West 18th Street
                                                       Houston, Texas 77008
                                                       Tel: 713.626.5300
                                                       Fax: 713.402.6154

                                                       RECEIVER

## **CERTIFICATE OF SERVICE**

I certify that on April 5, 2018, I served the foregoing document on all counsel of record and through the CM/ECF electronic filing system notice, or by other means as listed below consistent with the Federal Rules of Civil Procedure.

/s/  Thomas L. Taylor III

Thomas L. Taylor III
