IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, § § § | |
| Plaintiff, § § Civil Action No. 3:16-CV-1735-D | |
| VS. § § | |
| CHRISTOPHER A. FAULKNER, et al., § § | |
| Defendants. § | |

MEMORANDUM OPINION
AND ORDER

Defendants Christopher A. Faulkner ("Faulkner"), Jeremy S. Wagers ("Wagers"), and Judson F. Hoover ("Hoover") move to advance defense costs pursuant to the terms of a directors and officers insurance policy ("D&O Policy"). The D&O Policy is at least in part subject to this court's prior order freezing all the assets of Faulkner, Breitling Energy Corporation ("BECC"), and Breitling Oil & Gas Corporation ("BOG"), and placing these assets in a receivership. The court-appointed temporary receiver ("Receiver") opposes these motions. Defendant Parker R. Hallam ("Hallam") separately moves for the court to halt the ongoing distribution of the D&O Policy proceeds, and to reallocate the proceeds in a more equitable manner. For the following reasons, the court grants Faulkner and Wager's motion for the advancement of defense costs, grants Hoover's motion for the advancement of defense costs, and denies Hallam's expedited motion for order regarding remaining insurance proceeds and motion to protect the court's equitable jurisdiction and prevent

exhaustion of insurance policy.¹

I

Because this case is the subject of prior memorandum opinions and orders, *see, e.g., SEC v. Faulkner*, 2017 WL 4238705 (N.D. Tex. Sept. 25, 2017) (Fitzwater, J.) ("*Faulkner I*"), the court will only recount the background facts and procedural history pertinent to this decision.

In 2016 the U.S. Securities and Exchange Commission ("SEC") filed this lawsuit against Faulkner, BECC, Wagers, Hoover, Hallam, Joseph Simo, Dustin Michael Miller Rodriguez, Beth C. Handkins, Gilbert Steedley, BOG, Crude Energy, LLC, and Patriot Energy, Inc. The SEC alleges that, since 2011, Faulkner and his codefendants have

---

¹The Receiver filed on October 25, 2017 a motion to strike motion for advancement of defense costs filed by Carole A. Faulkner ("Carole"), purportedly on behalf of BECC, and for sanctions. The next day, Carole filed an unopposed motion to withdraw previously filed motion for defense costs, and the court terminated Carole's motion for defense costs. Accordingly, the court denies the Receiver's motion to strike as moot

The court also denies the Receiver's request for sanctions, which invokes this court's inherent authority. The court has inherent powers "necessary to protect the efficient and orderly administration of justice and . . . necessary to command respect for the court's orders, judgments, procedures, and authority." *In re Stone*, 986 F.2d 898, 902 (5th Cir. 1993) (per curiam). "[A] court may assess attorney's fees when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45-46 (1991). "The imposition of sanctions using the court's inherent power should be reserved for situations in which the court finds 'that fraud has been practiced upon it, or that the very temple of justice has been defiled.'" *Estate of Merkel v. United States*, 2009 WL 2002902, at *4 (N.D. Tex. July 9, 2009) (Fitzwater, C.J.) (quoting *Chambers*, 501 U.S. at 46). Here, Carole corrected her actions the day after the Receiver objected. Carole has not since renewed the motion or filed any other motion for the advancement of defense costs. The court finds that Carole did not engage in the bad faith or vexatious behavior necessary for the court to impose sanctions under its inherent powers, and it denies the Receiver's motion for sanctions.

orchestrated a massive scheme to defraud investors in Faulkner's oil and gas companies of approximately $80 million. The SEC asserts that, in carrying out this scheme, Faulkner and other defendants violated § 17(a) of the Securities Act of 1933, § 10(b) of the Securities Exchange Act of 1934, and SEC Rule 10b-5, promulgated thereunder.

In 2017 the SEC filed a motion for preliminary injunction, *ex parte* temporary restraining order, asset freeze, appointment of a receiver to conserve the assets of Faulkner, BECC, and BOG (collectively, the "Receivership Defendants"), and other ancillary relief (including a sworn accounting, document preservation, and expedited discovery). The SEC averred that, after it filed suit, the Receivership Defendants continued to defraud investors of an additional $110,000 in oil and gas production revenues.

On August 14, 2017 the court entered orders appointing a temporary receiver and granting a temporary restraining order and asset freeze order. These orders were limited in scope to "all oil-and-gas related assets" controlled by the Receivership Defendants. Aug. 14 Receivership Order at 1-2. The court allowed the parties to submit additional briefing regarding the remaining relief that the SEC requested.

In subsequent briefing, the SEC maintained that the asset freeze should be expanded to cover all of the Receivership Defendants' assets. It contended that this expansion was necessary to ensure that the Receiver would be able to accurately assess and secure assets likely needed for future disgorgement. Only Faulkner opposed the SEC's requested relief. He maintained that the scope should remain limited only to oil-and-gas assets. Alternatively,

he contended that the court should permit him and other insureds to access the "D&O Policy" so that the insureds could pay for their defense costs.

XL Specialty Insurance Company ("XL") issued the D&O Policy to BECC for a policy period of December 9, 2014 through April 2, 2016. The D&O Policy is a claims-made policy with an aggregate limit of liability of $1 million. The "Insured Persons" include "any past, present or future director or officer, or member of the Board of Managers, of [BECC] and those persons serving in a functionally equivalent role for the Parent Company or any Subsidiary operating or incorporated outside the United States." Hoover App. at 37. The D&O Policy consists of three insuring agreements: Insuring Agreement A, which covers Losses[2] from Claims[3] against Insured Persons; Insuring Agreement B, which covers Losses that BECC is required to pay as indemnification to an Insured Person; and Insuring Agreement C, which covers BECC's Losses related to a Securities Claim against the company. Regarding the priority of multiple payments among the three agreements, the D&O Policy specifies:

> it is understood and agreed that if Loss, including Defense Expenses, shall be payable under more than one of the Insuring Agreements, then the Insurer shall, to the maximum extent practicable and subject at all times to the Insurer's maximum aggregate Limit of Liability . . . pay such Loss as follows:

---

[2]Loss is defined as "damages, judgments, settlements or other amounts (including punitive or exemplary damages, where insurable by law) and Defense Expenses in excess of the Retention that the Insured is legally obligated to pay." Hoover App. at 38.

[3]A Claim is, *inter alia*, "any civil proceeding in a court of law or equity, or arbitration." Hoover App. at 36.

> (1) first, the Insurer shall pay that Loss, if any, which the Insurer may be liable to pay on behalf of the Insured Persons under Insuring Agreement (A);
>
> (2) second, the Insurer shall pay that Loss, if any, which the Insurer may be liable to pay on behalf of the Company under Insuring Agreement (B); and
>
> (3) third, the Insurer shall make such other payments which the Insurer may be liable to make under Insuring Agreement (C) or otherwise.

*Id.* at 23. Here, several of the defendants in the present action qualify as "Insured Persons" under the D&O Policy and seek policy proceeds to pay for defense expenses according to the policy's terms.

In *Faulkner I* the court granted in part and denied in part the SEC's requested relief. The corresponding order expanded the scope of the Receivership Assets that were subject to remedial orders from only those related to oil and gas activities to "all assets—in any form or of any kind whatsoever—owned, controlled, managed, or possessed by [the Receivership Defendants], directly or indirectly." Sept. 25 Receivership Order at 1. The court also held that, as a result of this expanded scope, "the D&O Policy is at least in part within the receivership estate." *Faulkner I*, 2017 WL 4238705, at *6. At the same time, the court held that "the fact that these funds are within the receivership estate does not preclude the court from granting an advancement of defense costs." *Id.*

Faulkner demonstrated that he and other defendants faced a real and immediate harm without access to the D&O Policy proceeds; without these funds they might be unable to

mount a defense in this case. Without full briefing on the potential harms to the receivership estate, however, the court could not "effectively balance the harms implicated" by providing Faulkner and other defendants with indefinite access to the proceeds. *Id.* Therefore, the court ordered "that the temporary receiver allow defendants access to the D&O Policy proceeds for the period required for the court to decide this question on full briefing, or, if sooner, the date the court by order denies such access." *Id.*

In accordance with the briefing schedule, defendants Faulkner and Wagers, and Hoover have filed separate motions for the advancement of defense costs. The Receiver opposes the motions.

While these motions have been pending, insureds under the D&O Policy have been able to submit losses and receive payments under the policy's terms. XL has received such requests and distributed payments on a regular basis.

On November 2, 2017 defendant Hallam submitted to the Receiver a written demand for indemnification and fee advancement, and on November 22, 2017 he submitted to XL a demand for coverage and claim for defense costs. One month later, XL determined that "Hallam is a former director of [BECC] and thus an Insured Person" under the D&O Policy. Hallam App. at 8. XL also informed Hallam that, at that time, $182,220.99 remained on the D&O Policy's limit of liability. XL anticipated that the D&O Policy would be fully exhausted from claims submitted during December 2017. On December 29, 2017 Hallam submitted a claim totaling $654,375.00 for defense costs for all covered matters since he

retained counsel in March 2015.

In January 2018 XL informed Hallam that it would distribute the D&O Policy proceeds on a pro rata basis for each firm for defense costs incurred only within December 2017. Hallam then moved for an expedited order directing XL to suspend further claim payments and to equitably distribute the remaining policy proceeds. The court advised the parties that it would consider the motion according to the time parameters of the local civil briefing rules rather than on an expedited basis. After XL advised the insured parties that it intended to make final payments, Hallam renewed his motion on an emergency basis on February 1, 2018. XL distributed the final payments under the D&O Policy at the same time. Under the court's direction, defendants Faulkner, Wagers, and Hoover filed their responses in opposition to Hallam's motion on February 2, and Hallam filed his reply on February 20. Hoover later filed a surreply, to which Hallam has replied.

II

"Once the equity jurisdiction of the district court has been properly invoked by a showing of a securities law violation, the court possesses the necessary power to fashion an appropriate remedy." *SEC v. Posner*, 16 F.3d 520, 521 (2d Cir. 1994) (quoting *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1103 (2d Cir. 1972)). Beyond appointing a receiver, "[t]he court is also empowered to freeze defendants' assets to preserve the status quo and prevent dissipation of ill-gotten gains so that they remain available to fund subsequent disgorgement orders and civil penalties." *SEC v. AmeriFirst Funding, Inc.*, 2007

WL 2192632, at *3 (N.D. Tex. July 31, 2007) (Fitzwater, J.); *see also SEC v. Brooks*, 1999 WL 493052, at *2 (N.D. Tex. July 12, 1999) (Fitzwater, J.) (citing *SEC v. Schiffer*, 1998 WL 307375, at *7 (S.D.N.Y. June 11, 1998)). "'It is a recognized principle of law that the district court has broad powers and wide discretion to determine the appropriate relief in an equity receivership.'" *SEC v. Safety Fin. Serv., Inc.*, 674 F.2d 368, 372-73 (5th Cir. 1982) (quoting *SEC v. Lincoln Thrift Ass'n*, 577 F.2d 600, 606 (9th Cir. 1978)). In this way, "the court has broad equitable power in securities fraud cases to fashion appropriate ancillary remedies necessary to grant full relief." *Faulkner I*, 2017 WL 4238705, at *3 (citing *Posner*, 16 F.3d at 521-22).

III

The court begins by addressing the motions of Faulkner and Wagers, and of Hoover, for the advancement of defense costs.

A

Although the D&O policy is part of a receivership estate, this does not preclude the advancement of defense costs. Because "the district court has broad powers and wide discretion to determine the appropriate relief in an equity receivership," *Safety Fin. Serv., Inc.*, 674 F.2d at 372-73 (internal quotation marks and citation omitted), several courts have concluded that the advancement of defense costs is appropriate, despite the fact that they may be drawn from a D&O policy within a receivership estate. *See, e.g., SEC v. Stanford Int'l Bank, Ltd.*, 2009 WL 8707814, at *3-4 (N.D. Tex. Oct. 9, 2009) (Godbey, J.) (declining

to determine whether D&O policy proceeds were part of receivership estate, but holding that even if they were, court would permit advancement of defense costs); *SEC v. Narayan*, 2017 WL 447205, at *6 (N.D. Tex. Feb. 2, 2017) (Lynn, C.J.) (noting that even in cases where D&O policy proceeds are within bankruptcy estate, "courts have nonetheless granted relief when the harm weighs more heavily against the directors or officers than the debtor") (citations omitted). In these cases, the courts have balanced the potential harm facing the defendants moving for defense costs with the harm to the receivership estate if such funds are released. In particular, they consider whether the harms are clear and immediate rather than hypothetical or speculative. *See Stanford Int'l Bank*, 2009 WL 8707814, at *3-4; *Narayan*, 2017 WL 447205, at *6; *In re Allied Digital Techs. Corp.*, 306 B.R. 505, 514 (Bankr. D. Del. 2004); *In re CyberMedica, Inc.*, 280 B.R. 12, 18 (Bankr. D. Mass. 2002). Courts will also examine the contractual terms of the policy to ensure that the defendant retains contractual rights to the contested proceeds. *See Narayan*, 2017 WL 447205, at *5.

B

Faulkner, Wagers, and Hoover maintain that they are entitled to the D&O Policy proceeds that they have received. Hoover contends that the court should enforce the priority of payments mandated by the D&O Policy, placing the Insured Persons over BECC; that the court should follow the *Narayan* court in balancing the harm of withholding defense costs against the harms to the estate; and that the real harms faced by Hoover and defendants is greater than the hypothetical costs advanced by the Receiver. Similarly, Faulkner and

Wagers posit that the insureds relied upon the existence of the D&O Policy proceeds and expected that the D&O Policy would afford them a defense; that the Receiver's and SEC's claims to the proceeds are speculative at this time; that the Receiver cannot negate the insureds' contractual rights to coverage under the D&O Policy; that the insurance proceeds were not obtained through fraud; and that depriving the insureds of insurance proceeds would have a chilling effect upon the ability of companies to retain officers to serve in their companies.

The Receiver contends that any remaining proceeds should be frozen and paid into the Receivership Estate. He maintains that the D&O Policy proceeds are Receivership Assets; that harm to the Receivership Estate is clear and immediate; that defendants have failed to establish harm greater than that of the Receivership Estate; and, alternatively, that the court should require defendants to provide tangible security for reimbursement should the claims against them not be recovered.

C

After examining the contractual provisions of the D&O Policy and balancing the potential harms to both defendants and the Receivership Estate, the court finds that all "Insured Persons" under the D&O Policy are entitled to the proceeds to pay for their defense costs. These include Faulkner, Wages, Hoover, and Hallam (the "Insured Defendants"). Accordingly, the court declines to extend the asset freeze to any remaining proceeds or reverse the prior payout of proceeds under the D&O Policy.

In several critical respects, this case mirrors *Narayan*, 2017 WL 447205. There, the SEC had accused the defendants of directing clients to make high-risk investments in a The Ticket Reserve, Inc. ("TTR")—a company for which they were directors —and covering up the finders fees that they received. *Id.* at *1. The *Narayan* court had entered an order freezing all of TTR's assets. *Id.* Two defendants moved for the advancement of defense costs under TTR's director and officer liability policy for expenses incurred in a derivative suit. The insurance policy in question, as here, had three insurance agreements that each covered claims against individual officers, those indemnified by TTR, and against TTR directly. Claims against individual officers retained the highest payment priority under the terms of the policy. *Id.* at *2. The *Narayan* court granted the defendants' motion for entry of order allowing advancement of defense costs, finding that they had demonstrated a contractual right to policy proceeds and that "the potential harm to [the defendants] in withholding defense costs far outweigh[ed] harm to the [Receivership Estate]." *Id.* at *6.

In the present case, the Insured Defendants have demonstrated that they have a current right to payment under the D&O Policy—a right that is superior to any potential right of the Receiver. The Insured Defendants have coverage under the D&O Policy. *See* Hoover App. at 51; Hallam App. at 8. As current or former directors or officers of BECC, the Insured Defendants qualify as Insured Persons, and their defense expenses qualify as "Losses" related to a "Claim"—i.e., the present SEC action. *See* Hoover App. at 51-53. Moreover, XL has regularly reimbursed the defense costs that the Insured Defendants have submitted

under the D&O Policy after determining that the incurred costs were reasonable. In this way, advancing defense costs is in accordance with the D&O Policy's terms.

The Receiver, by contrast, has demonstrated no such contractual right to the proceeds. A receiver "stand[s] in the shoes of the entity in receivership" and therefore acquires no greater rights in property that the receivership entity had. *Narayan*, 2017 WL 447205, at *5 (alteration in original) (quoting *Wuliger v. Mfrs. Life Ins. Co.*, 567 F.3d 787, 793 (6th Cir. 2009)). The Receiver states that he intends to demand reimbursement for "Asset Analysis and Recovery, Case Administration, Business Operations, Accounting/Auditing, Status Reports, and Data Analysis" to the extent permitted by the D&O Policy. Receiver Resp. at 4. But the Receiver points to no provision of the D&O Policy that might cover such expenses. And even if a certain provision of the D&O Policy does provide such coverage, the Receiver has not shown that payment of these costs would supersede payment of the Insured Defendants' immediate defense costs under the policy's priority of payment provision. *See* Hoover App. at 23. Essentially, "the Receiver provides no basis to expand [his] rights under the contract simply because the Court imposed a receivership." *Narayan*, 2017 WL 447205, at *5.

Furthermore, the balancing of harms also favors providing the Insured Defendants access to the D&O Policy proceeds. Faulkner, Wagers, and Hoover have been approved as insureds and reimbursed incurred defense costs covered by the D&O Policy since January 2017. *See* Hoover App. at 53. While their instant motions were pending, the Insured

Defendants continued to submit defense costs to XL, and XL advanced defense costs after determining their reasonableness, in accordance with the D&O Policy. The fact that the Insured Defendants reached the limits of their liability in a matter of months further indicates their need for the proceeds. Indeed, the Insured Defendants have submitted evidence indicating that their counsel depended on the advancement of defense costs. The court finds that the Insured Defendants have experienced the type of "clear, immediate, and ongoing defense expenses" that justifies advancing defense costs from an insurance policy within a receivership estate. *See Narayan*, 2017 WL 447205, at *5. Without money to fund a defense, the Insured Defendants' "ability to defend themselves in ongoing litigation [would have] likely [been] substantially impaired." *Id.*

This immediate need outweighs the potential harm to the Receivership Estate. The Receiver maintains that he is incurring expenses routinely as part of administering the Receivership Estate. As the court has explained above, however, the Receiver does not identify how such expenses would be covered under the D&O Policy, nor has he requested that XL reimburse such expenses at this time. The Receiver also contends that the D&O Policy proceeds must be frozen to preserve funds in anticipation of claims against the Receiver Estate from the investors that the defendants allegedly defrauded. The court recognizes that promoting the efficient administration of the Receivership Estate for the benefit of potential creditors is "a primary purpose of equity receiverships." *SEC v. Hardy*, 803 F.2d 1034, 1038 (9th Cir. 1986). "But at this point the possibility that the D&O

proceeds might one day be paid into the receivership does not justify denying directors' and officers' claims." *Stanford Int'l Bank*, 2009 WL 8707814, at *3. As the *Narayan* court explained:

> [o]n balance, therefore, it appears the [insureds] are apparently incurring actual expenses in defending . . . this case, and have demonstrated a current right to payment. The Receiver has only pointed to claims that may be paid out in the future. The Court, therefore, finds there is a clear, immediate, and actual harm to Movants that greatly outweighs any speculative and potential harm to the Receivership Estate.

*Narayan*, 2017 WL 447205, at *7.[4] For these reasons, the court grants the motions for the advancement of defense costs in accordance with the D&O Policy.

D

The Receiver separately maintains that, even if the Insured Defendants have access to the D&O Policy proceeds, they should be required to post security for any policy proceeds that must be reimbursed if it is later adjudicated that defendants committed fraud.[5] But "even

---

[4]The Receiver attempts to distinguish this case from *Narayan* and *Stanford* by noting that the receiverships in those cases had existed for at least eight months. Although additional time might enable a receiver to make the case for harm to the estate, the defendants in this case have demonstrated that they are facing clear and immediate harm without the advancement of defense costs.

[5]The D&O Policy excludes coverage for Losses connected to any Claim that was

> brought about or contributed to in fact by any: (1) intentionally dishonest, fraudulent or criminal act or omission or any willful violation of any statute, rule or law; or (2) profit or remuneration gained by any Insured to which such Insured is not legally entitled; as determined by a final, non-appealable adjudication in the underlying action.

- 14 -

assuming that claims asserted in this case . . . would be excluded from coverage if proven, [the] Receiver has not identified any Policy provision, nor cited any precedent, requiring that Insureds provide security for repayment in the event reimbursement is later required." *Narayan*, 2017 WL 447205, at *9. The sole case that the Receiver cites, *Pendergest-Holt v. Certain Underwriters at Lloyd's London*, 600 F.3d 562 (5th Cir. 2010), provides little support. In *Pendergest-Holt* directors and officers facing SEC charges sought a preliminary injunction to prevent an insurer from retroactively withdrawing coverage of a directors and officers policy. The panel held that the determination of whether money laundering occurred—thereby triggering the claw back provision—had to be made by a court in a separate action. *Id.* at 575. At no point did the panel discuss requiring the directors to post a security in the event coverage was retroactively withdrawn.

The court declines to require the Insured Defendants to provide any security for potential reimbursement.

IV

The court next considers Hallam's motions to prevent exhaustion of the D&O Policy and to equitably distribute its proceeds.

A

Hallam maintains that the court should remit any remainder of the D&O Policy proceeds into the registry of the court and direct an "equitable distribution" of the proceeds

---

Hoover App. at 30.

to him—both of any remaining proceeds and of policy proceeds that XL has already distributed to the other insureds. Hallam posits that, since March 2015, he had "made numerous requests for indemnification, for fee advancement, for disclosure of the identity of BECC's D&O insurance carrier, and a copy of the [D&O Policy]" from Faulkner, Wagers, and Hoover, among other BECC officers. Hallam Mot. at 3. Hallam contends that BECC's officers withheld XL's identity and were otherwise unresponsive to his requests. He asserts that he only discovered the existence of the D&O Policy as a result of Faulkner's objection to the asset freeze and appointment of a receiver. Hallam argues that the court has the authority to equitably distribute the D&O Policy proceeds to him; that he has been greatly disadvantaged by his inability to access the D&O Policy; and that he will face irreparable harm as a result of receiving only a fraction of his total defense costs under the D&O Policy. Faulkner, Wagers, and Hoover oppose Hallam's motion, and they maintain that the court should not alter XL's distribution of the D&O Policy proceeds.

B

The court declines to alter XL's distribution of the D&O Policy proceeds. Hallam maintains that the court has the authority to reallocate the proceeds because the court has "broad equitable power in securities fraud cases to fashion appropriate ancillary remedies necessary to grant full relief." Hallam Mot. at 7 (citing *Posner*, 16 F.3d at 521-22). But the court's authority not limitless; it is related to, and wielded to relieve, the underlying securities fraud at issue. *See, e.g., Posner*, 16 F.3d at 521-22 (holding that district court did

not abuse its discretion in issuing injunction because it had found that defendants "had committed securities law violations with a 'high degree of scienter'"); *Manor Nursing Ctrs.*, 458 F.2d at 1103 ("Once the equity jurisdiction of the district court has been properly invoked *by a showing of a securities law violation*, the court possesses the necessary power to fashion an appropriate remedy.") (emphasis added); *see also In re Sadkin*, 36 F.3d 473, 478 (5th Cir. 1994) (per curiam) (holding that bankruptcy court's equitable powers do not permit it to "constitute a roving commission to do equity") (internal quotation marks omitted). Although the court does have broad power, the only receivership cases Hallam cites—and the only cases the court has identified—are those in which the court has decided *whether* insureds should be given access to a D&O Policy that was or might have been part of a receivership estate. This form of relief derives from and addresses the very securities fraud being litigated. In relieving such violations, the court balances the interests of those who have allegedly been defrauded, the interest in protecting the investing public, and the interest of the defendants in accessing the insurance policy proceeds to which they are contractually entitled.

Here, however, Hallam's requested relief is attenuated from the underlying securities fraud at issue. He asks the court to resolve, not *whether*, but *how* D&O policy proceeds should be distributed among the parties seeking such proceeds. Hallam alleges that this is justified due to the conduct of the other defendants—specifically, because the BECC officers were unresponsive to his requests for indemnification and information about the D&O

Policy. But he has neither established, nor is it clear to the court, that this conduct is sufficiently related to a securities-law violation or other claim that is sufficient to trigger this court's broad remedial power.[6] Furthermore, Hallam does not cite any case indicating that a court would be justified in using its power to reallocate D&O policy proceeds that were otherwise allocated in accordance with that policy's terms.[7]

And even if the court had the authority to address Hallam's request for an "equitable distribution" of the D&O Policy proceeds, his factual assertions raise questions that might cause a court to hesitate before applying its equitable power. *Cf. In re Quenzer*, 19 F.3d 163, 165 (5th Cir. 1993) ("Full development and examination of the facts and the relative positions of the parties are imperative in the exercise of the court's equitable powers."). Beyond a single meeting with Hoover's counsel in 2015—the contents of which are contested by both sides—Hallam provides few details regarding his communications with the other BECC officers regarding policy coverage and indemnification. Similarly, it is not

---

[6]XL indicates that it informed BECC in September 2016 that, "based on [its] [r]eview of the employment and/or position held by the remaining individual defendants named in the SEC Action, none would seem to qualify as an Insured Person as set forth in the Policy other than Messrs. Faulkner, Wagers, or Hoover." Hallam App. at 8.

[7]The terms of the D&O Policy and Texas law indicate that XL need only advance the defense expenses Hallam incurred after Hallam provided notice to XL of the relevant Claim. The D&O Policy provides that "[n]o Insured may incur any Defense Expenses . . . without the Insurer's consent, such consent not to be unreasonably withheld." Hoover App. at 41. Texas law similarly provides that insurers have "no duty to defend—and thus cannot be required to pay any of [insured's] defense costs—until . . . the insured tendered the complaint to [the insurer]." *Royal Ins. Co. of Am. v. Hartford Underwriters Ins. Co.*, 391 F.3d 639, 644 (5th Cir. 2004).

clear that Hallam's only possible recourse was to wait more than two years before discovering the D&O Policy's existence in the course of this litigation. In addition, Hallam did not move the court to advance defense costs upon discovering the D&O Policy's existence, and he waited an additional two months before submitting a claim directly to XL.

Accordingly, considering the uncertain authority and facts involved, the court declines to alter XL's distribution of the D&O Policy proceeds in response to Hallam's present motions.

\* \* \*

For the reasons explained, the court grants Faulkner and Wager's motion for the advancement of defense costs, grants Hoover's motion for the advancement of defense costs, and denies Hallam's expedited motion for order regarding remaining insurance proceeds and motion to protect the court's equitable jurisdiction and prevent exhaustion of insurance policy.

**SO ORDERED**.

June 6, 2018.

_____
SIDNEY A. FITZWATER
UNITED STATES DISTRICT JUDGE