IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| Plaintiff, | § § | |
| | § | Civil Action No. 3:16-CV-1735-D |
| VS. | § § | |
| CHRISTOPHER A. FAULKNER, et al., | § § | |
| Defendants. | § | |

MEMORANDUM OPINION
AND ORDER

In this enforcement action by the U.S. Securities and Exchange Commission ("SEC"), the court-appointed temporary receiver ("Receiver") moves to expand the receivership estate to include additional parties and non-parties. For the reasons that follow, the court grants the motion in large part and denies it in part and enters today a first amended order appointing receiver.

I

This is an SEC enforcement action against Christopher A. Faulkner ("Faulkner") and other defendants alleging that Faulkner orchestrated a massive fraud scheme by which he swindled investors out of millions of dollars over a multi-year period. Because in a prior memorandum opinion and order the court has set out the basics of the alleged scheme, *see SEC v. Faulkner* (*Faulkner I*), 2017 WL 4238705, at *1-2 (N.D. Tex. Sept. 25, 2017) (Fitzwater, J.), it will recount only the background facts that are necessary to understand today's decision.

According to the SEC, Faulkner and his codefendants carried out their fraudulent activities using a number of interrelated entities. When the scheme began in 2011, Faulkner operated through defendant Breitling Oil & Gas Corporation ("BOG"), a limited liability company co-owned in equal parts by Faulkner, defendant Parker Hallam ("Hallam"), and defendant Dustin Michael Miller Rodriguez ("Miller"). In December 2013 Faulkner obtained control of a public company, which became Breitling Energy Corporation ("BECC"). At the same time, Faulkner created defendant Crude Energy, LLC ("Crude"), which operated as "BECC's covert sales arm." 1st Am. Compl. ¶ 10. Virtually all of the money solicited by, and invested in, Crude was transferred to BECC, from which Faulkner misappropriated large sums to pay for lavish personal expenses.

The next shift in the alleged scheme occurred in March 2015, after Faulkner had a falling out with Crude's president, Hallam. Faulkner established defendant Patriot Energy, Inc. ("Patriot"), which took over all of Crude's operations and mineral interests, intercepted investment checks intended for Crude, and essentially continued the same fraudulent scheme without Hallam. Throughout the "BECC phase" of the alleged scheme, investor funds were transferred from Crude and Patriot to BECC's operating bank accounts, which were in the names of BOG and non-party Breitling Royalties Corporation ("BRC"). BRC is another entity co-owned by Faulkner, Hallam, and Miller.

The SEC brought this enforcement action in June 2016. Based on evidence submitted by the SEC showing that Faulkner and his cohorts continued to defraud investors out of $110,000 after the initiation of this lawsuit, the court issued an *ex parte* order in August 2017

appointing a temporary receiver over the oil and gas assets of Faulkner, BOG, and BECC. In September 2017 the court entered a preliminary injunction and expanded the scope of the receivership order to cover *all* assets controlled by Faulkner, BOG, and BECC. *See Faulkner I*, 2017 WL 4238705, at *3-4. This order "encompass[ed] entities controlled by Faulkner to which the unrebutted evidence indicate[d] he may have redistributed either BOG's or BECC's investors' assets—including [BRC]." *Id.* at *4.

The Receiver now moves to expand the receivership order again to cover defendants Crude and Patriot and non-parties BRC, Breitling Ventures Corporation ("BVC"), Breitling Holdings Corporation ("BHC"), Breitling Operating Corporation ("Breitling Ops"), Inwood Investments, Inc. ("Inwood"), and Grand Mesa Investments, Inc. ("Grand Mesa"). Crude and Hallam (collectively, the "Crude Defendants") jointly oppose the Receiver's motion on the narrow ground that Crude should not be subjected to a receivership because it has no assets and no ongoing operations.

II

The court turns first to the Receiver's request to include defendants Crude and Patriot in the receivership estate. The Crude Defendants oppose the motion with respect to Crude, contending that receivership would be futile because Crude has no assets or ongoing operations.

A

A motion to "expand" the receivership estate is essentially a motion to appoint a receiver over additional entities. "Receivership is an extraordinary remedy that should be

employed with the utmost caution and is justified only where there is a clear necessity to protect a party's interest in property, legal and less drastic equitable remedies are inadequate, and the benefits of receivership outweigh the burdens on the affected parties." *Kimmis v. Atchley*, 2014 WL 6805478, at *2 (N.D. Tex. Dec. 3, 2014) (Fitzwater, J.) (quoting *Netsphere, Inc. v. Baron*, 703 F.3d 296, 305 (5th Cir. 2012)) (internal quotation marks omitted).

It is often appropriate to appoint a receiver over an entity that has defrauded the public, in violation of SEC regulations. *See SEC v. AmeriFirst Funding, Inc.*, 2007 WL 2192632, at *3 (N.D. Tex. July 31, 2007) (Fitzwater, J.) (quoting *SEC v. First Fin. Grp. of Tex.*, 645 F.2d 429, 438 (5th Cir. Unit A May 1981)); *see also Netsphere*, 703 F.3d at 306 ("[I]n cases of non-compliance with SEC regulations, a receiver may be appointed to prevent the corporation from dissipating corporate assets and to pay defrauded investors."). Indeed, once the "equity jurisdiction of the district court has been properly invoked by a showing of a securities law violation," the court has "broad discretion" to fashion an appropriate remedy. *SEC v. Posner*, 16 F.3d 520, 521 (2d Cir. 1994) (quoting *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1103 (2d Cir. 1972)). In *First Financial Group of Texas* the Fifth Circuit explained:

> [t]he district court's exercise of its equity power in this respect is particularly necessary in instances in which the corporate defendant, through its management, has allegedly defrauded members of the investing public; in such cases, it is likely that, in the absence of the appointment of a receiver to maintain the status quo, the corporate assets will be subject to diversion and waste to the detriment of those who were induced to invest in

> the corporate scheme and for whose benefit, in some measure, the SEC injunctive action was brought.

*First Fin. Grp. of Tex.*, 645 F.2d at 438 (discussing applicability of receivership where automatic stay in bankruptcy was in effect) (footnote omitted). The Fifth Circuit also observed:

> [i]t is hardly conceivable that the trial court should have permitted those who were enjoined from fraudulent misconduct to continue in control of (the corporate defendant's) affairs for the benefit of those shown to have been defrauded. In such cases the appointment of a trustee-receiver becomes a necessary implementation of injunctive relief.

*Id.* (quoting *SEC v. Keller Corp.*, 323 F.2d 397, 403 (7th Cir. 1963)). Receivers may also be appointed over individual—not only corporate—defendants if their fraudulent conduct makes such an appointment appropriate. *See, e.g., Janvey v. Alguire*, 647 F.3d 585, 598 (5th Cir. 2011); *SEC v. Stanford Int'l Bank, Ltd.*, 2009 WL 8707814, at *1 (N.D. Tex. Oct. 9, 2009) (Godbey, J.).

B

The Receiver maintains that Crude and Patriot should be included in the receivership estate because both entities were integral to the fraudulent scheme; both were subject to Faulkner's control; and both intermingled their assets with those of BECC, BOG, and BRC. The Receiver's unrebutted evidence supports these assertions. Crude and Patriot both sold oil and gas working interests to investors, representing that investor funds would be used to cover drilling, testing, equipment, and completion costs. Instead, Crude and Patriot transferred most of their funds to BECC—collectively, over $39 million. Faulkner then

further diverted much of these funds for his personal benefit. Between December 2013 and February 2016, Faulkner received $6.1 million in cash disbursements and $7.7 million in reimbursed personal expenses from BECC, Crude, and Patriot. Faulkner controlled both Crude and Patriot: he created the entities by renaming shell companies he previously owned, and he had final authority over their business activities and financial affairs. Moreover, in addition to the transfers described above, Crude and Patriot received millions of dollars in transfers from BOG, BECC, and BRC. The Receiver's evidence establishes that Crude and Patriot both played a central role in Faulkner's alleged securities violations.

The Crude Defendants do not contest the Receiver's characterization of Crude's role in Faulkner's alleged scheme. Their argument rests instead on the purported futility of placing Crude in receivership. The Crude Defendants have presented evidence that Crude entered into an escrow agreement in April 2015 by which it transferred all of its funds into an escrow account. Hallam maintains that, since then, Crude has had no assets and no business operations. Crude's attorney avers that Crude has cooperated fully with SEC investigators and has offered to turn over financial documents to the Receiver. The Receiver does not allege that Crude has any assets, and the evidence does not show that Crude now possesses any investor funds. Hallam seeks to avoid Crude's inclusion in the receivership to reduce his attorney's fees in this litigation, which he maintains have thus far exceeded $654,000 and which Hallam is bearing personally. *See SEC v. Faulkner* (*Faulkner III*), 2018 WL 2761850, at *3-4, *8 (N.D. Tex. June 6, 2018) (Fitzwater, J.).

On these facts, the court is unable to conclude that Crude should be included in the

receivership estate. Receivership is justified "only where there is a clear necessity to protect a party's interest in property . . . and the benefits of receivership outweigh the burdens on the affected parties." *Netsphere*, 703 F.3d at 305. Accordingly, a federal court may decline to place an entity in receivership where that entity has no assets, even if the entity has been used to perpetrate fraud. *See, e.g., United States v. Scott*, 667 Fed. Appx. 702, 703 (10th Cir. 2016) (memorandum opinion) (denying motion to appoint receiver over company that defrauded investors because company had no assets); *see also, e.g., Miller v. Up In Smoke, Inc.*, 2010 WL 5095812, at *9 (N.D. Ind. Dec. 8, 2010) (declining to appoint receiver over company that "is defunct, has no assets, and [has] massive debts"). According to the present record, Crude has no assets to preserve for future disgorgement to investors, and has already offered to share its financial documents with the Receiver—documents it has previously shared with the SEC. At the same time, a receivership would impose an additional burden on Hallam, who is the only individual defendant who was denied any significant disbursement from BECC's directors and officers insurance policy. *See Faulkner III*, 2018 WL 2761850, at *4. The benefits of placing Crude in receivership are outweighed by the appurtenant burdens, and thus receivership is not an appropriate remedy here.

The Receiver's argument to the contrary in his four-page reply brief is unconvincing. The Receiver asserts that Crude must be included in the receivership estate so that the "morass of title issues" resulting from Crude's over-conveyance of oil and gas working interests can be resolved during the claims process. *See* Receiver Reply 3. But the Receiver does not explain why placing Crude in receivership would make this process easier, or why

the documents the Crude Defendants have already provided to the SEC are insufficient to sort out these title issues. The Receiver also questions why including Crude in the receivership estate would impose additional costs on Hallam. The evidence that Hallam has submitted suggests that Crude's business records are in his custody. *See* Crude Opp'n App. 9 ("I facilitated the production of Crude business records in the custody of Mr. Hallam to counsel for the [SEC]."). In any event, there is no apparent reason for Hallam to respond to the Receiver's motion—and incur additional legal fees that he may have to bear personally—if including Crude in the receivership estate would not burden him individually.

C

There is a caveat to the court's decision not to include Crude in the expanded receivership. If the Receiver can later prove that Crude is in possession of any assets traceable to BECC or BOG investors, or if Crude at any point fails to reasonably cooperate with the Receiver's requests for information, the court's assessment of the benefits of placing Crude in receivership may change. Under such circumstances, the Receiver may move anew to expand the receivership estate to include Crude. For now, however, the court denies without prejudice this part of the Receiver's motion.

D

Unlike Crude, Patriot has not filed an opposition response to the Receiver's motion. There is no evidence showing that Patriot lacks assets or that Patriot has volunteered to cooperate with the Receiver. The court therefore finds that appointing a receiver over Patriot is necessary to preserve assets for future disgorgement to investors—particularly given

Patriot's past pattern of substantive securities law violations—that other legal and equitable remedies are insufficient, and that the benefits of receivership outweigh the burdens. The court grants the Receiver's motion with respect to Patriot.

III

The court now considers the Receiver's request to include certain non-party entities in the receivership estate. Although these entities have received notice of the Receiver's motion, none has opposed it.[1]

A

As discussed above, it is often appropriate to appoint a receiver over an entity that has violated securities laws and regulations. The court may also exercise its equitable powers over an entity that has *not* engaged in wrongdoing, but nonetheless "(1) has received ill-gotten funds; and (2) does not have a legitimate claim to those funds." *See Janvey v. Adams*,

---

[1]The Receiver's motion was served on the registered agent of BHC, Breitling Ops, and BVC. It was also served electronically on Faulkner via the court's CM/ECF system. Faulkner is the registered agent of BRC and the sole owner of Inwood. Moreover, Faulkner exercises a significant amount of control over Grand Mesa. Although the record does not identify Grand Mesa's designated agent for service of process, notice—as a constitutional matter—does not turn on such strict formalities. *See Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950). What matters is whether the notice given is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Id.* The high degree of control Faulkner exercises over Grand Mesa indicates that notice to Faulkner is sufficient to constitute notice to Grand Mesa. All of the above-named non-party entities, therefore, have received notice and an opportunity to be heard. *Cf. In re San Vicente Med. Partners Ltd.*, 962 F.2d 1402, 1407-08 (9th Cir. 1992) (holding that inclusion of non-party in receivership estate did not violate due process where non-party's general partner received actual notice of receivership proceedings, and thus non-party also had notice and opportunity to be heard).

588 F.3d 831, 835 n.2 (5th Cir. 2009) (quoting *SEC v. George*, 426 F.3d 786, 798 (6th Cir. 2005)); *see also SEC v. Cavanagh*, 155 F.3d 129, 136 (2d Cir. 1998) (stating the same). Ordinarily, such entities are named in the complaint as "relief defendants." *See, e.g.,* 1st Am. Compl. 1 (naming Tamara M. Freedman ("Freedman") and Jetmir Ahmedi as relief defendants). It is not always necessary, however, for an entity to be named as a party in order for the court to appoint a receiver over its assets. *See In re San Vicente Med. Partners Ltd.*, 962 F.2d 1402, 1408 (9th Cir. 1992) (holding, in context of SEC enforcement action, that non-party may be included in receivership order if requirements of due process are satisfied); *see also, e.g., SEC v. Nadel*, 2013 WL 2291871, at *1-3 (M.D. Fla. May 24, 2013); *SEC v. Elmas Trading Corp.*, 620 F. Supp. 231, 235-40 (D. Nev. 1985), *aff'd*, 805 F.2d 1039 (9th Cir. 1986).

This court has previously held that the present receivership estate "encompasses entities controlled by Faulkner to which the unrebutted evidence indicates he may have redistributed either BOG's or BECC's investors' assets—including [BRC]," a non-party. *Faulkner I*, 2017 WL 4238705, at *4. Such relief is necessary so that ill-gotten assets will not "be subject to diversion and waste to the detriment of those who were induced to invest in the corporate scheme." *First Fin. Grp. of Tex.*, 645 F.2d at 438; *see also Netsphere*, 703 F.3d at 305 (observing that receivership is appropriate "where there is a clear necessity to protect a party's interest in property"). The court adheres to the standard it articulated in *Faulkner I*, and will include in the receivership estate the assets of any non-party entity that is (i) controlled by Faulkner and (ii) in possession of funds traceable to BOG or BECC

investors.²

B

The court has already held that the assets of BRC are part of the receivership estate. *See Faulkner I*, 2017 WL 4238705, at *4; *see also SEC v. Faulkner* (*Faulkner II*), 2018 WL 888910, at *5 (N.D. Tex. Feb. 13, 2018) (Fitzwater, J.) ("[T]he [August 14] order's language makes clear that at least some of BRC's assets fall within its scope."). This is so because "BRC was controlled by Faulkner" and received transfers of about $12.8 million from BOG and BECC—facts the court has already found by clear and convincing evidence. *See Faulkner II*, 2018 WL 888910, at *5. The Receiver's uncontested evidence further reinforces this conclusion. There is no need to recount anew the reasons for findings the court has already made. The court grants the Receiver's motion with respect to BRC.

C

The court also finds that Inwood is subject to Faulkner's control and possesses assets traceable to BOG or BECC funds. Inwood is wholly owned by Faulkner. The only known asset of Inwood is a sum of money derived from Inwood's July 2017 sale of the Faulkner residence to an unrelated third party. Faulkner and relief defendant Freedman transferred their personal interests in the residence to Inwood on the day of the sale. Faulkner acquired his interest in the residence in January 2013, when his fraudulent scheme was in full swing; by the end of 2013, he had already diverted $10 million of investor funds for personal use.

---

²The court excludes Crude for the reasons explained above.

- 11 -

It does not require a great leap of logic to conclude that the residence itself was purchased with diverted funds—especially since the evidence to that effect is uncontested. Inwood thus qualifies as an entity "controlled by Faulkner to which the unrebutted evidence indicates he may have redistributed either BOG's or BECC's investors' assets." *Faulkner I*, 2017 WL 4238705, at *4. The court grants the Receiver's motion with respect to Inwood.

D

The court also finds that Grand Mesa, BVC, BHC, and Breitling Ops are subject to Faulkner's control, and received transfers of assets traceable to BOG and BECC funds. According to the Receiver:

> [o]ver $170,000 in BRC funds were funneled through BVC and Grand Mesa accounts. Almost $113,000 in BOG funds were funneled through BVC [d/b/a ] Grand Mesa, BVC [d/b/a ] BRC, BHC and Breitling Ops accounts. Over $33,000 in BECC funds were funneled through BVC [d/b/a] Grand Mesa, BVC [d/b/a] BRC and Breitling Ops accounts. Breitling Ops funds were funneled through a BVC [d/b/a] Grand Mesa account, as were other entity funds.

Mot. Expand Estate 16 (citations omitted) (citing Mot. Expand Estate App. 191). The Receiver's uncontroverted evidence therefore shows that funds solicited from investors were extensively intermingled in the accounts of all of these entities. The Receiver has also proved that Faulkner controlled these entities. Faulkner is listed as a director of BHC, and as the sole director and CEO of Breitling Ops. BHC and Breitling Ops both share an address with BOG and BECC. BVC has the same registered agent for service of process as BHC and Breitling Ops. And Faulkner is listed as the "visiting contact" on a BVC bank account. Mot.

Expand Estate App. 194-95. As to Grand Mesa, Faulkner told his employee Beth Handkins to make many of the reimbursement checks for his personal expenses payable to "Grand Mesa Investments." *Id.* at 164. These payments totaled over $2.7 million. Most significant, it appears that either Faulkner or his mother Carole Faulkner opened bank accounts in the names of Grand Mesa, BVC, BHC, and Breitling Ops using a false identity, and then funneled investor money through those accounts after the SEC initiated the present suit. On these facts, the court finds that Grand Mesa, BVC, BHC, and Breitling Ops are entities "controlled by Faulkner to which the unrebutted evidence indicates he may have redistributed either BOG's or BECC's investors' assets." *Faulkner I*, 2017 WL 4238705, at *4. The court grants the Receiver's motion with respect to Grand Mesa, BVC, BHC, and Breitling Ops.

\* \* \*

For the reasons explained, the court denies without prejudice the Receiver's motion with respect to Crude, and grants the Receiver's motion in all other respects. The court enters today a first amended order appointing receiver.

**SO ORDERED**.

September 12, 2018.

*[signature]*
SIDNEY A. FITZWATER
UNITED STATES DISTRICT JUDGE