IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

SECURITIES AND EXCHANGE §
COMMISSION, §
　　　　　　　　　　　　　　　§
　　　　　　　　　　　　　　　§
　　　　　　　Plaintiff, §
　　　　　　　　　　　　　　　§ Civil Action No. 3:16-CV-1735-D
VS. §
　　　　　　　　　　　　　　　§
CHRISTOPHER A. FAULKNER, et al., §
　　　　　　　　　　　　　　　§
　　　　　　　Defendants. §

MEMORANDUM OPINION
AND ORDER

In this civil enforcement action by the U.S. Securities and Exchange Commission ("SEC"), the court-appointed temporary receiver ("Receiver") moves to impose a constructive trust on certain real property owned by nonparty Carole Faulkner ("Carole"). Finding that the evidence in the current record is insufficient to support this relief, the court denies the Receiver's motion without prejudice.

I

This is a civil enforcement action by the SEC against defendant Christopher A. Faulkner ("Christopher") and other defendants, alleging that Christopher orchestrated a massive fraud scheme by which he swindled investors out of millions of dollars over a multi-year period. This case is already the subject of a number of memorandum opinions and orders. *See generally SEC v. Faulkner* (*Faulkner VI*), 2018 WL 4362729 (N.D. Tex. Sept. 12, 2018) (Fitzwater, J.) (granting in part and denying in part motion to expand receivership estate); *SEC v. Faulkner* (*Faulkner V*), 2018 WL 3708426 (N.D. Tex. Aug. 3, 2018)

(Fitzwater, J.) (granting in part and denying in part motion for sanctions); *SEC v. Faulkner*, 2018 WL 2739029 (N.D. Tex. June 7, 2018) (Fitzwater, J.) (approving Receiver's application for attorney's fees); *SEC v. Faulkner*, 2018 WL 2761850 (N.D. Tex. June 6, 2018) (Fitzwater, J.) (granting motions to advance defense costs); *SEC v. Faulkner* (*Faulkner II*), 2018 WL 888910 (N.D. Tex. Feb. 13, 2018) (Fitzwater, J.) (holding parties and non-parties in civil contempt); *SEC v. Faulkner*, 2017 WL 4238705 (N.D. Tex. Sept. 25, 2017) (Fitzwater, J.) (granting request for preliminary injunction and appointment of receiver). The court will therefore confine its discussion of the facts to those that are necessary to understand this decision.

At issue are two parcels of real property: Carole's residence, located on Ambleside Court in Colleyville, Texas ("the Ambleside Residence"), and Christopher's former residence, located on Inwood Road in Dallas, Texas ("the Inwood Residence"). Christopher previously owned the Inwood Residence through an entity called Inwood Investments, Inc. ("Inwood"), which is now part of the receivership estate.[1] *See Faulkner VI*, 2018 WL

---

[1]The record is unclear as to who—as between Christopher and Inwood—actually held title to the Inwood Residence, and when. Tamra Freedman ("Freedman"), Christopher's ex-wife, avers that she and Christopher owned the residence through Inwood, and that she gave Christopher her one-half interest in the residence in December 2015 by transferring her interest in Inwood to him. Christopher later stated in a letter that he transferred his interest in the Inwood Residence to Inwood in January 2017, suggesting that he had previously held title personally. The Receiver interprets this same letter to mean that Christopher transferred his interest in Inwood to Carole in January 2017. Further complicating matters is the existence of two general warranty deeds by which Freedman and Christopher purported to transfer their interests in the residence to Inwood in July 2017, on the date the house was sold to a third-party purchaser.

4362729, at *5. Although the record does not clearly establish the present legal ownership of Inwood, Christopher at least *was* at one time its sole owner and still exercises a high degree of control over the entity.[2] The court has previously concluded that, because the Inwood Residence was purchased in January 2013, "when [Christopher's] fraudulent scheme was in full swing," it was likely purchased using diverted investor funds. *See Faulkner VI*, 2018 WL 4362729, at *5. In July 2017 Inwood sold the house to an unrelated buyer. Afterward, $953,000 of proceeds from the sale were deposited in Frost Bank, and from that

---

[2]In *Faulkner VI*, the memorandum opinion and order expanding the receivership estate, the court stated that "Inwood is wholly owned by [Christopher] Faulkner." *Faulkner VI*, 2018 WL 4362729, at *5. This statement perhaps does not fully capture the disputed nature of Inwood's legal ownership. The evidence before the court on that motion showed that Christopher certainly owned Inwood as of December 2015, after Freedman transferred her one-half interest to him. The evidence further reflected that later, in a letter sent to the Receiver, Christopher suggested that Carole owned the entity. The credibility of that letter is questionable, however, given that it also states that Christopher transferred his ownership interest in the Inwood Residence to Inwood in January 2017—a statement that is directly contradicted by evidence showing the transfer occurred contemporaneously with the sale of the residence in July 2017. Moreover, Inwood transferred some proceeds from the sale to Freedman in satisfaction of an owelty lien arising from her divorce from Christopher, indicating that Christopher continued to exercise a high degree of control over Inwood. On that record, the court concluded that Christopher was likely still its legal owner.

But Christopher's apparent ownership of Inwood was unnecessary to the holding in *Faulkner VI*. The court was expanding the receivership estate to entities "controlled by [Christopher] Faulkner" to which investor funds may have been distributed, not just to entities he legally owned. *See id.* at *5. As discussed above, Inwood certainly qualifies as the former, if not the latter. Moreover, Inwood received notice of the motion to expand the receivership estate regardless of who owns it, because the motion was served on counsel for both Carole and Christopher. Inwood did not oppose that motion. Here, however, the legal ownership of Inwood is a more central issue, and the court has been presented with new evidence on the question in the form of Carole's affidavit. The court has thus considered the question of Inwood's ownership anew.

- 3 -

sum $887,000 of funds were converted to cashier's checks payable to Carole, "C.A. Faulkner," and "Citi." Receiver Aug. 3, 2018 Decl. ¶ 9. An additional check, in the sum of $30,000, was made payable to the Fort Worth Community Credit Union ("FWCCU"). Carole, who is Christopher's mother, presented the check to FWCCU to pay down the mortgage on her home, the Ambleside Residence. The Ambleside Residence has since been listed for sale.

Carole's role in all of this is subject to dispute. In reliance on a letter that Christopher's attorneys sent to the Receiver, the Receiver asserts that Christopher transferred nominal ownership of Inwood to Carole in January 2017 so that Carole could sell the Inwood Residence through Inwood at his direction and thereby obscure the true ownership of the resulting funds. The letter in question states that, when the Inwood Residence was sold, "the house was owned by Carole Faulkner, who signed the closing documents on behalf of Inwood. Mr. [Christopher] Faulkner transferred his interest in the house in January 2017 to Inwood, which sold the house in July 2017." Receiver Apr. 25, 2018 Decl. ¶ 3. The plain language of this evidence indicates that it was the *house* that was transferred to *Inwood* in January 2017, not the interest in Inwood to Carole. Nonetheless, the letter equates ownership of the residence by Inwood with ownership of the residence by Carole, suggesting that at some point Carole may have become Inwood's owner. The Receiver contends that Carole therefore wrongfully acquired the $30,000 check in the course of fraudulently hiding Christopher's money. He also avers that Carole told investigators that the remaining cashier's checks had been lost.

Carole, meanwhile, characterizes her relationship with Inwood as arm's-length. She avers that her role at Inwood was limited to managing and marketing the Inwood Residence pursuant to a contractual agreement she had with the company. According to Carole, she entered into this agreement in early 2016, on the promise that she would be paid for her efforts and reimbursed for her expenses when the Inwood Residence was eventually sold. She asserts that she had no relationship with Inwood before signing that contract, was never a director of the corporation, and at no point ever held title to the Inwood Residence. She purportedly only had the authority to "manag[e] issues, repairs, and maintenance of the Property and participate as needed in the closing." *See* Aug. 24, 2018 Decl. Carole Faulkner 3. The $30,000 check was supposedly a partial reimbursement for the expenses Carole incurred to maintain the property. Carole's evidence, if true, shows that Inwood still owes her more than $350,000 for fees and expenses. Additionally, Carole disputes that she ever told investigators that the other cashier's checks were stolen or lost; she states that she sent the checks to Christopher in California, and that the checks arrived there in July or August 2017.

The instant motion is not the first time the Receiver has accused Carole of hiding investor funds on Christopher's behalf. In February 2018, after an evidentiary hearing, the court held Carole in civil contempt for her activities relating to an entity called U.S. Property Investments, Inc. ("USPI"). *See Faulkner II*, 2018 WL 888910, at *11-13. Christopher had directed that his share of the funds from the sale of RackAlley, LLC ("RackAlley")—a California-based technology company in which Christopher had a one-third ownership

interest—be paid to USPI, a company that he and Carole both controlled. *See id.* at *10. The funds were receivership assets that should have been turned over to the Receiver under the terms of the September 25 receivership order. *See id.* at *11. The court found that Carole used her shared control over USPI to prevent the Receiver from accessing the RackAlley proceeds, in violation of the September 25 order. *See id.* at *11-12. Additionally, in November 2017 Carole and USPI initiated a lawsuit against the Receiver in California to challenge the Receiver's so-called "interference" with the business relationship between USPI and RackAlley. *See id.* at *13. In doing so, Carole knowingly violated the receivership order's stay provisions. *Id.* The court accordingly ordered Carole to turn over the RackAlley proceeds in USPI's possession, to dismiss her California state-court case, and to pay all reasonable and necessary attorney's fees and costs the Receiver incurred in defending the California lawsuit. *Id.* at *15.

The Receiver now moves to impose a constructive trust on the Ambleside Residence, arguing that such a remedy is necessary to reclaim the $30,000 of receivership assets that Carole paid toward her home mortgage. He contends that "time is of the essence" because the house is listed for sale. Receiver Aug. 3, 2018 Decl. ¶ 13. Carole opposes the motion, which is now ripe for decision.

II

The Fifth Circuit has acknowledged the equitable power of a federal court to impose a constructive trust to remedy an alleged violation of SEC regulations. *See Am. Cancer Soc'y v. Cook*, 675 F.3d 524, 529-30 (5th Cir. 2012). Carole and the Receiver agree that the Texas

law of constructive trusts applies here.[3]  "Under Texas Law, '[a] constructive trust is an equitable remedy created by the courts to prevent unjust enrichment.'"  *In re UTSA Apartments 8, L.L.C.*, 886 F.3d 473, 488 (5th Cir. 2018) (alteration in original) (quoting *Baker Botts, L.L.P. v. Cailloux*, 224 S.W.3d 723, 736 (Tex. App. 2007, pet. denied)).  "To obtain a constructive trust, the proponent must prove (1) the breach of a special trust, fiduciary relationship, or actual fraud, (2) unjust enrichment of the wrongdoer, and (3) tracing to an identifiable res."  *Id.* (quoting *Gray v. Sangrey*, 428 S.W.3d 311, 315 (Tex. App. 2014, pet. denied)).  "The burden of establishing the existence of the constructive trust

---

[3]The Fifth Circuit likewise has looked to Texas law in deciding whether to impose a constructive trust under analogous circumstances.  *See Cook*, 675 F.3d at 529-30 (citing Texas constructive trust standard in context of receivership imposed for alleged violation of SEC regulations—albeit without analyzing question of applicable law).  District courts in other circuits also cite state law in this context.  *See, e.g., SEC v. Private Equity Mgmt. Grp., Inc.*, 2012 WL 12882382, at *2 (C.D. Cal. Sept. 28, 2012); *SEC v. Morgan*, 2008 WL 11333818, at *3 (S.D. Fla. Feb. 12, 2008).  *But see Newby v. Enron Corp.*, 188 F.Supp.2d 684, 703-05 (S.D. Tex. 2002) (Rosenthal, J.) (analyzing extent of constructive trust remedy available to federal courts under Securities Act and Exchange Act by looking to treatises and English chancery court decisions).  This may be because federal courts have generally adopted state law in interpreting the scope of the federal constructive trust remedy in the context of the Securities Act and the Exchange Act.  *Cf. United States v. McConnell*, 258 B.R. 869, 872-73 (N.D. Tex. 2001) (Lynn, J.) (noting that "while federal law governs questions involving the interpretation of a federal statute, federal courts applying federal law can 'either fashion a uniform federal common law rule or adopt state law as the federal rule of decision,'" and then electing to apply federal rather than state common law of constructive trusts due to unique federal concerns implicated by case (quoting *In re Columbia Gas Sys., Inc.*, 997 F.2d 1039, 1055 (3d Cir. 1993))); *Sun Life Assur. Co. of Can. v. Dunn*, 134 F.Supp.2d 827, 833 (S.D. Tex. 2001) (applying, in ERISA interpleader action, federal common law as informed by Texas law of constructive trusts).  Or it is perhaps due to the operation of Fed. R. Civ. P. 69(a)(1), which provides that all "proceedings supplementary to and in aid of judgment or execution" are governed by state law.  In any event, neither party has contested the applicability of Texas law.

rests on the claimant, as does the burden of identifying and tracing the trust property." *In re Moore*, 608 F.3d 253, 263 (5th Cir. 2010) (quoting *In re Haber Oil Co.*, 12 F.3d 426, 436 (5th Cir. 1994)). The movant must meet this burden with facts proved by a preponderance of the evidence. *See Putaturo v. Crook*, 653 F.2d 1027, 1029 (5th Cir. Unit A Aug. 1981) (per curiam). The decision whether to impose a constructive trust is within the discretion of the court. *See Cook*, 675 F.3d at 529.

"Constructive trusts, being remedial in character, have the very broad function of redressing wrong or unjust enrichment in keeping with basic principles of equity and justice." *Meadows v. Bierschwale*, 516 S.W.2d 125, 131 (Tex. 1974). "Actual fraud, as well as breach of a confidential relationship, justifies the imposition of a constructive trust." *Id.* at 128 (collecting cases). The Supreme Court of Texas recently observed that actual fraud or a confidential relationship is only "generally" necessary to support a constructive trust remedy. *See Kinsel v. Lindsey*, 526 S.W.3d 411, 425-26 (Tex. 2017). "[T]he specific instances in which equity impresses a constructive trust are numberless—as numberless as the modes by which property may be obtained through bad faith and unconscientious acts." *Id.* at 426 (quoting *KCM Fin. LLC v. Bradshaw*, 457 S.W.3d 70, 87 (Tex. 2015)). Even so, "the reach of a constructive trust is not unlimited." *Bradshaw*, 457 S.W.3d at 87. Absent a fiduciary relationship, a showing of actual fraud is still usually required, and the movant *at least* must show that the property in question was wrongfully acquired. *See Kinsel*, 526 S.W.3d at 426 (citing *Pope v. Garrett*, 211 S.W.2d 559, 560 (Tex. 1948)); *Bradshaw*, 457 S.W.3d at 87 ("In weighing the imposition of a constructive trust, a court will identify whether a wrongful

taking has occurred."); *Wheeler v. Blacklands Prod. Credit Ass'n*, 627 S.W.2d 846, 851 (Tex. App. 1982, no writ) ("The very nature of a constructive trust presupposes a wrongful taking by B of property owned equitably or legally by A, or to which A has some claim of right."). Accordingly, to prevail on this motion to impose a constructive trust, the Receiver must establish, at an irreducible minimum, that Carole's acquisition of the $30,000 in question was wrongful.

III

A

The Receiver contends that, by taking nominal ownership of Inwood and then selling the Inwood Residence on Christopher's behalf, Carole committed fraud on those who invested in Christopher's scheme—i.e., she concealed the true ownership of the funds resulting from the sale. Moreover, the Receiver asserts that Carole has continued that fraud by refusing to disclose what value, if any, she gave to Christopher in exchange for his interest in Inwood. The Receiver also maintains that the $30,000 check Carole obtained as a result of this fraud constitutes unjust enrichment, and is traceable to an identifiable *res*: the Inwood Residence, which was purchased using stolen funds. Carole counters that because the Ambleside Residence is her homestead under Texas law, the court cannot impose a constructive trust on it. She contends that a constructive trust is improper because she was entitled to the $30,000 as just compensation for the work she performed for Inwood.

B

The Receiver has failed on the present record to meet his burden of establishing that

Carole wrongfully acquired the $30,000 check. The facts supporting the imposition of a constructive trust must be proved by a preponderance of the evidence. *See Putaturo*, 653 F.2d at 1029. Here, the critical fact supporting the Receiver's fraud theory is that Carole was the legal owner of Inwood at the time of the sale, thus concealing the reality that Inwood and its assets were still under Christopher's *de facto* control. So far as the court can discern, the only evidence the Receiver offers in support of this asserted fact is an excerpt from a letter sent by Christopher through his attorneys—an excerpt that implies, but does not state, that Carole was the legal owner of Inwood at the relevant time. Portions of the same letter are directly contradicted by other evidence presented by the Receiver, casting into doubt the veracity of the letter as a whole. Even if the court gives no weight to Carole's declaration and exhibits—and indeed, it would not be unreasonable to disregard them given that Carole has already tried to deceive the court, *see Faulkner V*, 2018 WL 3708426, at *4—this single shred of evidence is insufficient to establish that Carole was Inwood's legal owner. Without the necessary proof of this fact, the Receiver's version of events lacks support. Therefore, regardless of whether the Receiver's theory would constitute "actual fraud" as a matter of law, or would otherwise satisfy the Texas constructive trust standard, the Receiver has failed to prove as factual matter that Carole wrongfully acquired the funds in question.[4]

---

[4]The court is mindful of the fact that the clearest evidence of Inwood's ownership is likely in Inwood's possession—and Inwood itself has so far failed to comply with a court order directing it to produce such evidence. This fact may give rise to remedies against Inwood (and perhaps others from whom such evidence might be obtained), but it does not relieve the Receiver of his burden as movant.

The Receiver does not offer any other theory that would support the imposition of a constructive trust on the Ambleside Residence. He emphasizes in his motion and his reply that the funds Carole paid toward her home mortgage were derived from receivership assets. This assertion is correct. But the first amended order appointing the Receiver does not of itself entitle the Receiver to recover automatically all money traceable to receivership assets. *See Cook*, 675 F.3d at 529 ("We do not construe this boilerplate enabling order to do anything other than authorize [the Receiver] to pursue the recovery of assets that may have been transferred by the defendants in violation of governing law."). The Receiver does not (and cannot) assert that Inwood, Christopher, or Carole lacked capacity to sell the Inwood Residence or to spend the sale proceeds in July 2017, because the court did not enter its initial receivership order until August 2017. *See id.* The Receiver must therefore establish an independent legal basis to justify the recovery of lost assets, *see id.*, which he has not yet done.

C

Because the court holds that the Receiver has failed to present sufficient evidence to support his theory of actual fraud, it need not reach the question whether a constructive trust would be barred by Texas homestead law.[5] The court recognizes that, under Tex. Const. art. XVI, § 50, no homestead can be subjected to forced sale for the payment of debts other than those that fall within a narrow group. Because a constructive trust is not, itself, a forced sale

---

[5]For the purposes of the following discussion, the court assumes *arguendo* that Carole has homestead rights in the Ambleside Residence.

of property, it might be argued that a constructive trust definitionally is not subject to this constitutional restriction. The Receiver alludes to such an argument by asserting that he "does not seek to force the sale of Carole's alleged homestead." Receiver's Reply 3. Although the court need not rule on this contention here, it notes that the argument is in some tension with Fifth Circuit precedent applying art. XVI, § 50 to constructive trusts or similar equitable liens where those remedies did not, themselves, force a sale. *See, e.g., In re Camp*, 59 F.3d 548, 552 (5th Cir. 1995) (treating sanctions order as equitable lien subject to constitutional restrictions even though order itself did not force sale of property); *In re Daves*, 770 F.2d 1363, 1366-69 (5th Cir. 1985) (holding that constructive trust and equitable lien that did not conform to requirements of Texas homestead laws were invalid where—apparently—no sale had yet occurred). Moreover, the proceeds from the sale of a homestead retain their homestead status for six months. Tex. Prop. Code Ann. § 41.001(c) (West 2014); *see In re Marriage of Christodolou*, 383 S.W.3d 718, 720 (Tex. App. 2012, no pet.) ("The [forced sale] prohibition extends to proceeds from the disposition of a homestead as well."). If the Receiver's goal is to use a constructive trust to obtain the $30,000 in question after the Ambleside Residence is *voluntarily* sold, this statutory provision could hinder his efforts—unless, of course, the homestead laws do not protect wrongfully obtained funds in the first place.[6]

---

[6]Because the Receiver's evidence is insufficient to support his theory, the court need not decide whether Texas courts extend the state's homestead to property funded or improved with fraudulently acquired funds. Several Texas courts of appeals have concluded that they do not. *See Byrom v. Penn*, 2016 WL 4447698, at *1-3 (Tex. App.—Tyler Aug. 24, 2016,

D

Because the court's holding is based on a lack of evidence rather than the legal insufficiency of the Receiver's theory, the court denies the Receiver's motion without prejudice. *Cf. Faulkner VI*, 2018 WL 4362729, at *4 (permitting Receiver to move anew to expand receivership estate to include Crude Energy, LLC if Receiver could later prove entity possessed diverted investor assets). The court expresses no opinion on whether the Receiver's theory, if properly substantiated, would constitute "actual fraud," as that term has been defined by the Texas courts, or would otherwise satisfy the Texas constructive trust standard. If the Receiver is later able to prove by a preponderance of the evidence that Christopher transferred his interest in Inwood to Carole in order to conceal his ownership of

---

pet. denied) (affirming compelled sale pursuant to constructive trust of home built with stolen funds); *Bransom v. Standard Hardware, Inc.*, 874 S.W.2d 919, 928 (Tex. App.—Fort Worth 1994, writ denied) (upholding imposition of constructive trust on proceeds of sale of previously established homestead to recover embezzled funds paid toward mortgage); *Pace v. McEwen*, 617 S.W.2d 816, 818 (Tex. App.—Houston [14th Dist.] 1981, no writ) (suggesting that property acquired with fraudulently obtained funds cannot acquire homestead status); *Baucum v. Texam Oil Corp.*, 423 S.W.2d 434, 442 (Tex. Civ. App.—El Paso 1967, writ ref'd n.r.e.) ("It has long been decided that homestead and exemption laws of this State were never intended to be, and cannot be, the haven of wrongfully obtained money or properties."); *First State Bank of Ellinger v. Zelesky*, 262 S.W. 190, 192 (Tex. Civ. App.—Galveston 1924, no writ) (finding that property bought with stolen money lacked homestead character because "[u]nder the equitable doctrine of constructive trust, these facts show that [the legal title holder] was never the owner of the property"); *Smith v. Green*, 243 S.W. 1006, 1007-08 (Tex. Civ. App.—Amarillo 1922, writ ref'd) (holding that "[w]e do not think the constitutional and statutory provisions prohibit the establishment of a [constructive] trust against the homestead" where funds stolen from partnership by partner were used to pay for home improvements). Several bankruptcy courts that sit in Texas have also acknowledged and applied this exception. *See, e.g., In re Douglass*, 2015 WL 6446305, at *24 (Bankr. E.D. Tex. Oct. 23, 2015); *In re Cowin*, 2014 WL 1168714, at *48 (Bankr. S.D. Tex. Mar. 21, 2014).

the funds resulting from the sale of the Inwood Residence, the Receiver may move anew to impose a constructive trust on the Ambleside Residence. If the Ambleside Residence has been sold by the time the Receiver acquires such evidence, the Receiver may instead move for a constructive trust on any identifiable, traceable proceeds of the sale, up to the amount of $30,000. *See Meadows*, 516 S.W.2d at 129 ("Bierschwale would have, but for the sale to Goldman, been entitled to the imposition of a constructive trust on the apartment complex. It follows that Bierschwale is entitled to a constructive trust on the [p]roceeds of the sale of the apartment complex to Goldman."). Based solely on the present record the Receiver's motion must be denied.

* * *

For the reasons stated, the court denies without prejudice the Receiver's motion for imposition of a constructive trust.

**SO ORDERED**.

October 29, 2018.

_____
SIDNEY A. FITZWATER
SENIOR JUDGE