# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION**, | § | |
| Plaintiff, | § | |
| | § | |
| | § | |
| v. | § | Case No.: 3:16-cv-01735-D |
| | § | |
| **CHRISTOPHER A. FAULKNER, BREITLING ENERGY CORPORATION, JEREMY S. WAGERS, JUDSON F. ("RICK") HOOVER, PARKER R. HALLAM, JOSEPH SIMO, DUSTIN MICHAEL MILLER RODRIGUEZ, BETH C. HANDKINS, GILBERT STEEDLEY, BREITLING OIL & GAS CORPORATION, CRUDE ENERGY, LLC, PATRIOT ENERGY, INC.,** | § § § § § § § § § § § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| **TAMRA M. FREEDMAN and JETMIR AHMEDI**, | § § | |
| Relief Defendants. | § | |

---

**MOTION FOR ORDER APPROVING FIFTH INTERIM APPLICATION TO PAY FEES INCURRED BY THE RECEIVER FOR THE CALENDAR QUARTER ENDING DECEMBER 31, 2018**

---

**TO THE HONORABLE UNITED STATES DISTRICT COURT JUDGE:**

**COMES NOW**, Thomas L. Taylor III ("Receiver"), Court-appointed Receiver for Defendants Christopher A. Faulkner [("Faulkner")], Breitling Oil & Gas Corporation ("BOG"), Breitling Energy Corporation ("BECC"), and Patriot Energy, Inc. ("Patriot"), and non-parties Breitling Royalties Corporation ("BRC"), Breitling Ventures Corporation ("BVC"), Breitling Holdings Corporation ("BHC"), Breitling Operating Corporation ("Breitling Ops"), Inwood

Investments, Inc. ("Inwood") and Grand Mesa Investments, Inc. ("Grand Mesa") (collectively, the "Receivership Defendants"), moves the Court for an Order approving the Fifth Interim Application to Pay Fees Incurred By the Receiver for the period of October 1 through December 31, 2018 (the "Application"), and in support thereof would show the Court as follows:

## BACKGROUND

The First Amended Order appointing the Receiver (Dkt. 320) (the "Amended OAR") directs the Receiver and "Retained Personnel" to apply quarterly to the Court for compensation and reimbursement from the Receivership Estate. Accordingly, the Receiver submits this Motion for Order Approving this Fifth Interim Application to Pay Fees Incurred by the Receiver for the Calendar Quarter ending December 31, 2018. As prescribed by the Amended OAR, this Fee Application was submitted for review by the Staff of the Commission. The Staff has no objection to the Fee Application.

## APPLICATION FOR FEES AND EXPENSES OF THE RECEIVER AND HIS FIRM

1.      The Receiver has provided the Staff of the Commission with the present Application and they have stated that they have no objection to the Court's granting the Application as presented.

2.      Pursuant paragraph 59 of the Amended OAR, this Application seeks the approval and payment of the professional fees and expenses for the Receiver and his firm and his counsel during the period of October 1 through December 31, 2018 (the "Subject Period").

3.      The Receiver and his law firm have submitted three invoices for services rendered during the Subject Period. The Receiver and his law firm seek payment as follows: for the period (1) October 2018, $33,401.50 in fees; (2) November 2018, $28,474.00 in fees; and (3) December

2018, $16,252.50 in fees. Pursuant to the Amended OAR, the Receiver seeks the Court's approval and payment of these fees.

4.     Counsel to the Receiver, Dykema Gossett PLLC ("Dykema"), has submitted three invoices for services rendered through the Subject Period. Dykema seeks payment as follows: (1) October 2018, $9,000.27 in fees and expenses; (2) November 2018, $10,713.00 in fees and expenses; and (3) December 2018, $13,250.00. Pursuant to the Amended OAR, the Receiver seeks the Court's approval and payment of these fees and expenses.

5.     Counsel to the Receiver, Ballard & Littlefield, LLP ("Ballard & Littlefield"), has submitted three invoices services rendered through the Subject Period. Ballard & Littlefield seeks payment as follows: (1) October 2018, $1,755.00 in fees and expenses; (2) November 2018, $7,912.50 in fees and expenses; and (3) December 2018, $4,337.50. Pursuant to the Amended OAR, the Receiver seeks the Court's approval and payment of these fees and expenses.

6.     Counsel to the Receiver, Goforth Law, PLLC ("Goforth"), has submitted three invoices services rendered through the Subject Period. Goforth seeks payment as follows: (1) October 2018, $122.50 in fees and expenses; (2) November 2018, $3,720.60 in fees and expenses; and (3) December 2018, $11,492.60. Pursuant to the Amended OAR, the Receiver seeks the Court's approval and payment of these fees and expenses.

7.     The forensic accounting and computer forensics firm engaged by the Receiver, Pannell Kerr Forster of Texas, P.C. ("PKF") has submitted one invoice for services rendered through the Subject Period. Veritas seeks payment of $19,069.25 in fees and expenses. Pursuant to the Amended OAR, the Receiver seeks the Court's approval and payment of these fees and expenses.

8.      The forensic accounting and computer forensics firm initially engaged by the SEC and subsequently to support the Receivership, Veritas Advisory Group, Inc. ("Veritas") has submitted one invoice for services rendered through the Subject Period. Veritas seeks payment for the period November 1 to November 31, $1,732.50.00 in fees and expenses. Pursuant to the Amended OAR, the Receiver seeks the Court's approval and payment of these fees and expenses.

9.      Exhibit 1 provides the following information regarding the fees and expenses incurred by the Receiver and his firm for the Subject Period: (a) the dates upon which the services were rendered by each professional; (b) a description of the services rendered by each professional; (c) the hours worked by day and the hourly rates of each professional who provided services; and (d) the monetary value ascribed to each task performed by each professional.  The rates charged by the Receiver and his firm represent approximately a 35 – 40% discount from their normal and customary rates.

10.     Exhibit 2 provides the same information regarding the fees and expenses incurred by Dykema for the Subject Period.

11.     Exhibit 3 provides the same information regarding the fees and expenses incurred by Ballard & Littlefield for the Subject Period.

12.     Exhibit 4 provides the same information regarding the fees and expenses incurred by Goforth for the Subject Period.

13.     Exhibit 5 provides the same information regarding the fees and expenses incurred by PKF for the Subject Period.

14.     Exhibit 6 provides the same information regarding the fees and expenses incurred by Veritas for the Subject Period.

15.     Attached hereto as Exhibit 7 is the Standardized Fund Accounting Report ("SFAR") for the Subject Period as required by the Commission's Billing Instructions for Receivers in Civil Actions. As of the date of this Application, the Receivership Estate's cash on hand is $1,140,491.25.[1]

## JOHNSON FACTORS

16.     In support of this request, the Receiver respectfully directs the Court's attention to those factors generally considered by courts awarding compensation to professionals for services performed in connection with the administration of a receivership estate.  As provided by the Fifth Circuit Court of Appeals in *Migis v. Pearle Vision, Inc*., 135 F.3d 1041, 1047 (5th Cir. 1998), "[t]he calculation of attorneys fees involves a well-established process. First, the court calculates a 'lodestar' fee by multiplying the reasonable number of hours expended on the case by the reasonable hourly rates for the participating lawyers. The court then considers whether the lodestar figure should be adjusted upward or downward depending on the circumstances of the case. In making a lodestar adjustment the court should look at twelve factors set forth in *Johnson v. Georgia Highway Express, Inc*., 488 F.2d 714 (5th Cir. 1974)."  Those factors, as applied to the services rendered in this case by the Receiver and his firm, are as follows:

(A) *Time and Labor Required*:  The Receiver respectfully refers the Court to Exhibits 1, 2, 3, 4, 5, and 6 which detail the activities of several professionals during the Subject Period, showing significant hours of Receiver, legal, and paraprofessional time expended during the Subject Period in an effort to comply with the mandates set forth in the Amended OAR.

---

[1] This amount includes funds received after the Subject Period, which funds are not represented in the SFAR attached as Exhibit 7. The SFAR only includes figures through December 31, 2018.

(B) *Novelty and Difficulty of the Questions*:  Many of the tasks reflected in Exhibits 1 detail the complexity of some of the factual and legal questions at issue in this case.

(C) *Skill Requisite to Perform the Services Properly*:  The Receiver believes that the services required in this case demand individuals possessing considerable experience in asset seizure, tracing, and liquidation, as well as litigation skills to comply with the Court's Amended OAR for the benefit of investors. The Receiver and his counsel have considerable experience in these areas.

(D) *Preclusion of Other Employment Due to Acceptance of the Case*:  The Receiver and his counsel were precluded from engaging in other employment to the extent they expended hours performing services required by this case, although no specific representation was declined solely because of their services related to this Receivership.

(E) *Customary Fee*:  The hourly rates sought herein are substantially discounted below the rates charged by other practitioners of similar experience levels in the Northern District of Texas and represent a discount of approximately 35 – 40% of fees charged by the Receiver and his firm for SEC enforcement matters. Receiver's litigation counsel are billing the Receivership at similarly discounted rates.

(F) *Contingent Nature of Fee*: Payment of professional fees is subject to the approval procedure set forth in paragraphs 57 – 64 of the Amended OAR.

(G) *Time Limitations Imposed by the Client or Other Circumstances*:  The time requirements during the Subject Period have been substantial. It has been necessary for the Receiver and his professionals to move quickly in connection with this matter and thus afford it priority in the course of their overall business.

(H) *Experience, Reputation, and Ability of Attorneys*:  The Receiver submits that he and his firm and engaged counsel and accountants are recognized and respected in the securities enforcement community for their expertise and abilities.

(I) *Undesirability of the Case*:  This was not a factor in this case.

(J) *Nature, Length, and Professional Relationship with the Client*:  This was not a factor in this case.

(K) *Awards in Similar Cases*:   The Receiver relies on the Court's experience and knowledge with respect to fee awards in similar cases and submits that the fees requested in this Application are comparable to or lower than those in cases with similar subject matter in this District.

(L) *The Amount Involved and the Results Obtained*:

(i) *The Amount Involved*. As noted above, the Receiver seeks (i) approval and payment of $78,128.00 in fees incurred by the Receiver and his firm during the Subject Period; (ii) approval and payment of $32,963.27 in fees and expenses incurred by Dykema during the Subject Period; (iii) approval and payment of $14,005.00 in fees and expenses incurred by Ballard & Littlefield during the Subject Period; (iv) approval and payment of $15,335.20 in fees and expenses incurred by Goforth during the Subject Period; (v) approval and payment of $19,069.25 in fees and expenses incurred by PKF during the Subject Period; and (vi) approval and payment of $1,732.50 in fees and expenses incurred by Veritas during the Subject Period.

(ii) *The Results Obtained; necessary initial activity of the Receiver and Professionals.*

## I.        Receiver's Plan of Distribution

The Receiver has developed a Plan of Distribution which will shortly be presented to the Court. The Receiver has some reluctance to request formal approval of a final plan at this juncture because of the limited contact information available for putative investors and the requests of Notice.

At this juncture, it is clear that some number of putative claimants received conveyances of specific oil and gas interests (with record title) while other putative claimants invested in interests which were pooled and/or administered by Breitling entities. Even the specific conveyances (with record title) are problematic, however, because (1) defendants conveyed percentage interests which exceeded the interests actually owned by defendants and (2) some, if not all, of the oil and gas interests conveyed to investors were purchased with comingled investor funds. The status of claimants is further complicated because, in those circumstances in which title was purportedly conveyed, conveyances to investors in the fraudulent scheme were made by multiple entities including Receivership Entities BOG, BRC, and Patriot, and Defendant Crude Energy, LLC ("Crude") and non-party Crude Royalties, LLC ("Crude Royalties"). Although a number of putative claimants to the Receivership Estate invested with Crude and Crude Royalties (and received conveyances from those entities), they are not presently within the Receivership Estate. Moreover, certain oil and gas assets associated with the Receivership Estate are presently held in Crude's name on record title. The Receiver is investigating the extent of oil and gas assets held in the name of Crude/Crude Royalties or transferred to investors by Crude/Crude Royalties

and will likely renew his motion to include Crude and Crude Royalties in the Receivership Estate as a part of his proposed Plan of Distribution.

It appears that in the latter stages of the fraudulent scheme's operation, Breitling/Crude/Patriot personnel attempted, under stress, to effect transfers of assets into the names of individual investors. These transfers almost certainly involved assets which had been acquired by the Breitling entities with commingled funds, further complicating title to the assets.

An unknown number of investors who received conveyances/record title have been receiving income from producers associated with these assets even though they were purchased with commingled funds from the various entities. The Receiver is, of necessity, considering whether these investors are "net-winners" in the sense that they received greater returns than they invested, particularly in relation to other investors whose invested funds were commingled, but who did not receive record title or income related to their investments. As a part of a Plan of Distribution, the Receiver will shortly present to the Court recommendations as to the appropriate disposition with respect to these "net-winner" situations.

Upon presentation to the Court of a Plan of Distribution, the Receiver will propose that Receivership Assets ultimately be distributed to those investors who have suffered a "net out-of-pocket loss" resulting from their investments in or through the Breitling-affiliated entities. Receivership Assets would be distributed to these investors on a *pro rata* basis based upon the "net out-of-pocket loss" of each as a percentage of the total "net out-of-pocket losses" of all investor claimants -- without regard to the manner by which the investments were made. Each claimant's "net out-of-pocket loss" would be calculated as (1) the total amount invested in or through BOG, BRC, BECC, Crude/Crude Royalties, and Patriot (the "Offering Entities"); less (2) any amounts, or the value of any assets, received with respect to the investment (*e.g.*, payments or assets

transferred from a Breitling entity, payments from a third-party oil and gas operating company, the sale of any oil and gas interest received from an Offering Entity, or the sale of any shares of BECC stock).[2]

The Plan proposed would exclude "net winner" investors -- *i.e.*, those who received more in payments as a result of their investment than they invested into the scheme. Under the Texas Uniform Fraudulent Transfer Act, TEX. BUS. & COM. CODE §24.001 *et seq.* ("TUFTA"), transfers made "with actual intent to hinder, delay or defraud" creditors may be avoided, *id.* at §24.005, against any party who did not either (i) provide "reasonably equivalent value" or (ii) receive the transfer with objective "good faith." *Id.*, at §24.009(a). As a matter of law, an investor cannot provide "reasonably equivalent value" for their investment into a fraudulent scheme greater than the amount they invested.

A *pro rata* plan would be more equitable than other methods of distributing a receivership's assets, particularly methods based upon the "tracing" of assets to particular investors. A distribution based on tracing would be inequitable because "whether at any given moment a particular [investor's] assets are still traceable is a 'result of the merely fortuitous fact that the defrauders spent the money of the other victims first.'" *SEC v Credit Bancorp Ltd.*, No. 99-CV-11395, 2000 WL 1752979, at *15 (S.D.N.Y. Nov. 29, 2000) (quoting *Durham*, 86 F.3d at 72)). To allow one investor "to elevate his position over that of other investors similarly 'victimized' … would create inequitable results, in that certain investors would recoup 100% of their investment while others would receive substantially less []." *SEC v. Elliott*, 953 F.2d 1560, 1569 (11th Cir. 1992) (quotation omitted).

---

[2] The Receiver's Plan of Distribution will also provide a mechanism for disqualification of any claimants who are former employees or affiliates of Breitling-related entities from inclusion in any distribution based on evidence that their conduct facilitated the Breitling scheme, or that they had objective notice of the fraudulent nature of the scheme.

In application of these equitable principles, the Receiver will, in connection with his proposed Plan of Distribution, ask the Court to invalidate certain conveyance instruments, referenced above, executed by the Breitling-related entities in favor of some investors. The Receiver will seek to invalidate these conveyances through summary proceedings before the Court, affording notice and opportunity to respond to all affected parties.[3] Invalidation of these conveyances would be necessary for the Receiver to cure and recover title to these oil and gas assets and liquidate them for the benefit of all investor-claimants. Such action would effectively return these interests to the entities in Receivership which previously held title, after which the Receiver would be in a position to (1) receive funds held in suspense by operators and (2) liquidate the oil and gas interests under the supervision of this Court -- for the benefit of all defrauded investors under the Receiver's proposed plan.

The invalidation of these defective conveyances would be the most equitable solution because permitting some of the investors to retain record title to the respective oil and gas interests would amount to a "tracing" of their assets through the fraudulent scheme -- from (i) their participation in a specific offering, to (ii) the comingling of proceeds among offerings and Offering Entities, to (iii) the purchase of oil and gas interests with contaminated funds, to (iv) the transfer of oil and gas interests to the investors. Tracing investor proceeds in this manner would yield an inequitable result vis-à-vis other investors. See *Durham*, 86 F.3d at 72.

Moreover, permitting some investors to retain record title to the respective oil and gas interests would be inequitable vis-à-vis all other claimants because these investors would almost

---

[3] *See SEC v. Amerifirst Funding, Inc.*, No. 3:07-CV-1188-D, 2008 WL 282275, at *15 (N.D. Tex. Feb. 1, 2008) (Fitzwater, J.), *aff'd in part, vacated & remanded in part, on other grounds*, 570 F.3d 268 (5th Cir. 2009) ("[A] district court may employ summary rather than plenary proceedings to adjudicate the rights to property allegedly within the receivership estate.  Such summary proceedings related to receiverships do not offend the parties' due process rights 'so long as there is adequate notice and opportunity to be heard.'") (quoting *Am. Capital Invs.*, 98 F.3d at 1146) (citing *Wencke*, 783 F.2d at 838; *Universal Fin.*, 760 F.2d at 1037) (footnote omitted).

certainly be "net winners" who received more from the fraudulent scheme than they invested into it. After the conveyances of oil and gas interests by Offering Entities to investors are invalidated, these investors would participate in the Receiver's Plan to the extent that any royalty payments received by them to date do not exceed the amount they invested in the Breitling scheme.

Finally, the Receiver will request that the Court subordinate the claims of trade creditors and other similarly-situated unsecured creditors to the claims of investors. *See, e.g., PrivateFX*, 778 F.Supp. 2d at 786-87 (*citing Quilling v. Trade Partners, Inc.*, No. 1:03-CV-0236, 2006 WL 3694629, at *1-2 (W.D. Mich. Dec. 14, 2006) (finding that the equitable doctrine of constructive trust gave defrauded investors a "priority of right" over other claimants)).[4] In the unlikely event that distributions of Estate assets fully satisfy the investor-claimants' claims, the Receiver may seek leave from the Court to distribute any remaining funds to trade creditors and other unsecured creditors on a *pro rata* basis

## II.   Efforts to Identify Putative Claimants of the Receivership Estate

The Receiver has engaged Danielle Supkis-Cheek of Pannell Kerr Forster of Texas P.C. ("PKF Texas") to marshal all relevant data regarding investors in the Breitling fraudulent scheme, including amounts invested, amounts distributed, and property transferred, with the view to establishing a claims matrix and establishment of a formula for the ultimate distribution of Receivership Assets to claimants. Ms. Supkis-Cheek has recently performed similar operations in connection with an oil and gas Receivership arising in a Securities and Exchange Commission (the "Commission") enforcement action in the Western District of Texas. Ms. Supkis-Cheek and PKF Texas are working with personnel of the Internal Revenue Service ("IRS") and the Commission to gather relevant data sources that have been previously produced or created related to this matter

---

[4] As of this date, the Receiver is not aware of any debts or claims secured by Receivership Assets.

in order to compile a complete list of investors for the Receiver. PKF Texas is presently reviewing documentation that has been provided and continuing to gather additional documentation needed in order to assist in completing the claims matrix and the formula for distribution.

In response to inquiries from a number of interest holders/potential Receivership claimants, the Receiver posted a detailed statement regarding ongoing analysis of potential classes of claimants on the Receivership website.

### III.  Efforts to Identify and Recover Assets

#### A.  *Recovery of Oil and Gas Assets*

At the inception of the Temporary Receivership, the Staff of the Commission provided the Receiver with information which had been developed during their investigation regarding working interests and royalty interests known to have been held by the Receivership Defendants. Most of the identified oil and gas operators associated with these interests were served with that Order. To the fullest extent possible, the Receiver initiated communication with these oil and gas operators directing that all revenue and other assets (including assets held in suspense) be remitted to the Receivership Estate. The operators with whom the Receiver has been able to establish contact have cooperated in identifying and documenting oil and gas assets to be administered by the Receivership Estate; they have also cooperated in agreeing to transfer associated revenue going forward. The Receiver also has established communications with a number of investors -- and oil and gas operators associated with them -- who received specific conveyances. Upon information presently available, it appears that -- in some cases -- revenue to which these investors may arguably be entitled is being held in suspense by operators -- primarily because of over-conveyance issues which have become apparent to operators. It is likely that, in other cases, investors are still receiving revenue.

Going forward, the Receiver will continue to administer the existing oil and gas assets and the revenue associated with those assets while. The Receiver and his staff have assembled -- based upon incoming correspondence and royalty checks available to date -- a schedule of oil and gas assets which are presently thought to be subject to the Amended OAR. The schedule, attached hereto as **Exhibit C** sets forth the assets identified to date, along with additional data compiled.

In addition to efforts to harvest the available streams of revenue from the presently-known working and royalty interests, the Receiver and his staff are continuing to monitor whether and to what extent payments of Joint Interest Billings are required in order to preserve assets and determining whether and to what extent payment of such expenses can be justified in terms of preserving Receivership Assets. The Receiver also has initiated contact with law firms which regularly represent taxing authorities in order to determine whether and where there are tax liabilities associated with known interests. Where tax liabilities are located, it is anticipated that the Receiver will make best efforts to negotiate with respect to penalties and other fees which might be imposed. The Receiver also is attempting to recover and reinitiate payments from operators who have placed Breitling revenues in suspense for a variety of reasons.

### B.  *Efforts to Recover Liquid Assets*

#### 1.  **Cashier's Checks**

In connection with this Court's Order entered on February 13, 2018 (the "February 13 Contempt Order") (Dkt. 247), the Receiver expressly made demand that Mr. Faulkner account for a series of missing Cashier's checks totaling almost $1 million. The Receiver's demand for an accounting of these Cashier's checks was based upon the fact that funds used to purchase the Cashier's checks were traceable to oil and gas revenue of the Breitling entities. Defendant Christopher Faulkner disclaimed knowledge of the whereabouts of these Cashier's checks or the

proceeds associated with them. On March 19, 2018, the Receiver transmitted a letter to Mr. Faulkner's counsel rejecting this response and advising that Mr. Faulkner would be deemed to be in violation of the February 13 Contempt Order for failing to account for these assets traceable to revenue from the Breitling entities.

Prior to the commencement of the Receivership, Faulkner and his former wife, Tamra Freedman -- through Inwood Investments Inc. ("Inwood Investments"), a nominee, single-purpose entity -- disposed of their Inwood Road residence in Dallas having a value of approximately $2 million. At or about the time of the closing of the sale, ownership of Inwood Investments was transferred to Mr. Faulkner's mother, Carole Faulkner, apparently without consideration. And at or about the time of the sale, Inwood Investments, through Carole Faulkner, opened a business checking account at Frost Bank. The Receiver determined that the funds used by the Faulkners to purchase the Inwood residence were derived from an entity entitled Grand Mesa Investments, Inc. which, in turn, had received its funds from Breitling entities purportedly as compensation to defendant Faulkner.

Upon closing of the sale of the Inwood residence, Inwood Investments directed that Faulkner's ex-wife, Tamra Freedman, be paid from the proceeds of the sale of the Faulkner Residence to satisfy Christopher Faulkner's purported indebtedness to her -- confirming that Faulkner "controlled [and/or] managed" Inwood Investments directly or indirectly.

The Receiver determined that the remaining sale proceeds, slightly less than $1 million, were deposited into Inwood Investments' account at Frost Bank. At Carole Faulkner's instruction, the funds were disbursed in the form of sixteen Cashier's checks. Six of the Cashier's checks were negotiated to apparently legitimate institutions shortly after their issue. Ten of these Cashier's checks were not immediately negotiated. Five of these Cashier's checks (each in the amount of

$20,000) were made payable to Carole Faulkner; four checks (in the amounts of $700,000, $10,000, $10,000, and $50,000) were made payable to "C. A. Faulkner."

In connection with attempts by the United States Attorney's Office to enforce criminal seizure orders, Carole Faulkner represented to agents of the Federal Bureau of Investigation ("FBI") that the Cashier's checks were transmitted by FedEx to Christopher Faulkner but purportedly had been "lost." Carole Faulkner, nonetheless, refused to execute affidavits necessary in order for Frost Bank to reissue the purportedly "lost" Cashier's checks, or to provide any FedEx tracking information.

The Receiver learned of the transactions associated with the Inwood residence and the purportedly "lost" Cashier's checks which were purchased with the proceeds of the transaction early on in the administration of the Receivership Estate. Accordingly, on or about September 28, 2017, the Receiver communicated to Frost Bank a written request that the "lost" Cashier's checks be cancelled and replaced with checks made payable to the Receivership Estate. Frost Bank declined to do so on the ground that neither Inwood Investments (as remitter) nor Carole Faulkner or "C.A. Faulkner" as payees were specifically covered by the Receivership Order. The Receiver -- to no avail -- provided Frost Bank with a complete explanation of the sequence of events associated with the checks including the provenance of funds held by Inwood Investments and the relationship of Carole Faulkner and "C.A. Faulkner" to the Receivership Estate. Federal law enforcement officials had previously contacted Frost Bank to advise that the Cashier's Checks were subject to a seizure warrant. The Receiver continued to coordinate with law enforcement in their attempts to recover the checks or to secure lost check affidavits from the Faulkners.

Notwithstanding Carole Faulkner's representations to law enforcement that the Cashier's checks were lost, federal law enforcement officials learned that Ms. Faulkner had successfully

negotiated two of the $20,000 checks through an off-shore entity in the United Kingdom. At this juncture, the Receiver urged Frost Bank to freeze proceeds equal to the outstanding Cashier's checks or to otherwise invalidate the instruments themselves. The Receiver transmitted a letter to Carole Faulkner demanding that she cease and desist from negotiating the remaining Cashiers' checks which are property of the Receivership Estate. Ms. Faulkner attempted to negotiate the $50,000 Cashier's check through the same offshore entity in the United Kingdom. In this instance, however, Frost Bank had issued a stop payment Order and declined to honor payment on the check. The Cashier's Check and the $50,000 represented by it remain in possession of Frost Bank along with amounts remaining from the initial purchase of Cashiers' checks, or approximately $837,000.

As discussed hereinabove, on September 12, 2018, this Court expanded the Receivership to include Inwood Investments. Receiver's counsel immediately contacted counsel to Frost Bank transmitting the Court's Order and requesting instructions as to the mechanics of transferring Inwood Investments' assets to the Receivership Estate. Frost Bank declined to do so, asserting that there were no assets remaining at Frost Bank in the name of Inwood Investments, and further contending that it would be subjected to double exposure due to its inability to cancel the outstanding checks -- notwithstanding its previously stated and demonstrated ability to avoid successful negotiation of the checks.

On or about November 30, 2018, the Receiver moved this Court for an Order requiring Frost Bank to turn over the liquid assets held at Frost Bank as assets of the Receivership Estate. Dkt. 341. The Motion is presently pending before this Court.

2. **Assets in Possession of Christopher Faulkner Upon his Arrest**

On or about June 18, 2018 FBI and IRS agents arrested Defendant Faulkner as he was boarding an aircraft at Los Angeles International Airport destined for the United Kingdom. The United States Attorney's Office for the Northern District of Texas had initiated a criminal

complaint which was the basis for Mr. Faulkner's incarceration. In connection with the arrest of Mr. Faulkner, the United States Attorney took possession of items of personal property which were within Mr. Faulkner's custody and control including cash, gold bars and a watch of significant value. On September 6, 2018, the Receiver filed a Motion for Turnover of Assets Under the Control Of Christopher Faulkner (Dkt. 313), seeking turnover of the seized assets.

On September 27, 2018, non-party First Capital Gold, Inc. ("FCG") responded to the Receiver's Motion to Turnover Assets asserting that the cash and physical gold in question belonged to FCG and contending that Christopher Faulkner had been traveling to London in order to sell the property -- purportedly owned by FCG -- to a potential customer. FCG, represented by Carole Faulkner, purported to propound a Declaration in support of these contentions. Following an initial hearing of the matter before the Court on December 14, 2018, Earl Davenport, FCG's principal, contacted the Receiver and disclaimed FCG's assertion of ownership and indicating that Ms. Faulkner was no longer authorized to represent it. On January 9, 2019, the Receiver filed a Motion to Strike FCG's opposition to the Receiver's Motion for Turnover of Assets (Dkt. 377).

On January 16, 2019, the Court granted the Receiver's Motion for Turnover of the seized assets (Dkt. 390). On January 29, 2018, agents of the Federal Bureau of Investigation transferred the seized assets to the Receiver; the seized assets have been placed in a safe deposit box pursuant to this Court's Order.

3. **Inwood Proceeds Applied to Reduce a Home Equity Line of Credit on Carole Faulkner's Residence**

On August 3, 2018, the Receiver moved this Court for Imposition of a Constructive Trust over Carole Faulkner's real property located at 4010 Ambleside Court, Colleyville, TX. The Receiver's motion was based upon the use of $30,000 in proceeds of the sale of Inwood Residence.

On October 29, 2018, this Court denied the Receiver's motion without prejudice to a further showing.

### IV.    Receiver's Motion For Attorney's Fees Arising from Contempt Proceedings

On February 13, 2018, this Court held defendants Faulkner, BOG, and BECC, and non-parties Carole Faulkner, BRC, and U.S. Property Investments, Inc. ("USPI") in civil contempt for violating three Court orders: the August 14, 2017 Order Appointing a Temporary Receiver ("August 14 OAR"), the August 14 Asset Freeze Order (collectively, the "August 14 Orders"), and the September 25 OAR. The Court held that Faulkner, BOG, and BECC—knowingly aided and abetted by BRC—violated the August 14 OAR by diverting Receivership assets, failing to produce required documents, and failing to produce required corporate representatives. The Court also held that Faulkner—knowingly aided and abetted by Carole—violated the September 25 OAR by failing to turn over proceeds from the sale of one of his companies, RackAlley LLC (the "RackAlley Proceeds"). Finally, the Court held that Carole and USPI had aided and abetted Faulkner in violating the September 25 OAR by commencing a lawsuit against the Receiver in California state Court without leave of this Court.

In addition to holding these defendants and non-parties in civil contempt, the Court held that the Receiver was "entitled to recover his reasonable and necessary attorney's fees incurred in prosecuting the instant contempt motion." Dkt. 247 at 42. On March 13, 2018, the Receiver applied for award of attorney's fees consistent with the Court's Contempt Order and requested award of these attorney's fees be allocated according to the culpability of the various contemnors. Dkts. 258, 259.

On June 7, 2018, this Court approved Receiver's application and awarded him the total sum of $183,376.34 in attorney's fees and costs. The Court held that, of this sum, Faulkner, BECC,

BOG, and BRC are jointly and severally liable for $65,285.82 in attorney's fees and costs; Faulkner and Carole are jointly and severally liable for $59,195.82; and Carole and USPI are jointly and severally liable for $58,894.70. Pursuant to this Court's order, payment of these sums was due no later than 30 days after the Memorandum Opinion and Order was filed.

No amounts were paid pursuant to the Court's Order. On or about August 3, 2018, the Receiver moved this Court for Entry of Final Judgment upon the foregoing amounts. In open court, the Receiver withdrew that motion and the Court proceeded to hear evidence on the Receivers' Motion for Order to Show Cause Why Carole Faulkner Should Not be Held in Contempt of the Court's Fee Order. Dkt. 299. On January 22, 2019, this Court entered an Order holding Carole Faulkner in civil contempt of the Contempt Order and the Fee Award. The Court ordered Ms. Faulkner to pay $118,090.52 within 90 days. Should she fail to do so, the Court ordered that a nonpunitive fine be imposed upon her in the amount of $250 per day thereafter.

On August 24, 2018, the Receiver moved for an order approving his Application for Attorney's Fees and Costs Pursuant to Sanctions Order. Dkt. 307. On November 13, 2018, the Court granted the Receiver's motion requiring Carole Faulkner to pay $10,045.50 within 30 days. As of the date of this report, no payments have been received.

## V.       Potential Claims of the Receivership Estate

The Receiver has investigated various "clawback" claims pursuant to the Texas Uniform Fraudulent Transfer Act and related equitable principles.

### A.   Brokers/Sales Representatives

The Receiver is coordinating efforts with the Staff of the Commission regarding claims against individuals who were active in (and compensated from) the offer and sale of oil and gas interests by the Defendants. Payments were made by Defendants to numerous individuals and their

nominee entities aggregating millions of dollars. The Commission has initiated Administrative Proceedings against at least five of the brokers who received the largest amounts in payments. It is anticipated that the Commission will establish a Fair Fund to receive disgorgements achieved in these Administrative Proceedings for the benefit of claimants in the Receivership.

The Receiver has made demand upon other brokers and sales representatives who received payments and is attempting to locate and initiate communication with a number of others. In this regard, the Receiver understands that approximately sixteen individuals (mostly through nominee entities) received payments in excess of $100,000. In connection with these efforts, the Receiver is reviewing extensive accounting data assembled by Veritas Advisory Group, Inc. and by the Commission's Staff. To date, no settlements have been reached; the Receiver will pursue settlement discussions where fruitful but expects to initiate clawback litigation in the current quarter. As required by the Amended OAR, the Receiver will seek leave of this Court to initiate litigation if warranted.

### B.  Potential Claims Against Professionals

The Receiver is continuing his investigation and is conducting discovery regarding services provided to the Receivership Entities by legal and accounting professionals and others. The Receiver will shortly conclude as to whether legal action on behalf of the Receivership Estate is warranted concerning potential professional negligence and related claims. Receiver will also determine whether claw back actions are appropriate regarding professional fees and expenses paid by the Receivership Entities. As required by the Amended OAR, the Receiver will seek leave of this Court to initiate litigation if warranted.

### C.  The Commission's Settlements with Relief Defendants

On July 20, 2018, this Court entered a Final Judgment as to Relief Defendant Tamra Freedman. The judgment orders that Freedman is liable for $900,000 in disgorgement to be due within 180 days of the date of the judgement. Assets previously seized from Freedman ($795,247 in a frozen checking account and a 2014 Land Rover Range Rover) will be credited to offset against the judgment. The Receiver transported the seized vehicle from California to Texas via auto-transport service and effect a sale of the vehicle for $50,000 on or about October 24, 2018. On or about November 9, 2018, the U.S. Treasury initiated a transfer of $795,247 to the Receivership Estate. The Receiver has been advised that the balance of Ms. Freedman's disgorgement amount ($52,752.23) is being transmitted to the Receivership Estate on or about January 15, 2018.

In its Amended Complaint herein the Staff of the Commission included Jetmir Ahmedi as a Relief Defendant. The Commission concluded a settlement with Relief Defendant Ahmedi which required him to pay $222,000 of funds received from the Defendants. The settlement funds are to be transmitted to the Receivership Estate for distribution to investors. On or about March 8, 2018, $150,000 of the settlement funds were deposited into the Receivership Estate. A second payment of $5,000 was made on June 25, 2018. Required payments are in arrears and it is the Receiver's understanding that the Staff of the Commission has initiated collection proceedings.

**WHEREFORE, PREMISES CONSIDERED**, the Receiver prays that the Court (i) approve and authorize payment to the Receiver and his firm of $78,128.00 for services rendered during the Subject Period; (ii) approve and authorize payment to Dykema of $32,963.27 for services rendered and expenses incurred during the Subject Period; (iii) approval and payment of $14,005.00 in fees and expenses incurred by Ballard & Littlefield during the Subject Period; (iv)

approval and payment of $15,335.20 in fees and expenses incurred by Goforth during the Subject Period; (v) approval and payment of $19,069.25 in fees and expenses incurred by PKF during the Subject Period; and (vi) approval and payment of $1,732.50 in fees and expenses incurred by Veritas during the Subject Period; and (vii) grant such other and further relief to which the Receiver may show himself justly entitled to receive.

Dated: February 18, 2019                    Respectfully submitted,

                                            By:   /s/  Thomas L. Taylor III

                                            Thomas L. Taylor III
                                            Texas State Bar: 19733700
                                            taylor@tltaylorlaw.com

                                            THE TAYLOR LAW OFFICES, P.C.
                                            245 West 18th Street
                                            Houston, Texas 77008
                                            Tel: 713.626.5300
                                            Fax: 713.402.6154

                                            RECEIVER

## CERTIFICATIONS

Receiver certifies that he has read the Application. To the best of his knowledge, information and belief formed after reasonable inquiry: all fees and expenses therein are true and accurate; all fees contained in the Application are based upon rates detailed on each invoice and are reasonable, necessary and commensurate with the skill and experience required for the activity performed; the Receiver has not included in the amount for which reimbursement is sought the amortization of the cost of any investment, equipment or capital outlay; and the Receiver is not making a profit on any reimbursable service purchased from a third party (such as copying, imaging, bulk mail, messenger service, overnight courier, computerized research or title and lien searches).

I further certify that (i) the fees and expenses included herein were incurred in the best interests of the Receivership Estate; and (ii) with the exception of the Billing Instructions, Receiver has not entered into any agreement, written or oral, express or implied, with any person or entity concerning the amount of compensation paid or to be paid from the Receivership Estate, or any sharing thereof.

/s/ Thomas L. Taylor III
Thomas L. Taylor III

## CERTIFICATE OF CONFERENCE

I certify that I have provided the Staff of the SEC with the present Application and they have stated that they have no objection to the Court's granting the Application as presented.

/s/ Thomas L. Taylor III
Thomas L. Taylor III

## CERTIFICATE OF SERVICE

On February 18, 2019, I electronically submitted the foregoing Fee Application with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system. I hereby certify that I have provided copies to all counsel of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

I further certify that on February 18, 2019, I served a true and correct copy of the foregoing document on the following parties and persons entitled to notice that are non-CM/ECF participants:

Michael P. Gibson (via USPS)
Burleson, Pate & Gibson, LLP
Founders Square
900 Jackson St., Suite 330
Dallas, TX 75202
mgibson@bp-g.com
*Counsel for Defendant Beth C.*
*Handkins*

Alex More (Requested e-mail service only)
Carrington Coleman
901 Main St., Suite 5500
Dallas, TX 75202
amore@CCSB.com
*Counsel for Defendant Gilbert R. Steedley*

Christopher A. Faulkner (USPS)
Register No. 76501-112
FCI Seagoville
Federal Correctional Institution
P.O. Box 9000
Seagoville, TX 75159
*Pro Se Defendant*

Jeremy S. Wagers (via USPS)
23381 McCrory Road
Navasota, Texas 77868
jwagers@wagerslaw.com
*Pro Se Defendant*

    /s/ Thomas L. Taylor III
       Thomas L. Taylor III