IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| Plaintiff, | § § | Civil Action No. 3:16-CV-1735-D |
| vs. | § § | |
| CHRISTOPHER A. FAULKNER, et al., | § § | |
| Defendants. | § | |

---

**RECEIVER'S OMNIBUS RESPONSE TO OBJECTIONS
TO RECEIVER'S PROPOSED PLAN OF DISTRIBUTION**

---

THE TAYLOR LAW OFFICES, PC

Thomas L. Taylor III, Receiver
Texas Bar: 19733700
*taylor@tltaylorlaw.com*

245 West 18th Street
Houston, Texas 77008
Tel: 713.626.5300
Fax: 713.402.6154

GOFORTH LAW, PLLC

Andrew M. Goforth
Texas Bar: 24076405
*andrew@goforth.law*

7614 Fairdale Lane
Houston, Texas 77063
Tel:  (713) 464-2263
Fax:  (713) 583-1762

COUNSEL FOR RECEIVER

## TABLE OF CONTENTS

**TABLE OF CONTENTS** ................................................................................................. i

**TABLE OF AUTHORITIES** ........................................................................................ ii

**I.  Preliminary Statement** ........................................................................................... 2

**II. Response to the Royalty Class Objections and Conveyance Objections** ........... 2

    **A. The Royalty Interest Investors and the Working Interest Investors are Similarly Situated** ............................................................................................... 3

        *1.  The "mindsets" of Investor Claimants in purchasing Breitling securities do not differentiate them from other defrauded investors because the funds of all types of investors were comingled in Breitling accounts* ........................................................ 3

        *2.  A tracing-based distribution plan will cause an inequitable result, elevating certain Investor Claimants to the detriment of others based merely on the actions of the defrauders* ......................................................................................... 5

        *3.  Any tax-related benefits obtained by the working interest investors are not sufficient to support having separate classes of claimants, and can be accounted for in calculating these investors' net out-of-pocket losses* ......................................... 8

        *4.  If Claimants are Separated into Classes, More Than Two Classes Would be Necessary* .................................................................................................................. 10

    **B. Invalidating the Conveyances of Royalty Interests to Certain Investors is Necessary to Liquidate those Assets and is the Most Equitable Solution for All Investor Claimants** ......................................................................................... 11

**III. Response to the Working Interest Class Objection** ........................................... 15

**IV. Response to the Carole Faulkner Objection** ...................................................... 17

**V.  Conclusion** .............................................................................................................. 19

**RECEIVER'S OMNIBUS RESPONSE IN SUPPORT OF HIS MOTION TO APPROVE PROPOSED PLAN**
**OF DISTRIBUTION AND TO ESTABLISH PROCEDURES TO DETERMINE AND DISALLOW FINAL CLAIMS**

i

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*CFTC v. PrivateFX Global One*,
778 F.Supp. 2d 775 (S.D. Tex. 2011) .......................................................................... 2, 7, 8

*Cunningham v. Brown*,
265 U.S. 1, 44 S. Ct. 424, 68 L. Ed. 873 (1924) ................................................................. 3

*SEC v. Credit Bancorp, Ltd.*,
290 F.3d 80 (2d Cir. 2002) .................................................................................................. 3

*SEC v. Faulkner*,
No. 16-CV-1735-D, 2018 WL 4362729 (N.D. Tex. Sept. 12, 2018) ................................ 17

*SEC v. Faulkner*,
No. 16-CV-1735-D (N.D. Tex. Oct. 29, 2018) ................................................................. 18

*SEC v. Faulkner*,
No. 16-CV-1735-D (N.D. Tex. Nov. 13, 2018) ................................................................ 18

*SEC v. Faulkner*,
No. 16-CV-1735-D (N.D. Tex. Feb. 25, 2019) .......................................................... 17, 19

*SEC v. Forex Asset Mgmt. LLC*,
242 F.3d 325 (5th Cir. 2001) ......................................................................................... 6, 8

*SEC v. Wealth Mgmt. LLC*,
628 F.3d 323 (7th Cir. 2010) .............................................................................................. 3

*United States v. 13328 and 13324 State Highway 75 North*,
89 F.3d 551 (9th Cir. 1996) ................................................................................................. 3

*United States v. Davis*,
226 F.3d 346 (5th Cir. 2000) ....................................................................................... 17, 19

*United States v. Durham*,
86 F.3d 70 (5th Cir. 1996) ....................................................................................... 6, 7, 8, 11

*United States v. Moore*,
27 F.3d 969 (4th Cir. 1994) ............................................................................................... 17

**RECEIVER'S OMNIBUS RESPONSE IN SUPPORT OF HIS MOTION TO APPROVE PROPOSED PLAN
OF DISTRIBUTION AND TO ESTABLISH PROCEDURES TO DETERMINE AND DISALLOW FINAL CLAIMS**

ii

*United States v. Ward,*
197 F.3d 1076 (11th Cir. 1999) ........................................................................... 17


**Statutes**

11 U.S.C. § 541(b)(4)(B) ...................................................................................... 14


**IRS Revenue Rulings**

Rev. Rul. 2009-9, 2009-14 I.R.B. 735 (April 6, 2009) ...................................................... 9

Rev. Rul. 2009-20, 2009 I.R.B. Lexis 141 ................................................................ 9

RECEIVER'S OMNIBUS RESPONSE IN SUPPORT OF HIS MOTION TO APPROVE PROPOSED PLAN
OF DISTRIBUTION AND TO ESTABLISH PROCEDURES TO DETERMINE AND DISALLOW FINAL CLAIMS

iii

Thomas L. Taylor III ("Receiver"), Court-appointed temporary receiver in the above-entitled action ("Enforcement Action"), respectfully files this Omnibus Response ("Response") to various objections by potential Investor Claimants[1] (collectively, the "Objections")[2] to the Receiver's February 25, 2019 Motion to (1) approve the Receiver's proposed plan for the ultimate distribution of Receivership Assets (the "Plan") and (2) establish procedures to determine and disallow final claims against the Receivership (ECF No. 406) ("Motion")[3], and Receiver's Appendix in Support (ECF No. 407) (cited to as "R_APP").

For the most part, the Objections fall into two categories which the Receiver will address accordingly:[4]

1) the Perry, Wohrman, Kohls Trust, Braun/Meyer, Descamps, Oelkers, and Schwimmer Trust Objections (the "Royalty Class Objections"), asserted by "Jericho," "Babylon," and "Joshua" royalty interest investors, who oppose the Receiver's Plan on the grounds that royalty interest and working interest investors should be treated as two distinct claimant classes in the Receiver's Plan, and (as asserted in the PDM Holdings and Braun/Meyer Objections (the "Conveyance Objections")) that the Receiver is not entitled to invalidate the royalty conveyance instruments executed by Receivership Entities in favor of certain royalty interest investors (the "Conveyance Investors"); and

2) the Working Interest Objection, asserted by a "White Wolf #1" working interest investor, who opposes the Receiver's Plan on the basis that working interest holders in

[1] Capitalized terms not defined herein have the same meaning given to them in the Receiver's Motion.

[2] Filed at ECF Nos. 429 (the "PDM Holdings Objection"), 436 (the "Perry Objection"), 437 (the "Wohrman Objection"), 443 (the "Kohls Trust Objection"), 445 (the "Braun/Meyer Objection"), 447 (the "Descamps Objection"), 448 (the "Oelkers Objection"), 450 (the "Working Interest Class Objection"), and 455 (the "Schwimmer Trust Objection"). The Receiver refers collectively to the parties who lodged the Objections as the "Objectors".

[3] Cited to as "Mot. at _." Citations to page numbers in the Motion refer to the page numbers in the CM/ECF System-generated header.

[4] None of the Objectors oppose the Receiver's requested relief with respect to (1) the use of summary proceedings to determine final claims [Mot. at pp. 26 – 28]; (2) the notice procedures undertaken by the Receiver with respect to the Motion [Mot. at p. 28]; (3) the Court's setting a Claim Bar Date for the 180th day after entry of the Court's Order approving a plan of distribution [Mot. at p. 29]; (4) the Claims Confirmation Process through which the Receiver will establish final claim amounts [Mot. at pp. 29 – 30]; (5) the procedures for disqualifying potential claimants [Mot. at pp. 31 – 32]; or (6) the procedures for seeking reconveyance of assets conveyed to investors [Mot. at pp. 32 – 33]. Accordingly, these issues are not addressed herein and the Receiver submits that they are unopposed.

a "completed prospect [such as the White Wolf #1] are in a distinct class from those investors who do not have a completed and ongoing [working] interest." *Id*. at p. 1.

The Receiver also responds herein to the objection of Carole Faulkner, Defendant Faulkner's mother. ECF No. 452 (the "Carole Faulkner Objection"). In her objection, Ms. Faulkner opposes the Receiver's Plan on the grounds that she is entitled to funds purportedly transferred to her by Receivership Entity Inwood Investments, Inc. ("Inwood Investments") following the sale of Defendant Faulkner's residence in July 2017, but which purportedly are now in the Receiver's possession.

## I.     PRELIMINARY STATEMENT

Determining the manner through which to distribute limited assets to the victims of a significant fraudulent scheme is never without controversy. All Investor Claimants were victimized by Faulkner, and all have suffered significant losses. Consistent with prevailing legal precedent, the Receiver seeks to distribute the Receivership Assets in a manner that is most equitable to all Investor Claimants that have suffered losses from Faulkner's fraud. The Receiver empathizes with the Objectors and appreciates that they wish to minimize their losses from the fraudulent scheme. However, the Receiver contends that the only distribution regime through which *all* defrauded investors are treated in an equitable manner is to treat *all* Investor Claimants equally, as a single class, in which each will share in the distribution based upon his or her net out-of-pocket loss as a percentage of the total net out-of-pocket losses of all of the Investor Claimants. *See CFTC v. PrivateFX Global One*, 778 F. Supp. 2d 775, 784 (S.D. Tex. 2011) (Miller, J.).

## II.    RESPONSE TO THE ROYALTY CLASS OBJECTIONS AND CONVEYANCE OBJECTIONS

The Royalty Class Objectors ask the Court to fashion a distribution plan that treats royalty interest investors as a separate class from other investors -- particularly the working interest

investors. The Conveyance Objectors object to the Receiver's proposed invalidation of conveyances made to them from the Offering Entities, in order to liquidate those assets for the benefit of all Investor Claimants (including the Conveyance Objectors themselves, who would otherwise hold defective title upon which no producer would dispense royalty revenue). The Court should overrule these Objections for the reasons detailed below.

## A. The Royalty Interest Investors and the Working Interest Investors are Similarly Situated

The Court should reject the Royalty Class Objectors' request to place them in a separate class from other investors because they are similarly situated vis-à-vis Faulkner's fraudulent scheme to all other defrauded Investor Claimants. Courts should treat similarly situated victims similarly, under the maxim that "equality is equity." *See* Mot. at 19; *Basic Energy & Affiliated Resources*, 273 F.3d at 668 (approving district court's plan to treat investors "in the same manner" as others because "[a]s the Supreme Court noted in the original Ponzi case, such cases 'call strongly for the principle that equality is equity'") (citing *Cunningham v. Brown*, 265 U.S. 1, 13, 44 S. Ct. 424, 427, 68 L. Ed. 873 (1924)); *United States v. 13328 and 13324 State Highway 75 North*, 89 F.3d 551, 553-54 (9th Cir. 1996) (approving like distributions to similarly situated parties); *SEC v. Credit Bancorp, Ltd.*, 290 F.3d 80, 88 – 89 (2d Cir. 2002); *SEC v. Wealth Mgmt. LLC*, 628 F.3d 323, 333 (7th Cir. 2010).

> 1. *The "mindsets" of Investor Claimants in purchasing Breitling securities do not differentiate them from other defrauded investors because the funds of all types of investors were comingled in Breitling accounts*

The Royalty Class Objectors assert that they should be treated differently from other investors, and particularly working interest investors, because they had a different "mindset" than other investors when purchasing their royalty-interest securities from an Offering Entity. *See* ECF Nos. 436 at 2; 437 at 2; 443 at 2; 445 at 2; 447 at 2; 448 at 1; 455 at 2 – 3. The Royalty Class

Objectors have provided no evidence in support of their various characterizations of the royalty interest investors being retirees seeking only low-risk investments in or through retirement accounts. *See id*. Moreover, the Royalty Class Objectors have provided no evidence that the receipt of a purportedly documented real property interest has any bearing on the risk profile of a royalty investment. *See* ECF Nos. 436 at 2; 443 at 2; 445 at 2, 4; 447 at 2; 455 at 1, 2 – 3.[5] Although the royalty interest securities sold by Offering Entities were certainly different from the working interest securities, the purchasers of these securities are similarly situated because of, *inter alia*, Faulkner's extensive commingling of assets between and among the various Receivership Entities, contrary to representations made to all investors in their respective offering documents.

Some Royalty Class Objectors question whether commingling occurred. *See, e.g.*, ECF No. 445 at 2 ("The Royalty Investors wonder whether the monies paid to Crude Royalties were indeed commingled with any other entity"); *see also id*. at 3-4, 5. Others acknowledge that commingling occurred but minimize its significance, and or do not address commingling at all. However, the Commission established the commingling of Receivership Assets prior to the Receiver's appointment. *See, e.g.*, ECF Nos. 103, 105. The Court has continued to grant relief requested by the Receiver -- particularly with respect to the expansion of the Receivership Estate -- upon the same evidence of commingling first presented by the Commission. *See* ECF Nos. 320, 418.

The Receiver has presented substantially the same evidence of commingling in his Motion. *See* Mot. at 12 – 13. This evidence establishes that extensive commingling of royalty investor funds and working investor funds was undertaken at Faulkner's direction. In this regard, "[a]pproximately $5 million was transferred from BRC to BOG, so not only were [working

---

[5] If, for example, the oil and gas well(s) underlying a royalty interest ceases production -- a risk inherent in the investment -- the real property interest will be worthless. Such an interest is not akin to a secured interest in real property.

interest] investor funds in the various BOG offerings commingled, but [working interest] investor funds were also commingled with [royalty interest investor] funds from BRC." R_APP 273. Additionally, of the $23,752,000 deposited into Crude Energy accounts (working interest-related) and $19,062,000 deposited into Crude Royalties accounts (royalty interest-related), $35,346,000 (83%) was transferred into BECC accounts. R_APP at 289, 293. This means that -- at minimum -- $11,594,000 of royalty investor deposits into Crude Royalties (61%) were transferred to BECC and commingled with working interest-related proceeds. Moreover, over $6,400,000 in royalty investor funds were deposited directly into BECC accounts. R_APP 293. Collectively with the transfers from Crude Royalties to BECC, 71% of royalty investor proceeds -- at minimum -- passed through BECC accounts and were commingled with tens of millions of dollars of working interest investor proceeds.

The proceeds of both working interest investors and royalty interest investors were extensively commingled by Faulkner in the Breitling fraudulent scheme. These commingled assets were necessarily used in ways which Faulkner omitted to disclose in the offering documents for the various securities offerings in which the Investor Claimants participated -- particularly with respect to the tens of millions of dollars misappropriated by Faulkner over the course of the scheme. Due to the commingling of these assets, the royalty interest investors and working interest investors are similarly situated victims and should be treated equally under the Plan. *See* Mot. at 20 – 21.

2. *A tracing-based distribution plan will cause an inequitable result, elevating certain Investor Claimants to the detriment of others based merely on the actions of the defrauders*

The Royalty Class Objectors ask the Court to treat them as a separate class, distributing only to them the proceeds that derive from royalty interest-related Receivership Assets. To do so would be to ignore the reality that their funds were commingled with funds of investors in other

proposed classes, and to accept the fiction that only royalty interest investor proceeds were used with respect to royalty interest investments, and only working interest investor proceeds were used with respect to working interest investments.

In order truly to accomplish a multi-class distribution plan, tracing would be required to assign Investor Claimants into classes. In this regard, a royalty interest investor whose funds were not spent on royalty interest-related assets could not truly be in the same class as an investor whose funds did go towards royalty interest-related assets. As detailed in the Receiver's Motion, Mot. at 22 – 25, however, a tracing-based distribution plan would not be equitable because it would elevate those investors whose proceeds are traceable to current Receivership Assets above those investors whose proceeds are traceable to Faulkner's misappropriation, or even to expenditures on consumable assets (*i.e.*, office rent, telephone services, etc.). It would be inequitable to reward certain investors for "the merely fortuitous fact that the defrauders spent the money of the other victims" in a different way. *See United States v. Durham*, 86 F.3d 70, 72 (5th Cir. 1996). Tracing procedures in the present setting would be virtually impossible in any event.

Although some Objectors focus on whether tracing is possible or burdensome, *see, e.g.*, ECF No. 445 at 3; 455 at 3 – 4, a tracing-based distribution is inequitable even if it is not a burden on the Receivership Estate to accomplish. In *SEC v. Forex Asset Mgmt. LLC*, 242 F.3d 325 (5th Cir. 2001), for example, estate claimants the Whitbecks made a second investment of $800,000 in what turned out to be a fraudulent foreign currency investment scheme, just prior to its collapse. *Forex*, 242 F.3d at 327. The architect of that scheme deposited the Whitbeck's check -- and only that check -- into a bank account, then transferred most of those funds into a brokerage account -- with no other funds being deposited with the Whitbecks' funds. *See id*. Although tracing the

Whitbecks' funds was straight-forward, the District Court affirmed the receiver's *pro rata* distribution plan. *Id*. at 328.

The Whitbecks objected to the plan, arguing that their $800,000 check was deposited into a segregated account and therefore they should receive all of the funds that remained in that account. *Id*. The District Court disagreed, noting that a *pro rata* distribution was the most equitable means of addressing all victims' harms, and declining to elevate the Whitbecks' claims above those of the other investors. *Id*. The Fifth Circuit affirmed, citing the discretion given to District Courts in such circumstances to fashion appropriate relief "in a logical way." *Id*. at 331 (quoting *Durham*, 86 F.3d at 73).

The Fifth Circuit decided similarly in *Durham*. In that case, a tracing analysis uncovered that $70,970.13 of the $83,495.52 in funds remaining would go to a single claimant if tracing were applied. *See id*. at 72. The District Court declined to apply tracing, instead approving a *pro rata* distribution. *See id*. The District Court reasoned that "'all claimants stand equal in terms of being victimized by the defendant defrauders. The ability to trace the seized funds … is the result of the merely fortuitous fact that the defrauders spent the money of the other victims first[,] … [and tracing] would … elevate the position of … two victims on the basis of the actions of the defrauders.'" *Id*. (quoting the district court). The Fifth Circuit affirmed, noting that the District Court had "rationally considered the positions of the victims and held that following the tracing principle would be inequitable." *Id*. at 73.

Courts also have refused to apply tracing even "when a scheme involves more than one investment program." *PrivateFX*, 778 F. Supp. 2d at 783. In *PrivateFX*, a receiver recovered approximately $15 million in receivership assets for distribution to defrauded investors. *Id*. at 778. One investors group, the "Global One Investors," hired a forensic accountant who asserted

> that at least $10.6 million of the funds in the Receivership Estate were contributed by the Global One Investors, were originally placed in separate and distinct bank accounts, have always remained under the separate control of Global One in those accounts, and remained separate until the Receiver took possession of all of the defendants' assets.

*Id*. The Global One Investors opposed to the Receiver's *pro rata* plan of distribution, asserting that "the other investors who would benefit from the funds if distributed on a pro rata basis did not invest in a distinct investment program and cannot trace the assets they contributed." *Id*.

Based upon the holdings in *Forex* and *Durham*, the court in *PrivateFX* held that a tracing-based distribution "would leave the other investors, who were duped just like the Global One Investors, without a significant recovery." *Id*. at 782. It was fair and equitable:

> to include the funds from the Global One account in a pro rata distribution to all investors … because even though the Global One Investors only invested in the Global One accounts, it would be unfair for them to receive the bulk of the funds left from the fraudulent scheme of which the Global One accounts were a part simply because the funds they invested had not yet been dissipated.

*Id*. at 783.

The Court should decline to treat the royalty interest investors as a separate class of claimants in the instant case, upon the same reasoning in *Forex*, *Durham*, and *PrivateFX*.

3. *Any tax-related benefits obtained by the working interest investors are not sufficient to support having separate classes of claimants, and can be accounted for in calculating these investors' net out-of-pocket losses*

The Royalty Class Objectors also object to a distribution to a single class of claimants upon the basis that working interest investors received some form of preferential tax treatment. *See, e.g.*, ECF No. 455 at 2 ("royalty investors do not have the ability to claim tax write-offs for losses."). No Royalty Class Objector cites to a specific tax code provision or other basis upon which such tax treatment is based -- let alone specific evidence of such purported tax advantages. These

purported tax incentives are varyingly -- and inconsistently -- described as "write offs" (*id.*), "deductions"[6] and "credits."[7] No details are provided as to the actual nature of the tax incentives that form the basis of these Objections.

This tax incentive-based argument ignores that *all* Investor Claimants have suffered significant losses as a result of Faulkner's fraudulent scheme. And because these losses are the result of a fraudulent investment enterprise, *all* Investor Claimants will have the ability to make a claim to some extent regarding their losses for federal tax purposes. *See*, *e.g.*, Rev. Rul. 2009-9, 2009-14 I.R.B. 735 (April 6, 2009)[8] and Rev. Rul. 2009-20, 2009 I.R.B. Lexis 141[9].

Moreover, to the extent that some Investor Claimants have benefitted from tax-related write-offs or deductions to date, the Receiver can take these benefits into account in calculating the Investor Claimants' "net out-of-pocket losses". In this regard, any decrease in an Investor Claimants' tax liability as a result of their investment(s) in an Offering Entity will reduce their net out-of-pocket loss claim against the Receivership Estate on a dollar-for-dollar basis. Accordingly, royalty interest investors that have not enjoyed a tax-related benefit will have respectively larger claims than those working interest investors who have enjoyed tax-related benefits. Because every individual Investor Claimant's tax situation is unique, each will be required to submit to the Receiver, under penalty of perjury, all relevant information for the Receiver to analyze and apply to the "money in, money out" netting of the investment.

Notwithstanding the purported tax-related distinction between the royalty interest investments and the working interest investments offered by Breitling, the Royalty Class Objectors

---

[6] ECF No. 455 at 3.

[7] *E.g.*, ECF Nos. 436 at 1, 3; 443 at 1, 3.

[8] Accessed online on July 17, 2019 at [https://www.irs.gov/pub/irs-drop/rr-09-09.pdf].

[9] Accessed online on July 17, 2019 at [https://www.irs.gov/pub/irs-drop/rp-09-20.pdf].

are similarly situated vis-à-vis all other investors defrauded by Faulkner through the Breitling fraudulent scheme, and should be treated equally in the distribution plan adopted by the Court. To the extent that tax incentives were obtained, they are only relevant to the calculation of an investors "net out-of-pocket losses." Such incentives are not a relevant basis for creating a separate class of claimants against the Estate, and the Objections should be overruled with respect to the tax incentive issue.

### 4. If Claimants are Separated into Classes, More Than Two Classes Would be Necessary

Creating more than one claimant class of investors in the ultimate plan of distribution would necessitate the creation of at least three classes -- the Royalty Class Objectors ignore the claims of BECC shareholders against the Receivership Estate. As stated above, creating separate classes of claimants would inherently elevate certain classes of investors above others. This is particularly true with respect to the BECC shareholder claimants. In this regard, BECC shareholders purchased their shares of BECC stock from third parties, and not BECC. Accordingly, their assets never entered Breitling accounts, and no assets traceable to their investment proceeds would be available to distribute to them. Implementing a multi-class, tracing-based distribution program would place the BECC shareholder claimants below all other Investor Claimants. This would not be equitable.

Additionally, as demonstrated by the Working Interest Objection (discussed below), even members within the broadly defined classes sought by the Royalty Class Objectors assert that further distinctions are necessary. One Working Interest Objector asks the Court to recognize "the distinction between those working interest investors of a completed and producing prospect and other working interest investors." ECF No. 450 at p. 1. Other distinctions within the broadly

defined classes sought by the Royalty Class Objectors could also be made. For example, as previously detailed to the Court, the conveyance of royalty interests to royalty interest investors was done haphazardly. There are royalty interest investors who did not receive conveyances of property from Breitling, as others did. Others received conveyances not consistent with the offering documents in the offerings in which they participated. In this regard, even those royalty interest investors that received conveyances did not receive what they bargained for. Some necessarily received a greater interest than they bargained for, others received less. All received defective title because of haphazard and inaccurate conveyancing. It would not be equitable to treat these investors differently, when some have benefited more than others due only to the merely fortuitous fact that the defrauders treated them differently. *See Durham*, 86 F.3d at 72.

Moreover, distributing the Receivership Assets to several classes of claimants would necessitate a full tracing of assets from members of those classes, as detailed above. Such a tracing analysis is both overly-burdensome to the Receivership Estate and, even if tracing is possible it will, *inter alia*, elevate the claims of those investors whose funds were spent on current assets of the Estate above those whose funds were not. Accordingly, the Court should overrule the Royalty Class Objections.

## B. Invalidating the Conveyances of Royalty Interests to Certain Investors is Necessary to Liquidate those Assets and is the Most Equitable Solution for All Investor Claimants

The assertions made by the Conveyance Objectors with respect to the fractional royalty interests that were conveyed by Offering Entities to the Conveyance Investors are severely flawed, and their Objections to the Receiver's Plan in this regard should be overruled.

As an initial matter, the Conveyance Objectors' characterizations of the fractional royalty interests they received assumes as true the fiction represented to them by the Offering Entities in Faulkner's fraudulent scheme: that they would invest in an offering through an Offering Entity,

that the Offering Entity would purchase royalty interests with pooled investor funds, and that they would be conveyed their *pro rata* share in those royalty interests.[10] This characterization is clearly contrary to the evidence. In reality, tens of millions of dollars of royalty interest investor proceeds were transferred to other entities and comingled with working interest investor funds. This is the case with at least $5 million in royalty interest investor proceeds raised by BRC, and at least $18 million in royalty interest investor proceeds raised by Crude. *See supra*, at §II(A)(1).

Moreover, the Conveyance Objectors characterize the conveyances as both accurate and in-line with the bargain they made when investing in the Offering Entities -- that they received what they paid for, and the Receiver is trying to take that away from them.[11] However, the evidence shows that the conveyances from the Offering Entities were problematic -- to say the least -- for two main reasons.

First, conveyances were not executed in favor of all royalty interest investors or with regard to all investments an investor made in a royalty-based offering. The haphazard nature of the conveyancing of royalty interests to royalty investors by Breitling personnel is exemplified by the Braun/Meyer Objectors, who admit that they received "conveyances of some, but not all, of their interests" in the "Crude-Babylon" offering. ECF No. 445 at 2. The incomplete nature of the

---

[10] PDM Holdings member Paula Morris asserts that "[o]nce Breitling Royalties had received the full $150,000, I received a series of documents entitled 'Assignment and Conveyance of Overriding Royalty Interests (Jericho Properties).'" ECF No. 429 at 8, ¶19. The implication of this statement is that PDM Holdings' invested proceed actually went to the purchase of the assets underlying this "Assignment and Conveyance," and that the assets underlying this "Assignment and Conveyance" were what PDM Holdings had bargained for.

Braun/Meyer Objectors assert that "it appears undisputed that the Crude-Babylon royalty investors each paid for their interests, and the funds investors paid were deposited into Crude Royalties' bank account. Most of these investors (including the Royalty Investors) received actual written assignments of their interests, which were recorded." ECF No. 445 at 5. The implication of this statement is that the transaction occurred in the same manner as represented in the offering documents. Notably, the Braun/Meyer Objectors omit any assertion regarding the use of their funds "deposited into Crude Royalties' bank account" for the purchase of the assets underlying the "actual written assignments" of the interests conveyed to them.

[11] *See* FN.8, *supra*.

conveyances is particularly problematic vis-à-vis the distribution of Receivership Assets because investor-members of the same pool of investors were not treated equally. Although each investor-member of an investment pool was supposed to receive a *pro rata* share of the royalty interests purchased with the pooled proceeds[12], only some investor-members were conveyed interests, and these conveyances -- often made years after the Conveyance investor purchased their security from an Offering Entity[13] -- did not accurately represent the entire *pro rata* share of the investor-members who received them.

Second, the royalty interests that purportedly were conveyed were, in almost all instances, overstated vis-à-vis what interests were actually owned by the conveying Offering Entity. This created an anomalous situation in which the investors that received conveyances collectively received more than 100% of the interest which the Offering Entity purported to own. *See* Mot. at 12.[14] As a consequence, proceeds of these inaccurately conveyed royalty interests are in suspense and will not be paid to anyone until the conveyances are corrected. This can only occur under the aegis of this Court as proposed in the Plan of Distribution. Contrary to the characterizations made by the Conveyance Objectors[15], the foregoing circumstances have placed the royalty interest assets

---

[12] Less a percentage of those interests to be retained by the Offering Entity as compensation for conducting the offering.

[13] PDM Holdings mischaracterizes actual events when it asserts that it was conveyed royalty interests within three months of making its investment. In reality, it made a $50,000 investment on or about October 29, 2012. ECF No. 429 at 7 – 8, ¶¶8 – 10. PDM Holdings was paid royalties on the initial $50,000 investment. *Id.* at 8, ¶11. PDM Holdings made a second investment on or about April 4, 2013. *Id.* at ¶16.

[14] PDM Holdings asserts that it "has not seen evidence that the amount of overriding royalty interests assigned totaled over 100%, as the Receiver contends." The Receiver directs PDM to R_APP 199, 208, 212-251.

[15] The Braun/Meyer Objectors' assertion that "it seems to make no difference what Crude Royalties did with the [investor proceeds] after" conveyances were made to Conveyance Investors, ECF No. 445 at 6, further illustrates the Conveyance Objectors' acceptance of the fiction that they received what their investment proceeds were used to purchase. Moreover, if Crude acted in accordance with the offering documents, it begs the questions: Why was there money left over to transfer to other Receivership Entity accounts? Whose money actually purchased the royalty interest underlying what was conveyed to the Braun/Meyer Objectors? For what purpose were the investment proceeds

conveyed by the Offering Entities in jeopardy. They are not marketable and, in the hands of the Conveyance Investors, they are substantially diminished in value (if not outright worthless) because the over-conveyancing of the underlying royalty interests has severely clouded title held by the Conveyance Investors. These inaccurate conveyances were made to hundreds of parties, making it all but impossible to negotiate a solution among the interest holders -- even if the underlying facts were all known.[16]

It bears repeating that the operators of the oil and gas wells that underly these royalty interests have placed payment on these interests into suspense, to avoid being doubly liable should they pay royalties to the incorrect party. Mot. at 12. The Conveyance Investors hold unmarketable interests; moreover, they cannot and will not receive any income upon those interests unless and until title is cleared to the satisfaction of the oil and gas well operators.

In the Receiver's proposed Plan he would invalidate (reverse) the conveyances from the Offering Entities to individual Conveyance Investors, clearing title to the royalty interests which would then be held in the name of the Receivership Entity from which they came.[17] The Receiver would then obtain the funds held in suspense related to those royalty interests from the oil and gas

---

deposited by Braun/Meyer actually used? It appears that the Braun/Meyer Objectors do not wish to know the answers to these questions.

[16] PDM Holdings characterizes the conveyance of more than 100% of what was owned as a "minor error." ECF No. 429 at 2. The Receiver disagrees than an error which renders an asset unmarketable is minor. Nor can the Receiver be party to an agreement by which percentages of ownership are arbitrarily assigned to interest-holders. As the Receiver has previously informed the Court and defrauded investors, "the Receiver could not as an equitable -- or even factual -- matter, stipulate as to a specific interest conveyed to any potential claimant." ECF No. 283-2 at 4.

[17] PDM Holdings' reliance on the Bankruptcy Code, ECF No. 429 at 1 – 2, is erroneous. As an initial matter, while courts may look to the Bankruptcy Code for guidance in analogous situations in an equity receivership, the Code is not controlling. Even if the Court were to look to the Code in this instance, however, the sections cited to by PDM Holdings have a different meaning than that asserted by PDM. There is no Code provision that prevents a debtor's estate from owning a royalty interest asset. Rather, section 541(b)(4)(B) prevents a trustee from asserting that royalty interests *created by* the debtor, *e.g.*, in an oil and gas well it owns, cannot be reclaimed from a third party as part of the debtor's estate. *See In re Poivey*, Case No. 17-26408-bhl, at 10 – 11 (Bankr. E.D. Wis. Jan. 24, 2018). Accordingly, the Court should ignore PDM's application of section 541(b)(4)(B) to the facts at issue here.

operators, and clear those interests from being held in suspense, so that the Receivership Estate would receive the regular royalty payments due. The Receiver would then liquidate those royalty interests.[18] The funds previously held in suspense, and the proceeds from those sales, would be available for distribution to all Investor Claimants who were defrauded in Faulkner's scheme.

Because of the clouded title to the royalty interests resulting from the improper conveyancing by the Offering Entities, the Receiver's proposed Plan is the only practicable solution to the conveyance issue. Accordingly, the Receiver requests that the Court overrule the Conveyance Objections and grant the Receiver's Motion.

### III.   RESPONSE TO THE WORKING INTEREST CLASS OBJECTION

The Working Interest Class Objection demonstrates the inequity of dividing the Investor Claimants into various claimant classes. As detailed *supra*, at §II(A)(4), should the Investor Claimants be divided into classes, it would be necessary to divide them into more than the two classes proposed by the Royalty Class Objectors (working interest and royalty interest claimants). Doing so would particularly disadvantage BECC shareholders, who generally did not purchase their shares from BECC, and cannot trace their investment proceeds to any Receivership Assets.

Even within the working interest and royalty interest classes proposed by the Royalty Class Objectors, however, additional classes of investors could be recognized, as the Working Interest Class Objector proposes. The Working Interest Class Objector invested in the White Wolf #1 offering made by Crude. ECF No. 450 at p. 1. It asserts that this prospect "was completed and went into production in 2015." *Id*. Accordingly, the Working Interest Class Objector asserts, "the

---

[18] On May 31, 2019 the Receiver filed his Unopposed Motion (1) for Authority to Sell Oil and Gas Interests; (2) for Authority to Retain Sales and Marketing Firm; and (3) for Approval of Sales Procedures. ECF No. 438. That motion is currently pending before the Court.

working Interest [sic] investors in this completed prospect are in a distinct class from those investors who do not have a completed and ongoing interest," and that all production proceeds (including future payments and funds currently held in suspense) "rightly belong to a distinct and discoverable group of investors." *Id*. It asks the Court to recognize "the distinction between those working interest investors of a completed and producing prospect and other working interest investors." *Id*.

Essentially, the Working Interest Class Objector asks the Court to conduct a distorted form of tracing, which would benefit only a subset of the working interest investors. In this regard, it asks that the production proceeds of completed and producing properties be distributed to investors only in those offerings. Rather than trace investor proceeds from the initial deposit through to expenditures by Breitling entities (such as the purchase of the working interest in a specific prospect), the Working Interest Class Objector wants to reap the benefits of the completed and producing properties irrespective of whose funds actually were paid to purchase those prospects.

This approach ignores the factual reality of the Breitling fraudulent scheme, particularly with respect to the commingling of funds discussed above (*see* §II(A)(1)). Investor proceeds were regularly, if not universally, transferred from prospect-specific accounts to general operating accounts (or to other entities) before a working interest prospect was completed -- and on some occasions before any expenditures were made on the prospect. Expenditures for a prospect made after the prospect-specific account had been emptied were necessarily made with commingled funds of investors in distinctly separate offerings. In this regard, the approach of the Working Interest Class Objector fails for the same reasons the approach of the Royalty Class Objectors should -- they are based on the fiction that certain investors' funds were segregated and used to acquire and maintain certain classes of assets. Due to the extensive commingling of investor

proceeds, however, this is simply not the case. The Court should overrule the Working Interest Class Objection and order the distribution of Receivership Assets to a single class of claimants on a *pro rata* basis.

## IV.   RESPONSE TO THE CAROLE FAULKNER OBJECTION

Doubling down on what has been established as a fraudulent course of conduct, *see SEC v. Faulkner*, Civil Action No. 3:16-CV-1735-D, Slip Op. at 2 (N.D. Tex. Feb. 25, 2019) (ECF No. 403)[19], Defendant Faulkner's mother, Carole Faulkner, seeks the return of funds that are both the subject of a criminal seizure warrant and of this Court's Receivership Order. Ms. Faulkner has failed to establish -- or offer any evidence in support of -- a right to the funds at issue. At best, she would have a colorable claim as an unsecured creditor because of the fungibility of money.[20] Even that fraud-suffused unsecured claim would be subordinated to the claims of the Investor Claimants under the Receiver's proposed Plan. Mot. at 17. Because Ms. Faulkner does not assert any argument or authority that her purported claim should not be subordinated to those of the Investor Claimants, her objection should be overruled.

Inwood Investments became a Receivership Entity on September 12, 2018. ECF No. 320. As this Court is aware, in or about July 2017 Defendant Faulkner sold his residence (the "Inwood Residence") through a special purpose artifice to defraud styled Inwood Investments. ECF No. 403 at 2.[21] Thereafter, $840,000 of the sales proceeds "were converted to cashier's checks payable

---

[19] *See also SEC v. Faulkner*, 2018 WL 4362729, at *4, 5 (N.D. Tex. Sept. 12, 2018) (Fitzwater, J.) (held, on the basis of unrebutted evidence, that Faulkner purchased the Inwood Residence "using wrongfully-diverted investor assets.").

[20] *United States v. Davis*, 226 F.3d 346, 357 (5th Cir. 2000) ("money is fungible") (citing *United States v. Ward*, 197 F.3d 1076, 1083 (11th Cir. 1999); *United States v. Moore*, 27 F.3d 969, 976-77 (4th Cir. 1994)).

[21] This Court held, on the basis of unrebutted evidence, that Faulkner purchased the Inwood Residence "using wrongfully-diverted investor assets." *See SEC v. Faulkner*, 2018 WL 4362729, at *4, 5 (N.D. Tex. Sept. 12, 2018) (Fitzwater, J.); *see also* ECF No. 403 at 2 ("In January 2013 Faulkner purchased a residence using wrongfully-diverted investor assets.").

to 'Carole Faulkner' and 'C.A. Faulkner.'" *Id*. "A week after the sale of the [Inwood Residence], a United States Magistrate Judge issued a criminal seizure warrant authorizing the forfeiture of the instruments." *Id*.

Ms. Faulkner subsequently told agents of the Federal Bureau of Investigation ("FBI") "that she had sent the checks to Faulkner in California via Federal Express, and that the checks had been lost in transit." *Id*. at 2 – 3. The checks later turned up in the possession of Beniammine "Benny" Kheir ("Kheir"), a resident of Lebanon. *Id*. at 3. Ms. Faulkner had taken an extended vacation to Lebanon during this time period, from approximately April 2018, *SEC v. Faulkner*, Civil Action No. 3:16-CV-1735-D, Slip Op. at 8 (N.D. Tex. Oct. 29, 2018) (ECF No. 334), through at least November 2018. *SEC v. Faulkner*, Civil Action No. 3:16-CV-1735-D, Slip Op. at 110 (N.D. Tex. Nov. 13, 2018) (ECF No. 336).

Ms. Faulkner asserts -- without evidence -- that these funds were paid to her as compensation and / or expense reimbursements related to a Management Services Agreement purportedly entered into in or about March 2016 for the "management and sale" of the Inwood Residence. Ms. Faulkner further asserts she is owed $57,000 stemming from a 2002 Promissory Note through which she loaned Faulkner funds for the purchase of a previous home. She also claims to have incurred under the Management Services Agreement expenses in the amount of $30,000, which were partially repaid. ECF No. 452 at 2 – 3.

Notably, Ms. Faulkner has not submitted a single piece of evidence in support of her various assertions. She has not submitted a copy of the Management Services Agreement or evidence in support of the $30,000 in expenses which she claims to have incurred. Ms. Faulkner has not even asserted a specific amount of money to which she claims to be entitled. Ms. Faulkner also has not submitted any evidence of the 2002 Promissory Note, the payment to Faulkner of the

$57,000 in funds related to it, or that those funds were used to purchase the Inwood Residence. In any event, the Court has previously held that the Inwood Residence is an asset purchased "using wrongfully-diverted investor [Receivership] assets." ECF No. 403 at 2.

As an initial matter, at best Ms. Faulkner has an unsecured claim against the Receivership Estate. She asserts that the Receiver may be in possession of funds to which she has "legal ownership." However, "money is fungible." *Davis*, 226 F.3d at 357. To the extent that the Receiver is in possession of the funds she seeks, she is simply asserting an unsecured claim against the Receivership Assets. In his proposed Plan, the Receiver has sought the subordination of such claims to the claims of Investor Claimants. Mot. at 17. Ms. Faulkner has neglected to assert any authority in support of permitting her purported claim to be asserted on an equal footing with those of defrauded investors.

Finally, the Court should overrule Ms. Faulkner's objection as an attempt at taking an additional "bite at the apple." In this regard, Ms. Faulkner has tried to establish this same liability of Inwood Investments to her in previous litigation before the Court, to no avail. *See, e.g.*, ECF Nos. 308 at 4, 309 at 4. The Court should disregard her continuing attempts to obtain the same relief based upon no legitimate claim.

## V.   CONCLUSION

The Receiver sympathizes with the Objectors and recognizes the harsh reality that each of them has been defrauded in the Breitling scheme. No single distribution plan will satisfy all Investor Claimants. In light of all the circumstances, however, the Receiver believes that treating all Investor Claimants equally ensures the most equitable solution for all, consistent with applicable law. Accordingly, the Receiver respectfully requests that the Court grant his February

25, 2019 Motion (1) to approve the Receiver's proposed plan for the ultimate distribution of Receivership Assets and (2) to establish procedures to determine and disallow final claims against the Receivership Estate (ECF No. 406).

For the reasons detailed above, the most equitable manner through which to distribute the Receivership Assets is on a *pro rata* basis to a single claimant class consisting of all investors who have suffered a "net out-of-pocket loss" resulting from their investments in or through the Offering Entities. Faulkner and his confederates fraudulently induced members of the public to invest in the Breitling fraudulent scheme through various types of offerings and numerous entities, failed to observe corporate formalities and customary legal distinctions among the various Receivership and Offering Entities, and extensively commingled investors' proceeds.

Tracing all expenditures from the Breitling fraud to specific deposits of investor proceeds is not only an expensive and exceedingly complex undertaking, but -- even if accomplished successfully -- would cause an inequitable result in that it would exclude defrauded claimants from participation in the distribution -- particularly (i) shareholders who did not purchase their shares of stock from BECC, and (ii) those investors whose invested funds were misappropriated by Faulkner or otherwise spent on consumable assets (*i.e.*, office rent, telephone services, etc.). A distribution based on asset tracing will also disadvantage earlier investors, whose funds were spent years ago, to the benefit of later investors, whose funds are more easily traceable due to the constraints arising from the passage of time.

Dated: July 17, 2019

Respectfully submitted,

THE TAYLOR LAW OFFICES, PC

Thomas L. Taylor III
Texas Bar: 19733700
*taylor@tltaylorlaw.com*

245 West 18th Street
Houston, Texas 77008
Tel: 713.626.5300
Fax: 713.402.6154

COURT-APPOINTED RECEIVER


GOFORTH LAW, PLLC

By:     /s/ Andrew M. Goforth

Andrew M. Goforth
Texas State Bar: 24076405
*andrew@goforth.law*

7614 Fairdale Lane
Houston, Texas 77063
Tel:     (713) 464-2263
Fax:     (713) 583-1762

COUNSEL FOR RECEIVER


## CERTIFICATE OF SERVICE

I certify that on July 17, 2019 I filed the foregoing document through the Court's CM/ECF filing system, which satisfies service requirements under FED. R. CIV. P. 5(b)(2)(E).


    /s/ Andrew M. Goforth
    Andrew M. Goforth