IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| Plaintiff, | § § | |
| VS. | § § | Civil Action No. 3:16-CV-1735-D |
| CHRISTOPHER A. FAULKNER, et al., | § § | |
| Defendants. | § § | |

MEMORANDUM OPINION
AND ORDER

In this enforcement action by the U.S. Securities and Exchange Commission ("SEC"), the court-appointed temporary receiver ("Receiver") moves to approve a plan of distribution and to establish procedures to determine and disallow final claims. For the reasons that follow, the court grants the motion.

I

A

This is an SEC enforcement action against Christopher A. Faulkner ("Faulkner") and other defendants alleging that Faulkner orchestrated a massive fraud scheme by which he swindled investors out of millions of dollars over a multi-year period. The present case is already the subject of a number of memorandum opinions and orders. *See SEC v. Faulkner*, 2018 WL 5458789, at *1 (N.D. Tex. Oct. 29, 2018) (Fitzwater, J.) (collecting cases). The court will therefore summarize only the background facts that are pertinent to today's decision.

From 2011 until 2016, Faulkner—while misrepresenting his education and experience—sold royalty and working interest investments in various oil and gas prospects to investors across the country through several companies that he either owned or controlled, including: Breitling Energy Corporation ("BECC"), a public company, Breitling Oil & Gas Corporation ("BOG"), Crude Energy, LLC ("Crude Energy"), and Patriot Energy, Inc. ("Patriot"). Faulkner oversold the available units for each project and inflated the estimated costs to be incurred. Despite representing to investors that their funds would be segregated, Faulkner and his companies commingled and misappropriated significant portions of their investors' money through tens of millions of dollars in cash disbursements and reimbursements of Faulkner's personal expenditures. Throughout the scheme, Faulkner signed, and BECC filed, inaccurate and misleading financial reports with the SEC. Investors in Faulkner's companies generally recouped only a small fraction of their investment principal.

On June 24, 2016 the SEC filed the instant lawsuit alleging claims against Faulkner and the other defendants for violations of the Securities Act of 1933, the Securities Exchange Act of 1934, and SEC Rule 10b-5. On September 25, 2017 the court appointed the Receiver over defendants BECC and BOG. The court later expanded the receivership estate to include additional defendants and the non-party corporations under their control (collectively, excluding Faulkner, the "Receivership Entities").[1]

---

[1]The "Receivership Entities" are defendants BOG, BECC, Crude Energy, and Patriot, and non-parties Breitling Royalties Corporation, Breitling Ventures Corporation, Breitling

B

On February 25, 2019 the Receiver filed the instant motion to approve proposed plan of distribution and to establish procedures to determine and disallow final claims ("Plan Motion").

Under the proposed plan of distribution ("Plan"), the Receiver seeks to distribute Receivership Assets[2] to investors ("Investor Claimants") who have suffered a "net out-of-pocket loss" as a result of an investment in or through BOG, Breitling Royalties Corporation ("BRC"), BECC, Crude Energy, Crude Royalties, LLC ("Crude Royalties"), or Patriot (collectively, the "Offering Entities").  An Investor Claimant's "net out-of-pocket loss" would be calculated as the total amount invested in or through the Offering Entities less any amounts, or the value of any assets, received—and retained—with respect to the investment (e.g., payment or assets transferred from a Receivership Entity, payments from a third-party oil and gas operating company, the sale of any oil and gas interest received from an Offering Entity, or the sale of any shares of BECC stock).[3]  Receivership Assets would ultimately be distributed to the Investor Claimants on a *pro rata* basis based on the net out-of-pocket loss

Holdings Corporation, Breitling Operating Corporation, Breitling Energy Companies, Inc., Breitling Royalty Funds, LLC, Crude Royalties, LLC, Inwood Investments, Inc., and Grand Mesa Investments, Inc.

[2]"Receivership Assets" means all assets—in any form or of any kind whatsoever—owned, controlled, managed, or possessed by Faulkner and/or the Receivership Entities.

[3]"Net winner" investors, i.e., those who received more in payments as a result of their investments than they invested into the scheme, would be excluded from receiving payments under the Plan.

- 3 -

of each Investor Claimant as a percentage of the total net out-of-pocket losses of all Investor Claimants, without regard to the manner by which the investments were made.

To ensure a distribution of receivership assets that is equal to all Investor Claimants, the Receiver also proposes to seek invalidation of certain conveyances of royalty interests and overriding royalty interests (collectively, "royalty interests," unless otherwise provided) by Offering Entities to some defrauded investors ("Conveyance Investors"). The Receiver maintains that this is necessary because these royalty interests were allegedly purchased with contaminated funds from commingled accounts, and the conveyance instruments purportedly transferring these royalty interests to Conveyance Investors are materially defective in that they over-convey royalty interests in amounts greater than what the transferor Offering Entity owned. According to the Receiver, invalidating these defective conveyances and returning clear title to the transferor Offering Entity would enable the Receiver to liquidate these assets under court supervision for the benefit of all Investor Claimants under the Plan.

On March 28, 2019 the court conditionally approved the Plan, subject to proof of notice to interested parties and an opportunity to object.[4] The Receiver then compiled a list of 1,369 entities and individuals potentially affected by the Plan. Of this number, the Receiver was able to obtain addresses for 1,150, and the Notice of Plan (as defined in the Plan Motion) was served on those individuals and entities. As prescribed by the court,

_____

[4]The court entered its order conditionally granting the Receiver's Plan Motion on March 26, 2019. On March 27, 2019 the Receiver filed a motion to amend the court's March 26, 2019 order. On March 28, 2019 the court entered an amended order granting the Receiver's Plan Motion.

- 4 -

notices were also published in *The Dallas Morning News* and the national edition of *The Wall Street Journal*. The Receiver filed his Proof of Service on June 5, 2019, and objections were due by June 26, 2019.[5]

Objections to the Plan were timely filed by the following potential claimants: Paula D. Morris, on behalf of PDM Holdings, LLC ("PDM"); Charles and Cynthia Perry (collectively, "the Perrys"); Paul A. Wohrman ("Wohrman"); the Kohls Family Trust ("Kohls Trust"); Braun/Meyer, L.L.C. and Brad Meyer (collectively, "Braun/Meyer"); Michael A. Descamps ("Descamps"); Daniel E. Oelkers ("Oelkers"); and Marcus P. Gober ("Gober"). Carole A. Faulkner ("Carole Faulkner") and Daniel Schwimmer, on behalf of the Schwimmer Family Trust ("Schwimmer Trust") filed objections after the June 26, 2019 deadline. The Receiver filed an omnibus response to all of the objections on July 17, 2019.

On January 23, 2020 the court scheduled a hearing for April 6, 2020 on the timely objections to the Plan Motion. Due to the impact of the COVID-19 pandemic, however, the court canceled the hearing. In the interest of resolving the issues raised in the Plan Motion in the near term, the Receiver moved on March 23, 2020 to establish procedures for resolving the motion without a live hearing. After affording an opportunity for opposition responses, the court granted the Receiver's motion, holding that the Plan Motion would be decided on the papers, without an oral hearing, and permitting the Receiver and any objectors to file

---

[5]On June 7, 2019 the Receiver filed an unopposed motion to hold the court's March 28, 2019 order in abeyance until the court considered and ruled on any timely-filed objections to the Plan Motion. The court granted the Receiver's motion, entering an order holding in abeyance the March 28, 2019 order.

supplemental materials.  The Receiver filed supplemental materials on April 13, 2020.  The Perrys filed a supplemental submission to support non party request to release oil royalty assets to owners on April 22, 2020.[6]  The Plan Motion is now ripe for decision.

II

The timely objections[7] to the Plan can be categorized and addressed according to the following three arguments: (1) royalty interest ("RI") and working interest ("WI") investors should be treated as two distinct claimant classes in the Plan; (2) the Receiver is not entitled to invalidate the royalty conveyance instruments executed by Receivership Entities in favor of certain RI investors; and (3) WI holders in completed WI prospects are in a distinct class from those who invested in interests not subsequently completed.

To the extent the Receiver seeks relief to which no objections have been filed—e.g., the use of summary proceedings to determine final claims, the notice procedures undertaken by the Receiver with respect to the Plan Motion, the court's setting a claim bar date for the 180th day after entry of the court's order approving a plan of distribution, the Claims Confirmation Process through which the Receiver will establish final claim amounts, the

---

[6]The court permitted Objectors whose original objections were timely filed to file supplemental materials by April 13, 2020 and to file responses to any supplemental submissions made by the Receiver by April 23, 2020.

[7]Carole Faulkner filed an untimely objection, objecting to the Plan on the ground that she is entitled to funds purportedly transferred to her by Receivership Entity Inwood Investments, Inc. following the sale of Faulkner's residence in July 2017, but which purportedly are now in the Receiver's possession.  Because her objection was filed after the June 26, 2019 deadline and Carole Faulkner has failed to demonstrate cause for failing to file her objection by the court-ordered deadline, the court overrules the objection as untimely.

procedures for disqualifying potential claimants, and the procedures for seeking reconveyance of assets conveyed to investors, *see* Omnibus Resp. at 1 n.4—the court grants the Plan Motion with respect to the requested relief.

### III

The court turns first to the contention that RI and WI investors should be treated as two distinct claimant classes under the Plan. Several objectors (the "Royalty Class Objectors") object to the Plan on this ground.[8]

### A

The Royalty Class Objectors contend that the court should reject the Receiver's proposed *pro rata* plan of distribution because "there is only one asset" and "that single asset, if not all of it belongs to the oil royalty investors," Wohrman Obj. at 1 (bold font and capitalization omitted); the funds for the purchase of oil royalties came primarily from retirement savings accounts, IRA accounts, 401K accounts, pension funds, and other retirement accounts and RI investors were not able to claim immediate tax write-offs for their investments; WI investors were able to write their investments off "dollar for dollar" and have already received their investments back through utilizing their preferential IRS tax

---

[8]Objections on this ground were filed by the Perrys, Wohrman, Kohls Trust, Braun/Meyer, and Descamps. The Schwimmer Trust filed late objections on this same ground. The Receiver includes Oelkers in the group who filed Royalty Class Objections, but Oelkers actually filed a petition *in favor of* the Plan, stating that he holds RI *and* WI investments, that he "see[s] no difference in one investment over another," and that he "[s]imply [r]equest[s] the Receiver, to place . . . [WI] Investors and [RI] Investors together in one pot [and] then conduct the Distribution of Assets." Oelkers Obj. at 1-2.

treatment; WI investors and RI investors had "two distinct mind sets" and invested in two distinct classes of assets; WI investors were prepared to absorb any potential investment losses through an IRS preferential tax write-off, while the only expectation of the RI investors was to receive a consistent safe income throughout their retirement lives; because there are two distinct classes of investors, they should remain in their separate classes and the distribution of assets should take place using the existing assets of each investment class and should remain the exclusive assets of that investment class such that each would get back the percentage part of what the investor originally invested; to take away the assets of an RI investor or the assets from a WI investor to pay the other investor abridges the civil rights of each party who owns the asset; it would be unfair to blend the two distinct classes of investors for asset liquidation purposes because WI investors would be paid twice for their monetary investment: "[the] First Payment to the [WI] would be through the immediate 80% to 100% Tax Write Off.  The Second Payment would be by allowing the [WI] Investor to participate in the [RI] Investor's Asset Distribution," *id.* at 3; and it would be unfair to further compensate the WI investors using the investment dollars of the RI investors.[9]

The Receiver responds that the court should reject the Royalty Class Objectors' request to place them in a separate class from other investors.  Although the Receiver acknowledges that the RI securities that the Offering Entities sold are different from the WI securities, he maintains that the purchasers of these securities are nevertheless similarly

---

[9]Braun/Meyer also contends, *inter alia*, that there is no proof that Crude Royalties was involved in the working interest commingling.

situated because, *inter alia*, of Faulkner's extensive commingling[10] of assets between and among the various Receivership Entities.  The Receiver asks the court to reject the Royalty Class Objectors' tracing-based distribution plan, under which the Royalty Class Objectors would be treated as a separate class among which the proceeds that derive from RI Receivership Assets would be exclusively distributed.  He posits that such a plan ignores that the Royalty Class Objectors' funds were commingled with funds of investors in other proposed classes and requires the court to accept the fiction that only RI investor proceeds were used with respect to royalty investments and only WI investor proceeds were used with respect to WI investments; that to accomplish a multi-class distribution plan, tracing would be required to assign Investor Claimants into classes, and, in this regard, an RI investor whose funds were not spent on RI-related assets could not truly be in the same class as an investor whose funds did go toward RI-related assets; that a tracing-based distribution plan would be inequitable because it would elevate investors whose proceeds are traceable to current Receivership Assets above investors whose proceeds are traceable to Faulkner's

---

[10]The Receiver contends that the evidence establishes that extensive commingling of RI investor funds and WI investor funds was undertaken at Faulkner's direction: approximately $5 million was transferred from BRC to BOG, commingling investor funds in the various BOG offerings and commingling investor funds with RI investor funds from BRC; of the $23,752,000 deposited into Crude Energy accounts (WI-related) and $19,062,000 deposited into Crude Royalties accounts (RI-related), $35,346,000 (83%) was transferred into BECC accounts, which means that, at a minimum, $11,594,000 of RI investor deposits into Crude Royalties (61%) was transferred to BECC and commingled with WI-related proceeds; that over $6,400,000 in RI investor funds was deposited directly into BECC accounts; and that, collectively with the transfers from Crude Royalties to BECC, 71% of RI investor proceeds, at minimum, passed through BECC accounts and was commingled with tens of millions of dollars of WI investor proceeds.

misappropriation or expenditures on consumable assets; that it would be inequitable to reward certain investors for the mere fortuity that the defrauders spent the money of the other victims in a different way; and that, even if tracing were possible and not unduly burdensome, a tracing-based distribution would be inequitable and has been rejected by courts in other cases.

In response to the Royalty Class Objectors' arguments based on the preferential tax treatment that WI investors allegedly received, the Receiver contends that there is no specific evidence of any purported tax advantage; that the tax incentive-based argument ignores that *all* Investor Claimants have suffered significant losses as a result of Faulkner's fraudulent scheme and *all* Investor Claimants will therefore have the ability to make a claim to some extent regarding their losses for federal tax purposes; that to the extent some Investor Claimants have benefited from tax-related write-offs or deductions to date, the Receiver can take these benefits into account when calculating the Investor Claimants' "net out-of-pocket losses," and, accordingly, RI investors who have not enjoyed a tax-related benefit will have respectively larger claims than those WI investors who have enjoyed tax-related benefits; and that, in sum, "[t]o the extent that tax incentives were obtained, they are only relevant to the calculation of an investor['s] 'net out-of-pocket losses[,]' [and s]uch incentives are not a relevant basis for creating a separate class of claimants against the Estate." Omnibus Resp. at 10.  Finally, the Receiver maintains that creating more than one claimant class of investors in the Plan would necessitate at least three classes (RI investors, WI investors, and BECC shareholders) and numerous further distinctions within each class; would inherently elevate

- 10 -

certain classes of investors over others; would require the court to treat investors differently when some have benefited more than others due only to the mere fortuity that the defrauders treated them differently; and would necessitate a full tracing of assets, which is overly-burdensome to the Receivership Estate, and, even if possible, would elevate the claims of those investors whose funds were spent on current assets of the Estate above those whose funds were not.

In his supplemental submission in support of his Plan Motion ("Supplemental Submission"), the Receiver offers the declaration of Rodney Sowards ("Sowards"), in which Sowards details commingling by deposits of investor monies into incorrect bank accounts and transfers among the Breitling Entities' bank accounts.  The Receiver contends that the commingling of investor proceeds in various Breitling accounts supports the distribution of Receivership Assets on a *pro rata* basis rather than through a tracing methodology; that all investor victims of Faulkner's scheme had the same mind set when making their investments, i.e., all thought they were providing funds to the Offering Entities in exchange for an interest in an oil and gas investment, with the expectation that their funds would be segregated and used in line with the representations in the respective offering documents; that even if WI and RI investments are distinct, the proceeds received by the Offering Entities were not treated with any distinction, and those Investor Claimants entitled to a distribution of Receivership Assets should not be treated distinctively either, but should, instead, be treated equitably as similarly-situated victims of the same fraudulent scheme; and that, regarding tax-related differences between WI and RI investors, the Receiver can take any tax-related benefits into

- 11 -

account when calculating the Investor Claimants' "net out-of-pocket losses," and, regardless, the tax-related differences between WI and RI do not warrant treating WI and RI Investor Claimants differently, particularly in light of the extensive commingling of all investor proceeds by Faulkner and his confederates.

B

Largely for the reasons explained in the Receiver's Plan Motion, Omnibus Response, and Supplemental Submission, the court concludes that Receivership Assets should be distributed to all Investor Claimants on a *pro rata* basis and that WI Investors and RI Investors should not be treated as two distinct classes.

1

A district court has "broad powers and wide discretion to determine the appropriate relief in an equity receivership." *SEC v. Kaleta*, 530 Fed. Appx. 360, 362 (5th Cir. 2013) (per curiam) (quoting *SEC v. Safety Fin. Serv., Inc*., 674 F.2d 368, 372-73 (5th Cir. 1982)). In approving a distribution plan of receivership funds, "the district court, acting as a court of equity, [is] afforded the discretion to determine the most equitable remedy." *SEC v. Forex Asset Mgmt. LLC*, 242 F.3d 325, 332 (5th Cir. 2001). The court's "primary job . . . is to ensure that the proposed plan of distribution is fair and reasonable." *SEC v. Wealth Mgmt. LLC*, 628 F.3d 323, 332 (7th Cir. 2010) (citing *Official Comm. of Unsecured Creditors of WorldCom, Inc. v. SEC*, 467 F.3d 73, 84 (2d Cir. 2006)). In doing so, the court is not bound to follow any particular plan or method of distribution simply because it is "permissible under the circumstances." *United States v. Durham*, 86 F.3d 70, 73 (5th Cir. 1996). Rather,

- 12 -

the court is afforded broad discretion to determine "a logical way to divide the money," and tailor a distribution plan accordingly.  *Forex*, 242 F.3d at 331 (citing *Durham*, 86 F.3d at 73); *see also Wealth Mgmt. LLC*, 628 F.3d at 333 ("[D]istrict courts supervising receiverships have the power to 'classify claims sensibly.'" (quoting *SEC v. Enter. Tr. Co.*, 559 F.3d 649, 652 (7th Cir. 2009))).

"Courts have favored *pro rata* distribution of assets where [, as here] . . . the funds of the defrauded victims were commingled and where victims were similarly situated with respect to their relationship to the defrauders."  *SEC v. AmeriFirst Funding, Inc.*, 2008 WL 919546, at *3 (N.D. Tex. Mar. 13, 2008) (Fitzwater, C.J.) (quoting *SEC v. Credit Bancorp, Ltd.*, 290 F.3d 80, 88-89 (2d Cir. 2002)); *see also SEC v. Quan*, 870 F.3d 754, 762 (8th Cir. 2017) ("Courts have 'routinely endorsed' the pro rata distribution of assets to investors as the most fair and equitable approach in fraud cases. (citing cases)); *SEC v. Orgel*, 407 Fed. Appx. 504, 505 (2d Cir. 2010) (affirming district court's approval of *pro rata* distribution plan, noting that "this Court has upheld the district court's broad equitable authority to order a *pro rata* distribution even where some funds are traceable to specific claimants."); *Forex*, 242 F.3d at 331-32 (affirming District Court's approval of *pro rata* distribution plan where party's assets were held by defrauder in segregated accounts); *Durham*, 86 F.3d at 73 (affirming District Court's approval of *pro rata* distribution plan even though the majority of funds were traceable to specific claimants).  But the absence of commingling between various receivership entities does not render a pooled, *pro rata* distribution inequitable.  *See Forex*, 242 F.3d at 331-32.

- 13 -

2

The Royalty Class Objectors propose that the Receiver maintain a division between WI investors and RI investors, distributing to the WI class only those proceeds that derive from WI-related Receivership Assets and to the RI class only those proceeds that derive from RI-related Receivership Assets. The court declines in its discretion to adopt this proposed approach to distribution for at least two reasons. First, the Receiver has demonstrated a high level of commingling of RI investor funds and WI investor funds throughout Faulkner's fraudulent scheme.[11] *See* Omnibus Resp. at 4-5; Supp. Resp. at 4-5. As he explains, the Royalty Class Objectors' proposed distribution methodology "ignore[s] the reality that [RI] funds were commingled with the funds of [WI] investors" and requires acceptance of "the fiction that only [RI] investor proceeds were used with respect to [RI] investments, and only [WI] investor proceeds were used with respect to [WI] investments." Omnibus Resp. at 5-6. A tracing-based distribution methodology such as the one the Royalty Class Objectors propose would thus be exceedingly difficult to administer because not all WI investor funds were used to purchase WI investments and not all RI investor funds were used to purchase RI investments.

---

[11]To the extent Braun/Meyer contends the Receiver has not demonstrated that Crude Royalties "was in any way involved in the working interest commingling," Braun/Meyer Obj. at 5, the court rejects this contention. The Receiver has adduced specific evidence, which Braun/Meyer does not refute, that of the $23,752,000 deposited into Crude Energy accounts (WI-related) and $19,062,000 deposited into Crude Royalties accounts (RI-related), $35,346,000 (83%) was transferred into BECC accounts, which means that, at a minimum, $11,594,000 of RI investor deposits into Crude Royalties (61%) was transferred to BECC and commingled with WI-related proceeds.

Second, even assuming, as does the Receiver, that tracing would be available and not unduly costly or burdensome, the court agrees that the Royalty Objectors' proposed tracing-based distribution plan would be inequitable. Whether, and to what extent, a particular class of assets is traceable will be wholly dependent on how Faulkner and the other defendants spent the money of the different classes of victims. To allow one class of investors to elevate its position over that of other investors similarly "victimized" would create inequitable results, in that certain investors might recoup a substantially greater percentage than other investors who would receive substantially less. *See SEC v. Elliott*, 953 F.2d 1560, 1569 (11th Cir. 1992).[12]

The court is unpersuaded by the Royalty Class Objectors' argument that RI investors and WI investors should be treated differently due to the different "mind set" each had in initially investing in Faulkner's fraudulent scheme. RI investors and WI investors were fraudulently induced into making their investments based on the same misrepresentations, and both "unwittingly had the majority of their investments funneled into [Faulkner's] scheme, making most of their investments and thus most of their returns essentially fictitious." *Quan*, 870 F.3d at 762. Both classes of investors "were similarly situated in relationship to the fraud, in relationship to the losses, in relationship to the fraudsters, and in relationship to the nature of their investments, so that a . . . *pro rata* distribution is equitable." *Commodity Futures Trading Comm'n v. Walsh*, 712 F.3d 735, 748 (2d Cir. 2013) (citation

---

[12]In addition to the problems described above, the Royalty Class Objectors fail to account for the not insignificant third "class" of victims: the BECC shareholders.

- 15 -

and emphasis omitted).  "Because no investor knowingly takes the risk that she will be defrauded, the distribution plan need not take into account the fact that [RI] investors initially purchased less risky investments." *Quan*, 879 F.3d at 762 (citation omitted); *see also Walsh*, 712 F.3d at 751 ("[M]ere choices of different investment vehicles did not mean that the two groups of defrauded investors . . . were meaningfully dissimilar, given, *inter alia*, that both . . . lost money because they were defrauded by the same individual who stole their money." (citation and alterations omitted)).

Nor is the court persuaded that the different tax benefits available to the WI investors justify treating the two classes differently.  As the Receiver clearly explains, to the extent that some Investor Claimants have benefited from tax-related write-offs or deductions to date, the Receiver can take these benefits into account when calculating the Investor Claimants' "net out-of-pocket losses."  Thus RI investors who have not enjoyed a tax-related benefit may have respectively larger claims than those WI investors who have enjoyed tax-related benefits.  In sum, "[t]o the extent that tax incentives were obtained, they are only relevant to the calculation of an investor['s] 'net out-of-pocket losses[,]' [and s]uch incentives are not a relevant basis for creating a separate class of claimants against the Estate."  Omnibus Resp. at 10.

The Royalty Class Objectors have not convinced the court that RI and WI investors should be treated differently under the Receiver's proposed Plan or that their proposed tracing-based plan of distribution is either feasible under the circumstances of this case or would result in a fairer outcome.  Accordingly, the court overrules the Royalty Class

- 16 -

Objectors' objection.

IV

The court considers second the objection of PDM Holdings, Braun/Meyer, and the Perrys ("Conveyance Objectors") that the Receiver is not entitled to invalidate the royalty conveyance instruments executed by Receivership Entities in favor of the Conveyance Investors.[13]

A

PDM Holdings contends that Breitling Royalties conveyed certain RIs to it and properly recorded the conveyances in the appropriate county records; that the Receiver has not established any legal ground that would support a finding that the conveyances were not a legal transfer of overriding royalty interests or that these property rights were not perfected; that the Receiver has failed to provide evidence that the amount of overriding royalty interests assigned totaled over 100%, as he contends; that even if this were the case, the Receiver has not established that such a minor error in the individual percentages of parties

---

[13]The Perrys raise these arguments in their April 22, 2020 supplemental submission to support non party request to release oil royalty assets to owners. The Perrys and Wohrman have also filed hardship letters seeking the release of their royalty assets to the respective oil operators so that they can be placed back in legal pay status. *See, e.g.,* Perry Hardship Request at 1 ("[W]e are requesting the court to release all Non Party Breitling Royalties Corporation Assets, currently held in suspense, to the respective Oil Operators. We request this because we, as well as other Non Party Royalty Owners who may be having a Financial Hardship need their Royalty Income out of suspense to ease their Financial Burden. Secondly, we believe if the Non Party Oil Royalties are released back to the Oil and Gas Operators they would be the most knowledgeable and efficient Team to place the Non Party Royalty Owners into their legal and proper pay status." (bold font omitted)).

having pooled interests is sufficient to invalidate written, executed, and recorded assignments of such property rights; that the Receiver has not established that PDM Holdings' funds were commingled with other funds, and that even if PDM Holdings' funds were temporarily held in a non-segregated account, the Receiver has not established that this invalidates assignments to PDM Holdings that were written, executed, and recorded; and that PDM Holdings has received less than one third of what it invested in return for these duly recorded property interests and is entitled to receive the benefit of its legal, written, executed, and recorded assignments for as long as oil and gas is produced on the properties related to the assignments.

Braun/Meyer contends that it invested over $2.6 million in the "Crude-Babylon Royalty Income Program" and that, in exchange, it received actual deeds/conveyances of some, but not all, of its interests; that because of these deeds/conveyances, it has a valid and present claim to royalties on the production on the wells included in the Crude-Babylon program; that an RI, and the right to receive the royalty, is an interest in real property under state law; that any production revenue on the Crude-Babylon properties is subject to these RIs and Braun/Meyer has a free-standing state-law claim to that property; that this position gives Braun/Meyer considerable priority over an unassigned WI owner for many reasons, not the least of which is that the RI is not burdened by cost of production; and that

> it appears undisputed that the Crude-Babylon royalty investors each paid for their interests, and the funds investors paid were deposited into Crude Royalties' bank account. Most of these investors (including [Braun/Meyer]) received actual written assignments of their interests, which were recorded. While

> Crude Royalties may have transferred those funds paid by
> investors to others (including Faulkner or other receivership
> entities) after the interests were sold, such an action by itself
> does not—in any way—invalidate the conveyance to
> [Braun/Meyer].  To put it another way, it seems to make no
> difference what Crude Royalties did with the money *after the*
> *fact*, since [Braun/Meyer] hold[s] legal and equitable title to [its]
> royalty interests.

Braun/Meyer Obj. at 5-6.[14]

The Receiver responds that the Conveyance Objectors' characterization of the
fractional RIs they received assumes that they would invest in an offering through an
Offering Entity, that the Offering Entity would purchase RIs with pooled investor funds, and
that they would be conveyed their *pro rata* share in these RIs; that, in reality, tens of millions
of dollars of RI investor proceeds were transferred to other entities and commingled with WI
investor funds; that this is the case with at least $5 million in RI investor proceeds raised by
BRC, and at least $18 million in RI investor proceeds raised by Crude; that the evidence

---

[14]In their supplemental submission to support non party request to release oil royalty
assets to owners the Perrys argue that, if the Receiver liquidates their royalty assets "for
Pennies on the Dollar," to share with, *inter alia*, the WI investors, "it would be a Gross
Violation of [their] Basic Constitutional Rights, to Possess and Use [their] Legal Property
which allows [them] to Earn a Living," Perry Supp. Submission at 1; that they entered into
binding contracts with Breitling Oil Royalty, transmitted funds for a specific transaction, and
were conveyed a deed to the fractional interest of ownership in the Jericho Royalty Property
that they purchased; and that fewer than 1% of the royalty sales were oversold in the Jericho
Oil Property Group.  The Perrys request that the court release their "Non Party Breitling
Royalties Corporation Assets," currently held in suspense, to the respective oil operators for
the benefit of the oil royalty owners, arguing that the oil operators' in-house legal team could
"re-do the Deeds," and that the oil operators would be the most knowledgeable and efficient
team to place the Non Party Royalty Owners into their legal and proper pay status.  *Id.* at 1,
3.

shows that the conveyances from the Offering Entities were problematic because these conveyances were executed in a "haphazard" manner, with the Offering Entity conveying some but not all of the investors' interests; that this is problematic because investor-members of the same pool of investors were not treated equally, and although each investor-member of an investment pool was supposed to receive a *pro rata* share of the RIs purchased with the pooled proceeds, only some investor-members were conveyed interests, and these conveyances did not accurately represent the entire *pro rata* share of the investor-members who received them; that the conveyances from the Offering Entities were also problematic because the RIs that were purportedly conveyed were, in almost all instances, overstated, resulting in an anomalous situation in which the investors who received conveyances collectively received more than 100% of the interest that the Offering Entity purported to own; that proceeds of the inaccurately conveyed RIs are in suspense and will not be paid to anyone until the conveyances are corrected; that the foregoing circumstances have made the RI assets conveyed by the Offering Entities unmarketable and have severely clouded title held by the Conveyance Investors; that the operators of the oil and gas wells that underlie these RIs have placed payment on these interests into suspense to avoid being doubly liable should they pay royalties to the incorrect parties; that the Conveyance Investors cannot and will not receive any income upon those interests unless and until title is cleared; and that because of the clouded title to the RIs resulting from the improper conveyancing by the

Offering Entities, the Plan[15] is the only practicable solution to the conveyance issue.

In his Supplemental Submission, the Receiver offers additional evidence that non-RI investor funds were being used to purchase RI properties[16] and that Breitling was making at least some payments to RI interest holders from the commingled funds of other defrauded investors (including WI investors), not from income derived from RI interests.  He also proffers additional evidence that the Offering Entities over-sold and over-conveyed royalty

---

[15]As stated above, the Receiver proposes in the Plan to invalidate (reverse) the conveyances from the Offering Entities to individual Conveyance Investors, clearing title to the RIs, which would then be held in the name of the Receivership Entity from which they came.  The Receiver would then obtain the funds held in suspense related to those RIs from the oil and gas operators and clear those interests from being held in suspense so that the Receivership Estate would receive the regular payments due.  The Receiver would then liquidate those RIs so that the funds previously held in suspense, and the proceeds from these sales, would be available for distribution to all Investor Claimants who were victims of Faulkner's fraudulent scheme.

[16]The Receiver contends that RI property acquisitions costing $778,000 were paid from three BOG/BECC non-royalty general/operating bank accounts; that only $128,000 of RI investor deposits was deposited into these accounts (albeit improperly), with WI investor deposits of $7.8 million; and that, accordingly, at least $650,000 of the $778,000 acquisition costs came from WI investor deposits, commingled funds transferred from other bank accounts, or other income.  In the second example, the Receiver contends that RI property acquisition costs of $12.8 million were paid from two BRC general/operating bank accounts; that only $1.9 million of RI investor deposits was deposited into these accounts (albeit improperly) with WI investor deposits of $7,000; and that, accordingly, WI investor deposits, commingled funds transferred from other bank accounts, or other income must have been used to pay for RI property acquisition costs.  In the third example, the Receiver contends that BRC purchased an RI property and wired $500,000 to the seller from a BOG/BECC (non-royalty) general/operating bank account; that, as of the date of the wire, the only deposits made into this bank account were from either Pumpkin Ridge WI investor deposits or unknown sources; and that BRC's payment was therefore made using at least $395,000 of Pumpkin Ridge WI investor funds.

- 21 -

interests, conveying amounts greater than what the transferor Offering Entity owned.[17]  He

argues that the over-selling and over-conveyancing of RI properties to Conveyance Investors

belies the Conveyance Objectors' position that they received what they paid for as stated in

the offering documents because, in reality, the conveyances made to Conveyance Investors

were based upon inaccurate information and did not align with the Conveyance Investors'

*pro rata* share of the offerings in which they participated.  The Receiver maintains that, in

light of the evidence that Conveyance Investors received purported conveyances of assets

purchased with funds from other defrauded investors (including WI investors) and received

purported royalty payments from commingled investor funds not derived from income from

RI assets, and that the Offering Entities over-sold and over-conveyed RI offerings and assets,

the  most  equitable  solution  for  all  Investor  Claimants  is  to  invalidate  the  defective

conveyances at issue, return the RI assets with clean title to the Offering Entities for

liquidation, and distribute the sales proceeds (with all other Receivership Assets) *pro rata*

to all Investor Claimants.

B

To the extent the Conveyance Objectors challenge the Receiver's authority to seek the

invalidation of royalty conveyance instruments executed by Receivership Entities in favor

---

[17]The Receiver relies on the declaration of Scott Cox, Breitling's Vice President of
Land, who states that he became aware that the sum of the percentage interests conveyed to
Conveyance Investors was in excess of the percentage interest owned by Breitling in the
underlying properties, that BRC had "over-conveyed" the interests to investors, and that
Breitling had been making direct payments to Conveyance Investors to cover the overages
and to provide payments to investors commensurate with their purported interests.

- 22 -

of the Conveyance Investors, the court overrules the objection.

As stated above, "[i]t is a recognized principle of law that the district court has broad powers and wide discretion to determine the appropriate relief in an equity receivership." *SEC v. Stanford Int'l Bank, Ltd.*, 927 F.3d 830, 840 (5th Cir. 2019) (alteration in original) (citation omitted); *AmeriFirst Funding, Inc.*, 2008 WL 919546, at *3 ("A district court has wide latitude when it exercises its inherent equitable power in approving a distribution plan of receivership funds." (citing *Forex*, 242 F.3d at 331)).  "This discretion derives not only from the statutory grant of power, but also the court's equitable power to fashion appropriate remedies as 'ancillary relief' measures." *Stanford*, 927 F.3d at 840 (citing *SEC v. Wencke*, 622 F.2d 1363, 1369 (9th Cir. 1980)).  The purpose of an equity receivership is "to marshal assets, preserve value, equally distribute to creditors, and, either reorganize, if possible, or orderly liquidate." *Id.* (emphasis added) (quoting *Janvey v. Alguire*, 2014 WL 12654910, at *17 (N.D. Tex. July 30, 2014) (Godbey, J.)); *see also Wealth Mgmt. LLC*, 628 F.3d at 334 ("The goal in both securities-fraud receiverships and liquidation bankruptcy is identical—the fair distribution of the liquidated assets").  In order to achieve these objectives, "*in rem* jurisdiction over the receivership estate imbues the district court with broad discretion to shape equitable remedies necessary to protect the estate." *Stanford*, 927 F.3d at 840 (emphasis omitted).

The Receiver has established that at least some of the royalty conveyance instruments executed by Receivership Entities in favor of the Conveyance Investors are defective because they were purchased using non-RI investor funds (i.e., commingled funds) and/or the

- 23 -

Offering Entities over-sold and over-conveyed RI offerings and assets. As a result, not only are the proceeds from theses interests being held in suspense, but title to them is severely clouded and, therefore, unmarketable. *See* Omnibus Resp. at 14 ("The Conveyance Investors hold unmarketable interests; moreover, they cannot and will not receive any income upon those interests unless and until title is cleared to the satisfaction of the oil and gas well operators."). With respect to the defective conveyances that the Receiver moves to invalidate, the court agrees that, following the Receivers' proposed summary proceedings—and assuming that the Receiver is able to produce evidence that the specific royalty conveyance instrument at issue is actually defective—the most equitable approach is for the court to invalidate the defective conveyance, return the RI assets with clean title to the Offering Entities for liquidation, and for the Receiver to distribute the sales proceeds (with all other Receivership Assets) *pro rata* to all Investor Claimants.

To the extent the Conveyance Objectors suggest that they should be permitted to retain ownership of their respective RI investments—assuming that they actually hold record title[18]—the court concludes that this would yield an inequitable result. Given the fraudulent nature of the conveyances themselves, and the evidence that these conveyances were executed in a "haphazard" manner,[19] it would be inequitable to apply legal doctrines (such

---

[18]Even the Braun/Meyer Objectors acknowledge that they received "actual deeds/conveyances of some, but not all, of their interests" in the Crude-Babylon offering. *See* Braun/Meyer Obj. at 2.

[19]For example, some Conveyance Investors were actually conveyed interests, others were not; some conveyances accurately represented the *pro rata* share of the Conveyance

as, for example, the effect of recorded title under state law) that would favor one victim over another based on the mere fortuity of how that victim's investment was managed by Faulkner and the Offering Entities. *See, e.g., Walsh*, 712 F.3d at 749 ("[A] trustee or receiver devising a distribution plan is not required to apportion assets in conformity with . . . arbitrary allocations that were made by the defrauder, 'otherwise, the whim of the defrauder would . . . control[] the process that is supposed to unwind the fraud." (all but second alteration in original) (citing *In re Bernard L. Madoff Inv. Secs. LLC*, 654 F.3d 229, 241 (2d. Cir. 2011)). In other words, principles of equity dictate that those Conveyance Investors who, by mere fortuity, received recorded title in connection with an RI investment should not be permitted to retain that property while all other defrauded investors are limited to a *pro rata* distribution. *See, e.g, Elliott*, 953 F.2d at 1569 ("To allow any individual to elevate his position over that of other investors similarly 'victimized' . . . would create inequitable results, in that certain investors would recoup 100% of their investment while others would receive substantially less." (citation omitted)).

Accordingly, for these reasons and as set forth in the Receiver's Plan Motion, Omnibus Response, and Supplemental Submission, the court overrules the Conveyance Objectors' objection.

---

Investors who received them, others did not; some RI investments were purchased with commingled funds, others were not; and some Conveyance Investors were paid royalties with commingled funds, others were not.

V

The court now turns to the third argument: the objection of a single objector, Gober (the "WI Class Objector"), who opposes the Plan on the basis that WI holders in a completed prospect (such as, in Gober's case, the "Crude-White Wolf # 1") are in a distinct class from investors who do not have a completed and ongoing WI.

A

The WI Class Objector challenges the proposed Plan on the ground that it fails to provide equitable treatment, and he offers a distinction between the WI investors. He maintains that the Crude-White Wolf # 1 prospect was completed and went into production in 2015; that Crude Energy failed to complete the recordable assignments of the WIs for all investors, despite repeated assurances that the assignments would be accomplished; that all of the proceeds from the Crude-White Wolf # 1 prospect have been held in suspense by the operating company until released by the court; that the Receiver has not acknowledged that the WI investors in this completed project are in a distinct class from the investors who do not have a completed and ongoing interest; and that commingling the suspended funds and the ongoing production proceeds going forward, which rightly belong to a distinct and discoverable group of investors, is not an equitable basis for a *pro rata* distribution and fails to answer the question, "[t]o whom do the ongoing production proceeds rightly belong?" Gober Obj. at 1. The WI Class Objector requests that the Plan be modified to take into account the distinction between WI investors of a completed and producing prospect and other WI investors; that the suspended funds be distributed to the discoverable investors; and

- 26 -

that the Plan identify those investors in a manner that will allow proper assignment of their rightful legal interest in the future proceeds of the prospect.

The Receiver responds that the WI Class Objector is asking the court to conduct a distorted form of tracing, which would benefit only a subset of the WI investors; that rather than trace investor proceeds from the initial deposit through to expenditures by the Breitling entities (such as the purchase of the WI in a specific prospect), the WI Class Objector is seeking to reap the benefits of the completed and producing properties irrespective of whose funds were actually used to purchase those prospects; that the WI Class Objector's approach ignores the factual reality of the fraudulent scheme, particularly with respect to the commingling of funds; that investor proceeds were regularly, if not universally, transferred from prospect-specific accounts to general operating accounts (or to other entities) before a WI prospect was completed; that expenditures for a prospect made after the prospect-specific account had been emptied were necessarily made with commingled funds of investors in distinctly separate offerings; and that the approach of the WI Class Objector fails for the same reasons the approach of the Royalty Class Objectors should, i.e., it is based on the fiction that certain investors' funds were segregated and used to acquire and maintain certain classes of assets, but, due to the extensive commingling of investor proceeds, this is simply not the case.

B

For the reasons set out above, *see supra* § IV(B), and for the reasons explained in the Receiver's Plan Motion, Omnibus Response, and Supplemental Submission, the court

overrules the WI Class Objector's objection.  The Receiver has established the extensive

commingling of investor funds in connection with Faulkner's fraudulent scheme.  It would

be inequitable to permit a narrow subset of WI investors—i.e., those who hold a WI

investment in a completed prospect—whose investment funds were commingled in the same

manner and to the same extent as all of the other victims of the fraudulent scheme, to receive

a more favorable distribution of Receivership Assets.  For the reasons explained in detail

above, *see supra* §§ III(B) and IV(B), the most equitable approach is for all receivership

assets to be distributed on a *pro rata* basis, as proposed under the Plan.  The Working Interest

Class Objector's objection is therefore overruled.

VI

When deciding whether, and under what terms, a motion like the Plan Motion should

be granted, the court does not lose sight of the fact that the competing claimants are almost

always victims—victims of someone else's securities fraud.  Nor does it turn a callous eye

to those who have incurred hardships—sometimes with severe consequences—as a result of

being defrauded.  Unfortunately, victimized investors are often among the most vulnerable

and have the most to lose.  But in cases like this one where there are more victims seeking

relief (many of whom have probably incurred hardships) than there are available proceeds

to make them whole, the court ultimately must decide what is a fair, reasonable, and

equitable plan for distributing the relief that is actually available.

After considering the Plan Motion, the timely objections thereto, the Receiver's

Omnibus Response, the Receiver's Supplemental Submission, and the Perrys' supplemental

- 28 -

submission, the court finds and concludes that the proposed Plan is fair, reasonable, and equitable, and that the Plan Motion should therefore be granted.

VII

The Receiver may now carry out the parts of the Plan that have not yet been implemented. Within 14 days of the date this memorandum opinion and order is filed, or at a later date that the court approves at the Receiver's request, the Receiver must submit for court review any proposed orders (e.g., setting the claim bar date) that the Receiver deems necessary to authorize him to carry out the parts of the Plan that have not yet been implemented.

*   *   *

For the reasons explained, the Receiver's February 25, 2019 motion to approve proposed plan of distribution and to establish procedures to determine and disallow final claims is granted.

**SO ORDERED**.

April 28, 2020.

SIDNEY A. FITZWATER
SENIOR JUDGE

- 29 -