IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| Plaintiff, | § § | |
| VS. | § § § | Civil Action No. 3:16-CV-1735-D |
| CHRISTOPHER A. FAULKNER, et al., | § § | |
| Defendants. | § § | |

MEMORANDUM OPINION
AND ORDER

In this civil enforcement action, plaintiff Securities and Exchange Commission ("SEC") moves for remedies and for final judgments against defendants Beth C. Handkins ("Handkins"), Dustin Michael Miller Rodriguez ("Miller"), and Parker R. Hallam ("Hallam"). The SEC seeks disgorgement; prejudgment interest; third-tier civil penalties under § 20(d) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77t(d), and § 21(d) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78u(d)(3); and permanent injunctive relief against Hallam related to the sale of unregistered securities. The court grants the SEC's motion for the reasons that follow and enters a Fed. R. Civ. P. 54(b) final judgment as to these defendants today.

I

Because this case is the subject of several prior memorandum opinions and orders, *see, e.g., SEC v. Faulkner*, 2018 WL 5458789, at *1 (N.D. Tex. Oct. 29, 2018) (Fitzwater, J.) (collecting cases), the court will limit its discussion of the background facts and

procedural history to what is pertinent to today's decision.

The SEC alleges in this civil enforcement action that defendant Christopher A. Faulkner ("Faulkner"), with assistance from defendants Hallam, Miller, and Handkins, orchestrated a massive scheme (the "Faulkner Scheme") that defrauded investors out of approximately $80 million over the course of at least five years.[1]  The Faulkner Scheme involved the unregistered and fraudulent offer and sale of working interest investments in more than 20 oil-and-gas prospects in several states.  As pertinent here, Faulkner offered these investments through three separate entities—Breitling Oil and Gas Corporation ("BOG"), Crude Energy, LLC ("Crude"), and Patriot Energy, Inc. ("Patriot")—using confidential information memoranda ("CIMs") that were replete with material misrepresentations and omissions.

Hallam and Miller were active participants in the Faulkner Scheme, directing the sales efforts of BOG and Crude, and serving as the primary conduits for disseminating knowingly false and misleading statements to investors.  Additionally, at Crude (Hallam and Miller) and Patriot (Miller alone) they enabled Faulkner to control the entities behind the scenes and to misappropriate investor funds.  Handkins, who controlled all relevant bank accounts of BOG, Crude, and Patriot, made millions of dollars in payments for charges on Faulkner's personal

---

[1]Under the terms of the interlocutory judgments entered against Handkins and Miller, the court accepts as true all of the allegations in the original complaint with respect to these defendants.  Inter. Judg. as to Handkins at 3-4; Inter. Judg. as to Miller at 5.  Under the terms of the interlocutory judgment entered against Hallam, the court accepts as true all of the allegations in the amended complaint with respect to Hallam.  Inter. Judg. as to Hallam at 5-6.

credit cards; paid Faulkner for unsupported expense reimbursements and phony service fees; commingled investor funds; and consistently diverted funds to Faulkner at his behest and without regard for the intended use of the funds.  Hallam, Miller, and Handkins were each compensated for their vital roles in the Faulkner Scheme.

In June 2016 the SEC brought this civil enforcement action against Faulkner and others—including Hallam, Miller, and Handkins—alleging, *inter alia*, claims under the antifraud provisions of the Securities Act and the Exchange Act.  The day this lawsuit was filed, agreed interlocutory judgments were entered against Handkins and Miller.  In August 2016 an amended complaint was filed, and in April 2017 an interlocutory judgment was entered against Hallam.

The interlocutory judgments entered against Handkins, Miller, and Hallam contain a nearly identical provision that states, in pertinent part:

> Defendant shall pay disgorgement of ill-gotten gains, prejudgment interest thereon, and a civil penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]. The Court shall determine the amounts of the disgorgement and civil penalty upon motion of the Commission.  Prejudgment interest shall be calculated from March 1, 2016, based on the rate of interest used by the Internal Revenue Service for the underpayment of federal income tax as set forth in 26 U.S.C. § 6621(a)(2).  In connection with the Commission's motion for disgorgement and/or civil penalties, and at any hearing held on such a motion: (a) Defendant will be precluded from arguing that she did not violate the federal securities laws as alleged in the Complaint; (b) Defendant may not challenge the validity of the Consent or this Judgment; (c) solely for the purposes of such motion, the allegations of the Complaint shall be accepted as and deemed true by the Court; and (d) the Court may determine

> the issues raised in the motion on the basis of affidavits, declarations, excerpts of sworn deposition or investigative testimony, and documentary evidence, without regard to the standards for summary judgment contained in Rule 56(c) of the Federal Rules of Civil Procedure.

Inter. Judg. as to Handkins at 3-4(brackets in original); *see also* Inter. Judg. as to Miller at 5 (nearly identical provision with prejudgment interest calculated from April 28, 2016); Inter. Judg. as to Hallam at 5-6 (nearly identical provision with prejudgment interest calculated from March 31, 2015, and additional language regarding injunction). The interlocutory judgment entered against Hallam also provides:

> the Court shall determine, upon motion of the Commission, whether Defendant should be permanently restrained and enjoined from participating, directly or indirectly, including but not limited to through any other entity owned or controlled by him, in the issuance, purchase, offer, or sale of any security, provided however, that such permanent injunction shall not prevent Defendant from purchasing or selling securities for his account[.]

Inter. Judg. as to Hallam at 5.

Based on the interlocutory judgments, the SEC filed on January 24, 2020 a motion for remedies and motion for final judgments as to Hallam, Miller, and Handkins, which it supplemented on July 28, 2020.[2] The SEC seeks disgorgement, prejudgment interest, third-

_____

[2]On February 10, 2020 the court entered an order granting the unopposed joint motion to stay the case as to defendants Hallam, Miller, and Handkins pending a decision by the Supreme Court of the United States in *Liu v. SEC*, ___ U.S. ___, 140 S.Ct. 1936 (2020). On February 21, 2020 the court superseded the February 10, 2020 order. After the Supreme Court decided *Liu* the court directed defendants to respond to the SEC's motion by September 7, 2020. On July 28, 2020 the SEC supplemented its motion for remedies and final judgments. Hallam responded to the SEC's January 24, 2020 motion and July 28, 2020

tier civil penalties, and (as to Hallam only) a permanent injunction.  Neither Handkins nor Miller has responded to the SEC's motion.  Hallam has responded, however, and opposes the motion.

## II

The court begins with the SEC's request that the court order defendants to disgorge the compensation they received for their respective roles in the Faulkner Scheme.

## A

Disgorgement "is an equitable remedy meant to prevent the wrongdoer from enriching himself by his wrongs" by "wrest[ing] ill-gotten gains from the hands of [the] wrongdoer." *Allstate Ins. Co. v. Receivable Fin. Co.*, 501 F.3d 398, 415 (5th Cir. 2007) (quoting *SEC v. Huffman*, 996 F.2d 800, 802 (5th Cir. 1993)).  Before the Supreme Court's recent decision in *Liu v. SEC*, ___ U.S. ___, 140 S.Ct. 1936 (2020), courts across the country, including in the Fifth Circuit, had consistently recognized disgorgement as a form of "equitable relief" available under 15 U.S.C. § 78u(d)(5)[3] to remedy violations of the federal securities laws. *See, e.g., SEC v. Team Res. Inc.*, 942 F.3d 272, 277 (5th Cir. 2019) ("[T]he principle that district courts may order disgorgement in SEC enforcement proceedings is well established in our circuit."), *cert. granted, judgment vacated*, 141 S.Ct. 186 (2020) (mem. op.).  In *Liu*

───────────────

supplement in his September 18, 2020 response.

[3]The Exchange Act authorizes the SEC, in civil enforcement proceedings, to seek "any equitable relief that may be appropriate or necessary for the benefit of investors."  15 U.S.C. § 78u(d)(5).

the Supreme Court reaffirmed this view, holding that "a disgorgement award that does not exceed a wrongdoer's net profits and is awarded for victims is equitable relief permissible under § 78u(d)(5)." *Liu*, 140 S.Ct. at 1940.

"The district court has broad discretion in fashioning the equitable remedy of a disgorgement order." *Huffman*, 996 F.2d at 803. "Because disgorgement is meant to be remedial and not punitive, it is limited to property causally related to the wrongdoing at issue." *Allstate Ins. Co*, 501 F.3d at 413 (citation and internal quotation marks omitted). "Accordingly, the party seeking disgorgement must distinguish between that which has been legally and illegally obtained." *Id*. "The court's power to order disgorgement extends only to the amount with interest by which the defendant profited from his wrongdoing. Any further sum would constitute a penalty assessment." *SEC v. Blatt*, 583 F.2d 1325, 1335 (5th Cir. 1978).

"In actions brought by the SEC involving a securities violation, 'disgorgement need only be a reasonable approximation of profits causally connected to the violation.'" *Allstate Ins. Co.*, 501 F.3d at 413 (quoting *SEC v. First City Fin. Corp.*, 890 F.3d 1215, 1231 (D.C. Cir. 1989)). Once the SEC meets its burden of showing that "its disgorgement figure reasonably approximates the amount of unjust enrichment," the burden shifts to the defendant to "demonstrate that the disgorgement figure was not a reasonable approximation." *First City Fin.*, 890 F.2d at 1232. "[A]ny risk of uncertainty in calculating the amount 'should fall on the wrongdoer whose illegal conduct created that uncertainty.'" *SEC v. Bergin*, 2015 WL 4275509, at *2 (N.D. Tex. July 15, 2015) (Lynn, J.) (citation omitted).

B

"In the context of an offering of securities in violation of the securities laws, the proper starting point for a disgorgement award is the total proceeds received from the sale of the securities." *SEC v. AmeriFirst Funding, Inc.*, 2008 WL 1959843, at *2 (N.D. Tex. May 5, 2008) (Fitzwater, C.J.) (citing *SEC v. Manor Nursing Ctrs., Inc*., 458 F.2d 1082, 1104 (2d Cir. 1972)). The SEC's motion is supported by evidence that, during the five-year period immediately preceding the filing of this lawsuit, Hallam received $1,901,480, Miller received $1,454,533.00, and Handkins received $838,950 in compensation for their integral roles in the Faulkner Scheme. The SEC maintains that the Faulkner Scheme was wholly dependent on defendants' continued ability to raise money from investors in oil and gas offerings; that the misrepresentations in the various offering documents were important in influencing investors' decisions to invest, and, ultimately, keeping the investor funds flowing; and that, because BOG, Crude, and Patriot obtained funds from investors as a result of fraudulent offerings, the compensation that Handkins, Miller, and Hallam received for their integral roles in the scheme was ill-gotten. In its post-*Liu* supplement to its remedies motion, the SEC contends, *inter alia*, that the requested disgorgement against Hallam, Miller, and Handkins is consistent with *Liu*. It clarifies that the amount of disgorgement that it seeks from each defendant equals that defendant's respective net profits (i.e., the compensation each defendant received for that defendant's integral role in the Faulkner Scheme), and that the payments each defendant received had no value independent of fueling the fraudulent scheme and were, instead, the mechanism by which the wrongdoers siphoned money from

the fraud and were therefore merely dividends of profit under another name.

The court concludes that the SEC has met its burden of showing that the sums of $1,901,480 for Hallam, $1,454,533.00 for Miller, and $838,950 for Handkins are a reasonable approximation of net profits causally connected to each of these defendant's securities violations. The burden therefore shifts to each defendant to show that the amount in question as to that defendant is not a reasonable approximation. *See AmeriFirst Funding, Inc.*, 2008 WL 1959843, at *4 (citing *First City Fin.*, 890 F.2d at 1232).

## C

Handkins and Miller have not responded to the SEC's motion for remedies. Accordingly, they have not met their burden of demonstrating that the SEC's disgorgement figure "was not a reasonable approximation" of their net profits causally connected to their violations of the securities laws. *See First City Fin.*, 890 F.2d at 1232. The court therefore grants the SEC's motion for disgorgement in the amount of $1,454,533.00 as to Miller and $838,950 as to Handkins.

## D

### 1

Hallam opposes the SEC's disgorgement request on various grounds. He first contends that the SEC is not entitled to disgorgement because it has not met its burden of identifying a *res* that it has traced to the unlawful transactions in the first amended complaint and that is currently in Hallam's possession; that there is no existing *res* because Faulkner apparently dissipated the Crude and Patriot profits; that he never received a profit distribution

from these entities; that even if salary payments somehow constituted a profit distribution, he spent his "modest" salary on rent, groceries, and other living expenses; that most of the generic "distributions" listed by the SEC's accountants are reimbursements, funds apparently pilfered by Faulkner, and funds payable to third parties; and that, in sum, there is simply nothing to "disgorge," necessarily rendering any restitutionary award in this case a classic award of damages (a legal remedy).

He posits next that, even if disgorgement is available without a disputed *res*, the SEC can only recover the proven "net profits" that each defendant actually received; the SEC has not even attempted to provide the court any calculation of "net profits" for Breitling Energy Corporation ("BECC"), BOG, or Crude, the entities through which the transactions described in the complaint were conducted; recovery of Hallam's salary payments cannot be distinguished from an award of damages—i.e., a legal rather than equitable remedy—that any of the investor plaintiffs could recover against Hallam; Hallam's salary payments cannot constitute "net profits" under *Liu* because salary payments that Hallam received over the years represent an *expense* incurred by the companies through which the scheme was perpetrated, not a component of profit; the SEC has provided no tracing to segregate the sources of these payments between "legitimate" and "illegitimate" business conduct; and "[e]ighteenth and nineteenth century equity case law is replete with holdings that an equitable restitution claim does not lie where the plaintiff cannot show that the defendant *actually received* (and still has) the 'net profits' from the illicit conduct," Hallam Br. 24.

Finally, Hallam asserts that the SEC's attempt to characterize the entirety of Hallam's

salary payments a "net profit" must fail because the SEC did not take into account the extent of the *legitimate* business activities of Crude, BOG, or BEC, i.e., "those where investor funds were actually used to purchase working interests in wells which were actually drilled, from which distributions were actually made to investors." *Id.* at 25. He also maintains that, for the SEC to recover the miscellaneous "disbursements" it seeks, it would have to establish (1) the calculation of "net profits" of the entity that owns each of the bank accounts from which the disbursements were made; (2) the segregation of the "net profits" of the illegal transactions of that entity's business from the legal part of the business; (3) that funds representing the calculated "net profits" from the illegal transactions were deposited into the listed bank accounts, and in what amounts; (4) that the resulting balances were not commingled with other, non-tainted funds (or, if they were, that the percentage represented by the tainted funds has been calculated); (5) that the resulting balances of tainted funds were disbursed to Hallam for him to keep; and (6) that Hallam is still in possession of the disbursed funds in some identifiable account.

2

Hallam argues throughout that he never received a "profit distribution" from any of the Faulkner entities; that he was instead paid only a "modest salary"; and that this salary does not constitute "net profit" under *Liu* because the salary payments Hallam received over the years represent an *expense* incurred by the companies through which the scheme was perpetrated, not a component of profit. The court disagrees.

Hallam's attempts to characterize the payments he received from the various Faulkner

entities as "expenses" incurred by these entities, as opposed to "net profit" in his own hands, lack force.[4]  Under *Liu* a disgorgement award "that does not exceed a wrongdoer's net profits and is awarded for victims is equitable relief permissible under § 78u(d)(5)."  *Liu*, 140 S.Ct. at 1940.  Funds that Hallam received as compensation for his role in the Faulkner Scheme clearly constitute "net profits" *as to Hallam*, the wrongdoer.  Because Hallam has failed to present evidence of his *own* expenses,[5] the court can only conclude that the entirety of these funds constituted Hallam's net profits.  Under *Liu* disgorgement of these payments is clearly permitted.[6]  *See Liu*, 140 S.Ct. at 1940; *see also, e.g., SEC v. Merch. Capital, LLC*, 486 Fed. Appx. 93, 96 (11th Cir. 2012) ("We know of no authority, and the appellants cite none, which holds that salaries received, if modest and/or reasonable, cannot be considered ill-gotten gains.  The purpose of disgorgement is to deprive the wrongdoer of his ill-gotten gain, and there is no reason why salaries earned cannot be used to determine disgorgement."

_____

[4]The court need not decide whether the disbursement of ill-gotten gains in the form of a "salary" can *ever* constitute the type of "legitimate expense" that the court must deduct in calculating "net profit" for purposes of a disgorgement award.  *See Liu*, 140 S.Ct. at 1950 ("[C]ourts must deduct legitimate expenses before ordering disgorgement under § 78u(d)(5).").  Whether payments to Hallam constitute an expense deductible from an order of disgorgement under *Liu* is relevant only to the extent the SEC seeks disgorgement *from the entities that paid Hallam*, an issue not presented in the instant motion.

[5]As the court discusses below, *see infra* § II(D)(5), Hallam has failed to produce any evidence substantiating his assertion that the SEC included numerous expense reimbursements as revenue in calculating Hallam's net profits.

[6]In his response, Hallam relies on *City of Elizabeth v. American Nicholson Pavement Co.*, 97 U.S. 126 (1877), for the proposition that salary-type distributions are not recoverable in equity.  *City of Elizabeth* does not address disgorgement in the SEC civil enforcement context, however, and is therefore distinguishable.

- 11 -

(citation omitted)).

3

The court also rejects Hallam's contention that the SEC is not entitled to an award of disgorgement because it has not met its burden of identifying a *res* that it has traced to the unlawful transactions in the first amended complaint and that is currently in the possession of Hallam.

In the civil enforcement context, the SEC is not required to trace wrongfully-obtained funds to an identifiable *res* in the defendant's possession in order to obtain disgorgement. *See, e.g., Fed. Trade Comm'n v. Bronson Partners, LLC*, 654 F.3d 359, 374 (2d Cir. 2011) (noting that it is "uncontroversial that tracing is not required in disgorgement cases" and that "the Federal Reporter is replete with instances in which judges . . . deeply familiar with equity practice have permitted the SEC to obtain disgorgement without any mention of tracing."); *SEC v. First Pac. Bancorp*, 142 F.3d 1186, 1192 n.6 (9th Cir. 1998) (in civil enforcement action, "[t]he district court was not required to trace every dollar of the offering proceeds fraudulently retained by [defendant]"); *Fed. Trade Comm'n v. Life Mgmt. Servs. of Orange Cty., LLC*, 2019 WL 1093023, at *8 (M.D. Fla. Jan. 24, 2019) ("[W]hile the amount of the disgorgement must reasonably approximate[] the amount of unjust enrichment, [t]he remedy of disgorgement is not limited to the specific moneys or other assets wrongfully obtained." (alterations in original) (internal quotation marks and citations omitted)); *SEC v. Quan*, 2014 WL 4670923, at *13 (D. Minn. Sept. 19, 2014) ("[T]he Court has the equitable authority to order disgorgement in an amount equal to Defendants' ill-gotten gains without

requiring that the amount disgorged be tied to specific funds or assets within Defendants' possession and control."), *aff'd*, 817 F.3d 583 (8th Cir. 2016). "[D]isgorgement is an equitable obligation to return *a sum equal to the amount wrongfully obtained*, rather than a requirement to replevy a specific asset." *SEC v. Banner Fund Int'l*, 211 F.3d 602, 617 (D.C. Cir. 2000) (emphasis added). As one court has explained:

> the requirement of a causal relationship between a wrongful act and the property to be disgorged does not imply that a court may order a malefactor to disgorge only the actual property obtained by means of his wrongful act. Rather, the causal connection required is between the amount by which the defendant was unjustly enriched and the amount he can be required to disgorge. To hold, as [defendant] maintains, that a court may order a defendant to disgorge only the actual assets unjustly received would lead to absurd results. Under [defendant]'s approach, for example, a defendant who was careful to spend all the proceeds of his fraudulent scheme, while husbanding his other assets, would be immune from an order of disgorgement.

*Banner Fund Int'l*, 211 F.3d at 617; *see also SEC v. Rosenthal*, 426 Fed. Appx. 1, 1 (2d Cir. 2011) ("Imposing such a tracing requirement would allow [a] defendant to escape disgorgement by spending down illicit gains while protecting legitimately obtained assets or, as was the case here, by commingling and transferring such profits.").

The court is unpersuaded by Hallam's reliance on cases outside the SEC civil enforcement context to argue that tracing to an identifiable *res* is a requirement for disgorgement under the securities laws. *See, e.g.,* Hallam Br. 16-21 (citing *Mertens v. Hewitt Assocs.*, 508 U.S. 248 (1993) (ERISA[7] case); *Great-W. Life & Annuity Ins. Co. v. Knudson*,

---

[7]The Employee Retirement Income Security Act of 1974.

- 13 -

534 U.S. 204 (2002) (ERISA case), and their progeny and arguing that, where there is nothing to "disgorge," any restitutionary award is rendered an award of damages, i.e., a legal remedy).  A similar argument was raised by the defendant and rejected by the Eighth Circuit in *SEC v. Quan*, 817 F.3d 583 (8th Cir. 2016).  In *Quan* the defendant argued, as does Hallam, that when disgorgement is not limited to specific assets traced back to a violation, it is a *legal* remedy that cannot be awarded under a statute permitting only "equitable relief." *Id.* at 594.  The panel disagreed.  It distinguished the Supreme Court's holding in *Knudson* that ERISA,[8] which allows civil suits for "appropriate equitable relief," did not authorize a "restitution" claim that sought, "in essence, to impose personal liability . . . for a contractual obligation to pay money," which was not a remedy "typically available in equity."  *Knudson*, 534 U.S. at 210, 211.  The Eighth Circuit explained that a civil enforcement suit

> is not about restitution in the same sense, and the SEC seeking disgorgement is not analogous to a private plaintiff suing for money it is owed under a contract.  Indeed, disgorged funds are paid not to the SEC, but to the district court, which has discretion over how to disburse them.  [Defendant] cites no authority suggesting a lawsuit by an organ of the government acting in the public interest to enforce specific statutory and regulatory provisions and prevent violators from keeping their ill-gotten gains resembles a traditional suit at law.

*Quan*, 817 F.3d at 594-95 (citations omitted).  Like the defendant in *Quan*, Hallam has failed to convince the court that *Mertens*, *Knudson*, or their progeny require the SEC to trace a

---

[8]The statute at issue in *Knudson* was 29 U.S.C. § 1132(a)(3), which authorizes a civil action "by a participant, beneficiary, or fiduciary . . . to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of . . . the terms of the plan."

defendant's ill-gotten profits to an identified *res* currently in the defendant's possession in order to obtain disgorgement under § 78u(d)(5).  Nor has Hallam cited any other authority that would require tracing when disgorgement is sought in the context of an SEC civil enforcement action.

Finally, it is irrelevant that Hallam maintains that he spent his "modest salary" on rent, groceries, and other living expenses.  If the SEC "shows a causal relationship between the defendant's wrongdoing and the amount by which he was unjustly enriched, that amount of money may be disgorged even if the defendant has otherwise disposed of, reinvested, or spent the particular assets that he wrongfully obtained."  *SEC v. Seghers*, 298 Fed. Appx. 319, 336 (5th Cir. 2008) (citing *Banner Fund Int'l*, 211 F.3d at 617).  In other words, "[a] defendant is not immune from disgorgement merely because he has spent or lost the proceeds of his fraudulent scheme."  *Id*. (citing *Banner Fund Int'l*, 211 F.3d at 617).  Any profits that Hallam obtained by wrongdoing are ill-gotten gains even if he spent them on ordinary living expenses.  *See id.*

4

Hallam next contends that the SEC is not entitled to disgorgement of the full amount of funds disbursed to him by the various Faulkner entities because the SEC has failed to take into account the fact that some of Crude's and  BOG's business activities were legitimate.  Hallam maintains that investor funds were used to purchase working interests in wells that were actually drilled, from which distributions were actually made to investors, and that "if an enterprise derives profits from both legal and illegal means, the plaintiff must segregate

the profits from each part and compute the stolen profits form the wrongful conduct of the business, still deducting expenses to obtain a gross profit and then other necessary expenditures."  Hallam Br. 25.

Although Hallam is correct that the SEC cannot require a defendant to disgorge compensation that is *not* tied to unlawful activity, *see, e.g., SEC v. E-Smart Techs., Inc*, 139 F.Supp.3d 170, 189 (D.D.C. 2015) (SEC not entitled to disgorgement of defendant's *entire* salary when "most of the salary appears to have been earned *before* the violation at issue."); *SEC v. Levin*, 2015 WL 11199843, at *3 (S.D. Fla. July 15, 2015) (disgorgement of entire salary received in 2008 and 2009 not subject to disgorgement when securities violations did not begin until halfway through 2008), Hallam's argument regarding Crude's and BOG's legitimate business activities is misplaced.

In pertinent part, Hallam contends that Crude and BOG were able to return "millions . . . to investors from the actual working interests or royalties on actual, drilled and producing wells," Hallam Br. 25, but he ignores the fact that *all* of the working interest sales for which he was responsible[9] violated the securities laws.  In other words, this is not a case where the

_____

[9]The amended complaint alleges that Hallam sold working interest investments using misleading offering materials.  *See, e.g.*, Am. Compl. ¶ 61 ("Faulkner, Hallam, Miller, and BOG's sales staff also used Simo's projections to entice investors to invest in BOG's offerings.  However, they failed to disclose that Simo's projections were consistently, and abysmally, overstated."); *id.* ¶ 64 ("Hallam, Miller, and the salespeople disseminated BOG's materially misleading offering materials for the BOG Offerings and reiterated these misrepresentations as part of their sales efforts to investors.."); *id.* ¶ 94 ("Hallam, Miller, and the salespeople disseminated the materially misleading offering materials for the Crude Offerings and reiterated these misrepresentations as part of their sales efforts."); *id.* ¶ 148 ("By engaging in the conduct described herein, Faulkner, Hallam, Miller, Simo, BOG, Crude,

defendant was compensated in part for his *legal* activity and in part for his *illegal* activity. Nor is this a case where the defendant received compensation before the conduct that violated the securities laws began or after it ended. Were either of these scenarios present, Hallam's argument that the SEC is only entitled to disgorgement of that portion of his salary linked to the illegal sales might hold some weight. But in this case, because *all* of the securities that Hallam sold were in violation of the securities laws, the court finds that *all* of the compensation Hallam received for his role in the sale of these securities is subject to disgorgement.

Hallam's reliance on *Liu* in support of his argument is again misplaced. In *Liu* the Court held that "[c]ourts must deduct legitimate expenses before ordering disgorgement under § 78u(d)(5)." *Liu*, 140 S.Ct. at 1950. It then explained that, in the case before it, "some expenses from the petitioners' scheme went toward lease payments and cancer-treatment equipment. Such items arguably have value independent of fueling a fraudulent scheme." *Id.* The Court then left "it to the lower court to examine whether including those expenses in a profits-based remedy is consistent with the equitable principles underlying § 78u(d)(5)." *Id.* But this holding from *Liu* does not apply to the calculation of Hallam's net

---

and Patriot, directly or indirectly, singly or in concert, in the offer or sale of securities, by use of the means or instrumentalities of interstate commerce or of the mails, and at least negligently, obtained money or property by means of untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."). Hallam does not argue or present any evidence that he did not violate the federal securities laws with respect to *each and every* working interest that he sold.

profits, all of which are linked to his compensation. This is because, even assuming *arguendo* that the purchase of working interests was a legitimate business expense that should be deducted from any amount the *purchasing entities* should be required to disgorge, these working interests are not a legitimate business expense that *Hallam* incurred. The SEC seeks disgorgement of Hallam's compensation, and he adduces no evidence that any portion of this compensation was spent acquiring legitimate investments in working interests.

Moreover, even assuming *arguendo* that some of the disbursements Hallam received constitute compensation paid out of funds from non-fraudulent sources or compensation for his legitimate (i.e., non-fraudulent) business activities, Hallam has made no attempt to prove what portion of his salary is linked to legal activity and what portion is linked to illegal activity. *See, e.g., SEC v. Renaissance Capital Mgmt.*, 2003 WL 23353464, at *2 (E.D.N.Y. Aug. 25, 2003) (awarding as disgorgement full amount defendant claimed constituted "salary" where defendant "has not provided any persuasive evidence that the amounts were salary unrelated to the fraud."), *rec. adopted*, 2003 WL 23353490 (E.D.N.Y. Oct. 31, 2003), *aff'd sub nom.*, *SEC v. Andrescu*, 117 Fed. Appx. 160 (2d Cir. 2004). Because the SEC met its initial burden, the burden shifted to Hallam to "demonstrate that the disgorgement figure was not a reasonable approximation." *First City Fin.*, 890 F.2d at 1232. Hallam has failed to make the required showing.

5

Finally, to the extent that Hallam contends that "most of the generic 'disbursements' listed by the SEC's accountants are reimbursements, funds apparently pilfered by Faulkner,

and funds payable to third parties," Hallam Br. 21, the court concludes that Hallam has not

met his burden to demonstrate that the SEC's "disgorgement figure was not a reasonable

approximation" of his net profits, *First City Fin*., 890 F.2d at 1232.

In his declaration, Hallam avers:

> I believe there are numerous errors in [the SEC's] schedule [of disbursements to Hallam], and that it does not accurately reflect the funds I received. I left Crude and the other Companies in May, 2015, so it is illogical for the disbursement calculation to continue through February 29, 2016. There were numerous cash withdrawals attributed to me in 2011 and 2012 that I did not execute. There were numerous expense reimbursements included as revenue. If those amounts were paid to me, I believe they were reimbursements for funds I had advanced for company expenses. Toward the end of my tenure, once I realized Mr. Faulkner was misappropriating money, I withdrew all of the money from the remaining Crude accounts to safeguard them from Mr. Faulkner. Those funds were later transferred to an escrow agent. I did not receive those funds. The following is a table of entries I think are in error:

| | |
|---|---|
| $51,000.00 | Gotham/Pepper Hamilton |
| $40,000.00 | Al Carmona |
| $1,290.88 | Brazil |
| $24,900.00 | 6/18/15 |
| $19,071.71 | Expense reimbursement |
| $100,300.00 | Cash withdrawals wrongfully attributed to Hallam |
| $175,000.00 | Indemnification for legal fees; paid to attorneys |
| $494,874.04 | Withdrawals to safeguard, later transferred to escrow agent |

- 19 -

| $906,436.63 | Incorrect entries |
|-------------|-------------------|

Hallam App. 3-4.

To the extent that Hallam challenges the SEC's disgorgement figure on the basis that it includes $100,300.00 in cash withdrawals that Hallam did not execute, he has not produced any evidence that would substantiate this assertion. He has failed to identify which cash withdrawals were wrongfully attributed to him, and he has not produced any evidence that would show that he did not, in fact, make the alleged withdrawals.

Hallam contends that the SEC has improperly included in its calculations expense reimbursements as revenue. But he has failed to produce any documentation establishing that he, in fact, paid the money as referenced. Moreover, he neither explains the purpose of the identified expenses (for example, "Gotham/Pepper Hamilton," "Al Carmona," "Brazil,") nor produces any evidence that these alleged reimbursements were for "*legitimate* business expenses," as *Liu* requires. *See Liu*, 140 S.Ct. at 1950 (emphasis added) ("[C]ourts must deduct legitimate expenses before ordering disgorgement under § 78u(d)(5).").

To the extent that Hallam disputes the SEC's inclusion of $494,874.04, which he maintains represents "[w]ithdrawals to safeguard, later transferred to escrow agent," Hallam provides no evidence that this withdrawal was for a legitimate business expense, and he does not state the current disposition of these funds or the identity of the escrow agent.

Finally, Hallam's identification of $906,436.63 as "Incorrect entries" is clearly insufficient to meet Hallam's burden with respect to this amount.

Once the SEC presents evidence reasonably approximating the amount of ill-gotten gains, the burden of proof shifts to the defendant to "clearly . . . demonstrate that the disgorgement figure [is] not a reasonable approximation." *First City Fin.*, 890 F.2d at 1232. "[A]ny risk of uncertainty in calculating the amount 'should fall on the wrongdoer whose illegal conduct created that uncertainty.'" *Bergin*, 2015 WL 4275509, at *2 (citation omitted). Hallam has failed to clearly demonstrate that the SEC's disgorgement figure is not a reasonable approximation of his wrongfully obtained net profits. Accordingly, the court grants the SEC's motion to the extent that the SEC requests disgorgement in the amount of $1,901,480 from Hallam.

### III

The court now considers the SEC's motion for prejudgment interest.

### A

The SEC requests that the court award prejudgment interest as to each defendant, calculated according to the rate of interest used by the Internal Revenue Service ("IRS") for the underpayment of federal income tax. Hallam opposes the SEC's request, contending that an award of prejudgment interest is not authorized by the Securities Act or Exchange Act; that this remedy was not "typically available" in pre-fusion equity jurisprudence; and that prejudgment interest calculated using the IRS underpayment rate results in an amount in excess of the actual dollar value of the disgorgement, thus rendering prejudgment a penalty barred by the law of equity. The court disagrees with Hallam's arguments.

- 21 -

B

It is well-settled that courts may add prejudgment interest to a defendant's disgorgement amount to prevent him from benefiting from the use of ill-gotten gains interest free. *See Blatt*, 583 F.2d at 1335. Where, as here, a wrongdoer enjoyed access to funds over a prolonged period as a result of his wrongdoing, ordering payment of prejudgment interest is consistent with the equitable purpose of the disgorgement remedy. *See, e.g., AmeriFirst Funding, Inc.*, 2008 WL 1959843, at *5 ("Courts have recognized that an assessment of prejudgment interest, like the disgorgement remedy, is intended to deprive wrongdoers of profits they illegally obtained by violating the securities laws." (quoting *SEC v. Sargent*, 329 F.3d 34, 40 (1st Cir. 2003))). Hallam, Handkins, and Miller should each be ordered to pay prejudgment interest because these defendants enjoyed the benefits of their victims' money, thereby offending basic principles of justice and equity. *See SEC v. Greenview Inv. Partners, L.P.*, 2020 WL 973750, at *3 (N.D. Tex. Jan. 2, 2020) (Fish, J.).

The IRS underpayment of federal income tax rate is appropriate for calculating prejudgment interest in SEC enforcement actions. That rate of interest "reflects what it would have cost to borrow the money from the government and therefore reasonably approximates one of the benefits the defendant derived from its fraud." *SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1476 (2d Cir. 1996). Accordingly, the court grants the SEC's request for prejudgment interest, calculated using the tax underpayment rate, as follows: $424,375.38 as to Hallam; $266,524.97 as to Miller; and $156,960.22 as to Handkins.

- 22 -

IV

The court now turns to the SEC's request for an award of third-tier civil penalties.

A

Section 20(d) of the Securities Act and § 21(d)(3) of the Exchange Act authorize the court to impose civil penalties.  *See* 15 U.S.C. §§ 77t(d), 78u(d)(3).  These penalties "are designed to punish the individual violator and deter future violations of the securities laws." *SEC v. Stanford Int'l Bank, Ltd.*, 2013 WL 12360438, at *6 (N.D. Tex. Apr. 25, 2013) (Godbey, J.) (quoting *SEC v. Opulentica*, LLC, 479 F.Supp.2d 319, 331 (S.D.N.Y. 2007)). "Without civil penalties, the only financial risk to violators is the forfeiture of their ill-gotten gains."  *Id.* (quoting *SEC v. Koenig*, 532 F.Supp.2d 987, 995 (N.D. Ill. 2007)).

The statutes set out a three-tier penalty structure that provides increasing penalty amounts based on the severity of the violations.  *SEC v. Helms*, 2015 WL 5010298, at *20-21 (W.D. Tex. Aug. 21, 2015).  All violations are subject to first-tier penalties.  *See* 15 U.S.C. §§ 77t(d), 78u(d)(3).  Second-tier penalties are warranted when violations involve "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement."  *Id.* Third-tier penalties are appropriate for violations that involve fraud and "result[] in substantial losses or create[] a significant risk of substantial losses to other persons."  *Id.*

Defendants are subject to third-tier civil penalties under § 20(d) of the Securities Act because they violated § 17(a)(1)-(3) of the Securities Act, and each of these violations involved fraud or deceit.  Moreover, these violations directly or indirectly caused substantial losses to other people.  Defendants are likewise subject to third-tier civil penalties under §

21(d)(3) of the Exchange Act because their violations of § 10(b) of the Exchange Act involved fraud or deceit, and this conduct directly or indirectly caused substantial losses to other people.

B

The court next determines the amount that each defendant should be required to pay.

1

The maximum penalty the court may award is either the defendant's gross amount of pecuniary gain as a result of the violation or the amount set by statute, whichever is greater. *See* 15 U.S.C. §§ 77t(d), 78u(d)(3).  Under the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, the maximum third-tier penalty amount is $150,000 per violation for violations occurring from March 4, 2009 to March 5, 2013 and $160,000 per violation for violations occurring from March 6, 2013 to November 2, 2015.  *See* 17 C.F.R. § 201.1001, Table I.

Although the tier determines the maximum penalty amount, the actual amount imposed is left to the court's discretion.  *SEC v. Kern*, 425 F.3d 143, 153 (2d Cir. 2005).  Neither § 20(d) of the Securities Act nor § 21(d) of the Exchange Act provides any guidance as to the proper amount of the civil penalty.  A number of courts, however, including in this circuit, have relied on the same principles in making this decision:

> (1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to

the defendant's demonstrated current and future financial
condition.

*AmeriFirst Funding, Inc.*, 2008 WL 1959843, at \*7 (citing cases).  "Other courts have

considered such additional factors as the cooperation of the defendant with law enforcement

authorities and the adequacy of other criminal or civil sanctions to punish the defendant."

*Id.* (citing cases).  "While these factors are helpful in characterizing a particular defendant's

actions, the civil penalty framework is of a discretionary nature and each case has its own

particular facts and circumstances which determine the appropriate penalty to be imposed."

*Opulentica*, 479 F.Supp.2d at 331 (internal quotation marks omitted).

2

The factors counsel in favor of imposing the civil penalties specified below.  Under

the first factor, the court concludes that defendants' securities violations were egregious, not

only with respect to the sheer number of misrepresentations in connection with the sale of

unregistered securities, but also in their nature.  Hallam and Miller directed the sales efforts

of BOG, Crude, and Patriot (Miller only), using CIMs that contained material

misrepresentations regarding, *inter alia*, Faulkner's education and experience in the oil and

gas industry; BOG's use of investor funds; Faulkner's involvement in Crude;  BOG's and

Crude's alleged segregation of investor funds; and BOG's, Crude's, and Patriot's payment

of transaction-based compensation to salespersons.  Additionally, Hallam, Miller, and their

sales staff failed to disclose that the geologist projections on which they relied to entice

investors were consistently overstated and that actual production was often less than 10% of

the projections.  They sold investors a larger percentage of working interests in prospects than BOG actually owned, and occasionally sold interests in prospects that BOG did not even own.  And they approved transfers among the various entities, knowing that they were not tied to specific prospects.

Handkins controlled all bank accounts and regularly commingled investor funds from various offerings into one bank account, even though she knew this practice contradicted representations in the CIMs.  She also routinely diverted commingled investor funds to Faulkner and BECC, in direct violation of the representations to investors in the CIMs; improperly used commingled investor funds from BOG, Crude, and Patriot to pay personal expenses incurred by Faulkner; and facilitated and effected Faulkner's misappropriation of approximately $30 million of investor funds.  The above-described conduct was egregious.

The second factor, the degree of defendants' scienter, also weighs in favor of imposing the penalties the court hereafter imposes.  The complaint and amended complaint, which defendants have agreed "shall be accepted as and deemed true by the Court,"[10] allege that Hallam, Miller, and Handkins "directly or indirectly, singly or in concert, in the offer or sale of securities, by use of the means or instrumentalities of interstate commerce or of the mails, *knowingly or with severe recklessness*, employed devices, schemes, or artifices to defraud."  Compl. ¶ 139 (emphasis added); Am. Compl. ¶ 147 (same); *see also* Compl. ¶ 147 (alleging, in support of Exchange Act claim that defendants "engaged in the above-

---

[10]Inter. Judg. as to Handkins at 3-4; Inter. Judg. as to Miller at 5; Inter. Judg. as to Hallam at 5-6.

referenced conduct *knowingly or with severe recklessness*," (emphasis added)); Am. Compl.

¶ 155 (same).  In the securities context, "severe recklessness" is defined as

> those highly unreasonable omissions or misrepresentations that
> involve not merely simple or even inexcusable negligence, but
> an extreme departure from the standards of ordinary care, and
> that present a danger of misleading buyers or sellers which is
> either known to the defendant or so obvious that the defendant
> must have been aware of it.

*SEC v. Sethi*, 910 F.3d 198, 206 (5th Cir. 2018) (citing *Broad v. Rockwell Int'l Corp.*, 642

F.2d 929, 961-62 (5th Cir. 1981) (en banc)).  Severe recklessness "is viewed as a lesser form

of intent, rather than merely a greater degree of ordinary negligence."  *In re Baker Hughes

Secs. Litig.*, 136 F.Supp.2d 630, 647-48 (S.D. Tex. 2001) (citation omitted).  Accordingly,

the court rejects Hallam's contention that he acted with mere negligence, i.e., "his own

naivety and admitted lack of judgment," Hallam Br. 35, and that the SEC has failed "to

establish that Hallam's participation was knowing or reckless," *id.* at 38-39.

Moreover, with respect to at least some of the alleged violations, actual knowledge

is either alleged in the amended complaint or can be logically inferred.  For example, the

amended complaint alleges that "Hallam *knew*" that Handkins "made hundreds of thousands

of dollars in payments to Amex directly out of Crude's bank accounts for charges made by

Faulkner."  Am. Compl. ¶ 85 (emphasis added).  It asserts that "Hallam and Miller, who led

Crude's sales efforts and managed Crude's salespeople, reviewed the offering materials and

were aware that the statements therein . . . omitted any mention of Faulkner's involvement

in the company."  Am. Compl. ¶ 87.  As Crude's president and CIO, respectively, Hallam

and Miller certainly would have known that Faulkner was directing and controlling all of Crude's operations.[11]  It also alleges that BOG's, Crude's, and Patriot's CIMs stated that only company officers would offer and sell working interests to investors, and that no one would receive transaction-based compensation.  Yet the court can reasonably infer that, as managers of BOG's and Crude's sales staff, Hallam and Miller would have known that this representation was untrue since their sales staff received millions of dollars in transaction-based compensation.

In his response to the SEC's motion, Hallam argues that

> [t]hroughout the Faulkner Scheme, the companies employed a host of lawyers, auditors, CPA[s] and other professionals, all chosen by Faulkner but all possessing the education, licensing and experience to convince Hallam that their advice was sound. This included in-house counsel Jeremy Wagers . . . and outside lawyers such as those at well-regarded law firm Scheef & Stone LLP, who advised Hallam on the legality of the CIM[s].  The companies employed in-house and outside accountants and auditors, including Rothstein Kass & Company, PLLC, who provided comfort to Hallam that the financial affairs of the operation—including the flows of funds—were sound and consistent with accounting and legal requirements.

Hallam Br. 36-37.[12]  Reliance on the advice of counsel or another professional is an accepted

---

[11]Hallam maintains in his response that he did not know that he was required to disclose the fact that Faulkner exercised actual control over Crude.  But his alleged lack of knowledge of the securities laws, even if true, still constitutes severe recklessness under the facts of this case.

[12]Hallam also requests leave submit supplemental briefing upon the conclusion of limited discovery and that the court set the matter for hearing.  He maintains that "the issues to be resolved in the assessment of penalty tiers—including Hallam's scienter and good faith reliance on counsel and accountants—are best presented to the court through the live

"means of demonstrating good faith and represents possible evidence of an absence of any intent to defraud." *United States v. Peterson*, 101 F.3d 375, 381 (5th Cir. 1996). But Hallam has failed to provide sufficient detail, much less evidence, to demonstrate good faith with respect to the various alleged securities violations. For example, Hallam generally describes the professionals on whose advice he purportedly relied, but he does not state who gave him advice, what specific advice he was given or when, or whether any of the conduct that violated the securities laws was based on the advice of an attorney, accountant, or auditor. Accordingly, although the court agrees that reliance on the advice of counsel or another professional would generally weigh against a high penalty amount, it is unconvinced in this case that Hallam has demonstrated good faith based on the reliance on professional advice. Instead, the court concludes, as it must, that Hallam acted at least with severe recklessness, if not knowledge, with respect to all of the alleged securities violations. This degree of scienter weighs in favor of the penalty amount hereafter imposed.

The third and fourth factors also weigh in favor of imposing the penalties imposed. Defendants' conduct has caused substantial losses to investors—approximately $70 million—and occurred over a period of four and a half years for Hallam (three years working "under Faulkner," and 18 months as Crude's president) and longer for the other defendants.

───────────────────

appearance of the defendant for the Court to judge the veracity of his account and the sincerity of his testimony." Hallam Br. 40. The court denies Hallam's requests. Hallam has had sufficient time to complete any necessary discovery, especially given that evidence regarding scienter and good faith are particularly within Hallam's own possession. And to the extent Hallam requests a hearing, he has not established that one is necessary given the arguments Hallam makes in his opposition response.

Finally, the fifth factor does not weigh against the penalties imposed.  Hallam states in his response that he "is without substantial assets, has a modest income and has a negative net worth."  Hallam Br. 39.  In his affidavit, Hallam avers that if the court ordered a tier two or three penalty, he "could not pay it."  Hallam App. 5.  But Hallam has failed to present any evidence to substantiate his assertions regarding his current financial condition.  Hallam has not adduced evidence concerning his current net worth, his annual income, the value of his total assets, or the amount and nature of his total liabilities.  Accordingly, this factor does not weigh against the penalty imposed on Hallam.

Some courts have also considered whether the defendants have cooperated with law enforcement.  *See AmeriFirst Funding, Inc.*, 2008 WL 1959843, at *8.  The SEC acknowledges that all three defendants have agreed to bifurcated settlements; have voluntarily met with counsel for the SEC on a few occasions, both before and after the filing of this lawsuit; and have provided sworn declarations in support of the SEC's August 2017 motion for preliminary injunction, *ex parte* temporary restraining order, asset freeze, appointment of receiver, and other ancillary relief.  Hallam also states that he left the business well before anyone else; quickly went to the Department of Justice and the SEC; and has given live testimony and information to assist the receiver, all with no assurance that he would not be criminally prosecuted.  The court concludes that this factor assists the defendants to the extent of finding that no higher penalties are warranted.

3

Considering all of the factors, the court concludes that it should impose penalties in the alternate amounts that the SEC requests.[13]

Beginning with Miller and Handkins, their conduct was egregious and they acted with severe recklessness, if not knowledge. They committed repeated violations of the securities laws over a period of at least five years, and their conduct has caused substantial losses to their victims. Moreover, Miller and Handkins have not submitted a response in opposition to the SEC's request for third-tier penalties. Accordingly, the court concludes that Miller should be required to pay a civil penalty in the amount of $1,454,533.00, and that Handkins should be required to pay a civil penalty in the amount of $838,950.

The factors also weigh in favor of imposing a high tier-three penalty against Hallam. He was also involved in the Faulkner Scheme for a lengthy period of time, and, through his sales efforts, he enabled Faulkner to access millions of dollars of investor funds. Accordingly, the court concludes that a Hallam should be required to pay a civil penalty in

---

[13]The SEC "requests that the Court order Defendants to pay maximum third-tier penalties for each of their violations of the federal securities laws. Alternatively, the Commission requests that the Court order Defendants to pay penalties equal to the gross amount of their pecuniary gain, which would be the disgorgement amounts identified[.]" P. Mot. at 23. Based on the record before it, the court concludes that the SEC's alternative request provides a fairer basis for imposing tier three penalties than does a calculation based on the number of violations. Although the SEC maintains in its reply brief that Hallam's violations number at least 200, the number of alleged violations by Miller and Handkins is not sufficiently established, and the court declines to base the penalty imposed on Hallam on an approximation, even if it is viewed as a minimum one, when the disgorgement amount reliably measures how Hallam should be penalized.

the amount of $1,901,480.

## V

To the extent that Hallam challenges the SEC's inclusion of a "penalty offset" provision in its proposed final judgment, the court rejects this challenge. First, Hallam expressly agreed to the "penalty offset" in his April 11, 2017 consent, which states:

> To preserve the deterrent effect of the civil penalty, [Hallam] agrees that he shall not, after offset or reduction of any award of compensatory damages in any Related Investor Action based on [Hallam]'s payment of disgorgement in this action, argue that he is entitled to, nor shall he further benefit by, offset or reduction of such compensatory damages award by the amount of any part of [Hallam]'s payment of a civil penalty in this action ("Penalty Offset").

Hallam Apr. 11, 2017 Consent at 3. Second, the penalty offset is meant to preserve the deterrent effect of the *civil penalty*. It states that Hallam cannot use his payment of a civil penalty in this lawsuit as a credit in another lawsuit. As the SEC explains, "otherwise he would be effectively reimbursed for the penalty thereby stripping the civil penalty of its deterrent effect." P. Reply 10. Hallam's arguments based on the punitive nature of this offset and its unavailability in pre-fusion courts of equity are therefore misplaced.

## VI

Finally, the SEC seeks an injunction permanently enjoining Hallam from participating, directly or indirectly, in the issuance, purchase, offer, or sale of any

unregistered[14] securities.

A

Section 20(b) of the Securities Act "authorize[s] the [SEC] to seek and direct[s] the courts to enter permanent restraining orders upon a 'proper showing' that the defendant 'is engaged or is about to engage' in violations of the securities laws." *SEC v. Zale Corp.*, 650 F.2d 718, 720 (5th Cir. Unit A July 1981). "The SEC is entitled to injunctive relief when it establishes (1) a prima facie case of previous violations of federal securities laws, and (2) a reasonable likelihood that the wrong will be repeated." *SEC v. Offill*, 2012 WL 1138622, at *4 (N.D. Tex. Apr. 5, 2012) (Fitzwater, C.J.) (quoting *SEC v. Calvo*, 378 F.3d 1211, 1216 (11th Cir. 2004)). Courts analyze a number of factors to determine whether past violations of the securities laws constitutes a reasonable likelihood of future transgressions, such as the "(1) egregiousness of the defendant's conduct, (2) isolated or recurrent nature of the violation, (3) degree of *scienter*, (4) sincerity of defendant's recognition of his transgression, and (5) likelihood of the defendant's job providing opportunities for future violations." *SEC*

---

[14]The interlocutory judgment against Hallam refers to "any security," and at one point in the SEC's motion, it refers to "any security." P. Mot. at 23. But elsewhere in the same motion (in the SEC's request for relief, *id.* at 25), and in its proposed judgment, the SEC seeks a judgment permanently enjoining Hallam from participating "in the issuance, purchase, offer, or sale of any *unregistered* securities." P. Proposed Final Judg. at 6 (emphasis added). This court has previously consulted the SEC's proposed judgment when determining the relief it is requesting in a civil enforcement action. *See AmeriFirst Funding, Inc.*, 2008 WL 1959843, at *9 (interpreting the SEC's proposed final judgment as an implied request to permanently enjoin a defendant from violating certain sections of the Securities Act, the Exchange Act, and SEC Rule 10b-5). The court concludes that the SEC's request for relief pertains to *unregistered* securities, or that the permanent injunction included in the final judgment should, in any event, apply to *unregistered* securities.

*v. Gann*, 565 F.3d 932, 940 (5th Cir. 2009) (citing *Blatt*, 583 F.2d at 1334 n.29).  The "critical question in issuing the injunction and also the ultimate test on review is whether defendant's past conduct indicates that there is a reasonable likelihood of further violations in the future."  *Blatt*, 583 F.2d at 1334.

B

The SEC has established that Hallam previously violated the federal securities laws.  The court thus focuses on whether the SEC has established that there is a reasonable likelihood that the wrong will be repeated.  *Offill*, 2012 WL 1138622, at *4.

In support of its request for a permanent injunction, the SEC has adduced evidence that, on February 9, 2018, the Texas State Securities Board ("TSSB") entered an emergency cease and desist order ("TSSB Order") against Hallam and others, concluding that Hallam was engaged in fraud in connection with the offer for sale and sale of securities; that Hallam was making an offer containing a statement that is materially misleading or otherwise likely to deceive the public; and that Hallam's conduct, acts, and practices threaten immediate and irreparable harm.  The SEC also contends that Hallam has worked in the oil and gas industry, primarily as a salesman, for the past 20 years, and that, "[a]s such, there is a high likelihood that Hallams' job will provide opportunities for future violations, as evidenced by the [TSSB Order]."  P. Br. 24.  Hallam responds that he believes his inclusion in the TSSB Order was in error; that he was never served with that order or contacted by the TSSB; and that the TSSB later dropped Hallam from the proceeding altogether, entering a subsequent, superseding order against other individuals.

The court has already addressed the first three factors, *see supra* § IV(B), and concludes that each weighs in favor of the SEC's request for a permanent injunction. The court also concludes that the fifth factor—the likelihood of opportunities for future violations—weighs in favor of issuing injunctive relief. Although Hallam objects to the SEC's reliance on the TSSB Order, he does not deny his involvement with the other individuals against whom the TSSB proceeded, does not deny having engaged in fraud in connection with the TSSB matter, and has not specifically responded to the SEC's contention that there is a reasonable likelihood that he will commit further securities violations in the future.[15]

Accordingly, the court will permanently enjoin Hallam "from participating, directly or indirectly, including, but not limited to, through any entity owned or controlled by him, in the issuance, purchase, offer, or sale of any unregistered securities, provided however that

---

[15]Hallam instead argues that neither the statutory scheme nor the pre-fusion law of equity permits an injunction against future participation in the sale or issuance of securities. The court disagrees. Both the Securities Act and the Exchange Act authorize the relief the SEC seeks here, i.e., an injunction prohibiting future violations of the securities law. *See* 15 U.S.C. § 77t(b) ("Whenever it shall appear to the Commission that any person is engaged *or about to engage* in any acts or practices which constitute *or will constitute* a violation of the provisions of this subchapter, . . . the Commission may, in its discretion, bring an action . . . to enjoin such acts or practices, and upon a proper showing, a permanent or temporary injunction or restraining order shall be granted without bond." (emphasis added)); 15 U.S.C. § 78u(d) ("Whenever it shall appear to the Commission that any person is engaged *or is about to engage* in acts or practices constituting a violation of any provision of this chapter . . . it may in its discretion bring an action . . . to enjoin such acts or practices, and upon a proper showing a permanent or temporary injunction or restraining order shall be granted without bond." (emphasis added)).

- 35 -

such injunction shall not prevent him from purchasing or selling securities for his own personal account." *See* P. Proposed Judg. at 6; *see also, e.g., Helms*, 2015 WL 5010298, at *18 (finding permanent injunction enjoining defendants from engaging in future violations of securities laws was warranted where all five factors weighed heavily in favor of granting permanent injunction); *Stanford Int'l Bank, Ltd.*, 2013 WL 12360438, at *5 (finding SEC is entitled to injunction prohibiting future violations of securities laws where defendants "committed serious violations of the securities laws, did so recurrently, and did so with a high degree of scienter.").

* * *

For the reasons stated, the court grants the SEC's January 24, 2020 motion for remedies and motion for final judgments as to Hallam, Miller, and Handkins, as supplemented on July 28, 2020. The court enters a Rule 54(b) final judgment today consistent with this memorandum opinion and order.

**SO ORDERED**.

January 8, 2021.

_____
SIDNEY A. FITZWATER
SENIOR JUDGE

- 36 -